# EXHIBIT 1

HARRIET MARIE LANE - 11/20/2019

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

HARRIET LANE,            *
                         *
        Plaintiff,       *
                         *
v.                       *  C.A. No. 4:19-cv-00435
                         *
SIEMENS ENERGY, INC.,    *
                         *
        Defendant.       *

*********************************************************

ORAL DEPOSITION OF
HARRIET MARIE LANE
NOVEMBER 20, 2019

ORAL DEPOSITION of HARRIET MARIE LANE, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on November 20, 2019, from 9:12 a.m. to 2:59 p.m. before Constance Koenig, RMR and CSR No. 6577 in and for the State of Texas, reported by stenographic method at The Bail Law Firm, PLLC, 3120 Southwest Freeway, Suite 450, Houston, Texas 77098, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record attached hereto.

## Page 2

A P P E A R A N C E S:

FOR THE PLAINTIFF:
    Mr. Ashok Bail
    THE BAIL LAW FIRM, PLLC
    3120 Southwest Freeway, Suite 450
    Houston, Texas 77098
    832.216.6693
    ashok@baillawfirm.com

FOR THE DEFENDANT:
    Ms. Ashlee Grant
    BAKER & HOSTETLER LLP
    811 Main Street, Suite 1100
    Houston, Texas 77002
    713.646.1316
    agrant@bakerlaw.com

## Page 3

I N D E X

Appearances                                              2

HARRIET MARIE LANE

  Examination by Ms. Grant                               7

Changes and Signature                                  263

Reporter's Certificate                                 265

E X H I B I T S

Exhibit 1   Résumé of Harriet Marie Lane           14
            (NO BATES NUMBERS)
Exhibit 2   Job Search Log (NO BATES NUMBERS)      26
Exhibit 3   Certified Copy of Public Records       31
            (SIEMENS-LANE_001001-088)

Exhibit 4   Plaintiff's Response to                34
            Defendant's First Set of
            Interrogatories to Plaintiff and
            Request for Production
            (NO BATES NUMBERS)

Exhibit 5   Defendant Siemens Energy, Inc.'s       74
            Second Supplemental Responses to
            Initial Discovery Protocols for
            Employment Cases

Exhibit 6   Safecall Limited Call Report SIE       78
            03/17 (SIEMENS-LANE_00242-246)
Exhibit 7   Conversation Notes Dated               85
            February 8, 2017
            (SIEMENS-LANE_00999)
Exhibit 8   Chain of Emails                        96
            (SIEMENS-LANE_ 001098)

Exhibit 9   Chain of Emails                       108
            (SIEMENS-LANE009189-190)

## Page 4

Exhibit 10  Contents of a HR Investigation        117
            Report Safecall Report SIE 03/17
            (SIEMENS-LANE_00247-251)
Exhibit 11  Siemens Energy, Inc., Memorandum      123
            to Harriet Lane from Patti Davis
            Dated February 13, 2017
            (SIEMENS-LANE_00060-062)

Exhibit 12  Performance Improvement Plan          124
            Dated May 22, 2017
            (SIEMENS-LANE_ 00063)

Exhibit 13  Meeting Notes, Private Meeting        133
            with HR-Toni Horton & Employee
            Harriet Lane dated July 21, 2017
            (SIEMENS-LANE_00334-336)
Exhibit 14  Removal of Performance                139
            Improvement Plan, September 12,
            2017 (SIEMENS-LANE_ 00066)
Exhibit 15  2nd Set of Claims Two Weeks after     144
            Initial Claim, August 8, 2017,
            (SIEMENS-LANE_00345-346)
Exhibit 16  Meeting Notes, August 15, 2017        153
            (SIEMENS-LANE_001117)

Exhibit 17  Email (from Lane to Hubbard)          163
            Dated July 25, 2016, Subject:
            RE:  Update (SIEMENS-LANE_00436)

Exhibit 18  Chain of Emails Dated July 22,        166
            2016, July 25, 2018, Subject:
            RE:  Out of the Office
            (SIEMENS-LANE_ 00438-439)
Exhibit 19  Harriet Lane FY17 Goals and           183
            Expectations
            (SIEMENS-LANE 00194-205)
Exhibit 20  2016 PMP Form for Lane, Harriet       194
            (SIEMENS-LANE_00187-190)

Exhibit 21  Letter of Termination                 217
            (SIEMENS-LANE_00067-068)

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 5

1    Exhibit 22   Delegation of Authority (DOA)   220
2                 Position Elimination
                  (SIEMENS-LANE_00845-846)
3    Exhibit 23   Application For Employment   228
4                 (SIEMENS-LANE_00001-007)
5    Exhibit 24   Offer of Employment Letter   229
6                 (SIEMENS-LANE_00029-030)
     Exhibit 25   Electronic Signature Summary   231
7                 (SIEMENS-LANE_00047-048)
8    Exhibit 26   Siemens US Policy EEO/AA Policy   233
                  Statement—Harassment Free
9                 Workplace
10   Exhibit 27   Siemens US Policy Open   234
                  Communication
11                (SIEMENS-LANE_00815-816)
12   Exhibit 28   Siemens US Policy Recording   234
                  Devices (SIEMENS-LANE_00791-792)
13
     Exhibit 29   Siemens US Standards of Conduct   235
14                (SIEMENS-LANE_00211-217)
15   Exhibit 30   Siemens US Policy Performance   236
                  Improvement Process
16                (SIEMENS-LANE_00809-814)
17   Exhibit 31   Siemens US Policy Reduction in   237
                  Force Process
18                (SIEMENS-LANE_00793-796)
19   Exhibit 32   Siemens Business Conduct   238
                  Guidelines
20                (SIEMENS-LANE_00762-789)
21   Exhibit 33   Siemens US Agreement Employee   239
                  Patent and Secrecy Agreement
22                (SIEMENS-LANE_00033-039)
23   Exhibit 34   Email (Lane to Lane) Dated   240
                  January 16, 2017, Subject: Work
24                Emails Part 4
                  (SIEMENS-LANE_001104)
25

Page 6

1    Exhibit 35   Email (Lane to Lane) Dated   240
                  January 16, 2017, Subject: Work
2                 Emails Part 5
                  (SIEMENS-LANE_001105-106)
3
     Exhibit 36   Email (Lane to Lane) Dated   240
4                 January 16, 2017, Subject: Work
                  Emails Part 7 (SIEMENS-LANE_001107)
5
     Exhibit 37   Email (Lane to Lane) Dated   240
6                 May 30, 2017, Subject: Emails
                  from Week 5/22/17
7                 (SIEMENS-LANE_001108)
8    Exhibit 38   Email (Lane to Lane) Dated   240
                  September 25, 2017, Subject:
9                 Work 1 b (SIEMENS-LANE_001119-120)
10   Exhibit 39   Charge of Discrimination   245
                  (SIEMENS-LANE_00347-349)
11
     Exhibit 40   Amended Charge of Discrimination   247
12                (NO BATES NUMBERS)
13   Exhibit 41   Equal Employment Opportunity   248
                  Commission Notice of Right to Sue
14                (SIEMENS-LANE_00355)
15   Exhibit 42   Plaintiff's Amended Complaint   249
                  (NO BATES NUMBERS)
16
     Exhibit 43   Plaintiff's Initial Discovery For   252
17                Employment Cases
                  (NO BATES NUMBERS)
18
19
20
21
22
23
24
25

Page 7

1                 HARRIET MARIE LANE,
2    having been first duly sworn, testified as follows:
3                 E X A M I N A T I O N
4    BY MS. GRANT:
5        Q.  Good morning.
6        A.  Good morning.
7        Q.  Could you please state your full name and
8    address for the record, please.
9        A.  Harriet Lane, Harriet Marie Lane, 3022 Helmsley
10   Drive, Pearland, Texas 77584.
11       Q.  And how long have you lived at your address in
12   Pearland, Texas?
13       A.  Approximately five years.
14       Q.  And you are the plaintiff in a lawsuit that you
15   filed against your former employer, Siemens Energy,
16   Inc.?
17       A.  Yes.
18       Q.  Can we agree if I say "Siemens" or "SEI," I am
19   referring to the Defendant Siemens Energy, Inc.?
20       A.  Yes.
21       Q.  It's a little bit of a mouthful.  So I want to
22   make sure you understand that's what I'm referring to
23   when I use that term.
24            My name is Ashley Grant.  I represent
25   Siemens in this lawsuit, and I'm here to just ask you

Page 8

1    some questions about your lawsuit and the claims here
2    today.
3            Have you ever given your deposition
4    before?
5        A.  No.
6        Q.  So before we start, I want to go over some
7    ground rules both for you and I's benefit.  The first
8    one, as you notice, we have this lovely Court Reporter
9    sitting here to my left.  She's typing every single word
10   you and I state here today.  Because of that, I'm going
11   to ask that you give verbal answers so that she can make
12   sure we get your answers down.  For example, don't nod,
13   shake your head, give a yes or a no.  Along those same
14   lines, no uh-huhs or huh-uhs.  They don't read right or
15   it may be unclear what your answer is.
16            So can you agree to give me verbal
17   answers?
18       A.  Yes.
19       Q.  Very good.  And do you understand that you are
20   under oath here today as if you are testifying in court?
21       A.  Yes.
22       Q.  And that your answers will be truthful and
23   accurate to the best of your knowledge?
24       A.  Yes.
25       Q.  Are you on any medications that may prevent you

HARRIET MARIE LANE - 11/20/2019

## Page 9

1  from testifying truthfully or accurately here today?
2      A. No.
3      Q. If you do not recall an answer, please feel
4  free to say so. Also, if you don't understand my
5  question, please ask me to reask it; otherwise, if you
6  do answer, I will just go ahead and assume that you
7  understood the question that I was asking. Understood?
8      A. Yes.
9      Q. Along the lines of going back to having this
10 Court Reporter here, it's hard to write down or respond
11 to what we're saying when two people talk over each
12 other. So along those line, if you could please wait
13 until I finish my question to give your answer, that
14 will make sure we have got a clear record. Okay?
15     A. Yes.
16     Q. And also along those same lines, I will try to
17 wait for you to finish your answer until I start my
18 question. This is the hardest part I will say for
19 ground rules on both sides.
20     A. I understand.
21     Q. And I always try to wait, too, because this is
22 a good practice of getting used to the format.
23         What did you do to prepare for your
24 deposition here today?
25     A. Conversations, reading documents, conversations

## Page 10

1  with my attorney, reading documents.
2      Q. Without telling me the contents of those
3  conversations with your attorney, did you meet with him
4  in person or was it on the phone?
5      A. We have had both phone and in-person meetings.
6      Q. And how many meetings have you had to prepare
7  for this deposition?
8      A. That I can't recall.
9      Q. You said you reviewed documents to prepare, as
10 well?
11     A. Yes.
12     Q. Do you recall what documents you prepared?
13     A. The court filing information from the
14 defendant, from you-all. So those are some of the
15 documents that I reviewed.
16     Q. When you say "information," are you referring
17 to documents that we produced in this litigation?
18     A. Yes.
19     Q. Did you speak with anyone else besides your
20 attorney to prepare for today?
21     A. No.
22     Q. Have you had any emails or text-messages or
23 instant-message communications with anyone about your
24 deposition here today, other than your attorney?
25     A. No.

## Page 11

1      Q. Are there any documents or information that you
2  have related to your lawsuit that you have not produced
3  to your attorney in this matter?
4      A. No.
5      Q. Let's start with a little bit of your
6  background.
7          Are you currently married?
8      A. No.
9      Q. What is your education background?
10     A. Highest level of education, master's.
11     Q. And where did you receive your master's?
12     A. Indiana Weslayan University, Marion, Indiana.
13     Q. I'm from Indiana. A lot of people aren't from
14 Indiana.
15         What was your master's in?
16     A. Business.
17     Q. And what about your undergrad?
18     A. That was in general studies with a
19 concentration in social and behavior science.
20     Q. Was that also at Indiana Weslayan?
21     A. Indiana University, Purdue University.
22     Q. IUPUI?
23     A. Yes.
24     Q. Are you currently employed?
25     A. I have my -- I'm a subcontractor consultant.

## Page 12

1      Q. So you provide certain services to companies on
2  a 1099 basis?
3      A. Yes.
4      Q. And to whom do you provided these subcontracts?
5      A. It varies.
6      Q. Do you have any long-standing consultant
7  agreements, or is it a project-by-project basis?
8      A. Project-by-project basis.
9      Q. And how long have you been a consultant?
10     A. I have been doing that off and on, just off and
11 on since I got laid off.
12     Q. And approximately how many projects are you
13 currently working on at this time?
14     A. I don't have any right now.
15     Q. How many on average would you typically say you
16 have in any given time?
17     A. Maybe one or two.
18     Q. Are these for different clients, or do you have
19 a repeat clients?
20     A. Different clients, different clients.
21     Q. And typically how long are your projects?
22     A. They can go six months.
23     Q. Is six months the longest, typically?
24     A. Yes.
25     Q. And what's the shortest you have had a project

3 (Pages 9 to 12)

HARRIET MARIE LANE - 11/20/2019

Page 13

1   last?
2       A. Maybe 12 weeks.
3       Q. And what type of consulting services do you
4   provide?
5       A. Training, auditing.
6       Q. What type of training?
7       A. Training on ISO standards, training on their
8   procedures, their business process procedures, training
9   on API, Q1, Q2.
10      Q. And is this auditing and training services that
11  you provide similar to the services or your duties that
12  you had while you worked at Siemens?
13      A. No.
14      Q. And with respect to the consulting services,
15  does the 1099 go to you individually, or do you work
16  through another company to place you at these projects?
17      A. It comes to me. I receive it.
18      Q. So there is a company that places you at the
19  different projects?
20      A. Uh-huh.
21      Q. And what is that company?
22      A. Perry Johnson is one of them.
23      Q. Any others?
24      A. Mireaux Management Solutions.
25      Q. Mireaux?

Page 14

1       A. M-I-R-E-A-U-X Management Solutions.
2       Q. Any others?
3       A. Not now.
4       Q. Any others since your layoff?
5       A. It was called LRQA Lloyds, L-L-O-Y-D-S.
6           (Exhibit 1 was marked.)
7       Q. (BY MS. GRANT) I'm handing you what has been
8   marked as Exhibit 1, which is a document you produced in
9   this litigation. That is your résumé.
10          Do you recognize Exhibit 1?
11      A. Yes.
12      Q. And at the bottom here under "Professional
13  Experience" it does list a number of companies, the
14  first one being Mireaux Management Solutions.
15          Is this the company that you say places
16  you on different projects that we discussed?
17      A. Yes.
18      Q. So it says you have been working with them
19  since January of 2018?
20      A. Yes.
21      Q. And are you still working with them?
22      A. Yes.
23      Q. And how many projects have you been placed on
24  through Mireaux Management Solutions?
25      A. That I can't recall.

Page 15

1       Q. You'd said earlier right now you don't have any
2   projects. Other than right now, have there been other
3   periods of time when you haven't had any projects or
4   assignments?
5       A. Yes.
6       Q. Do you recall when those periods were?
7       A. Not really. It varies.
8       Q. Is it more often than not you have a project
9   going on?
10      A. Right now this is a slow period for me. So
11  sometimes I do have projects going. I mean, it varies.
12  So right now -- most of the time I do have some kind of
13  project going on.
14      Q. And with respect to Mireaux Management, do you
15  get to choose the projects that you are placed on?
16      A. No. So they'll tell me this is what I have,
17  and then, yes, I do get to select them.
18      Q. So you can reject a project or accept one if
19  you choose?
20      A. Right.
21      Q. Have you rejected projects that Mireaux
22  Management has given you?
23      A. No.
24      Q. Do you recall any specific projects or clients
25  that Mireaux Management Solutions has placed you on?

Page 16

1       A. Yes.
2       Q. Which ones have you received through Mireaux
3   Management?
4       A. One has been Chemjet.
5       Q. And how long was your assignment with Chemjet?
6       A. That was about six months or so.
7       Q. Was that the auditing and training services we
8   discussed earlier?
9       A. Yes. So that was auditing, that was the
10  consulting.
11      Q. And do you recall how much you made when you
12  were working with Chemjet?
13      A. No.
14      Q. Do you recall whether it was more or less than
15  what you made when you were working for Siemens?
16      A. It was less.
17      Q. Do you remember the six-month period you worked
18  for Chemjet?
19      A. I want to say it was maybe March last year,
20  started March of last year.
21      Q. So approximately March to September 2018?
22      A. Uh-huh.
23      Q. What other projects have you received through
24  Mireaux Management?
25      A. Another one called Epic, E-P-I-C. That one

4 (Pages 13 to 16)

HARRIET MARIE LANE - 11/20/2019

Page 17

1  wasn't finished.  It went bankrupt.
2      Q.  And what kind of consulting services did you
3  provide to Epic?
4      A.  Similar to Chemjet, the auditing, the
5  consulting.
6      Q.  And do you recall how much you made while you
7  were on the project with Epic?
8      A.  Not right off, no.
9      Q.  Do you recall if it was more or less than what
10  you made while working for Siemens?
11      A.  Less.
12      Q.  Do you recall how long you were working on the
13  project with Epic?
14      A.  Maybe that one was about six months, too,
15  maybe.  Three to six months, something like that.
16      Q.  And do you recall when you were performing
17  these services for Epic?
18      A.  I would be guessing, so I don't want to guess.
19  I can't remember.
20      Q.  I appreciate that, to please not guess.
21          Do you remember whether it was before or
22  after Chemjet?
23      A.  After.
24      Q.  Any other projects that you were placed on
25  through Mireaux Management Solutions?

Page 18

1      A.  Those are the only consulting.
2      Q.  Other than consulting, has there been any other
3  projects or placements you have received through Mireaux
4  Management?
5      A.  The auditing, the internal auditing.
6      Q.  And what internal auditing projects have you
7  been placed on?
8      A.  Those have been different companies, internal
9  auditing for ISO 9001, 14001, API Q1 and Q2, just
10  internal auditing, various clients.
11      Q.  It's my understanding you testified earlier
12  that this is different than the type of duties you had
13  while you were working at Siemens.
14      A.  Right.
15      Q.  How long would your internal auditing
16  assignments or projects last?
17      A.  So maybe one day, two-day audit.
18      Q.  Those there are much more short-term as opposed
19  to the long-term training and consulting projects we
20  discussed earlier?
21      A.  Yes.
22      Q.  And approximately how many internal auditing
23  assignments have you received through Mireaux?
24      A.  Maybe about ten.
25      Q.  And when you are doing an internal auditing

Page 19

1  assignment, are you paid by the day or the hour?
2      A.  Day.
3      Q.  What is your daily rate when you do internal
4  auditing?
5      A.  That's about $400, if it's a day.  If it's a
6  full day.
7      Q.  Are they typically a full day, or can they be
8  half days?
9      A.  Yes.
10      Q.  Do you remember any of the -- specifically the
11  ten assignments you have done through Mireaux
12  Management?
13      A.  Those have been various ones, various clients,
14  oil and gas clients mainly in the Houston area and
15  throughout.
16      Q.  Throughout Texas or?
17      A.  Yes, and other states as well.
18      Q.  What other states?
19      A.  Louisiana, Mississippi.
20      Q.  And with the internal auditing, is it similar
21  to the consulting services where you can choose to
22  accept an audit project or decline one?
23      A.  Uh-huh.
24      Q.  And have you ever declined an audit assignment
25  from Mireaux Management?

Page 20

1      A.  No.
2      Q.  Other than the approximately ten audits and the
3  two Epic and Chemjet consulting projects, have you
4  received any other placements through Mireaux
5  Management?
6      A.  Training like on the standards, the ISO
7  standards, the API standards.  Training on the ISO
8  standards, like 9001, just the 9001 and lead auditor
9  training.
10      Q.  Where you go in and train an auditor for a
11  company to then do the audits at a later date?
12      A.  Right.
13      Q.  And is this similar or different than duties
14  you performed when you were at Siemens?
15      A.  Different.
16      Q.  And when you get a training assignment, how
17  long does that typically last?
18      A.  Those can be maybe two to three days.
19      Q.  And again, do you charge by the day or the
20  hour?
21      A.  Yes.
22      Q.  Which one, the day --
23      A.  The day.
24      Q.  And is that the $400 day rate, or is that
25  different?

5  (Pages 17 to 20)

HARRIET MARIE LANE - 11/20/2019

Page 21

1  A. 400.
2  Q. Approximately how many trainings have you been
3  placed on for Mireaux Management?
4  A. Maybe 3.
5  Q. Do you recall the dates of when those were?
6  A. I just did one earlier this month, and then I
7  want to say I did one in the fall.  So those have all
8  been in 2019.
9  Q. The next one on Exhibit 1 you have listed
10 is -- or I guess backing up, is there any other projects
11 or placements you have received through Mireaux
12 Management?
13 A. No, just the consulting, auditing and training.
14 Q. And the next one we have got is Perry Johnson,
15 who you mentioned earlier, too.  Is that a similar
16 company as Mireaux Management?
17 A. No.
18 Q. What kind of company is Perry Johnson?
19 A. So that's the certification body.  That's the
20 registrar.  They're the registrar certification body,
21 same difference.
22 Q. And so they provide the certifications that you
23 are given the training and the auditing on, correct?
24 A. Yes.
25 Q. And they, also, it sounds have a way of placing

Page 22

1  you to do similar projects or assignments related to
2  those certifications?
3  A. Yes.
4  Q. And how many placements have you received
5  through Perry Johnson Registrar?
6  A. That's been quite a number.  So that's been
7  quite a few.  I don't recall the exact number.
8  Q. Are those the long-term consulting projects we
9  discussed?
10 A. These are all auditing.  This is all auditing.
11 External auditing.  Yes, most of those are one day.
12 Q. And what is your day rate through Perry
13 Johnson?
14 A. 250, 300.
15 Q. What is your day rate now?
16 A. 300.
17 Q. And is this again the same type of situation
18 where you can reject an assignment or accept one?
19 A. Yes.
20 Q. And have you rejected any assignments or audits
21 that Perry Johnson has given you?
22 A. Some.
23 Q. And the assignments that you receive through
24 Perry Johnson, are these similar to the types of duties
25 that you had while you were working for Siemens?

Page 23

1  A. No.
2  Q. And have you ever -- strike that.
3  Are you accepting assignments for Perry
4  Johnson and Mireaux at the same time?
5  A. I can, yes.
6  Q. And --
7  A. As long as there is no conflict.
8  Q. Meaning the day of an audit or the day of a
9  training?
10 A. Uh-huh.
11 Q. And just so you know, when I say "strike that,"
12 that's just a direction to her just to back up kind of
13 what I said.  I saw you and you were like, What is she
14 saying?
15 And it's says here you have been receiving
16 placements with Perry Johnson through November 2017 to
17 present?
18 A. Uh-huh.  Yes.
19 Q. And where have your audits been with Perry
20 Johnson?
21 A. That's been all over the United States,
22 Houston, Longview, other states like up north like
23 Pennsylvania, yeah.
24 Q. In your consulting work do you have any
25 employees that report to you?

Page 24

1  A. No.
2  Q. Just a single consulting service?
3  A. Yes.
4  Q. Below Perry Johnson you have got LRQA
5  Registrar, which is the other entity that you listed
6  earlier.  What kind of services or consulting projects
7  do you receive through LRQA?
8  A. That's another registrar like Perry Johnson.
9  Q. And do you receive the audit assignments like
10 you do through Perry Johnson?
11 A. Yes.  Not anymore.  I don't work for them
12 anymore.
13 Q. When did you stop working for -- accepting
14 projects from LRQA?
15 A. I want to say -- was it last summer?  I don't
16 know.  Earlier this summer, something like that.  I was
17 a subcontractor, so they didn't need the services
18 anymore.
19 Q. With respect to Mireaux, Perry Johnson or LRQA,
20 have you ever been offered the opportunity to become a
21 full-time employee with them?
22 A. No.
23 Q. It's solely been this independent contractor
24 1099 services?
25 A. Yes.

6 (Pages 21 to 24)

HARRIET MARIE LANE - 11/20/2019

Page 25

1  Q. With LRQA we talked about the auditing. Do you
2  provide any training projects or consulting?
3  A. No. Just external auditing.
4  Q. And these are the one-day assignments we
5  discussed before?
6  A. Sometimes they may be more than one day. They
7  used to be more than one day.
8  Q. What's the maximum an audit would take?
9  A. Five days.
10 Q. Have you had many five-day assignments through
11 LRQA or Perry Johnson?
12 A. No.
13 Q. That's a long time.
14     Are they typically a day or on average?
15 A. One to two, typically two days at least or a
16 day and a half.
17 Q. And what's your rate for LRQA or was your rate?
18 A. Okay. So you're talking about LRQA now?
19 Q. Yes.
20 A. That one I want to say was about 500.
21 Q. And you said you stopped providing services
22 because they said it was no longer needed?
23 A. Right.
24 Q. And how many assignments or audits did you
25 receive or were placed on through LRQA?

Page 26

1  A. Not many, maybe five, approximately five. And
2  this is just guessing if I'm telling you numbers,
3  because I don't have the log in front of me.
4     (Exhibit 2 was marked.)
5  Q. (BY MS. GRANT) I'm handing you what's been
6  marked as Exhibit 2. You had just mentioned a log. So
7  is this the log you are referring to?
8  A. No.
9  Q. Okay. So we'll get back to this real quick.
10 But going back to LRQA, were there any instances where
11 you rejected any placements or assignments?
12 A. Rejected, yes.
13 Q. Do you recall how many instances or times?
14 A. No.
15 Q. And with LRQA what would cause you to reject an
16 assignment?
17 A. Unavailable.
18 Q. And you had said earlier you rejected some
19 assignments with Perry Johnson. Would that be because
20 you were unavailable for those?
21 A. Right.
22 Q. And the same with Mireaux Management?
23 A. Yes, uh-huh.
24 Q. And for the unavailability, was that related to
25 another project or a personal endeavor or the typical

Page 27

1  reason for the unavailability?
2  A. Both. It could be personal related. It could
3  be because I'm going work for another one of the
4  services -- another one of the companies that I provide
5  subcontractor services to.
6  Q. Is there any other company besides the three we
7  have gone over that you have provided consulting
8  services to?
9  A. No.
10 Q. In your --
11 A. Just so you know, just for correction, so
12 Mireaux is the only one that's consulting. These other
13 two are external auditing.
14 Q. I appreciate the clarification.
15     And then Mireaux you also do the training,
16 correct?
17 A. Yeah. So that's the training, the internal
18 auditing and the consulting.
19 Q. While Perry Johnson and LRQA are just auditing?
20 A. External auditing.
21 Q. And what's the different between internal and
22 external auditing?
23 A. So external, the companies that Perry Johnson
24 or LRQA would send me to, these companies like Shell or
25 Conoco, they're certified to like ISO 9001. So I'm just

Page 28

1  going in -- because they're already certified, I'm just
2  going in to confirm that they comply to whatever
3  certification that they have in place. So that's the
4  external.
5     Whereas, if I worked -- if I go to like a
6  Shell and I'm doing the internal audit but I'm doing it
7  as a subcontractor on behalf of Shell as their internal
8  auditor. Instead of, you know, yourself doing it if you
9  worked there and they would subcontract myself to do it
10 on their behalf.
11 Q. Understood. Thank you for that.
12     Have you ever had any internal auditing
13 placements since your termination from Siemens?
14 A. Uh-huh, through Mireaux.
15 Q. So Mireaux does internal while Perry Johnson
16 and LRQA do external?
17 A. Right.
18 Q. Understood. Thank you.
19     In addition to the consulting work, it
20 looks like Exhibit 2 is a job search log. And does this
21 log outline the positions you have applied for for
22 permanent employed, or what are the list of jobs here on
23 Exhibit 2?
24 A. So these are permanent positions that I have
25 applied for, and then maybe DNV and BSI more subcontract

7 (Pages 25 to 28)

HARRIET MARIE LANE - 11/20/2019

Page 29

1  stuff or jobs.
2      Q.  And I see here you have got noted on here the
3  instances where you received an interview, correct?
4      A.  Right.
5      Q.  Does Exhibit 2 reflect all of the instances of
6  job searches outside of the Mireaux, Perry Johnson and
7  LRQA that you have undertaken since your termination?
8      A.  That I have searched for?
9      Q.  Yes.
10     A.  Yes, that I recall, that I can recall at the
11  time.
12     Q.  So according to Exhibit 2, the last time you
13  applied for a separate position was approximately one
14  year ago with ABS Group?
15     A.  Yes.
16     Q.  And would that be one year ago from around now
17  or -- I know we produced these approximately a couple
18  months ago.  Do you recall when that one-year-ago
19  benchmark is?
20     A.  No, because like I said, I would have to go
21  look at the history in LinkedIn or in whatever job
22  search I'm using at the time.
23     Q.  And you actually came to my next question, how
24  were you applying to these positions?  Mostly online?
25     A.  Right.

Page 30

1      Q.  Did you ever receive any offers for employment
2  from the companies listed here?
3      A.  No.
4      Q.  Overall in your work as a consultant, are you
5  receiving more or less in total than what you earned
6  from Siemens?
7      A.  Less.
8      Q.  And how much did you earn while you worked at
9  Siemens?
10     A.  I don't have that information in front of me.
11  I know it was over 90,000.
12     Q.  That would be in the company's payroll records?
13     A.  Uh-huh.
14     Q.  Approximately what is your aggregate income as
15  a consultant since you have been terminated?
16     A.  This year I haven't reached anywhere half of
17  what I made for -- like I said, I don't have it in front
18  of me.  I would be guessing at this point.
19     Q.  But that could be received from your tax
20  records?
21     A.  Yes.
22     Q.  At any time since your termination from
23  Siemens, have you received unemployment benefits?
24     A.  Yes.
25     Q.  When did you start receiving unemployment?

Page 31

1      A.  When I was terminated.
2      Q.  Did Siemens oppose your unemployment claim?
3      A.  Not that I am aware of.
4          (Exhibit 3 was marked.)
5      Q.  (BY MS. GRANT)  I'm handing you what's been
6  marked Exhibit 3.  Exhibit 3 are records, certified
7  records from the Texas Unemployment Commission regarding
8  your request for unemployment.
9          I just want to verify, with respect to how
10  much you earned in benefits, would you assume -- do you
11  recall off the top of your head how much you received?
12     A.  No.
13     Q.  And would these records be the most accurate
14  place to find that information?
15     A.  Probably.
16     Q.  Do you recall approximately how many weeks you
17  received unemployment?
18     A.  No.
19     Q.  If you could turn on Exhibit 3 if you look at
20  the bottom left-hand corner, you see where it says
21  "Siemens-Lane" and there are numbers?  Those are called
22  Bates numbers.
23     A.  Okay.
24     Q.  If you could turn to the Bates-numbered
25  page 1003.  It's towards the front.

Page 32

1      A.  Okay.
2      Q.  If you look at the type here it says -- I do
3  just want to go over some information here.  It's about
4  a third of the way through the top it says, "Last
5  employment detail."  And it has two columns of
6  information.  For separation type it says, "Permanent
7  layoff."
8          Is that correct, that you reported to the
9  Texas unemployment that you were terminated as part of a
10  permanent layoff?
11     A.  Yes.
12     Q.  And if you turn to a page 1022.  1022 is a
13  Statement of Wages and Potential Benefits Amounts, and
14  it's a copy of something that was mailed.
15          Do you recall receiving this in the mail
16  from the Texas Unemployment Commission?
17     A.  Probably so.
18     Q.  At the bottom here it says your weekly benefit
19  amount would be $494 per week.  Do you know if that's
20  approximately how much you earned in unemployment
21  benefits?
22     A.  Yes.
23     Q.  And it says the maximum you could receive is
24  approximately $12,844; is that correct?
25     A.  Okay.

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 33

1    Q. Or I guess do you have any reason to doubt --
2    A. No.
3    Q. -- to contest that?
4    A. Uh-uh.
5    Q. And is this the amount of unemployment wages
6  that you collected in this matter?
7    A. Yes.  I mean, if it says it here.
8    Q. Are you receiving any other financial
9  assistance other than unemployment?
10   A. No.
11   Q. Do you have any other sources of income besides
12  the consulting that we have discussed and unemployment?
13   A. And unemployment?
14   Q. Yes.
15   A. No.  I mean, I have benefits for my children,
16  but that's for them.
17   Q. Other than this lawsuit, have you ever been a
18  party to a lawsuit or litigation?
19   A. No.
20   Q. Other than the charge of discrimination you
21  filed with the EEOC, have you filed any other -- the
22  charge you filed against Siemens, have you filed any
23  other charges of discrimination against an employer?
24   A. No.
25   Q. Have you ever been charged with a felony or

Page 34

1  misdemeanor?
2    A. No.
3        (Exhibit 4 was marked.)
4    Q. (BY MS. GRANT)  I'm handing you what's been
5  marked as Exhibit 4.  Exhibit 4 is titled "Plaintiff's
6  Responses to Defendant's First Set of Interrogatories."
7  As part of litigation, one of the things that parties do
8  is exchange written questions that you provide answers
9  to.  So in this case Siemens provided you or served you
10  with interrogatories and these are your purported
11  answers to these interrogatories.
12       Do you recall seeing Exhibit 4 before?
13   A. Yes.
14   Q. And did you review these answers before you
15  provided them to your attorney/Siemens?
16   A. Yes.
17   Q. And did you understand or did you verify that
18  the answers in these interrogatories are truthful and
19  accurate to the best of your knowledge or ability?
20   A. Yes.
21   Q. I want to turn to Interrogatory No. 1.  So it's
22  on page 4.
23       MR. BAIL:  Page 4 is missing -- it was
24  here -- wait a second.  We don't have pages 4, 5, 6 and
25  7.  Do you?

Page 35

1        MS. GRANT:  I do not.
2        MR. BAIL:  I have the interrogatories in
3  front of me on my computer.
4        MS. GRANT:  Can we go off the record for a
5  second?
6        (A recess was taken.)
7    Q. (BY MS. GRANT)  I am handing you what's now
8  been marked as Exhibit 4, which are your interrogatory
9  responses.
10       And did you verify that your responses
11  were truthful and accurate to the best of your
12  knowledge?
13   A. Yes.
14   Q. And it's your contention these are still
15  truthful and accurate?
16   A. Yes.
17   Q. Turning to Interrogatory No. 1, we asked you to
18  identify every person that you believed had knowledge
19  relevant to your claims.  And in response to Exhibit 1
20  you named three people.
21   A. What page are we on?
22   Q. It's page 4.  That one.
23       Do you see the people you listed there?
24   A. Yes.
25   Q. You listed Melissa Shovelski, Kathy DeGeorge

Page 36

1  and Kimberly Long.  I want to ask you some questions
2  about each of these three individuals.
3        First, who is Melissa Shovelski?
4    A. She's an employee at Siemens.
5    Q. And what is Ms. Shovelski's race?
6    A. She's a Caucasian.
7    Q. And I assume she's a female.
8    A. Yes.
9    Q. And to your knowledge, is she currently
10  employed by Siemens?
11   A. I'm not sure.
12   Q. When is the last time you spoke with
13  Ms. Shovelski?
14   A. Shortly after -- the week after -- the week of
15  my termination.
16   Q. Did you speak with her after you had been
17  terminated?
18   A. Yes.
19   Q. At the time --
20   A. Well, speak, no.  She sent me a text.
21   Q. Other than the text she sent you the same week
22  of your termination, have you had any other
23  communications?
24   A. Not that I can recall.  I don't recall.
25   Q. And what was the basis or the nature of her

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 37

```
1   text?
2       A. Saying that she heard about what happened.
3       Q. That you were laid off?
4       A. Yes.
5       Q. What was her position at Siemens?
6       A. I don't remember the title.
7       Q. Was she your supervisor or your peer?
8       A. Peer.
9       Q. Did you ever supervise Ms. Shovelski?
10      A. She was never my employee.
11      Q. Was she in the same group or division as you?
12      A. She was at Siemens.  She was in project
13  management.
14      Q. Do you recall who her supervisor was?
15      A. I want to say Ravi, but I'll be guessing.
16      Q. How was your relationship with Ms. Shovelski?
17      A. What do you mean?
18      Q. Was it friendly, positive, negative?
19      A. Friendly, positive.
20      Q. What knowledge does Ms. Shovelski have about
21  your claims?
22      A. None that I'm aware of.  I mean, what do you
23  mean?  As far as discrimination and race?
24      Q. Yes, the claims in this lawsuit.
25      A. I didn't tell her that I was filing a lawsuit.
```

Page 38

```
1       Q. I guess what knowledge did she have that would
2   be relevant to your lawsuit here today?
3       A. She's witnessed some of the treatment.
4       Q. And what treatment did Ms. Shovelski witness?
5       A. I mean, she witnessed me being treated
6   differently because of my race and also because of my
7   gender.
8       Q. Treated differently by whom?
9       A. Bill Piatt.
10      Q. That Ms. Shovelski witnessed?
11      A. Yes.
12      Q. Anyone else?
13      A. That's all I can recall right now.
14      Q. And what did Ms. Shovelski witness with respect
15  to the different treatment that you experienced from
16  Mr. Piatt?
17      A. That it was different.  She's made comments
18  about how he treats women.  How he treats women, you
19  know, she's made those comments.
20      Q. What comments did Ms. Shovelski make?
21      A. I don't recall.  But there was a difference.
22  You can tell that he had -- there was not something
23  right in terms of how he was interacting with women.
24      Q. And when you say "interacting with women," was
25  that different treatment limited to you, or did it apply
```

Page 39

```
1   to other women in the facility.
2       A. Me and then also other women in the facility.
3       Q. Did Ms. Shovelski ever identify any specific
4   instances of different treatment, or was it just a
5   general vibe of different treatment?
6       A. Some of that information I believe is like I
7   provided those recordings.  So that would be in there of
8   what comments she made.  I can't verbatim repeat
9   everything that she said.
10      Q. But you have the recordings that you
11  provided --
12      A. Right.
13      Q. -- some of those were conversations you had
14  with Ms. Shovelski.
15      A. Right.
16      Q. And the nature of those were discussing
17  Mr. Piatt's treatment of women?
18      A. Yes.
19      Q. Did Ms. Shovelski know that you were recording
20  her?
21      A. No.
22      Q. Where did your recordings or conversations with
23  Ms. Shovelski occur?
24      A. At lunch, during lunch, off the Siemens
25  property, some were in conference rooms at Siemens.
```

Page 40

```
1       Q. And if I recall, you have produced close to
2   about 100 recordings.  Is that correct?
3       A. It's a lot.
4       Q. Do you recall how many of those would have
5   involved Ms. Shovelski?
6       A. No.
7       Q. But it was multiple?
8       A. Yes.
9       Q. And on each occasion Ms. Shovelski did not know
10  you were recording her?
11      A. That's correct.
12      Q. And so with respect to the differences of
13  treatment by Mr. Piatt of women, the best way to -- or
14  best source for those instances would be the recordings?
15      A. Yes, because I don't want to misstate her.
16      Q. Other than her witnessing different treatment
17  by Bill Piatt of you and other women, what other
18  knowledge does Ms. Shovelski have regarding your claims
19  here today?
20      A. None that I'm aware of.
21      Q. Are you contending that Ms. Shovelski
22  discriminated against you because of your race or
23  gender?
24      A. No.
25      Q. Did you ever overhear Ms. Shovelski make any
```

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 41

1  comments regarding your race or gender?
2      A. No.
3      Q. Are you asserting any claims or seeking any
4  relief because of Ms. Shovelski's actions?
5      A. No.
6      Q. The next person you have listed -- and I guess
7  backing up real quick, is this the overall I guess
8  summary of Ms. Shovelski's knowledge related to your
9  claims?
10     A. In terms of what?  What I just said right now?
11     Q. Yes.
12     A. Okay.  Like I said, you have to refer to the
13 recordings.
14     Q. So other than her statements in the recordings,
15 is there any other relevant knowledge that Ms. Shovelski
16 may have about your claims here today?
17     A. That I'm aware of, I don't know what she might
18 know that I don't know.  I don't know that.
19     Q. But you have no personal knowledge of any other
20 information Ms. Shovelski may have?
21     A. No.
22     Q. The next person you have, again, is Kathy
23 DeGeorge.  Who is Kathy DeGeorge?
24     A. She's another peer, a female employee at
25 Siemens that I worked with at the time.

Page 42

1      Q. And going to the bottom, it says there is a
2  list of -- description that she has.  In your own words,
3  what description or relevant knowledge do you believe
4  Ms. DeGeorge has about your claims here today?
5      A. Well, she told me things -- like I said, there
6  are several recordings, multiple recordings in regards
7  to her, too.  But she did make comments that Bill was
8  out to get me, that he had a thing against minorities.
9      Q. And with respect to the comment that Bill is
10 out to get you, did she state that she believed that was
11 because of your race or your gender?
12     A. She did say he had issues with minorities
13 because it was myself and another minority.
14     Q. Who was that other minority?
15     A. I can't recall.  I mean, I know the guy.  It
16 was a guy.  Juan.
17     Q. Juan is a male?
18     A. Uh-huh.
19     Q. Do you recall his race?
20     A. Hispanic.
21     Q. So with respect to issues or different
22 treatment that Mr. Piatt exhibited towards minorities,
23 that would be you and Juan?
24     A. No.  I'm telling you what Kathy said.
25     Q. And so Kathy, when she identifies her

Page 43

1  description of different treatment by Mr. Piatt --
2  correct?
3      A. Yes.
4      Q. -- it's with respect to you and Juan?
5      A. Yes.
6      Q. And is that among the conversations in your
7  recordings?
8      A. Yes.
9      Q. Is the nature of Ms. DeGeorge's comment
10 concerning Mr. Piatt's different treatment, that's
11 reflected in that recording?
12     A. Yes.
13     Q. Did Ms. DeGeorge know at the time that you were
14 recording her?
15     A. No.
16     Q. Do you recall where this recording or
17 conversation took place?
18     A. Conference rooms at Siemens.
19     Q. With respect to -- other than her knowledge of
20 Mr. Piatt saying he's out to get you and he has issues
21 with minorities, is there any other knowledge that
22 Ms. DeGeorge may have regarding your claims here today?
23     A. I mean, she saw things that went -- things that
24 took place.  She was working there at the organization.
25     Q. What specific examples or things did

Page 44

1  Ms. DeGeorge witness?
2      A. Like my work being taken away, being given to
3  other people, my responsibilities being taken away.
4      Q. Anything else?
5      A. There was the excessive monitoring.  There was
6  also changes in the way the processes were carried out.
7      Q. Were there any other forms of discrimination
8  that Ms. DeGeorge witnessed?
9      A. That's all I can recall right now.
10     Q. And what was Ms. DeGeorge's race?
11     A. She was a white Caucasian lady.
12     Q. You answered my next question for me.  That
13 would be a lady.
14     Now, first you said she witnessed your
15 work being taken away from you.  When did this occur?
16     A. When I came back from FMLA.
17     Q. And when did you take FMLA leave?
18     A. February of 2017.
19     Q. And so when you returned in February 2017 --
20     A. No.  That's when I took it, February.  When I
21 returned --
22     Q. And when did you return?
23     A. May 2017.
24     Q. I appreciate the clarification.
25     And so Ms. DeGeorge witnessed in May 2017

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 45

1   your work and responsibilities being taken away?
2       A. Uh-huh.  That goes for Melissa, too.
3       Q. Ms. Shovelski?
4       A. Yes.
5       Q. To your knowledge, was Ms. DeGeorge or
6   Ms. Shovelski involved in the decision to take your work
7   and responsibilities away?
8       A. Not that I'm aware, but they did -- some of my
9   duties and responsibilities were distributed to them.
10      Q. What was Ms. DeGeorge's position?
11      A. I don't know her job title.  I want to say -- I
12  don't know her job title.  We didn't -- when I came back
13  from maternity leave, she worked for someone totally
14  different.  But she was located the same location there
15  in Houston.
16      Q. Do you recall what department she was in?
17      A. We were in the same department.  I think at the
18  time we were under finance.
19      Q. So in May 2017 you were under finance?
20      A. I don't recall but we were in the same
21  department.
22      Q. And did Ms. DeGeorge or Ms. Shovelski ever
23  share with you their belief that your duties were taken
24  away because of your gender or your race?
25      A. That's what I was saying.  Kathy was

Page 46

1   insinuating that Bill was out to get me, wanted to get
2   rid of me.
3       Q. And you understand that comment to be in
4   reference to taking away your duties and
5   responsibilities?
6       A. Right.
7       Q. And so the conversations or recordings that you
8   had with Ms. DeGeorge took place when you returned from
9   your leave in May 2017?
10      A. Yes.  After.
11      Q. Sometime after May 2017.
12      And is it your contention that it was Bill
13  Piatt who made the decision to take your work and
14  responsibilities away?
15      A. Along with Bill, I believe he had some
16  involvement in it because initially -- yes.
17      Q. Is it your contention that anybody else was
18  involved in that decision?
19      A. Yes.
20      Q. Who?
21      A. HR.
22      Q. Who in HR?
23      A. Linda Hubbard.
24      Q. Anybody else?
25      A. The president there at the time, his name was

Page 47

1   Mark Shipley.
2       Q. Anybody else?
3       A. Not that I recall.
4       Q. And on what do you base your contention that
5   these three were involved in the decision to take away
6   your work?
7       A. Well, I believe that it was Bill that was the
8   ringleader.
9       Q. And on what do you base that belief?
10      A. Because he was discriminating against me
11  because I'm an African-American female.
12      Q. And backing up, on what do you base the belief
13  he was the one that made the decision to take away your
14  duties?
15      A. Well, there was another lady that told me when
16  I came back from maternity leave that he asked
17  to -- there were conversations.  I mean, I really don't
18  understand your question.  Can you rephrase it?
19      Q. Well, you are saying you believe it was
20  Mr. Piatt who took your duties away.  I'm just asking,
21  how did you form that conclusion?  What evidence do you
22  have that it was Mr. Piatt that made that decision?
23      A. Because originally -- I believe it's in the
24  claim there -- that when my supervisor, the
25  African-American Ayana Browne left, when she left, he

Page 48

1   came to me and said that I'm going to -- I'm going to
2   report to him.
3       And so -- and then also, too, the
4   receptionist also informed me that when I was on
5   maternity leave, he asked her to deactivate my badge
6   because I wasn't going to be coming back.  And then my
7   responsibilities were distributed to her.
8       Q. And so backing up first with regards to when
9   your supervisor Ayana Browne left, when did that occur?
10      A. That was in 2016.  I don't recall the month.
11      Q. And when she left in 2016, did you end up
12  reporting directly to Mr. Piatt?
13      A. No.
14      Q. And next with respect to -- you mentioned your
15  leave from February to May 2017, and that's maternity
16  leave?
17      A. FMLA.
18      Q. You have been referring it to as maternity
19  leave.
20      A. No.
21      Q. Was it related to a childbirth?
22      A. No.
23          MR. BAIL:  I just thought I missed
24  something.
25          MS. GRANT:  I thought the same thing.

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 49

1       A.  FMLA, the medical leave.
2       Q.  (BY MS. GRANT)  It was not maternity leave or
3   related to childbirth?
4       A.  No.
5       Q.  And so the other reason why you believe it was
6   Mr. Piatt that made the decision in addition to this
7   comment in 2016 was his statement about deactivating
8   your badge?
9       A.  Right.
10      Q.  Any other evidence that you believe that it was
11  Mr. Piatt who made the decision to take away your
12  duties?
13      A.  He's always been over the audit program prior
14  to me taking it over.
15      Q.  When did you take over the audit program?
16      A.  When I came on board with Siemens back in,
17  what, 2015, 2014.
18      Q.  And what duties did you have that were removed
19  from you?
20      A.  So I was responsible for the document
21  management system.  That was taken away from me.  All
22  kinds of stuff.  So the only thing they had me doing
23  when I came back was internal auditing.
24          So if you look at that job description,
25  senior business process specialist, I wasn't doing that.

Page 50

1   I was -- the only thing I was responsible for was
2   internal auditing.
3       Q.  And everything else on the job description for
4   the senior business process specialist got taken away
5   from you?
6       A.  Right.  Distributed to several other people.
7       Q.  Do you recall who this was distributed amongst?
8       A.  Kathy DeGeorge, Melissa, Kimberly Long, Irene,
9   you know, the receptionist, other employees.  Those are
10  just a few of the names.
11      Q.  With respect to Kathy DeGeorge, do you recall
12  what duties were distributed to her?
13      A.  The internal auditing.
14      Q.  Any others?
15      A.  I was also responsible for doing reports for
16  customer satisfaction.  That was given to her, like
17  KPI's performance and metrics.
18      Q.  Any other duties distributed to Ms. DeGeorge?
19      A.  Not that I can recall.
20      Q.  And these were distributed to her when you
21  returned from FMLA leave in May?
22      A.  That's when I found out, yes.
23      Q.  The next one is Melissa.  Who's Melissa that
24  your duties were distributed to?
25      A.  Melissa, so the auditing part of that.

Page 51

1       Q.  Is this Ms. Shovelski?
2       A.  Yes.
3       Q.  Any others?
4       A.  No.
5       Q.  And again, these were taken away from you and
6   given to Ms. Shovelski or you learned of these duties
7   being taken away when you returned from FMLA leave in
8   May 2017?
9       A.  Yes.
10      Q.  You said Kimberly Long?
11      A.  Right.
12      Q.  I assume this is a female.
13      A.  Yes.
14      Q.  What is Ms. Long's race?
15      A.  She's a Caucasian lady.
16      Q.  And what duties did she receive of yours?
17      A.  The auditing and the KPI reporting.
18      Q.  Any others?
19      A.  Uh-uh.  No.
20      Q.  And again, you learned of her assuming these
21  responsibilities when you returned from FMLA leave in
22  May 2017?
23      A.  Yes.
24      Q.  You also said Irene.  I assume Irene is a
25  female.

Page 52

1       A.  Yes.
2       Q.  And what is Irene's race?
3       A.  Irene is Venezuelan.
4       Q.  And what duties were given to Irene?
5       A.  Okay.  And so I've got to get my memory right
6   here.  Irene is the receptionist.  Just put
7   receptionist.  Right now I can't think of her name.  So
8   she took on the management system.
9       Q.  So when you referred to Irene and receptionist,
10  you have got the same person in your mind?
11      A.  Right.
12      Q.  And again, you learned that she was given these
13  duties when you returned in May 2017?
14      A.  Yes.
15      Q.  And it's your contention that Mr. Piatt was the
16  one who transferred these duties and responsibilities to
17  her?
18      A.  Yes.
19      Q.  And you contend you lost these duties because
20  of your gender?
21      A.  Right, and retaliation because of the
22  discrimination that I had filed.
23      Q.  What evidence do you have that Mr. Piatt
24  transferred these duties to Melissa, Kathy, Kimberly and
25  the receptionist because of your gender?

13  (Pages 49 to 52)

HANNA & HANNA, INC.
713-840-8484

Page 53

1      A.  Evidence?  I mean, he didn't tell me that or
2  anything like that.
3      Q.  Other than your personal belief Mr. Piatt
4  transferred these duties because of your gender, do you
5  have any other evidence?
6      A.  No.
7      Q.  And you said that these duties were transferred
8  to Kathy, Melissa, Kimberly and the receptionist in
9  retaliation?
10     A.  Yes, I think so.  I think he was trying to get
11  rid of -- yes.
12     Q.  In retaliation for what?
13     A.  For me complaining about the behavior, the way
14  I was treated at Siemens and filing a complaint.
15     Q.  And who did you complain to?
16     A.  That was internally.  That was to Linda
17  Hubbard, the HR lady, initially.
18     Q.  And what other complaints do you believe the
19  duties were taken from you in retaliation for?
20     A.  What do you mean?
21     Q.  You said you believe these duties got
22  transferred to these four in retaliation for complaints.
23  So you said you complained internally to Linda Hubbard.
24  What other complaints do you believe?
25     A.  And also to Patti.  She was the lady who came

Page 54

1  in and did the investigation.
2      Q.  So you contend that you lost these duties in
3  retaliation for your internal complaints to Linda and to
4  Patti Davis?
5      A.  Yes.
6      Q.  Anything else?
7      A.  No.
8      Q.  And what evidence do you have that Mr. Piatt
9  removed these duties in retaliation for your complaints?
10     A.  Well, I don't have evidence as far as the
11  reason he did it.
12     Q.  But you have a personal belief that he did it
13  in retaliation?
14     A.  Yes.
15     Q.  Next with regards to -- strike that.  Back up a
16  little bit.
17          When you returned in May 2017, did you
18  experience a decrease in pay?
19     A.  No, just the responsibilities that were
20  involved.
21     Q.  Did you experience any sort of decrease in your
22  leave of seniority?
23     A.  My job title stayed the same, senior business
24  process specialist.
25     Q.  So other than losing part of your

Page 55

1  responsibilities, these changes didn't affect any other
2  terms and conditions of your employment?
3      A.  No.
4      Q.  Did it affect your hours?
5      A.  No.
6      Q.  And all of these four individuals held a
7  different position than you, correct?
8      A.  Right.
9      Q.  So they assumed part of your responsibilities
10  on top of the responsibilities they are already
11  performing?
12     A.  Yes.
13     Q.  Going back when we were discussing -- we got
14  down this road with Kathy DeGeorge, and I asked you what
15  discrimination she witnessed.  The next one you listed
16  was the excessive monitoring, correct?
17     A.  Uh-huh.
18     Q.  Excessive monitoring by whom?
19     A.  That would be Bill.  He's the one that was
20  wanting me to do surveys for every time an internal
21  audit was performed.  He wanted to do a customer
22  satisfaction survey.
23     Q.  And so when you say Bill, you're referring to
24  Mr. Piatt?
25     A.  Right.

Page 56

1      Q.  And did Ms. DeGeorge ever make any comments she
2  believed this new duty of customer satisfaction surveys
3  was in discrimination?  Was discriminatory?
4      A.  She didn't say "discriminatory" but she knew I
5  was being treated different than any of the other
6  auditors.  That was something new again when I came back
7  from maternity leave.
8      Q.  And so the excessive monitoring began in May
9  2017?
10     A.  Yes.
11     Q.  And with respect to Ms. DeGeorge's witnessing
12  or beliefs regarding this, is that reflected in the
13  recordings?
14     A.  Yes.  He was trying to gain evidence or trying
15  to get someone to say something bad about me, yes.
16     Q.  And so when you say excessive monitoring and
17  you refer to the customer satisfaction surveys, what you
18  are saying is these new surveys that he implemented, he
19  was hoping that someone would criticize your work
20  performance?
21     A.  Yes.  But he also did.  So that's when I came
22  back in May.  But then after my supervisor left in 2016,
23  he was also doing some excessive monitoring, sending me
24  emails and, you know, things of that nature as well.
25     Q.  And did Ms. DeGeorge --

14  (Pages 53 to 56)

HARRIET MARIE LANE - 11/20/2019

Page 57

1   A. I did not report to him at the time.
2   Q. Did Ms. DeGeorge witness those?
3   A. Which ones?
4   Q. The emails.
5   A. No.
6   Q. Was she aware of this 2016 excessive
7   monitoring?
8   A. No. She did not but Kimberly did, Kimberly
9   Long. Oh, Kathy DeGeorge was aware of the customer
10  satisfaction surveys, yes.
11  Q. But not the 2016 excessive monitoring?
12  A. No. That was Linda Hubbard and that was also
13  Kimberly Long.
14  Q. You had referenced other auditors.
15  A. Uh-huh.
16  Q. Who are these other auditors?
17  A. So those are the ones that we were talking
18  about, Melissa, Kathy.
19  Q. Kimberly?
20  A. Uh-huh.
21  Q. What about the receptionist?
22  A. No. She was never an auditor.
23  Q. But these -- Kathy, Melissa and Kimberly
24  performed auditing duties on top of their other duties
25  and responsibilities?

Page 58

1   A. Yes.
2   Q. They were not solely auditors?
3   A. No.
4   Q. And when you returned, your only responsibility
5   was internal auditing?
6   A. Right.
7   Q. Did Kathy, Melissa and Kimberly when you
8   returned in May 2017 report to the same supervisor as
9   you?
10  A. No.
11  Q. And with these customer satisfaction surveys,
12  you said that it was Mr. Piatt that implemented that?
13  A. Right.
14  Q. And it's your contention he did that in order
15  to discriminate against you because of your gender?
16  A. Yes, and retaliation.
17  Q. Did he -- is it your contention he did that to
18  discriminate against you because of your race?
19  A. Yes.
20  Q. First with respect to discrimination, what
21  evidence do you have that he implemented this customer
22  survey report because of your race or gender?
23  A. Well, I just know that he didn't do it to any
24  other people that were -- you know, there were -- I know
25  he didn't -- that wasn't done to anyone other than --

Page 59

1   you know, I'm a black woman. So I don't know that he
2   did but to any of the -- Kathy, Melissa or Kimberly and
3   they're Caucasians.
4   Q. So with respect to the customer
5   service -- customer survey report, correct?
6   A. Uh-huh.
7   Q. What was that? Can you explain to me what that
8   is?
9   A. It was KPIs, just getting feedback on any
10  audits that I performed.
11  Q. And so when you performed an audit, then the
12  subjects of the audit afterwards had to complete that
13  report?
14  A. Right.
15  Q. And so it's your contention that if an audit
16  was done by anybody else, Mr. Piatt didn't have that
17  report be filled out?
18  A. Right.
19  Q. And do you know for certain that no one
20  else --
21  A. No, I don't know that.
22  Q. And this customer service report was
23  implemented in May 2017 when you returned?
24  A. When I came back, around that time frame. And
25  I had been with the company at that time, what, three

Page 60

1   years. So I started in 2014, came back in 2017. So...
2   Q. With respect to the customer service reports,
3   did you ever experience any disciplinary action as a
4   result of any responses to those?
5   A. No.
6   Q. Did those have any effect on your pay?
7   A. No.
8   Q. Did those have any effect on any terms and
9   conditions of your employment?
10  A. No.
11  Q. But he still had other people fill these out
12  and comment on how you did your job?
13  A. Right.
14  Q. And you said this was done in retaliation. Was
15  it retaliation for, as we discussed before, your
16  internal complaints to Linda and Patti Davis?
17  A. Yes.
18  Q. Anything else?
19  A. No.
20  Q. The other one you stated, the other acts of
21  discrimination that Kathy DeGeorge witnessed was certain
22  changes in processes; is that correct?
23  A. Right.
24  Q. And what changes in processes are you
25  referring?

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 61

1    A.  Okay.  So we're talking about the internal
2  auditing.  So prior to me filing those complaints, there
3  was never a requirement for a customer satisfaction
4  survey to be completed.
5    Q.  And so it goes back to what we just discussed?
6    A.  Right.
7    Q.  Any other changes in processes that you contend
8  Ms. DeGeorge saw that were discriminatory?
9    A.  None that I recall.
10    Q.  Were there any other acts of discrimination
11  that Ms. DeGeorge witnessed that formed the basis of
12  your complaints?
13    A.  That she told me about, no, not that I can
14  recall.
15    Q.  Were there any other acts of retaliation that
16  Ms. DeGeorge witnessed that form the basis of your
17  complaint?
18    A.  Not that I recall.
19    Q.  Are you contending or asserting any claims here
20  on any actions that Ms. DeGeorge took towards you?
21    A.  No.
22    Q.  Did you ever hear Ms. DeGeorge making any
23  comments about your race or your gender?
24    A.  No.
25    Q.  Is there any other knowledge you think

Page 62

1  Ms. DeGeorge might have here related to your complaints?
2    A.  Not that I'm aware of.
3    Q.  The next person you have listed is Kimberly
4  Long.  Who is Ms. Long?
5    A.  She's another female employee at Siemens.
6  She's Caucasian.
7    Q.  And what was Ms. Long's position?
8    A.  She was responsible for EHS, environmental
9  health and safety.
10    Q.  Was this a different position than you?
11    A.  Yes.
12    Q.  And you contended earlier that she's one of the
13  ones that took your duties when you returned in May?
14    A.  Yes.  She did some internal auditing.
15    Q.  And what knowledge do you believe Ms. Long has
16  regarding your claims?
17    A.  Oh, she had a lot of knowledge.  I mean, we sat
18  side by side in cubicles.  People would come to her and
19  make comments about me to her.  She's even made
20  statements that Bill is discriminatory towards women.
21  You know, all that's on the recording.  She also
22  witnessed the differential treatment.  Yeah, so she has
23  a lot of evidence.  She witnessed the excessive
24  monitoring.  She witnessed all of that.
25    And then she also, you know -- yeah, like

Page 63

1  I said.  So they said they let me go because of the -- I
2  mean, they had their reasons, but she had a lot of
3  evidence?
4    Q.  So she has knowledge regarding your
5  termination?
6    A.  Yes.  She has knowledge about the termination,
7  yes.  When you say "knowledge about the termination,"
8  you're talking about that I'm no longer at Siemens?
9    Q.  Correct.
10    A.  She knows that I'm no longer there, yes.
11    Q.  Does she have any knowledge regarding reasons
12  or the basis for your termination?
13    A.  I don't know about that.  But she does have
14  knowledge about the claims that I did not tell her.  So
15  she has knowledge about the claims, and that's on the
16  recording.
17    Q.  Did you inform Ms. Long that you were recording
18  your conversation?
19    A.  No.
20    Q.  And would you say that the best description of
21  Ms. Long's knowledge is in those recordings?
22    A.  Right.  So she did tell me that Linda Hubbard
23  told her about it, about the complaints that I filed
24  that were personal and private.
25    Q.  And is that on the recording?

Page 64

1    A.  That Linda Hubbard told her about them, yes,
2  about me filing the complaint, yes.
3    Q.  To your knowledge, is Ms. Long still employed
4  at Siemens?
5    A.  I'm not sure.
6    Q.  When was the last time you spoke with Ms. Long?
7    A.  During the time when I worked with Siemens.
8    Q.  You have not spoken to her since you were laid
9  off?
10    A.  No, ma'am.
11    Q.  Who was Ms. Long's supervisor?
12    A.  I can't remember.
13    Q.  Was it a different supervisor than yours?
14    A.  Yes.
15    Q.  Was Ms. Long one of your peers?
16    A.  Yes.
17    Q.  Are you contending that Ms. Long ever took any
18  actions to discriminate against you because of your
19  gender or race?
20    A.  No.
21    Q.  Do you contend that Ms. Long took any actions
22  to retaliate against you because of any action?
23    A.  No.
24    Q.  Did you ever overhear Ms. Long make any
25  comments about your race or your gender?

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 65

1    A. No.
2        Q. Is any action by Ms. Long forming the basis of
3    your lawsuit here today?
4        A. What do you mean?
5        Q. Meaning did Ms. Long do something that you are
6    now contending -- are you suing for the actions that
7    Ms. Long did?
8        A. No.
9        Q. Now, I want to go back to the list of knowledge
10   and topics that you say Ms. Long knows about. The first
11   one you listed was comments made by people to her about
12   you.
13       A. Uh-huh.
14       Q. Who made these statements to Ms. Long?
15       A. Okay. So she did tell me that when I came back
16   from -- who? I know Melissa King was one of the ladies
17   who made comments to her. Management, as far as who
18   those individuals were in terms of me coming back and
19   who I was going to report to, I'm not sure who that was,
20   who those conversations were with.
21       Q. But she overheard or was involved in
22   communications with management --
23       A. Right.
24       Q. -- just that general term while you were out on
25   leave --

Page 66

1        A. Right.
2        Q. -- regarding once you came back who you would
3    report to?
4        A. Yes.
5        Q. Any other comments that she overheard or
6    conversations she had with others about you?
7        A. That I'm aware of, no.
8        Q. You said she had conversations with Melissa
9    King. What was the basis, to your knowledge, of those
10   communications with Ms. King?
11       A. She was asked about my hours. You know, if I'm
12   not at my cubicle where I'm located at, where did I go,
13   things of that nature.
14       Q. Any other comments that you say to your
15   knowledge Ms. Long overheard or participated in about
16   you?
17       A. In the ones with Linda in regards to the reason
18   why I was on FMLA and that, like I told you, she was
19   told by Linda I had filed the complaint.
20       Q. And so with respect to the conversations with
21   Linda, the first conversation that Ms. Long supposedly
22   had was, first, why you were on FMLA leave?
23       A. Right.
24       Q. And this was the February 2017 to May 2017
25   leave?

Page 67

1        A. Right.
2        Q. And what did Ms. Hubbard tell Ms. Long with
3    respect to why you were on leave?
4        A. I would only be guessing, but she told her that
5    I was -- I would only be guessing. Like I said, that's
6    in that recording.
7        Q. The recording is of Ms. Long telling you what
8    Ms. Hubbard told her?
9        A. Yes.
10       Q. As to why you were on leave?
11       A. Yes.
12       Q. Do you recall whether or not that information
13   that Ms. Hubbard told Ms. Long was true or false?
14       A. I believe it was false, yes.
15       Q. And why were you on FMLA leave from February
16   2017 to May 2017?
17       A. So that was related to mental health issues.
18   So that's in the report there from the doctor. Mental
19   health, you know, the stress and everything caused by
20   the job.
21       Q. And is this what Ms. Hubbard told Ms. Long
22   regarding why you were out on leave?
23       A. Like I said -- no. Hers was saying I filed a
24   lawsuit -- or that I filed -- it wasn't a lawsuit at the
25   time. It was the discrimination that I had filed with

Page 68

1    Patti. And she was saying that -- that's why I said
2    you've got to listen to the recording, you know, to get
3    all the evidence.
4        Q. And so informed -- strike that.
5            The nature of Ms. Hubbard's conversation
6    with Ms. Long was that you were out on FMLA leave, and
7    she tied it to a complaint that you had filed?
8        A. Right.
9        Q. And the best nature as far as Ms. Hubbard's
10   conversation with Ms. Long would be that recording?
11       A. Right.
12       Q. But you didn't overhear this conversation?
13       A. No.
14       Q. To your knowledge, did Ms. Long ever overhear
15   any conversations or comments made about your race or
16   gender?
17       A. Not that I'm aware of, no.
18       Q. And then the next subject as far as knowledge
19   or categories of knowledge was Bill Piatt's
20   discriminatory treatment or different treatment toward
21   women?
22       A. Yes.
23       Q. And was that with respect to you specifically
24   or women in the workplace in general?
25       A. Women in the workplace.

HANNA & HANNA, INC.
713-840-8484

Page 69

1    Q. Did Ms. Long ever communicate to you that she
2  felt Mr. Piatt was discriminatory to her?
3    A. Yes.
4    Q. In what way did she feel he discriminated
5  against her?
6    A. Just the way that he would treat her in
7  comparison to men.
8    Q. And so with respect to Mr. Piatt's
9  discriminatory treatment, would you say he treated all
10  women differently?
11    A. I don't know about that. All I know is what he
12  did towards me and what she said. And there is a
13  recording from Melissa about how she feels he is.
14    Q. The next one you said is just your overall
15  differential treatment. What differential treatment was
16  Ms. Long aware of?
17    A. Me having -- when I came back from medical
18  leave, me having to badge in -- you know, my recordings
19  of what time I came into the office, you know, the badge
20  reports. So yes, she was aware of that. I
21  guess -- yes. And so -- and then the surveys.
22    Q. The customer satisfaction surveys we discussed
23  before?
24    A. Uh-huh.
25    Q. Any other differential treatment that Ms. Long

Page 70

1  has witnessed or was aware of?
2    A. Not that I recall.
3    Q. Turning to the badge in, badge out, what did
4  that consist of?
5    A. Okay. So at Siemens you use your employee
6  badge to access the facility. But then you can't use
7  that badge -- you don't need the badge to let you out of
8  the building.
9    Q. It just lets you in?
10    A. Right. And so when I came back from FMLA, I
11  was told to badge in and then also send an email to my
12  supervisor what time I was leaving, what time I was
13  going to lunch, things of that nature as a salaried
14  employee.
15    Q. And are you aware of any other employees who
16  were required to send these emails about when you were
17  leaving?
18    A. No. That was just me.
19    Q. And you said to your supervisor. Who was your
20  supervisor at this time?
21    A. Her name was Donna. And she became my new
22  supervisor when I came on board after returning from
23  FMLA.
24    Q. And prior to May 2017, you didn't have to send
25  these emails?

Page 71

1    A. No.
2    Q. Do you recall who made the decision to make you
3  send these emails?
4    A. In the meeting that consisted of -- I don't
5  know who made the decision, no.
6    Q. Is it your contention that you were required to
7  send these emails notifying Ms. Wilson of when you were
8  leaving because of your gender or race?
9    A. I believe it has something to do with the
10  retaliation. I believe a lot of this has to do with the
11  retaliation, filing the complaint, yes.
12    Q. And with respect to in retaliation, was it for
13  your internal complaints to Ms. Hubbard and Ms. Davis?
14    A. Yes.
15    Q. Anything else?
16    A. No.
17    Q. Having to badge in or badge out -- or it's more
18  just sending the emails of notifying when you were
19  leaving, did that have any effect on your pay?
20    A. No.
21    Q. Did it have any effect on any of your other
22  benefits that you received?
23    A. No.
24    Q. Did it result in any disciplinary action? Say
25  did you get any disciplinary action based upon when you

Page 72

1  reported you were leaving?
2    A. No.
3    Q. Was it a quick email, Hey, I'm leaving for
4  lunch; Hey, I'm leaving for the day?
5    A. I would send an email, yes.
6    Q. So typically it was about two emails a day?
7    A. Right. I think I even sent emails, too, when I
8  was going to the restroom and things like that, too.
9    Q. So whenever you left your desk, you were
10  required to report?
11    A. Well, they wanted me to report, so I tried to
12  give them as much information as they needed.
13    Q. But they didn't specifically say, When you go
14  to the restroom, you need to let me know?
15    A. No.
16    Q. But you did send those because you were trying
17  to comply with this requirement to let them know when
18  you were leaving?
19    A. Uh-huh.
20    Q. Any other differential treatment that Ms. Long
21  was aware of other than the customer survey reports and
22  the badge in and badge outs?
23    A. Uh-huh. Not that I'm aware of.
24    Q. Next you said she also was aware of excessive
25  monitoring. We have discussed two bits of excessive

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 73

1  monitoring, the first one being in 2016 with emails from
2  Mr. Piatt.
3          Ms. Long, was she aware of that?
4      A. Yes. And then, like I said, we were cube
5  mates. So they would ask her questions.
6      Q. About your whereabouts?
7      A. Yes.
8      Q. Who asked these questions?
9      A. Bill. I think he was the main person. And
10  Melissa, I previously stated, King.
11     Q. And this was before your leave?
12     A. Yes.
13     Q. Was she aware of the excessive monitoring that
14  you said occurred when you returned back from leave, the
15  customer survey reports?
16     A. I believe she was, yeah. She gets those badge
17  reports.
18     Q. Did Ms. Long ever indicate to you that she
19  believed this excessive monitoring was discriminatory?
20     A. As far as -- I have to look -- listen to the
21  recordings. She didn't say that, I think they are doing
22  this because they are discriminating against you. I
23  don't think she said those words.
24     Q. Did she ever indicate that she believed the
25  excessive monitoring was done in order to retaliate

Page 74

1  against you?
2      A. No.
3      Q. Is there any other knowledge that Ms. Long
4  would have regarding your complaints here other than
5  what we've discussed?
6      A. No.
7      Q. And Ms. Long was one of the individuals that
8  took some of your duties, correct?
9      A. Yes.
10     Q. And she performed these internal auditing
11  duties on top of her separate duties in EHS?
12     A. Right.
13          (Exhibit 5 was marked.)
14     Q. (BY MS. GRANT) I'm handing you what I'm
15  marking as Exhibit 5.
16     A. Okay.
17     Q. So as I previously stated, we had sent you
18  interrogatories, and the first one was asking about
19  individuals with relevant knowledge. One of the
20  requirements that courts have, and actually,
21  specifically our judge, is that the parties as to
22  exchange information at the beginning of the lawsuit
23  called initial disclosures.
24     A. Okay.
25     Q. Exhibit 5 is Siemens' initial disclosures where

Page 75

1  it is various categories of information that you have to
2  give. And one of those categories of information is the
3  same question, individuals with relevant knowledge. So
4  I want to go through some of the people that Siemens
5  identified and go through the same exercise that we just
6  went through.
7      A. Okay.
8      Q. So let's turn to -- it starts at page 7.
9      A. Okay.
10     Q. And so starting on page 7 is the list of
11  individuals that Siemens claims have knowledge. The
12  first person is you, Harriet Lane, and we're here to
13  find out what knowledge you have.
14     A. Yes.
15     Q. The second person listed is Patti Davis. Do
16  you know who Patti Davis is?
17     A. Yes.
18     Q. Who is Ms. Davis?
19     A. She works for Siemens, human resources.
20     Q. And what is Ms. Davis's race?
21     A. African-American.
22     Q. And I assume she's a female.
23     A. Yes.
24     Q. Can we agree if I incorrectly identify or use
25  the wrong pronouns, you will let me know?

Page 76

1      A. Yes.
2      Q. So if I say "she," I don't then have to ask you
3  if she's a female?
4      A. Yes.
5      Q. We'll skip that question. It's a weird one but
6  you never know.
7          And when was the last time you spoke with
8  Ms. Davis?
9      A. That was back in February, I believe, in 2017.
10     Q. And I believe you referenced she's one of the
11  individuals that you had filed complaints with.
12     A. Yes.
13     Q. And you did this in her role as human
14  resources?
15     A. Yes.
16     Q. And Ms. Davis was not your supervisor?
17     A. No.
18     Q. Or your peer?
19     A. No.
20     Q. And we have -- she works in Orlando, Florida;
21  is that correct?
22     A. Okay.
23     Q. Did she work in the same facility as you?
24     A. No.
25     Q. And you said you complained to her. Did you

HANNA & HANNA, INC.
713-840-8484

Page 77

```
 1    complain to her directly or how did the complaint come
 2    to Ms. Davis?
 3         A. She did the investigation, so she interviewed
 4    me.
 5         Q. So she did an investigation into a complaint
 6    you filed?
 7         A. Yes.
 8         Q. How did you file this complaint?
 9         A. Through the Safecall.
10         Q. A hotline?
11         A. Yes.
12         Q. Is this a hotline provided by Siemens?
13         A. Yes.
14         Q. And what's the purpose of this hotline?
15         A. You can file any type of complaints you would
16    have related to the complaint that I filed.
17         Q. And so Siemens had a mechanism by which you can
18    call in and raise complaints?
19         A. Yes.
20         Q. Did you make this complaint anonymously?
21         A. No. I stated my name.
22         Q. Did you have the option to state it
23    anonymously?
24         A. I can't remember.
25         Q. Do you recall when you made this complaint?
```

Page 78

```
 1         A. I want to say January of 2017.
 2         Q. And then once you made this complaint,
 3    Ms. Davis was the investigator assigned to investigate
 4    the subject of this complaint?
 5         A. Yes.
 6              (Exhibit 6 was marked.)
 7         Q. (BY MS. GRANT) I'm handing you what's been
 8    marked as Exhibit 6. Exhibit 6 is a call report that
 9    purports to summarize the nature of your call to the
10    call line.
11              Have you seen Exhibit 6 before?
12         A. Yes.
13         Q. Does Exhibit 6 accurately describe or reflect
14    your complaint that you made to the Safecall report?
15              MR. BAIL: Take some time to look it over,
16    please.
17              MS. GRANT: Yes.
18         A. Okay.
19         Q. (BY MS. GRANT) Turn back to Exhibit 6. Does
20    Exhibit 6 accurately reflect the contents of your
21    complaint that you made?
22         A. Right, but they don't have everything in here.
23         Q. So what do you recall is missing from this
24    report?
25         A. Like the complaints in regards to how I was
```

Page 79

```
 1    treated with Bill, and also it doesn't mention anything
 2    here about Mr. Shipley. So yes.
 3         Q. And with respect to Exhibit 6, it says here the
 4    time and date was 6 p.m. on February -- Friday,
 5    January 27, 2017.
 6              Is that accurate?
 7         A. I can't remember the time. Like I said
 8    earlier, it was January 2017.
 9         Q. And it says here, nature of allegation, unfair
10    treatment; that is correct?
11         A. Yes.
12         Q. And with respect to it says "Person(s)
13    involved," it lists Melissa King. And you contend that
14    in addition to Ms. King, you also complained about Bill
15    Piatt and Mark Shipley?
16         A. Yes.
17         Q. Is it Mark or Mike?
18         A. Mark. Management as a whole. I kept saying
19    "management."
20         Q. And after you made this phone call, Ms. Davis
21    was then assigned to investigate your complaint; is that
22    correct?
23         A. Yes.
24         Q. Was there anything -- when you called the
25    hotline, did you specifically state you believed you
```

Page 80

```
 1    were discriminated against because of your race or
 2    gender?
 3         A. I can't remember that. I know that came later,
 4    yes.
 5         Q. But in the initial call, that did not come up?
 6         A. I don't know the exact words that were used,
 7    but yeah.
 8         Q. And when you say "that came later," did that
 9    come with Ms. Davis?
10         A. Right. And then other documents that I
11    documented in.
12         Q. Upon receipt of this complaint, are you aware
13    of what Ms. Patti Davis did to investigate?
14         A. Do I know what she did?
15         Q. Yes.
16         A. Her role or what?
17         Q. You said her role was the investigator?
18         A. Yes.
19         Q. What was the -- are you aware of what actions
20    she took to investigate your complaint?
21         A. No.
22         Q. Did you speak with Ms. Davis as part of your
23    investigation?
24         A. Yes.
25         Q. What was your overall impression of Ms. Davis?
```

HARRIET MARIE LANE - 11/20/2019

Page 81

1    A. In the recording there I think when I met with
2    Ms. Davis, she had already formed her opinion. You
3    asked me did I know whether or not -- what she did
4    to -- what actions she took, no. But when I was
5    there -- previously to me meeting her, no, I was not
6    aware of those actions. But when I initially had the
7    meeting with her, that's when I became aware of the
8    actions that she had already participated in with other
9    people. And these were all managers, and these were all
10   people that were part of the complaint, the majority of
11   them.
12          So my overall impression and that's what I
13   asked her on the recorder, What do you want from me,
14   because she had already formed her opinion.
15   Q. And on what do you conclude she had already
16   formed her opinion?
17   A. I based it on she telling me she had talked to
18   other people, and the way that she was coming at me.
19   Q. How was she coming at you?
20   A. Like in attack mode, confrontational.
21   Q. How many meetings did you have with Ms. Davis?
22   A. One, very brief.
23   Q. And you recorded that meeting?
24   A. Yes.
25   Q. Did Ms. Davis know --

Page 82

1    A. Yes.
2    Q. -- you were recording that meeting?
3    A. No.
4    Q. Where did that meeting take place?
5    A. That was also at the Siemens facility in one of
6    the conference rooms.
7    Q. So with respect to that meeting you had with
8    Ms. Davis, the recording would be the accurate
9    reflection of what you guys spoke about?
10   A. Right.
11   Q. Did you record the entire conversation?
12   A. No.
13   Q. About how much? Most of it?
14   A. Yes, most of it.
15   Q. When did you start recording?
16   A. As soon as I walked in.
17   Q. So you do have the beginning? You have the
18   beginning of the conversation?
19   A. Yes.
20   Q. Why did you end the recording?
21   A. It ended on its own. It interrupted.
22   Q. Did you record it on your phone?
23   A. Yes.
24   Q. Were all of your recordings taken on your
25   phone?

Page 83

1    A. Yes.
2    Q. With respect to all of the approximately
3    100 recordings you had, was anybody aware that you were
4    recording them at the time?
5    A. No.
6    Q. And were these all taking place at the Siemens
7    facility?
8    A. No.
9    Q. You said some of them might have been outside
10   at lunch?
11   A. Yes.
12   Q. Besides maybe being off-site but on a lunch
13   break in Siemens' facilities, did they take place
14   anywhere else?
15   A. No.
16   Q. One of the things going to Exhibit 6 here where
17   if you turn to the third page -- it has "244" at the
18   bottom -- it says "Caller's expectations" at the top.
19          What were your expectations with respect
20   to any remedial action that you wanted in response to
21   this complaint?
22   A. I wanted them to be made aware of the
23   discrimination, the unfair treatment, the differential
24   treatment. I wanted them to be made aware of what was
25   going on.

Page 84

1    Q. When you say "they," who are you referring to?
2    A. I called Safecall. So I wanted them -- I mean,
3    they didn't work there at Siemens, so I wanted to bring
4    it to their knowledge of how an employee was being
5    treated.
6    Q. As a third-party investigator or service, you
7    wanted them to look into these allegations?
8    A. Yes.
9    Q. Did you expect any sort of disciplinary or
10   other action to be taken against Ms. King, Mr. Piatt or
11   Mr. Shipley?
12   A. No.
13   Q. But you just wanted them to know and
14   investigate the matter?
15   A. Right.
16   Q. How did you learn about the existence of the
17   Safecall hotline?
18   A. I can't remember. I can't remember.
19   Q. Did Siemens give you any sort of training on
20   the existence of it?
21   A. I don't think so.
22   Q. Were there any sort of postings or signs or
23   anything?
24   A. No. I probably did some research on my own and
25   found out.

21 (Pages 81 to 84)

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 85

1    Q.  Would that have been research through the
2  Siemens intranet?
3    A.  Yes.
4    Q.  So Siemens -- sort of materials that informed
5  you of the existence of this hotline?
6    A.  Yes.
7    Q.  You said when you walked in she informed you
8  she had already spoken with people, and you took it that
9  Ms. Davis had reached her conclusions already?
10   A.  Patti, yes.
11   Q.  Patti.
12          What do you believe were Ms. Davis's
13  conclusions at this meeting?
14   A.  That whatever they told her, that she believed
15  them.
16   Q.  So she was already forming the basis of
17  believing management over your complaints?
18   A.  Right.
19   Q.  And finding your complaints were
20  unsubstantiated?
21   A.  Right.
22          (Exhibit 7 was marked.)
23   Q.  (BY MS. GRANT)  I'm handing you what's been
24  marked as Exhibit 7.  Exhibit 7 are -- have you seen
25  Exhibit 7 before?

Page 86

1    A.  Yes.  I mean, yes, I have seen this.
2    Q.  Did you see this when you were preparing for
3  your deposition here today?
4    A.  Prior to, yes.
5    Q.  And Exhibit 7, do you understand these to be
6  Ms. Davis's notes regarding her meeting with you?
7    A.  I mean, that's what it says, yes.
8    Q.  February 8, 2015, is this the same meeting that
9  would have been reflected in that recording?
10   A.  Yes, I believe so.
11   Q.  And so if I wanted to hear the actual
12  conversation, I could go to your recording as opposed to
13  viewing this summary?
14   A.  Right.
15   Q.  I want you to review this --
16          MR. BAIL:  Can we go off the record for a
17  second?
18          MS. GRANT:  Yes.
19          (Discussion off the record.)
20   Q.  (BY MS. GRANT)  I just want to clarify for the
21  record, your complaint was -- according to Exhibit 6,
22  your complaint was made on January 27, 2017, correct?
23   A.  Yes.
24   Q.  And then you met with Ms. Davis as part of her
25  investigation on February 8, 2017?

Page 87

1    A.  Okay.
2    Q.  And this is the same conversation that you have
3  on your recordings, correct?
4    A.  Right.
5    Q.  I want you to take a look at these notes, and
6  let me know if there's anything in here that you think
7  is inaccurate.
8    A.  What does she mean, "Therefore, she would just
9  not go"?  What does that mean?
10          MR. BAIL:  Underline or highlight portions
11  that you want to talk to her about.
12   A.  (Witness complies.)
13   Q.  (BY MS. GRANT)  So the highlighted portions on
14  Exhibit 7 are what you think are inaccurate based on the
15  conversation you had with Ms. Davis?
16   A.  Right.
17   Q.  And so first it looks like you have got the
18  first paragraph that says --
19   A.  Not really inaccurate.  These are her own
20  words.  And then again, this goes back to she had
21  already formed her opinion, the confrontation and then
22  also the attacking.
23   Q.  And so the highlighted portions are examples or
24  at least evidence that she had formed her opinion
25  already and are examples of when she was attacking of

Page 88

1  you?
2    A.  So these are examples.
3          MR. BAIL:  Do you want to explain to her
4  why you highlighted those?
5          THE WITNESS:  Okay.
6    Q.  (BY MS. GRANT)  Let's go ahead first one,
7  "Therefore, she would not go.  She felt Melissa was
8  harassing her by asking her where she has been when she
9  was not in the scheduled meetings."
10   A.  So I'm not sure what she means.  "Therefore" --
11  who is "she"?  And I'm not sure what that means.
12   Q.  But other than just not understanding that
13  portion, did you tell Ms. Davis that you felt Melissa
14  was harassing you by asking where you were when you were
15  not at scheduled meetings?
16   A.  So here this is why I highlighted that, because
17  she's giving one example of harassment.
18   Q.  But you gave her many more?
19   A.  Yes.  And then other people, as well.
20   Q.  The next section you highlighted is in the next
21  paragraph below.
22   A.  Okay.  Then I'm not sure why that's in there
23  about me taking care of my mother.
24          MR. BAIL:  Just start it off so she can --
25          THE WITNESS:  Okay.

HARRIET MARIE LANE - 11/20/2019

Page 89

1   Q. (BY MS. GRANT)  What was the next section you
2   highlighted?
3       A. "Harriet did not agree and chose to still be
4   out as she needed to be."  I'm not sure what that means.
5   That's very inaccurate.
6       Q. So you did not -- it's your contention that you
7   did not tell Ms. Davis that you --
8       A. If I read this, it's saying Harriet did not
9   agree and chose to still be out as she needed to be.
10      Q. And with respect to "She said that Melissa was
11  not supportive because the team needed to be in the
12  office every day to interact on various projects," so
13  you did not agree with that contention of Ms. Lane?
14      A. If she's saying, Harriet did not agree and
15  chose to still be out, what are you saying?  If I'm
16  reading it, it's saying Harriet didn't agree that
17  employees need to be in the office every day.  So
18  therefore, she was out anyway.  But I wasn't...
19      Q. So just breaking that up, did you not agree
20  with Ms. King's belief or statement that the team needed
21  to be in the office every day?
22      A. I agree with that totally because I worked in
23  the office every day except for Saturdays and Sundays.
24      Q. But you disagree that you told her that -- A,
25  you disagree with that in that you just decided to be

Page 90

1   out of the office when needed?
2       A. Yeah, I disagree with that statement here.  And
3   then going back to the next paragraph here.
4       Q. Yes, the third one.  What did you highlight?
5       A. "She said she wanted to report to a different
6   manager or for Melissa to modify her behavior and treat
7   her differently (which in her mind meant just leave her
8   alone so she can do whatever she wants to do)."  I'm
9   not -- that's not anything that I said.
10      Q. So you never informed Ms. Davis that you wanted
11  to report to a different manager?
12      A. Yes.  If we can't come to terms and improve our
13  relationship, then I would like to be -- have another
14  manager.  And that's when I was told there are no other
15  managers available.  But when I came back from leave,
16  there was.  I was put under another manager.  But this
17  here, what it says in parentheses, I'm not sure how she
18  was able to form that statement.
19      Q. You don't know on what basis she decided that
20  you had just wanted to be left alone so you can do
21  whatever you wanted to do?
22      A. Right.
23      Q. But you did ask either to have a different
24  manager or have Melissa modify her behavior, correct?
25      A. Right.  Let's come to -- I didn't say modify

Page 91

1   her behavior because I can't tell an adult or my
2   supervisor to modify her behavior.  So those weren't my
3   words, either.
4       Q. And just really quick about one comment that
5   you had said.  You said when you came back from leave
6   you did report to a different manager?
7       A. Yes.
8       Q. When you came back from leave, to your
9   knowledge, was Ms. King still an employee to Siemens?
10      A. No.
11      Q. So your reporting to a different manager was in
12  part because Ms. King no longer worked there, correct?
13      A. I don't know.  I just know when I came back, I
14  had a different manager.
15      Q. All right.  And then let's move to the next
16  paragraph.
17      A. Okay.  So that would be the last one, that's
18  all highlighted.
19      Q. The whole paragraph?
20      A. Yes.
21      Q. Did Ms. Davis tell you that she would write her
22  report from the discussion she had with you and provide
23  it to HR?
24      A. So this is my reason for highlighting this, key
25  word, "report."  When I came back, I got a PIP.

Page 92

1       Q. Did you ever see a report drafted by Ms. Davis?
2       A. No, not until I came back.  Along with the PIP.
3   It was all connected.
4       Q. Did she tell you she would write a report?
5       A. A report but I got a PIP, a Performance
6   Improvement Plan.
7       Q. Did she also give you a report?
8       A. No.  She didn't give me anything.
9       Q. But did Ms. Davis prepare a report?
10      A. There was one prepared by her, yes.
11      Q. Along with it?
12      A. Yes.
13      Q. And why else do you have this highlighted?  Did
14  she say Linda Hubbard would follow up with you?
15      A. I just highlighted the whole thing, but the
16  main thing is she said she would give me a report.  I
17  didn't receive the report.  Linda provided me with a
18  report, and she didn't put anything in here about a
19  Performance Improvement Plan.
20      Q. Okay.  Thank you.
21         As far as -- again, I know I've said this,
22  but I want to make sure I'm clear, the actual subject of
23  your -- almost the entire conversation was in that
24  recording, correct?
25      A. Yes, almost, yes.

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 93

1    Q. Do you recall when it kicked off and ended?
2    A. No.
3    Q. Did it capture most of the conversation?
4    A. Right. And it was a majority of Patti doing
5  the talking and I was listening.
6    Q. Going back to the actual nature of your
7  complaint, the Safecall report, I just want to go
8  through and make sure I understand what you were
9  complaining about that Ms. Davis was investigating.
10       You have got a number of different items.
11  Turning to Exhibit 6, No. 1 says you were singled out by
12  Ms. King for unfair treatment.
13       Melissa King was your supervisor, correct?
14    A. Yes.
15    Q. When was Ms. King your supervisor?
16    A. I don't know exactly when she became my
17  supervisor, but, yeah, she was my supervisor the year of
18  2016, 2017.
19    Q. Was Ms. King your supervisor when you left on
20  leave?
21    A. Yes.
22    Q. On February 2017?
23    A. Yes.
24    Q. But then when you returned in May 2017, she was
25  no longer your supervisor?

Page 94

1    A. Right.
2    Q. And you have no knowledge regarding the basis
3  of why Ms. King was not your supervisor when you
4  returned?
5    A. No.
6    Q. How did Ms. King single you out or treat you
7  unfairly?
8    A. She just treated me differently than some of
9  the other employees.
10    Q. How did she treat you differently?
11    A. Like I said, excessive monitoring, you know, we
12  never had a -- I had to consistently demand that we talk
13  about -- not demand but request that we talk about my
14  expectations once she became my supervisor. That never
15  occurred until after -- she became my supervisor in
16  2016, but we never had the conversation about
17  expectations and goals until like February of 2017.
18  Yeah.
19    Q. Any other unfair treatment by Ms. King?
20    A. No, not at the time.
21    Q. And you relayed these two complaints regarding
22  the excessive monitoring and the goals and expectations
23  to Ms. Davis in the investigation?
24    A. Yes.
25    Q. And --

Page 95

1    A. Then there was like questions about my PTO,
2  when I'm going to take PTO, and just a lot of things
3  about my personal time off. So there was issues there,
4  as well.
5    Q. So Ms. King would ask you questions about your
6  PTO?
7    A. Not really. We talked about it. Yeah, that's
8  when she sent me an email asking me what time I was
9  going to come in. You know, so she wanted to have that
10  documented, what time I was going to come in in the
11  mornings, what time I was going to leave, things of that
12  nature.
13    Q. Any other unfair treatment by Ms. King that was
14  forming the basis of your complaint?
15    A. Not that I can think of.
16    Q. With respect to the excessive monitoring, I
17  know earlier we discussed Bill Piatt. How was Ms. King
18  doing the excessive monitoring of you?
19    A. Well, they're good friends. She and Bill Piatt
20  are very good friends. So I would see him going into
21  her office, and then when she would come out of the
22  office, it was like he was coaching her.
23    Q. So with respect to the excessive monitoring
24  that you described by Mr. Piatt earlier, Ms. King did
25  the same type of things?

Page 96

1    A. She couldn't do the customer satisfaction
2  because she was no longer there at the time.
3    Q. But the 2016 that we discussed, you said the
4  emailing, asking where you were --
5    A. No. She asked me what time I'm going to come
6  in, what time I'm going to, you know, come in. She
7  wanted an email on that. Her office was down the hall,
8  and so she wanted me to email her what time I was going
9  to come in every day and what time I was going to leave.
10    Q. Now, what do you mean she emailed you? Was she
11  asking you that you email her every single day --
12    A. No.
13    Q. -- or was she asking once what would your
14  schedule be?
15    A. What my schedule would be. She wanted that
16  documented.
17    Q. And are you aware of whether or not she asked
18  this of other employees?
19    A. No, I'm not sure.
20       (Exhibit 8 was marked.)
21    Q. (BY MS. GRANT) I'm handing you what's been
22  marked as Exhibit 8. Exhibit 8 is an email
23  communication dated October 18, 2016, between Ms. King
24  and you.
25       Do you recognize this email?

HANNA & HANNA, INC.
713-840-8484

Page 97

1   A. Yes.
2   Q. First off at the top you'll see there looks
3   like an email forward to hmlane33@yahoo.com.
4       Is that your personal email address?
5   A. Yes.
6   Q. Why did you forward this to your personal email
7   address?
8   A. So at the time -- when did this happen?  This
9   was after I filed the complaint.  That was before I
10  filed -- that was after -- that was before I filed the
11  complaint.  But remember in July -- June-July time
12  frame, that's when I started making complaints to Linda.
13  So there was no resolution.  So I had to, you know,
14  cover myself, and so I'm emailing myself.
15  Q. Did you inform anyone at Siemens that you were
16  forwarding these emails to your personal email?
17  A. No.
18  Q. Now, with respect to this email communication,
19  if you look at the bottom, Dear Ms. Lane, "I'm trying to
20  get a feel for what hours everyone works.  So could you
21  please provide me with your normal business working
22  schedule?"
23      Is this the excessive monitoring of your
24  schedule?
25  A. Yes.

Page 98

1   Q. And so do you contend that she sent you this
2   email in order to discriminate against you?
3   A. Yes.
4   Q. On what basis?
5   A. Basis because I'm being an African-American
6   woman.
7   Q. But you are not sure if she asked any other
8   employees to --
9   A. No.
10  Q. -- give her schedules?
11      MR. BAIL:  Make sure she finishes her
12  statement.
13  Q. (BY MS. GRANT)  It's hard and I know I have
14  done it a couple of times too.
15      MR. BAIL:  It gets conversational after a
16  while.
17  Q. (BY MS. GRANT)  Is there any other occasions
18  that Ms. King sent you a similar email?
19  A. I'm not sure.  There may have been.
20  Q. But what we were just discussing on the
21  excessive monitoring, this is the email you are
22  referring?
23  A. Yes.
24  Q. And you don't know, again, if she asked her
25  other employees?

Page 99

1   A. No.
2   Q. On what basis do you believe this was because
3   of your race?
4   A. She didn't have any other black females that
5   worked for her.
6   Q. Other than the fact she didn't have any other
7   African-American females, is there any other evidence to
8   support your belief that she did this to discriminate
9   against you?
10  A. No.
11  Q. Do you contend that she did this to
12  discriminate against you because of your gender?
13  A. No.  We're both females.  No.
14  Q. Do you contend that she sent this email in
15  order to retaliate against you for anything?
16  A. Like I said -- no.
17  Q. But she did monitor you and ask about your
18  schedule because you are an African-American female?
19  A. Uh-huh.
20  Q. Any other form of excessive monitoring that you
21  contend or that you complained about with respect to
22  Ms. King?
23  A. No.
24  Q. You stated also the demand -- Ms. King refused
25  to talk to you about your goals and expectations?

Page 100

1   A. Right.
2   Q. What are those goals and expectations?
3   A. Just something I wanted to talk about.  Because
4   she was my new supervisor, and this is something that I
5   had done with Patrik.  Any time I received a new
6   supervisor, I wanted to get that rapport.  So I would
7   talk about, you know, what are your goals, what are your
8   expectations and things of that nature.
9       And she never wanted to do that, like I
10  said.  So she became my supervisor in 2016.  We didn't
11  have the meeting until 2017.
12  Q. And so this was not a formal Siemens procedure?
13  It was a request by you to, Hey, you're my new
14  supervisor.  I want to sit down and figure out what do
15  you expect of me?
16  A. Right.
17  Q. But you did end up having this conversation,
18  but as you said, months later?
19  A. Right.  Right.
20  Q. Did not having this meeting have any effect on
21  your pay?
22  A. No.  I mean, I don't know.  At the time we were
23  doing merit increases, so I don't know.
24  Q. Would this goals and expectations meeting, to
25  your knowledge, have any effect or role on merit

HARRIET MARIE LANE - 11/20/2019

Page 101

1    increases?
2        A.  Yes.
3        Q.  And what effect?
4        A.  I mean, if you set your goals and expectations,
5    remember that's your performance plan.  And so -- and
6    also your objectives.  And so when you identify those,
7    when it comes to mid-year and then also comes to the end
8    of the year, they are going to use that information to
9    base whether or not you get a merit increase or
10   promotion.  So yes, I believe it was used to form a
11   basis for merit and pay increases as well.
12       Q.  When each year would you receive merit bonuses
13   and pay increases?
14       A.  I can't remember exactly.  I want to say it was
15   either November or May -- or maybe March of the
16   following year.
17       Q.  And for around that time did you receive a
18   merit increase or bonus reflecting the 2016 year?
19       A.  I can't remember.
20       Q.  Is there any other allegation of unfair
21   treatment by Ms. King that you raised during this
22   Safecall?
23       A.  Not that I can recall.
24       Q.  What basis or do you contend that Ms. King
25   refused to have this meeting with you because of your

Page 102

1    race?
2        A.  What, the meeting?
3        Q.  Yes.
4        A.  I'm not sure why she didn't want to have the
5    meeting.
6        Q.  Going back to Exhibit 6, the next couple bullet
7    points have a description of facts, and Bullet Point
8    No. 4 it describes in October 2016 Ms. King was assigned
9    as a new officer on your team.
10           Does that refresh your recollection as to
11   when Ms. King became your manager?
12       A.  Okay.
13       Q.  She started asking you what hours you would be
14   working on a daily and weekly basis.  "Ms. Lane believes
15   she was being singled out by Ms. King, as her other two
16   colleagues she worked with were not treated in the same
17   way."
18           That is the email we already discussed,
19   correct?
20       A.  Okay.
21       Q.  Correct?
22       A.  Yes.
23       Q.  No. 5 too says, "Ms. Lane was also told she
24   would not be allowed to work from home, and any time off
25   or late starts for welfare matters would have to be

Page 103

1    taken from her PTO rather than working the time up at
2    the end of a shift."
3            Do you recall making a complaint about
4    that with respect to Ms. King?
5        A.  I don't know if it was to her or HR but yes.
6        Q.  And do you contend Ms. King required you to use
7    PTO because of your gender or race?
8        A.  The PTO?  No, I don't think that had anything
9    to do with my gender or my race.
10       Q.  Do you believe it was in retaliation for
11   anything?
12       A.  Yes.  Like I said, I believe she was being
13   coached by Bill Piatt, yes.
14       Q.  So you believe that Ms. King's requirement that
15   you take PTO was done in retaliation for complaining to
16   Ms. Hubbard about Bill King?
17       A.  Bill Piatt.
18       Q.  Piatt.  Thank you.
19           Do you have any knowledge that Ms. King
20   was aware of your complaints about Mr. Piatt?
21       A.  No.
22       Q.  And on what basis do you believe that Ms. King
23   required you to take PTO in instances where you came in
24   late in retaliation?
25       A.  Used PTO for coming in late?  I don't

Page 104

1    understand.
2        Q.  No. 4 says any time you were off or late
3    starts, you would have to take PTO.  That's what No. 5
4    says?
5        A.  Oh, No. 5.
6        Q.  Yes.
7        A.  Okay.  So what was your question again in
8    regards to that?
9        Q.  Backing up, do you contend -- is No. 5 do you
10   contend Ms. King's actions were done in retaliation for
11   your complaints about Bill Piatt?
12       A.  For this here?
13       Q.  Yes.
14       A.  No.  Just the -- like I said, the excessive
15   monitoring.
16       Q.  Were there any other actions you believe
17   Ms. King took in retaliation for your complaints about
18   Mr. Piatt?
19       A.  Not that I can think of right now.
20       Q.  But with respect to the PTO issue, you are not
21   contending that was done in retaliation for any actions?
22       A.  No.
23       Q.  Is the issue regarding taking your PTO forming
24   the basis of any complaints you have here today?
25       A.  No.

26  (Pages 101 to 104)

HARRIET MARIE LANE - 11/20/2019

Page 105

1      Q. Moving down to Bullet Point No. 6 -- strike
2   that.
3          Bullet Point No. 7, you state that you
4   felt you had been targeted by Ms. King and believed it
5   to be a form of harassment.  And here she says you tried
6   to stop -- Ms. King tried to stop you from going to a
7   prestigious audit workshop in Germany and that had to be
8   overruled by a senior member of management when Ms. Lane
9   brought it to their attention via HR.
10         A. Yes.
11         Q. Is it your contention that you were prevented
12  from going to this workshop in Germany because of your
13  gender or race?
14         A. I believe it was more so because of the race,
15  yes.
16         Q. And is that forming the basis of any of your
17  complaints here today?
18         A. Yes.  I was eventually allowed to go, but it
19  was overruled by her manager.
20         Q. So you were actually ultimately allowed to
21  attend this Germany training?
22         A. Right.  Patrik allowed me to go.
23         Q. When was this training?
24         A. I want to say that was in January 2017.
25         Q. Was this training required for your position?

Page 106

1          A. Yes.
2          Q. As a result of this training, did you receive
3   any sort of increase in your merit or your pay?
4          A. No.
5          Q. Did you receive any additional duties and
6   responsibilities or promotion because you attended this
7   training?
8          A. No.
9          Q. What was the reason that Ms. King tried to
10  prevent you from going?
11         A. I'm not sure.
12         Q. And it's your contention that Ms. King at least
13  tried to stop you because of your race?
14         A. Right.
15         Q. Do you contend she tried to stop you from going
16  in retaliation for anything?
17         A. Yes.
18         Q. Is it the complaints about Ms. Hubbard?
19         A. To --
20         Q. To Ms. Hubbard about Mr. Piatt?
21         A. Yes.
22         Q. On what basis do you believe that Ms. King had
23  said no to this training because of your race?
24         A. That's -- I get confused here.  Can you reword
25  that when you say "basis"?

Page 107

1          Q. Yes, absolutely.
2          What evidence do you have that Ms. King
3   didn't -- or I guess said no to this training at first
4   because of your race?
5          A. I don't have any.
6          Q. Your personal belief?
7          A. Right.
8          Q. What evidence do you have that Ms. King said no
9   to this training in retaliation for your complaints
10  about Bill Hubbard [sic]?
11         A. I don't have any evidence, other than my
12  personal beliefs.  Well, my personal belief is my
13  evidence.
14         Q. Who ultimately approved of you going to the
15  training?
16         A. That was Patrik.
17         Q. What is Patrik's full name?
18         A. Hols, H-O-L-S.
19         Q. What is Mr. Hols' race?
20         A. He's a German.
21         Q. Is he Caucasian?
22         A. I thought they were German.
23            MR. BAIL:  There could be a black German.
24  There's very few.
25         A. He's white.

Page 108

1          (Exhibit 9 was marked.)
2          Q. (BY MS. GRANT)  I'm handing you what's been
3   marked as Exhibit 9.  Exhibit 9 is an email chain
4   entitled "Upcoming Trainings."
5          Do you recall or recognize Exhibit 9?
6          A. Yes.
7          Q. And is Exhibit 9 the email discussing the
8   Germany training that we're discussing right now?
9          A. Yes.
10         Q. And according to Exhibit 9, it says if you look
11  on the front page, Ms. King told you that the reason you
12  were not entitled to go to the training was due to the
13  financial position or the costs associated with the
14  training.
15         Did she tell you that?
16         A. I mean, this is what's in the email.
17         Q. Did you have any reason to believe that was not
18  true at the time you received it?
19         A. Yes.
20         Q. On what basis did you believe that was not
21  true?
22         A. Because other locations -- it was a global
23  company, and so other locations, other people in my role
24  were being afforded the opportunity, allowed the
25  opportunity to attend.  Even a colleague that

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 109

1  lived -- that was in -- yes.  So I believe this is not
2  true.
3      Q.  Did any other colleagues at the Telge facility
4  that you worked at get the opportunity to attend this
5  Germany training at this time?
6      A.  No.  They didn't receive an invite, and no.
7      Q.  Do you have any personal knowledge about the
8  budget or financial position of the company in your
9  division at this time?
10     A.  I'm sure there were -- we have the all-hands
11 meetings, town hall meetings, and they talked about it
12 at that time.  But as far as if we were in the negative
13 or anything like that, I don't have that information
14 with me.
15     Q.  And then above that, if you look December 7, so
16 about a week later is where Mr. Hols tells you that he's
17 decided you actually can now go to the meeting?
18     A.  Right.  Yes.  He's the one that gave the
19 approval.
20     Q.  I want to go back.  According to Ms. King's
21 email, it says that Patrik was the one who decided at
22 first not to send you.
23         Did you believe that to be false?
24     A.  Patrik?  No, I didn't believe that, no.
25     Q.  You believe it was Ms. King at first who said

Page 110

1  no?
2      A.  Yes.
3      Q.  And Patrik here says, "As I said, we are under
4  significant financial constraints."
5          Did you again believe that was false from
6  Mr. Hols?
7      A.  Yes.
8      Q.  But despite those, you still did get to go to
9  the training?
10     A.  Right.
11     Q.  Let's jump back to Exhibit 6.  I would just
12 keep Exhibit 6 handy because we are going to walk
13 through those.
14         We were on Item No. 7.  The next one is
15 Item No. 8 where it says, "Ms. King also delayed a
16 'goals and expectations' appraisal."
17         Is that what we have already discussed
18 today?
19     A.  You are saying on No. 7 or 6?
20     Q.  No. 8 on Exhibit 6.
21     A.  Yes.
22     Q.  No. 9 says various meetings take place with
23 Ms. Lane, Ms. King, Mr. Hols and Ms. Hubbard to resolve
24 the matters and find a way forward.
25         Is that with respect to the items

Page 111

1  discussed?
2      A.  Okay.  I don't understand No. 9.  You are
3  talking about No. 9?
4      Q.  Yes.
5      A.  "All of the above information and more is in
6  the domain of Siemens HR."  Who is saying this?
7      Q.  This appears to be a summary of your
8  complaints.  Did you relay to them that Ms. Hubbard had
9  all the information about these items you described?
10     A.  I'm not aware of that.  And then "Various
11 meetings have taken place with Ms. Lane" -- because they
12 are talking about me -- "and Ms. King, Mr. Hols and
13 Ms. Hubbard to resolve matters and find a way forward."
14     Q.  Did you have meetings with Mr. Hols, Ms. King
15 and Ms. Hubbard?
16     A.  Talking about a way forward?
17     Q.  Yes.
18     A.  No.  Remember, the Safecall was in January.  So
19 I have never had a meeting -- remember, I was filing the
20 complaints in July of 2016 and we never had a meeting.
21     Q.  But with respect to these items on this list
22 that we have gone through, the training, the goals and
23 expectations, the singling out with the hours, did you
24 ever have any meetings prior to January 2017 to discuss
25 those?

Page 112

1      A.  Okay.  So we had emails, no meetings.
2      Q.  Okay.  And is that why you then ultimately made
3  the call to Safecall?
4      A.  Because of this?
5      Q.  Because you only had emails.
6      A.  No.  This is a combination of everything.
7      Q.  Okay.  Next, if you move to No. 10, it says
8  "Ms. Lane feels the company has closed ranks and
9  unfairly taken the side of Ms. King as various emails
10 have recently been sent to all the workforce about when
11 PTO can and cannot be taken."
12         As we discussed, you are not forming any
13 complaints in this lawsuit about your PTO?
14     A.  No, nothing about PTO.
15     Q.  No. 11 reflects statements made by Kim Long,
16 that Ms. Long noticed you were treated different from
17 other colleagues.
18         Are those statements we already discussed?
19     A.  Yes.
20     Q.  You stated that -- No. 12, the report states
21 that you reported you felt you were being treated
22 unfairly and suffered a great distress at the hands of
23 Ms. King and it's taken a toll on your health in a
24 negative way?
25     A.  Yes.

28  (Pages 109 to 112)

HARRIET MARIE LANE - 11/20/2019

Page 113

1    Q.  Did you complain about that in Safecall?
2    A.  Yes.
3    Q.  What tolls did it have?
4    A.  I believe I released for you guys to get the
5  medical report.  So you'd probably have to refer to that
6  to get more information.
7    Q.  So with respect to your medical symptoms as a
8  result of the actions of Siemens, that's best reflected
9  in the medical reports?
10    A.  Yes.
11    Q.  Did you raise any other allegations or
12  complaints about Ms. King in this hotline complaint?
13    A.  Not that I'm aware of, no.
14    Q.  You also said that you raised complaints and
15  allegations about Bill Piatt?
16    A.  Yes.
17    Q.  And what complaints did you raise about Bill
18  Piatt in your Safecall complaint to Ms. Davis?
19    A.  So I made those calls to -- I made those
20  complaints to Safecall, Linda Hubbard, Patti, Tony,
21  several times.
22    MR. BAIL:  But what specifically did you
23  complain to Safecall about Bill?
24    A.  Differential treatment, the discrimination,
25  pretty much that's what I complained about.

Page 114

1    Q.  (BY MS. GRANT)  What we have already discussed?
2    A.  Yes.
3    Q.  Finally, you said earlier that you also
4  complained to Ms. Davis in this complaint about Mark
5  Shipley?
6    A.  Right.
7    Q.  And who is Mark Shipley?
8    A.  He was the president, CEO.  I can't remember
9  the title.  One of the two.
10    Q.  And what is Mr. Shipley's race?
11    A.  He's Caucasian.
12    Q.  And I'm not sure if I asked you, what is
13  Mr. Piatt's race?
14    A.  Caucasian.
15    Q.  What complaints did you have at this time
16  regarding Mark Shipley?
17    A.  So like I said, he was allowing this.  So he
18  was allowing some of the treatment to go forward, and he
19  and Bill were also good friends.
20    Q.  And so do you contest that Mr. Shipley allowed
21  Mr. Piatt to continue to do the actions we've already
22  discussed because of your gender?
23    A.  Because of my gender, because of my race,
24  because of me being -- filing the complaints.
25    Q.  Do you have any knowledge that Mr. Shipley was

Page 115

1  aware of your complaints to Linda Hubbard?
2    A.  Yes.
3    Q.  On what do you base the conclusion that
4  Mr. Shipley was aware that you complained to Ms. Hubbard
5  about Mr. Piatt?
6    A.  Okay.  So when I came back from FMLA, she told
7  me.  He was part of the PIP meeting.
8    Q.  Are you aware of whether Mr. Piatt was aware of
9  your complaints to Ms. Hubbard about you?
10    A.  He was in that meeting.
11    Q.  So there was a meeting when you came back from
12  leave that discussed your complaints to Ms. Hubbard?
13    A.  There was a meeting when I came back about the
14  Performance Improvement Plan, and they were all in the
15  meeting.
16    Q.  During this meeting did they specifically
17  reference your complaints to Ms. Hubbard?
18    A.  I can't remember.
19    Q.  Did you record that meeting?
20    A.  Yes, ma'am.
21    Q.  Did they know you were recording?
22    A.  No.
23    Q.  But that recording would be the most accurate
24  reflection of the PIP conversation?
25    A.  Right.  There were several meetings about that

Page 116

1  PIP.
2    Q.  Did you record the entire conversation when you
3  were placed on the PIP?
4    A.  I recorded the entire conversation, yes, ma'am.
5    Q.  Other than allowing Mr. Piatt to treat you the
6  way we have discussed, is there any other actions that
7  you complained about with respect to Mr. Shipley?
8    A.  Not that I can recall.
9    Q.  Other than your personal belief that he did
10  this in discrimination and retaliation against you, do
11  you have any evidence?
12    A.  No.  Other than, like I said, what Linda said.
13    Q.  Other than your personal belief and the fact
14  that he knew of your complaints?
15    A.  Right.  That Linda said he knew about the
16  complaints and he was a part of the meeting.
17    Q.  At the time you raised this Safecall complaint,
18  did you raise any other complaints of discrimination or
19  retaliation?
20    A.  Outside of Siemens?  No.
21    Q.  Yes, to your Safecall report?
22    A.  No.
23    Q.  And are you aware of how Ms. Davis ultimately
24  concluded in her investigation?
25    A.  She gave the Performance Improvement Plan and

HANNA & HANNA, INC.
713-840-8484

Page 117

1    she -- you said there was a report, too.  You showed me
2    that report.
3              MS. GRANT:  Can we take a couple minutes
4    off the record?
5              MR. BAIL:  Sure.
6              (A recess was taken.)
7              (Exhibit 10 was marked.)
8         Q.  (BY MS. GRANT)  Ms. Lane, I'm handing you
9    what's now been marked as Exhibit 10.
10             Have you seen Exhibit 10 before?
11        A.  Yes.
12        Q.  What is Exhibit 10?
13        A.  "Contents of a HR Investigation Report Safecall
14   Report SIE 03/17."
15        Q.  And is Exhibit 10 a final report from Ms. Davis
16   outlining her conclusions and her investigation?
17        A.  Yes, that's what it has on there.
18        Q.  And were you ever given a copy of this report?
19        A.  No.
20        Q.  Were you aware that she issued a final report?
21        A.  It was -- no.
22        Q.  I want to go to --
23             MR. BAIL:  Can we go off the record?
24             MS. GRANT:  Yes.
25             (A recess was taken.)

Page 118

1         Q.  (BY MS. GRANT)  Ms. Lane, we're back on the
2    record.  You understand we're still under oath here
3    today?
4         A.  Yes.
5         Q.  When we took a break, we were discussing
6    Ms. Davis' final report from her investigation, which is
7    Exhibit 10.
8              Am I correct that you testified that you
9    had not seen Exhibit 10 before?
10        A.  No.
11        Q.  But did you understand that Ms. Davis concluded
12   that your concerns about unfair treatment, being
13   targeted or being harassed were not substantiated?
14        A.  Right.
15        Q.  As far as you know, are you aware of any
16   personal connection between Ms. Davis and Ms. King?
17        A.  No.
18        Q.  Are you aware of any connection between
19   Ms. Davis and Mr. Shipley?
20        A.  No.
21        Q.  And what about Ms. Davis and Mr. Piatt?  So is
22   there any evidence or are you aware of any evidence that
23   would lead to a belief that Ms. Davis had any sort of
24   bias towards any of these three individuals?
25        A.  No.  Other than the fact these were -- these

Page 119

1    were managers.  Other than my permanent belief, I don't
2    have any evidence.
3         Q.  Even though you didn't see Exhibit 10, did
4    Ms. Davis relay the findings or her conclusion to you?
5         A.  This year, no, I have never seen this.  I
6    didn't see the report until I got back -- until I was
7    returned from medical leave.
8         Q.  So I want to break that up.  So you did see
9    Exhibit 10, but you didn't see it until May 2017?
10        A.  No.  This is the conclusion, correct?
11        Q.  Yes.
12        A.  No.  The report is what I saw, the one that we
13   saw, Exhibit 6.
14        Q.  So the outline of your --
15        A.  7.
16        Q.  Oh.  So you were given, when you returned, a
17   copy of her notes?
18        A.  This is all I received.
19        Q.  Okay.  Thank you.
20             And then --
21        A.  I have never seen this.
22        Q.  But you were aware that Ms. Davis concluded
23   your claims were not substantiated, correct?
24        A.  So you are saying -- what do you mean by that?
25        Q.  I had asked you earlier Ms. Davis' conclusion

Page 120

1    was that your claims were not substantiated.  And you
2    said you were aware of that conclusion.
3         A.  Okay.
4         Q.  How did you become aware of that conclusion?
5         A.  So you are saying not substantiated?  No.  The
6    only thing I knew -- it was my belief this was the final
7    report.
8         Q.  Okay.
9         A.  Exhibit 7.
10        Q.  Okay.
11        A.  I never knew that there was anything other
12   than --
13        Q.  I'm not talking about the existence of
14   Exhibit 10.  I'm talking about her ultimate conclusion
15   that your complaints were not substantiated.
16        A.  No, I didn't know that was her conclusion.
17        Q.  Thank you.
18             Is it your contention that Ms. Davis took
19   any actions to discriminate against you?
20        A.  Ms. Davis?  I think it was more for
21   retaliation -- I mean, Ms. Davis?
22        Q.  Yes.
23        A.  No.
24        Q.  So you are not forming any claims today in this
25   lawsuit based on Ms. Davis' actions?

HARRIET MARIE LANE - 11/20/2019

Page 121

1      A. No.
2      Q. So your claims are not based upon the
3  conclusions of Ms. Davis' investigation?
4      A. So mine are for discrimination race, gender and
5  then also retaliation.
6      Q. I understand that, but not based on anything
7  Ms. Davis did or did not do?
8      A. Well, some of the information in that report,
9  this one here, Exhibit 7. Okay? I believe that was
10  used to -- as retaliation, yes.
11      Q. So you believe Ms. Davis' conclusions were in
12  retaliation against you?
13      A. Right. So going back to what I said, that when
14  I had the conversation with her, it was more
15  confrontational and attacking. So, yes.
16      Q. And you believe she was acting that way in
17  retaliation?
18      A. Yes.
19      Q. In retaliation for what?
20      A. So me filing the complaint with the Safecall
21  and then also those complaints that was filed to Linda,
22  yes.
23      Q. And did you discuss with Ms. Davis your
24  previous complaints to Linda Hubbard?
25      A. Yes.

Page 122

1      Q. And on what basis do you believe Ms. Davis was
2  confrontational toward you in your meeting in order to
3  retaliate against you?
4      A. Going back to I filed a complaint.
5      Q. On what basis why do you believe she did that
6  in order to retaliate against you?
7      A. I'm not sure what her personal belief was or
8  her personal reason.
9      Q. But your personal belief was she acted that way
10  in order to retaliate against you?
11      A. Yes.
12      Q. Other than being confrontational towards you in
13  that meeting and already making up her mind as far as
14  investigation, did Ms. Davis undertake any other actions
15  that you believe were retaliation against you?
16      A. No.
17      Q. Did you have any other contact with Ms. Davis
18  after her investigation?
19      A. Right. Yes. So we had a call.
20      Q. And what did you discuss during that call?
21      A. She was going to provide a report, which I
22  never received.
23      Q. Is that a call separate from that conversation
24  in Exhibit 7?
25      A. Yes.

Page 123

1      Q. Was that before or after Exhibit 7?
2      A. This happened on 2/8. This was after, the call
3  was after.
4      Q. And you had mentioned that after this
5  investigation you were then informed that you were being
6  placed on a PIP?
7      A. Yes, Performance Improvement Plan, when I
8  returned from FMLA, medical leave.
9          (Exhibit 11 was marked.)
10      Q. (BY MS. GRANT) I'm handing you what's been
11  marked as Exhibit 11.
12      A. Do I keep Exhibit 10 out?
13      Q. We are done with Exhibit 10.
14          And Exhibit 11 is dated February 13, 2017,
15  and it's a memo to you from Ms. Davis.
16          Do you recognize Exhibit 11?
17      A. Yes.
18      Q. And just turn real quick to the back page.
19  There it says here "Acknowledgment of receiving this
20  letter," said you refused to sign, but below that is a
21  note and a signature.
22          Is that your handwriting?
23      A. This note, yes.
24      Q. Not your signature?
25      A. This is a different document, because the one

Page 124

1  that I had was circled. The one that I made comments on
2  was circled. The date is circled on here.
3          MR. BAIL: Where? Where?
4          THE WITNESS: I had circled down here.
5  And this is not the same one.
6          Mr. BAIL: You had circled this?
7          THE WITNESS: Yes.
8          (Exhibit 12 was marked.)
9      Q. (BY MS. GRANT) I'll hand you what's been
10  marked as Exhibit 12. Is Exhibit 12 the document that
11  you are referring when you talk about the PIP?
12      A. Yes.
13      Q. And so you received this on May 22, 2017?
14      A. This here?
15      Q. Yes.
16      A. I'm not sure of the date because here it says
17  "5/24," and I'm not sure of the date. And again, they
18  took the dates off that were there at the very bottom
19  where I had circled.
20          MS. GRANT: It appears my --
21      A. This is a control document, so it's going to
22  have a control number at the bottom.
23      Q. (BY MS. GRANT) Is it your contention that
24  Ms. Davis had any role in the decision to place you on a
25  PIP?

HARRIET MARIE LANE - 11/20/2019

Page 125

1      A.  Yes.
2      Q.  And do you believe that Ms. Davis placed you on
3  a PIP in order to discriminate against you?
4      A.  Yes.
5      Q.  Based on what status?
6      A.  Me filing the complaints.
7      Q.  In retaliation against you?
8      A.  Yes, ma'am.
9      Q.  Who placed you -- you said you had a call with
10  her where you were informed of being placed on a PIP?
11      A.  No.  I didn't say that.  You asked me about did
12  I have any other calls or any other interaction with her
13  after Exhibit 7, which is dated 2/8/2017.
14      Q.  And you said you were placed on a PIP
15  thereafter?
16      A.  So what I said is, yes, we had interactions
17  after 2/8 which was a call.  So I didn't get the PIP or
18  become -- and become aware of the PIP until I came back
19  from maternity leave.  I did not have a call with her
20  during that time, which was in May of 2017.
21      Q.  So when was the last call you had with
22  Ms. Davis?
23      A.  So that was in February, maybe a couple of days
24  after Exhibit 7.  I can't remember the exact date, but
25  that's on the recording as far as the exact date.

Page 126

1      Q.  So you recorded that phone call, as well?
2      A.  Yes.
3      Q.  Could that have been February 13, 2017?
4      A.  No.
5      Q.  Was it much later after that?
6      A.  I'm not sure of the date.
7      Q.  And what did you discuss in that call with
8  Ms. Davis?
9      A.  She was talking about that she was going to put
10  a report together and that I would receive a copy of
11  that report.
12      Q.  So after that call, did you have any other
13  communications with Ms. Davis?
14      A.  No, ma'am.
15      Q.  On what do you base your conclusion that
16  Ms. Davis was involved in the decision to place you on a
17  PIP?
18      A.  Okay.  Because allegations that she made in her
19  report.
20      Q.  Exhibit 7?
21      A.  Yes, Exhibit 7.
22      Q.  Were you ever explicitly told that Ms. Davis
23  was involved in the decision to place you on a PIP?
24      A.  No.
25      Q.  So it's your contention that Ms. Davis in her

Page 127

1  role as a human resources employee retaliated against
2  you for coming to human resources and filing a
3  complaint?
4      A.  Yes, ma'am.
5      Q.  And she did so by placing you on a Performance
6  Improvement Plan?
7      A.  Ms. Davis can't do that.  She just did the
8  investigation.  Her evidence, her investigation is what
9  helped to form the basis of me being put on a PIP,
10  Performance Improvement Plan.
11      Q.  Okay.  That's great clarification.  So
12  Ms. Davis' role is she investigated the complaint, came
13  to the conclusion, put together Exhibit 7, and as a
14  result of that, you were then placed on a PIP?
15      A.  Some of the information, yes, was used, I
16  believe, to put me on the PIP.
17      Q.  You say that belief is your personal belief?
18      A.  Uh-huh.
19      Q.  Do you have any other belief --
20      A.  Let me go through here.  I mean, they put
21  evidence in here.  So it says -- so they had information
22  on here that I remember seeing.  This is the PIP?
23      Q.  Yes.
24      A.  Okay.  So, yeah, I believe that, like I said,
25  because I filed the complaint with Safecall, also with

Page 128

1  Linda, that was all -- and, you know, her making these
2  comments in here, that was just information used to put
3  me on the PIP.
4      Q.  Do you know who ultimately made the decision to
5  place you on a PIP?
6      A.  No, I don't.
7      Q.  Going back to Ms. Davis, other than her
8  investigation conclusions being used in your PIP, are
9  you asserting any other actions that she took in order
10  to retaliate against you?
11      A.  No.
12      Q.  Did you ever hear Ms. Davis make any comments
13  about your gender or your race?
14      A.  No.
15      Q.  Did Ms. Davis ever make any statements, any
16  negative statements about the fact that you filed a
17  hotline complaint?
18      A.  Negative?  Not that I can recall.
19      Q.  Other than her investigation and the fact that
20  I know her investigation conclusions were used in the
21  PIP, is there any other knowledge that Ms. Davis may
22  have regarding your claims here today?
23      A.  Not that I'm aware of.
24      Q.  If you go back to -- you have it set out here,
25  Exhibit 5 where we're listing people who have knowledge,

32  (Pages 125 to 128)

HARRIET MARIE LANE - 11/20/2019

Page 129

1    we discussed Ms. Davis. It's on page 8.
2        A. Yes.
3        Q. So turn to the next page. We have got --
4    Patrik Hols is the next person we have listed.
5        A. Okay.
6        Q. Who is Patrik Hols?
7        A. He's the former director of finance.
8        Q. And he's the German we discussed earlier?
9        A. German? Yeah.
10       Q. To your knowledge, is he currently employed by
11   Siemens?
12       A. I'm not aware.
13       Q. When was the last time you talked to Mr. Hols?
14       A. I mean, last time we had any interaction was
15   when I was working at Siemens. That was back in 2017.
16       Q. What was Mr. Hols's position?
17       A. He was over the finance department.
18       Q. So he was your supervisor?
19       A. When?
20       Q. Was Mr. Hols your supervisor?
21       A. At one time he was but my interim supervisor
22   after my supervisor Ayana Browne left.
23       Q. In 2016?
24       A. Yes.
25       Q. Before Ms. King?

Page 130

1        A. Yes.
2        Q. Then afterwards was he still your supervisor,
3    or what was his position once Ms. King came to be
4    employed?
5        A. He wasn't my supervisor.
6        Q. How was your relationship with Mr. Hols?
7        A. I believe it was -- we didn't have much
8    interaction, but I think it was a good relationship.
9        Q. Did Mr. Hols ever make any statements regarding
10   your race or your gender?
11       A. No.
12       Q. Are you contending that Mr. Hols took any
13   action to discriminate against you because of your
14   gender?
15       A. No.
16       Q. Is it your contention that Mr. Hols took any
17   action to discriminate against you because of your race?
18       A. No.
19       Q. Is it your contention that Mr. Hols took any
20   actions in order to retaliate against you because of any
21   complaints you made?
22       A. No.
23       Q. Are you forming any basis of your lawsuit here
24   at all on any actions by Mr. Hols?
25       A. No.

Page 131

1        Q. As far as you know, did Mr. Hols have any
2    personal knowledge or involvement in the decision to
3    place you on a PIP?
4        A. Yes. It looks like his name is on there, from
5    Hols, Patrik Hols.
6        Q. Other than his name being on there, do you have
7    any knowledge that he was involved in placing you on a
8    PIP?
9        A. No.
10       Q. Do you know whether or not Mr. Hols had any
11   involvement with respect to your termination?
12       A. No, I don't know that.
13       So was it a layoff or a termination? It's
14   the same?
15       Q. I'm sorry? Was it a layoff or termination?
16       A. Layoff.
17       Q. It is your understanding your employment ended
18   as a layoff?
19       A. Right. Because I know you have been saying
20   "termination," but I didn't know if that was the same or
21   what.
22       Q. I appreciate the word sometimes will be used --
23   just similar terms we see a lot.
24       As far as you know, did Mr. Hols witness
25   any acts of discrimination or retaliation against you?

Page 132

1        A. Not that I recall.
2        Q. And I think I asked this, but I apologize. So
3    you are not basing any claims here based on Mr. Hols's
4    actions?
5        A. No.
6        Q. Is there any personal knowledge that you
7    believe Mr. Hols may have that would be relevant to your
8    claims?
9        A. Personal knowledge? Not that I'm aware of.
10       Q. Below Mr. Hols is Toni Horton.
11       A. Okay.
12       Q. Who is Toni Horton?
13       A. She was HR at the time I was working there for
14   Siemens.
15       Q. And is Toni a male or female?
16       A. She is a female.
17       Q. Okay.
18       A. And I don't know her race. I don't know if
19   she's Caucasian or African-American. So race is
20   unknown.
21       Q. And you said she was your HR representative at
22   Siemens?
23       A. Yes.
24       Q. Was she your HR representative for the entirety
25   of your employment at Siemens?

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 133

1    A. No.
2    Q. From what period was she your HR,
3  approximately?
4    A. When I came back from FMLA and up until the
5  time I left. When I came back in May, May of 2017 up
6  until the time I left in October of 2017.
7    Q. How was your relationship with Ms. Horton?
8    A. It was okay.
9    Q. Did Ms. Horton ever make any comments regarding
10  your gender or your race?
11    A. She's made comments about -- I know she's a
12  minority. She did say that. She said, "We're both
13  minorities" because I have made several complaints to her,
14  several complaints to her in the past. So...
15    Q. And let's go through, what complaints did you
16  make to Ms. Horton?
17    A. I can't remember. Those are all emails. I
18  can't remember. It was more about the same things that
19  were continuing to happen as far as the way the -- Bill
20  was treating me, that I was being targeted, that I was
21  getting differential treatment, that it was retaliation,
22  that there was discrimination because of my race and
23  gender. So...
24        (Exhibit 13 was marked.)
25    Q. (BY MS. GRANT) I'm handing you what's been

Page 134

1  marked as Exhibit 13. Exhibit 13 are notes at the top
2  it says with HR Toni Horton and you.
3        Have you seen Exhibit 13 before?
4    A. I believe so, yes.
5    Q. And according to this, you had a meeting with
6  Ms. Horton on July 21. Does that refresh your
7  recollection with respect to any meetings or complaints
8  you made with Ms. Horton?
9    A. Okay. Yes.
10    Q. And during this meeting what was -- does
11  Exhibit 13 accurately reflect the complaints you made to
12  Ms. Horton?
13    A. Okay. Let me read this.
14        Okay. I read that. Okay.
15    Q. Does Exhibit 13 reflect -- accurately reflect
16  some complaints you made to Ms. Horton?
17    A. Yes, some of the complaints, yes.
18    Q. And according to this, you raised complaints
19  about Kim Long, correct?
20    A. Yes.
21    Q. And Bill Piatt?
22    A. Yes.
23    Q. Donna Wilson?
24    A. Right.
25    Q. First, let's start with Kim Long. What was the

Page 135

1  basis of your complaints to Ms. Horton at this time?
2    A. Just pretty much what it says there.
3    Q. And are you basing your allegations in this
4  lawsuit about your complaints with Kim Long here?
5    A. This is just a summary of the continued
6  harassment that I was undergoing. These are some of
7  the -- these are some of the examples.
8    Q. So do you contend Ms. Long harassed you because
9  of your race?
10    A. No. You asked me that earlier. No, I'm not
11  saying that. I don't know why she was harassing me that
12  day.
13    Q. But you don't believe it was because of your
14  race or gender?
15    A. No, I wouldn't say that.
16    Q. With respect to Bill Piatt, here you state,
17  "Several employees have noticed and one employee came to
18  me stating, 'He is bullying you and setting you up for
19  hostile work environment.'"
20        Who made that statement to you?
21    A. I can't recall.
22    Q. And with respect to here you also complain he's
23  requiring you to do audits a certain way, what was this
24  new way that Mr. Piatt was requiring you to do audits?
25    A. We talked about that a little bit earlier.

Page 136

1  Once I do the audit, he wants me -- he wants a survey
2  done about my performance, customer satisfaction survey.
3        He also in the past he wanted me to
4  use -- I have never used a checklist. He wanted me to
5  start using a checklist and send the questions to the
6  auditors in advance of the audit taking place. Just a
7  whole revamp of the process that wasn't documented, and
8  it was varying from the actual documented procedure for
9  internal audit.
10    Q. So was that the basis of your complaints to
11  Ms. Horton?
12    A. For this situation here?
13    Q. Yes.
14    A. That's what I was telling her that he was
15  trying to bully me into doing things his way.
16    Q. And do you believe he was trying to bully you
17  in order to discriminate against you because of your
18  race?
19    A. Yes.
20    Q. And on what do you base that?
21    A. His actions because he wasn't doing this to
22  anyone else. It was just me.
23    Q. Were there any other auditors at the time?
24    A. Yeah. We talked about Melissa Shovelski,
25  Kimberly Long, Kathy DeGeorge. Those are all white

HARRIET MARIE LANE - 11/20/2019

Page 137

1    females.
2         Q.   And do you have any personal knowledge that he
3    did not require this checklist and this customer
4    satisfaction survey?
5         A.   Yes.
6         Q.   Did he tell you that they weren't required to
7    do that?
8         A.   No, they didn't tell me that.  But they weren't
9    using it.  I was.
10        Q.   How do you know they weren't using it?
11        A.   Because I would be a part of the audit process.
12   Sometimes I would be the team leader or -- not
13   sometimes.  I was the lead auditor.
14        Q.   And so these other employees were not lead
15   auditors?
16        A.   No.
17        Q.   And they were doing other duties in addition to
18   the auditing duties, correct?
19        A.   Yes.
20        Q.   Was there anyone else who was acting as lead
21   auditor at this time?
22        A.   Not that I can recall at that location.
23   Remember, Siemens is a global company.  So at that
24   location, not that I can recall at the moment.
25        Q.   Were there any other lead auditors that

Page 138

1    reported to Mr. Piatt?
2         A.   Not that I recall.
3         Q.   And do you believe he made you do this new
4    process and do things his way in order to retaliate
5    against you?
6         A.   Yes.
7         Q.   Do you have any evidence that Mr. Piatt was
8    aware of your complaints to Linda Hubbard about him?
9         A.   Remember that meeting that we had, because this
10   was after I came back in May.  So he was aware of that
11   because of the meeting that we had.
12        Q.   And he was -- was he aware of your filing a
13   complaint to Ms. Davis?
14        A.   I believe so, yes.
15        Q.   And why do you believe that he was aware of
16   that complaint?
17        A.   Because in the Performance Improvement Plan it
18   talks about it there.  So when we were having the
19   meeting, this was being shown during that meeting.
20        Q.   And Mr. Piatt was at that meeting?
21        A.   Yes.
22        Q.   Who else was at that meeting?
23        A.   So you had Patrik Hols, you had Donna Wilson,
24   you had Linda Hubbard, Mark Shipley.
25        Q.   And being placed on that Performance

Page 139

1    Improvement Plan, did that have any effect on your pay?
2         A.   No.
3         Q.   Did it have any effect on your duties or
4    responsibilities?
5         A.   Yeah.  They took a lot of my responsibilities
6    away.
7         Q.   As a result of being placed on the PIP?
8         A.   I'm not sure if that was the reason.
9         Q.   But you were just saying that you learned of
10   the two around the same time?
11        A.   Yes.
12        Q.   How long were you on a Performance Improvement
13   Plan?
14        A.   From the time I came in in May.  I want to say
15   I went off of that September, August.  You might have
16   the document with you.
17        Q.   I do.  Good call.
18             Here's Exhibit 14.  Exhibit 14, you
19   recognize this?
20        A.   Yes.  Let's see here.
21        Q.   Wait.  Let's take that back.  I gave you the
22   wrong document.  Here we go.  This is Exhibit 14.
23             (Exhibit 14 was marked.)
24             Is this the document notifying you that
25   you were being placed -- taken off of a Performance

Page 140

1    Improvement Plan?
2         A.   Yes.
3         Q.   And you were taken off on September 12, 2017,
4    correct?
5         A.   Yes.
6         Q.   And who made the decision to take you off of
7    the Performance Improvement Plan?
8         A.   I'm not sure.  I know that Linda -- not Linda,
9    Toni Horton and Donna Wilson were in the meeting.
10        Q.   And did they tell you why you were taken off
11   the Performance Improvement Plan?
12        A.   This is what I received here.  Exhibit 14 is
13   all the information in there.  They didn't go into any
14   details that I can recall.
15        Q.   Did you believe this was a justifiable, good
16   decision?
17        A.   What did I say here?  Did I make a comment?
18             MR. BAIL:  Can I talk to my client one
19   second?
20             MS. GRANT:  Can we wait until she answers
21   the question?
22             MR. BAIL:  Sure.  You can finish the whole
23   line of questioning.  Whenever you have the opportunity.
24        Q.   (BY MS. GRANT)  Were you happy with being taken
25   off of the Performance Improvement Plan?

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 141

1      A. Was I okay with being taken off? I was okay
2  with it, yes.
3      Q. What negative effects did the Performance
4  Improvement Plan have on you? I don't mean physical or
5  emotional. I mean with respect to your employment.
6          Did it affect any terms or conditions of
7  your employment?
8      A. I don't know. Remember just a month later I
9  was laid off. So I don't know. But this did go in my
10  record.
11     Q. The Performance Improvement Plan and the fact
12  that you were removed off of it?
13     A. Yes. All that's in my employment history.
14     Q. But you are not aware of -- you have no
15  personal knowledge of any specific negative effects on
16  your terms or conditions of employment that the PIP had?
17     A. No.
18         MS. GRANT: We can take a quick break.
19         MR. BAIL: Just a couple minutes.
20         (A recess was taken.)
21     Q. (BY MS. GRANT) Ms. Lane, you understand you're
22  still under oath?
23     A. Yes.
24     Q. When we were last discussing, we were going
25  over your Performance Improvement Plan. And, also, we

Page 142

1  were talking about Ms. Toni Horton, correct?
2      A. Yes.
3      Q. Exhibit 13 was one example of notes of a
4  complaint you made to Ms. Toni Horton. Approximately
5  how many times did you make complaints to Ms. Horton?
6      A. This is a summary of some but I made more. Not
7  all of them were documented.
8          MR. BAIL: Approximately how many?
9          THE WITNESS: Let me see how many are here
10  so I can add to it. Maybe about five, six, something
11  like that.
12     Q. (BY MS. GRANT) And did you specifically
13  complain to Ms. Horton that you believed actions were
14  being taken against you because of your race?
15     A. Yes.
16     Q. And did you complain to her that you felt you
17  were being discriminated against because of your gender?
18     A. Yes.
19     Q. And did you complain to her that you felt you
20  were being harassed because of your race and gender?
21     A. Yes.
22     Q. And did you complain to Ms. Horton that you
23  believed you were being retaliated against?
24     A. Yes.
25     Q. And what did Ms. Horton do in response to your

Page 143

1  complaints?
2      A. Nothing. She said she was going to
3  investigate, follow up, things like that. She just took
4  my information, but there was never any investigations.
5  That I'm aware of.
6      Q. Other than Exhibit 13, were there other
7  instances of complaints you made to Ms. Horton?
8      A. Yes. We had conversations, yes. And you have
9  those recordings as well, all the conversations we had.
10     Q. And was Ms. Horton aware that you were
11  recording her?
12     A. No.
13     Q. Did these recordings of Ms. Horton take place
14  on the Siemens premises?
15     A. Yes.
16     Q. So your recordings would be an accurate
17  reflection of the complaints you made to Ms. Horton
18  during your employment?
19     A. Yes.
20     Q. Did you record all of your complaints with
21  Ms. Horton?
22     A. Any conversations with her, I believe I did.
23     Q. But as far as documented emails, those would be
24  the place for any written complaints you made?
25     A. Right.

Page 144

1          (Exhibit 15 was marked.)
2      Q. (BY MS. GRANT) I'm handing you
3  Exhibit 14 -- wait, we're on 15. Excuse me. Exhibit 15
4  are -- have you seen Exhibit 15 before?
5      A. Yes.
6      Q. When did you see Exhibit 15?
7      A. This was part of the evidence that you guys
8  presented.
9      Q. Did you review Exhibit 15 prior to -- or in
10  preparation for your deposition here today?
11     A. Yes.
12     Q. And did Exhibit 15 accurately -- Exhibit 15
13  reflects communications you had with Ms. Horton on
14  August 8, 2017, correct?
15     A. Okay. Let me look here. So what is this down
16  here? This is some retyping of the conversation?
17     Q. It appears here it was a retyping of her email,
18  an email that you had complained about from Ms. Wilson?
19     A. Since I can't see the whole email, since I
20  don't see the emails that I actually sent to her, then
21  it is hard for me to say if this is accurate or not.
22     Q. Okay. But do you recall making a complaint to
23  Ms. Horton on or around August 8?
24     A. Yes.
25     Q. And do you recall who you complained about or

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 145

1  the basis of your complaints on this occasion?
2       A. So I'm sure it was more about some of the
3  people like you saw some in there about Donna.  You saw
4  some in there about Bill.  So those people or
5  individuals.
6       Q. And so if I look here at Exhibit 15, the first
7  person, as you said, was Donna Wilson, correct?
8       A. Yes.
9       Q. And what were your complaints about Donna
10 Wilson?
11      A. So the name calling was from her.
12      Q. And what name calling?
13      A. She was calling me silly.  You saw that on
14 Exhibit 13.
15      Q. And you contend that Ms. Wilson's comment to
16 you calling you silly -- do you contend that was because
17 of your race or your gender?
18      A. No, I don't think it has -- well, maybe my
19 race, yes.
20      Q. And on what do you base the calling you silly
21 was because of your race?
22      A. Why was she calling me silly?  I mean, I don't
23 know that she called anyone else silly.
24      Q. How many times did she call you silly?
25      A. That I can recall, that one time.

Page 146

1       Q. In what context did Ms. Wilson call you silly?
2       A. We were in her office, we were talking and she
3  said -- she made the comment.  I can't remember exactly
4  what we were talking about.
5       Q. And then she said you are being silly?
6       A. Uh-huh.  It wasn't anything that we were joking
7  about or anything like that.  And I know it had
8  something to do with -- yeah, we weren't joking.  It
9  wasn't like we were having fun.
10      Q. Did Ms. Wilson call you any other names that
11 you took offense to?
12      A. No.
13      Q. And did you complain to Ms. Horton about
14 anything else that Ms. Wilson did?
15      A. Not that I can recall right now.
16      Q. You said you also complained about Bill Piatt,
17 which is in both 13 and 15, correct?
18      A. Yes.
19      Q. And what were your complaints to Ms. Horton
20 about Mr. Piatt?
21      A. Again, just the differential treatment, things
22 that he was doing, the singling me out.
23      Q. Is it the items that we have already discussed
24 here today?
25      A. Yes.

Page 147

1       Q. And did you tell Ms. Horton you believed these
2  were being done because of your race?
3       A. Yes.
4       Q. And did you complain that you believed
5  Mr. Piatt's actions were done because of your gender?
6       A. Yes.
7       Q. And did you complain to Ms. Horton that the
8  actions of Mr. Piatt that we have discussed already were
9  in retaliation against you?
10      A. Yes.
11      Q. Is there anyone else that you complained to
12 Ms. Horton about?
13      A. I talked about Linda.
14      Q. Linda Hubbard?
15      A. Uh-huh.  I believe that's in one of the emails
16 there.
17      Q. And what complaints did you raise to Ms. Horton
18 regarding Ms. Hubbard?
19      A. Okay.  Says here -- okay.  I think it was more
20 about my -- that she was discriminating about me being
21 on FMLA after I came back from FMLA.
22      Q. And on what basis do you believe Ms. Hubbard
23 was retaliating against you, meaning how was she
24 retaliating against you?
25      A. She was retaliating against me because when I

Page 148

1  had -- just giving me inaccurate information in regards
2  to -- just trying to be confrontational and
3  argumentative and trying to provoke me.
4       Q. And how was she being argumentative and
5  confrontational and trying to provoke you?
6       A. When I would ask her questions about the
7  difference between what I had received from corporate HR
8  in regards to my time or balance for FMLA and then what
9  she was telling me, there was a variation there.  So I
10 was trying to get clarification on it and things of that
11 nature.  So she was just trying to provoke me,
12 especially because it was a sensitive subject and a
13 sensitive -- yeah.
14      Q. And you believe that she was acting
15 confrontational and trying to provoke you in retaliation
16 for taking FMLA leave before?
17      A. Or retaliation for filing these complaints.
18      Q. Okay.
19      A. Remember, the retaliation is the basis of the
20 Safecall, the calls that I made to her, and then all
21 other claims that I have made.
22      Q. Are you raising any complaints or allegations
23 that you were retaliated against for taking your FMLA
24 leave?
25      A. Yes.

37 (Pages 145 to 148)

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 149

1    Q.  And do you believe Ms. Hubbard took any actions
2  to retaliate against you because of FMLA?
3    A.  So FMLA, I believe so.  She was part of the
4  PIP, too, decision.
5    Q.  And so you had said you complained to
6  Ms. Horton about Ms. Hubbard and her retaliation for
7  FMLA leave.
8    A.  Uh-huh.
9    Q.  So what did you believe Ms. Hubbard was doing
10 in retaliation for you taking FMLA?
11   A.  So the variation -- so when corporate told
12 me something about -- gave me my balance for the days
13 that I had, it was different from what Ms. Hubbard had
14 stated.
15   Q.  And so you believe she was giving you incorrect
16 information as a way to retaliate against you for taking
17 FMLA leave?
18   A.  For FMLA and for the complaints as well.
19   Q.  We have discussed the retaliation complaints.
20 I guess do you contend that you were placed on the PIP
21 in retaliation for raising the complaints?
22   A.  Yes.
23   Q.  And we've discussed that already.
24       Do you believe you were placed on the PIP
25 in retaliation for taking the FMLA leave?

Page 150

1    A.  I believe so, too.
2    Q.  On what do you form that -- what evidence do
3  you have to support your conclusion that you were
4  retaliated against for your FMLA leave?
5    A.  Okay.  So if we look at some of the claims here
6  in this report, we're talking about Exhibit 12, the PIP,
7  or Performance Improvement Plan.  None of this
8  information was communicated to me until after I came
9  back from FMLA.  So I never knew about a PIP, was never
10 put on a PIP, was never reprimanded or anything until
11 after I came back.  So Linda's name is on here.  Donna
12 Wilson's name is on here.  So that tells me that Linda
13 had something to do with this.  And then it also
14 mentions even on the PIP about Safecall and the
15 conversations with Patti.
16   Q.  And so -- but we're talking about your FMLA
17 leave, not the Safecall.
18       So other than the fact that you received
19 the PIP after you came back from FMLA leave, what other
20 evidence do you have that you were placed on the PIP in
21 retaliation for the Safecall --
22   A.  My personal belief --
23   Q.  -- the FMLA?
24   A.  -- and then me getting the PIP after I came
25 back from maternity -- from medical leave.

Page 151

1    Q.  Thank you.
2       And you complained about that retaliation
3  to Ms. Horton?
4    A.  Yes.
5    Q.  And you also complained to Ms. Horton that
6  Ms. Hubbard was retaliating against you for FMLA leave
7  by giving you inaccurate information?
8    A.  I didn't say giving me inaccurate information.
9  Just the treatment overall.
10   Q.  The confrontational --
11   A.  Yes.
12   Q.  And on what do you base your conclusion that
13 Ms. Hubbard was acting confrontational towards you in
14 order to retaliate against you for taking FMLA?
15   A.  What evidence?  I mean, just the communication.
16 We had a conversation.
17   Q.  Because it was about FMLA leave?
18   A.  Yes.
19   Q.  Other than the fact that that was the subject
20 matter of your conversation and your personal belief, do
21 you have any other evidence that she was confrontational
22 to you because you had taken FMLA leave before?
23   A.  No, not that I recall.
24   Q.  And you had taken FMLA leave from February to
25 May 2017, correct?

Page 152

1    A.  Yes.
2    Q.  But you had mentioned you requested it later?
3    A.  I was getting information about it later, yes.
4    Q.  Are you contending you were retaliated against
5  for actually taking it February to May or requesting
6  more information later?
7    A.  That I had taken it.
8    Q.  Okay.  I just wanted to make clear because you
9  have got two FMLA situations.
10       What was Ms. Horton's response to your
11 complaints regarding Ms. Hubbard?
12   A.  That she's going to investigate.  That's what
13 she would always tell me.
14   Q.  And do you contend that she never investigated
15 your claims?
16   A.  I never received a report.  I never received
17 any type of report.
18   Q.  Do you have any personal knowledge about any
19 conclusions Ms. Horton came to regarding your
20 allegations?
21   A.  No.
22   Q.  And if Ms. Horton concluded that your
23 complaints couldn't be substantiated, were you aware
24 that she ever reached that conclusion?
25   A.  No.

38  (Pages 149 to 152)

HARRIET MARIE LANE - 11/20/2019

Page 153

1   Q.  Did Ms. Horton ever relay to you that your
2   complaints or beliefs were substantiated?
3       A.  No, not that I recall.
4           (Exhibit 16 was marked.)
5       Q.  (BY MS. GRANT)  I'm handing you what's been
6   marked as Exhibit 16.  Do you recognize Exhibit 16?
7       A.  The information.  Is this information from an
8   email?
9       Q.  These are Toni Horton's notes regarding a
10  meeting.
11      A.  Okay.  So this is the evidence that you-all
12  provided.
13      Q.  And do you recall meeting with Toni Horton on
14  August 15, 2017?
15      A.  Yes, that sounds about right.
16      Q.  And here it states you were providing
17  additional complaints to her?
18      A.  Okay.
19      Q.  Is that correct?
20      A.  Uh-huh.  Yes.
21      Q.  And in here you state that you felt you were
22  being discriminated against on the basis of your
23  ethnicity?
24      A.  Yes.
25      Q.  You made a comment about the client surveys

Page 154

1   that we have discussed before?
2       A.  Yes.  The customer satisfaction.  But in here
3   it says "client" but it's the same.
4       Q.  In here you also raise a complaint about your
5   badge being canceled?
6       A.  Yes.
7       Q.  And do you recall making that complaint to
8   Ms. Horton?
9       A.  Yes.
10      Q.  Is that the email issue we discussed earlier,
11  or is that a separate one?
12      A.  Okay.  So this is talking about when the
13  receptionist told me Bill asked her to deactivate my
14  badge when I was on -- and that I was not coming back,
15  but I was on FMLA.
16      Q.  To your knowledge, was your badge canceled?
17      A.  Yes.
18      Q.  And how do you know your badge was canceled?
19      A.  So I couldn't use it when I came back from
20  FMLA.
21      Q.  Was that issue ultimately fixed and was your
22  badge allowed to be used?
23      A.  Yes.  So they had to reactivate the badge.
24      Q.  How long did that take?
25      A.  I'm not sure.  Maybe the same day, something

Page 155

1   like that.  I'm not sure.
2       Q.  And it says this is not typical for someone on
3   leave?
4       A.  Yes.
5       Q.  Do you contend your badge was canceled in order
6   to discriminate against you because of your race or your
7   sex?
8       A.  Right, and the retaliation, yes.
9       Q.  Do you contend this was retaliation for your
10  complaints about Mr. Piatt?
11      A.  Right.
12      Q.  And do you contend your badge was canceled in
13  order to retaliate against you because of your complaint
14  to Ms. Davis, the hotline complaint?
15      A.  Yes.
16      Q.  And do you contend that your badge was canceled
17  to retaliate against you for taking leave?
18      A.  Yes.
19      Q.  What evidence do you have that your badge was
20  canceled because of your race or your gender?
21      A.  It didn't happen until I came back from leave.
22  Prior to then, it wasn't -- it was working fine.
23      Q.  Any other evidence that you support -- that you
24  contend supports your contention your badge was canceled
25  to discriminate against you because of your gender or

Page 156

1   race?
2       A.  No.
3       Q.  What evidence do you have that your badge was
4   canceled in retaliation for your complaints to Ms. Davis
5   and Ms. Hubbard?
6       A.  So it didn't happen until after the return of
7   the FMLA.
8       Q.  Any other evidence?
9       A.  No.
10      Q.  And any -- other than the fact your badge was
11  canceled when you returned from FMLA, do you have any
12  other evidence that your badge was canceled to retaliate
13  against you for taking FMLA leave?
14      A.  No.
15      Q.  If you look at the next bullet point,
16  your complaint -- or backing up, do you know who made
17  the decision to cancel your badge?
18      A.  No.  Well, I do.  The receptionist told me it
19  was Bill Piatt that said cancel my badge.
20      Q.  Based on what the receptionist told you, you
21  believe it was Mr. Piatt?
22      A.  Yes.
23      Q.  The next bullet point, it says the
24  investigation into your claim had already been conducted
25  by the time Kimberly Long was interviewed by Linda

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

### Page 157

1 Hubbard.

2       Q. Do you recall in what context that

3 statement was referencing?

4       A. Okay. I believe this was going back -- "Stated

5 the investigation into her" -- I can't read her mind, so

6 I'm not going guess. I don't know what she was talking

7 about.

8       Q. And I didn't either so I wanted to see if you

9 had any knowledge.

10            The next bullet point is you think the

11 company's manufacturing emails to make them look as if

12 they were coming from you. How many instances did this

13 happen?

14       A. I can't remember exactly, exactly how many

15 instances but it happened.

16       Q. In what instance do you recall when or any

17 specific times that this happened?

18       A. So it was after I came back from FMLA, as far

19 as -- so sometime around that time frame. I can't

20 remember.

21       Q. And what was the email that was sent out

22 claiming to have come from you?

23       A. Whatever was sent here to Ravi. This I can't

24 remember.

25       Q. And so you're saying there was an email sent to

### Page 158

1 Ravi, but you had sent that email to someone else?

2       A. Yes.

3       Q. So the mistake was it going to Ravi?

4       A. I can't remember.

5       Q. Okay. And you believe that there was some sort

6 of scheme between Bill and IT to send out these emails?

7       A. Right.

8       Q. Did this email result in any sort of

9 disciplinary action or other effect on your employment?

10       A. I can't remember at the time.

11       Q. And why did you believe there was some sort of

12 scheme between IT and Bill Piatt to send out these fake

13 or incorrect emails?

14       A. Probably because basically what it's saying.

15 It wasn't coming from me. Looked it was coming from

16 somewhere else. I can't remember on this.

17       Q. Are you -- this email example, is this forming

18 the basis of any claims in this lawsuit?

19       A. No.

20       Q. The next bullet point it talks about taking

21 away your duties. Is that what we have discussed

22 already?

23       A. Yes.

24       Q. And do you have any knowledge about who made

25 the decision to take away your duties?

### Page 159

1       A. Yes. That's what Linda told me. It was Bill

2 and it was Donna.

3       Q. When did she tell you it was Bill and Donna?

4       A. When I came back from FMLA in May of 2016.

5       Q. 2017?

6       A. 2017.

7       Q. Did -- what did Linda tell you with respect to

8 the reasons for why your duties were being taken away?

9       A. She didn't give me a reason.

10       Q. And on what basis do you believe Donna and Bill

11 took away your duties because of your gender or race?

12       A. Okay. On basis I don't have. It's personal

13 belief.

14       Q. And what evidence do you have that they -- or I

15 guess backing up, do you contend that your duties were

16 taken away in retaliation for your complaints to

17 Ms. Hubbard and the hotline complaints?

18       A. Yes.

19       Q. And I believe I have already asked you this,

20 but that's based on your personal belief?

21       A. Right, and the fact that prior to my FMLA, I

22 had -- if you have the senior business process

23 specialist job description, I was responsible for all

24 those duties prior to me going on FMLA. But when I came

25 back, everything was taken away.

### Page 160

1       Q. And you believe those were taken away in

2 retaliation for the complaints to Ms. Hubbard, the

3 complaints to Ms. Davis and the hotline and taking FMLA

4 leave?

5       A. Yes.

6       Q. Other than Exhibits 13, 15 and 16, did you

7 raise any other complaints with Ms. Horton regarding any

8 alleged harassment or discrimination?

9       A. No, other than the recordings that I previously

10 stated that you guys have copies of.

11       Q. Do you recall approximately how many recordings

12 you have of Ms. Horton?

13       A. Oh, okay. Yeah, that's quite a few. I mean,

14 probably more than five.

15       Q. Okay. And those recordings would be the most

16 accurate reflection of your complaints that you made to

17 Ms. Horton during your employment?

18       A. Yes, conversations and such.

19       Q. Are you contending that Ms. Horton took any

20 actions in order to discriminate against you because of

21 your race?

22       A. Ms. Horton, no. She was involved in the -- no,

23 I wouldn't say her.

24       Q. And do you contend that Ms. Horton took any

25 actions to discriminate against you because of your

40  (Pages 157 to 160)

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 161

1  gender?
2      A. No.
3      Q. Is it your contention that Ms. Horton took any
4  actions to retaliate against you because of your
5  complaints to Ms. Hubbard or the hotline?
6      A. No.
7      Q. And do you contend that Ms. Horton took any
8  actions to retaliate against you for taking FMLA leave?
9      A. No.
10     Q. Are you basing any of your lawsuit claims here
11  today on Ms. Horton's actions?
12     A. No.
13     Q. To your knowledge, did Ms. Horton have any role
14  or involvement in the decision to place you on a PIP?
15     A. No. That was prior to her, no.
16     Q. And to your knowledge, did Ms. Horton have any
17  involvement in the decision to lay you off?
18     A. I don't know. I mean, she's just HR. No, I
19  don't think she was part of her decision, no.
20     Q. If there was evidence that Ms. Horton was
21  involved in that decision, would you have any
22  reason -- evidence to refute that?
23     A. No.
24     Q. The next person on Exhibit 5, if we turn the
25  page from Toni Horton -- strike that.

Page 162

1          Real quick, is there any other relevant
2  knowledge Ms. Horton may have about your claims here
3  today?
4      A. That I'm aware of, no.
5      Q. Turning to the next page, this is Linda
6  Hubbard. We have talked about her a bit, but now we'll
7  go more specific.
8          Who is Linda Hubbard?
9      A. She was the HR manager at the time I was there
10  at Siemens.
11     Q. And what is Ms. Hubbard's race?
12     A. She's an African-American female.
13     Q. And she was in human resources, correct?
14     A. Yes.
15     Q. And from what period of time was she in human
16  resources?
17     A. She hired me on. That was November of 2014.
18  And then she was there just shortly after when I came
19  back in May of 2017. And then I don't know -- but she
20  wasn't there when I left in October of 2017. She was
21  still with Siemens but not that location.
22     Q. How was your relationship with Ms. Hubbard?
23     A. It was okay.
24     Q. And we have discussed -- you had discussed
25  earlier you raised some complaints to Linda Hubbard?

Page 163

1      A. Yes.
2      Q. And it's those complaints that form the basis
3  of your retaliation claim?
4      A. Yes.
5      Q. And what complaints did you raise to
6  Ms. Hubbard?
7      A. So those are in the emails from July. I told
8  her how I was being harassed by Bill, Melissa. So I had
9  those conversations with her and also sent emails to
10  her.
11         (Exhibit 17 was marked.)
12     Q. (BY MS. GRANT) I'm handing you what's been
13  marked as Exhibit 17. Exhibit 17 is an email from you
14  to Linda Hubbard dated July 25, 2016.
15         Is this the complaint you referenced that
16  you made to Ms. Hubbard forming the basis of your
17  retaliation complaint?
18     A. This is one of them, yes.
19     Q. Approximately how many emails did you send to
20  Ms. Hubbard, or how many complaints did you make to
21  Ms. Hubbard?
22     A. So there were verbal complaints that I made to
23  her. There were documented complaints. I mean, I
24  complained to several times.
25     Q. And this -- the complaints in Exhibit 17 are

Page 164

1  concerning Bill Piatt?
2      A. Right.
3      Q. Is it Piatt or Piatt?
4      A. Piatt.
5      Q. And so you're complaining here about
6  Mr. Piatt's questioning and comments to you regarding
7  when you were working remotely or coming to your desk,
8  correct?
9      A. Yes.
10     Q. And is it your contention that he was doing the
11  actions documented here in Exhibit 17 because you were
12  female?
13     A. Right.
14     Q. And because of your race?
15     A. Yes.
16     Q. And on what do you base your conclusion that
17  Mr. Piatt was undertaking each of the comments here
18  because of your race or your gender?
19     A. Personal belief. And then also comments from
20  other people saying -- yeah, like I told you, the
21  recordings from Melissa. This was prior to that. But
22  it was obvious that he had some issues with women, and
23  if you are black, more so.
24     Q. Did he undertake any of these other actions,
25  you know, here it says make a comment questioning why

41 (Pages 161 to 164)

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 165

1  you are in the office, asking if you have permission to
2  work from home remotely.  Are you aware of any other
3  times where he did this to any other female employee?
4      A.  No.
5      Q.  Are you aware of him doing such inquiries or
6  making such comments to other employees at all?
7      A.  No.
8      Q.  And what was Ms. Hubbard's response to
9  Exhibit 17?
10      A.  She did no response.
11      Q.  Did Mr. Piatt's behavior ever cease or get
12  better?
13      A.  No.
14      Q.  Did it get worse?
15      A.  It remained pretty much -- like I said, it got
16  worse when I came back from leave, because remember, it
17  started picking up.  He wanted me to do the client
18  surveys.  He became my supervisor.  The same man that I
19  complained about became my supervisor.
20      Q.  When you came back from leave, I thought it was
21  Ms. Wilson that was your supervisor.
22      A.  Both of them.
23      Q.  You had two supervisors?
24      A.  Yes.
25      Q.  If Siemens said only Ms. Wilson was your

Page 166

1  supervisor, what evidence do you have to refute that?
2      A.  What they told me.  So he was my supervisor.
3  Donna Wilson was finance.  Bill Piatt was more for the
4  auditing and things of that nature.  So I had to report
5  to him on that basis.  That's in the recording where it
6  talks about how I would report to Linda and then how I
7  would report to Bill.  So there were several emails any
8  time we had performance reviews it was both of them.  So
9  yes, he was my supervisor, also.
10      Q.  You said he had a role in your performance
11  reviews?
12      A.  Yes.
13      Q.  Do you know if he had the ability to hire or
14  fire you?
15      A.  Yes.
16      Q.  Did he have the ability to make decisions with
17  respect to your pay?
18      A.  Yes.
19          (Exhibit 18 was marked.)
20      Q.  (BY MS. GRANT)  I'm handing you what's been
21  marked as Exhibit 18.
22      A.  Thank you.
23      Q.  Do you recognize Exhibit 18?
24      A.  Yes.
25      Q.  And Exhibit 18 appears to be another email from

Page 167

1  you to Linda regarding Mr. Piatt.
2      A.  Right.
3      Q.  And was this another complaint that you were
4  sending her regarding his actions towards you?
5      A.  Yes.
6      Q.  And here it looks like he was inquiring as to
7  whether you had gotten permission from your supervisor
8  to work remotely that day.
9      A.  Right.
10      Q.  And you believe that he asked you that because
11  of your race and gender?
12      A.  Right.
13      Q.  And are you aware whether or not he would ask
14  other employees working remotely if they had permission?
15      A.  No.
16      Q.  Would you have any personal knowledge that he
17  never did to anybody else?
18      A.  I wouldn't know that.
19      Q.  Did you receive any disciplinary action because
20  of Mr. Piatt's emails, whether it be in Exhibit 17 or
21  18?
22      A.  I don't know.  I don't know if this, you know,
23  was me -- do I have any evidence?
24      Q.  Yes.
25      A.  No.

Page 168

1      Q.  Do you believe Mr. Piatt was involved in the
2  decision to place you on a PIP?
3      A.  He was in that room when I had that
4  conversation.  Yes, he was in the meeting.
5      Q.  Other than being in the meeting, do you have
6  any evidence that he was involved in the actual decision
7  to place you on that PIP?
8      A.  No, I don't know that.
9      Q.  Do you have any evidence that Mr. Piatt was
10  involved in the decision to lay you off?
11      A.  Remember, I was doing the internal auditing,
12  and so remember for Donna she was more finance.  And so
13  internal auditing, that was under him.  So I believe I
14  did have a hand in the decision to lay me off.
15      Q.  Other than Exhibits 17 and 18, you said you
16  also had verbal discussions with Hubbard about
17  Mr. Piatt?
18      A.  Yes.
19      Q.  Did you complain to Ms. Hubbard about anyone
20  else other than Mr. Piatt?
21      A.  We talked about Ms. Melissa King.
22      Q.  And what complaints did you raise about Melissa
23  King to Ms. Hubbard?
24      A.  I can't remember all of them, but they're
25  documented.  I was talking to her about her asking me

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 169

1   questions about me, what time I'm coming in, what time
2   I'm leaving, you know, things of that nature.
3       Q.  Is it the discussion we had about items we
4   discussed with Ms. King earlier?
5       A.  Yes.
6       Q.  The excessive monitoring?
7       A.  Yes.
8       Q.  So what actions, if any, did Ms. Hubbard take
9   with respect to Ms. King?
10      A.  She never did any -- no, none.
11      Q.  And did you raise any complaints about anyone
12  else besides Ms. King and Mr. Piatt to Ms. Hubbard?
13      A.  No.
14      Q.  And if I recall, you are also saying
15  Ms. Hubbard did take actions to retaliate against you
16  because of your FMLA leave.
17      A.  I believe so, yes.
18      Q.  And we have discussed the confrontational
19  attitude earlier?
20      A.  Yes.
21      Q.  Are you basing any of your claims here today on
22  Ms. Hubbard's actions?
23      A.  No.
24      Q.  With respect to you said the inaccurate
25  information Ms. Hubbard gave you, that was regarding the

Page 170

1   amount of hours of FMLA leave you had?
2       A.  Right.
3       Q.  Did you believe that she did that
4   intentionally?
5       A.  I believe so.  I don't know for sure.  I mean,
6   I don't know.  I can't remember what I was thinking at
7   the time then.
8       Q.  When was the last time you talked with
9   Ms. Hubbard?
10      A.  When I was -- way before she left because I
11  left -- I was laid off in October 2017.  And she left
12  prior to then.  So maybe around the time that she was
13  there, that's the last time we had any type of
14  interaction.
15      Q.  How would you describe your relationship with
16  Ms. Hubbard?  Did you have a positive relationship with
17  her?
18      A.  Well, initially, and then when I would -- she
19  wasn't taking any actions to some of the complaints that
20  I was making.  And that's when I had to -- so, you know,
21  I wouldn't really so -- so, no.  Initially positive but
22  then towards the end negative.
23      Q.  Did you hear -- did Ms. Hubbard ever make any
24  comments to you regarding your race?
25      A.  No.

Page 171

1       Q.  Did Ms. Hubbard ever make any comments to you
2   about your gender?
3       A.  No.
4       Q.  Did you ever hear any Siemens employee make any
5   comments to you about your race?
6       A.  About my race?
7       Q.  Yes.
8       A.  No.  I mean, no.  About me being
9   African-American?
10      Q.  Correct.
11      A.  Well, the one from Kathy DeGeorge when she was
12  saying that the differential treatment that he shows
13  towards minorities, yes.
14      Q.  Other than her observation that she believed
15  Mr. Piatt treated minorities different, did you hear any
16  other Siemens employee during your employment make any
17  comments about your race?
18      A.  No.
19      Q.  Did any Siemens employee -- again, other than
20  observations of Mr. Piatt maybe treating you differently
21  because you're a woman, did you have any comments
22  directed to you about your gender?
23      A.  No.
24      Q.  Did Ms. Hubbard ever make any negative comments
25  to you about the fact that you came and complained to

Page 172

1   her?
2       A.  No.
3       Q.  Did Ms. --
4       A.  Well, let's go back.  She did tell me a story,
5   and I believe that's -- I can't remember if I have a
6   recording on that.  Basically, what she was saying in
7   that conversation was, you know, suck it up.  Deal with
8   it.
9       Q.  And you have this on a recording?
10      A.  I can't remember.
11      Q.  Did you record all of your conversations or
12  complaints to Ms. Hubbard?
13      A.  No.
14      Q.  Did Ms. Hubbard know you were recording her?
15      A.  No.
16      Q.  Did any of the individuals on your recording
17  know at the time that you were recording them?
18      A.  No, not to my knowledge.
19      Q.  And for your conversations with Ms. Hubbard
20  that you recorded, did you -- did those take place on
21  Siemens' property?
22      A.  Yes.
23      Q.  Were all your recordings face-to-face meetings?
24      A.  Yes.  Like we would go in the conference room.
25  So yes, they were face-to-face.

43 (Pages 169 to 172)

HARRIET MARIE LANE - 11/20/2019

Page 173

1  Q. Did you record any telephone calls?
2  A. No.
3  Q. Did Ms. Hubbard make any negative comments to
4  you about the fact that you took FMLA leave?
5  A. No.
6  Q. Did she make any negative comments to you about
7  your need to take FMLA leave?
8  A. No.
9  Q. Did she make any comments to you about the fact
10  that you requested later after you returned about your
11  subsequent request for FMLA leave?
12  A. No.
13  Q. Did anybody at Siemens make any negative
14  comments to you about taking FMLA leave?
15  A. Not that I recall.
16  Q. Did any Siemens employee make any negative
17  comments to you about your second request for FMLA
18  leave?
19  A. Let's go back. Let's go back. In the
20  recording from Kimberly, remember, that's FMLA. And she
21  said that Linda told her the reason why I was out on
22  FMLA was personal-related issues. It didn't have
23  anything to do with Siemens. So this is what Kimberly
24  told me that Linda said, and that's in the recording.
25  Q. So you contend that is a negative statement

Page 174

1  about your FMLA leave?
2  A. Right. I mean, it's a negative conversation
3  because my personal information should not be discussed
4  with anyone else.
5  Q. Other than the fact that she said you were
6  taking FMLA for a personal reason, did she disclose any
7  other information about your FMLA leave, Ms. Hubbard?
8  A. Not that I know of. Like I said, you have to
9  refer to that recording.
10  Q. And your contention that that statement was
11  inaccurate is -- what part of that would be inaccurate?
12  A. Saying that it didn't have anything to do with
13  Siemens.
14  Q. Do you know if you submitted any paperwork that
15  specifically said you needed FMLA leave because of
16  Siemens' actions?
17  A. It is not going to say because of Siemens'
18  actions. It's going to state the medical condition.
19  Q. And did you ever have any diagnosis that said
20  you suffered from that specific medical condition
21  because of Siemens?
22  A. Because of Siemens, no. Well, work-related.
23  It may have that information in there. I don't have it
24  in front of me. You might have to bring it up.
25  Q. And what doctor was the one that completed your

Page 175

1  FMLA paperwork?
2  A. I don't know who does that. I mean, that's
3  sent over.
4  Q. What doctor were you visiting for this
5  condition?
6  A. So I had my primary care doctor, Dr. Talati,
7  and then I also have my therapist that I was seeing at
8  the time. The psychiatrist came later.
9  Q. And who is your therapist?
10  A. Sharon Alexander.
11  Q. With respect to -- what was the actual medical
12  condition for your FMLA leave?
13  A. It was stress, but I don't know the medical
14  term.
15  Q. Okay. To your knowledge, was Ms. Hubbard
16  involved in the decision to place you on your PIP?
17  A. I just know that her name was signed on here.
18  Q. And other than her name being on there, do you
19  have any knowledge of her involvement in that -- in
20  placing on you a PIP?
21  A. No.
22  Q. To your knowledge, was Ms. Hubbard involved in
23  the decision to terminate your employment -- excuse me;
24  layoff, to lay you off?
25  A. No, she was gone by that -- I don't know. I

Page 176

1  don't know for sure. She wasn't there, that part of the
2  meeting. That was only Toni Horton and Donna Wilson and
3  myself. No, I don't think she had a part to play in
4  that.
5  Q. Other than what we discussed here, would
6  Ms. Hubbard have any other relevant knowledge regarding
7  your claims here today?
8  A. None that I'm aware of.
9  Q. If we go back to Exhibit 5, after Ms. Hubbard
10  is Melissa King.
11  A. Okay.
12  Q. And that is your former supervisor that we have
13  been discussing here today, correct?
14  A. Yes.
15  Q. And what is Ms. King's race?
16  A. She's a Caucasian female.
17  Q. And Ms. Hubbard -- Ms. King became your
18  supervisor around October 2016?
19  A. Yes.
20  Q. And when you returned from leave on May 2017,
21  she was no longer your supervisor?
22  A. No.
23  Q. Are you contending that Ms. King discriminated
24  against you because of your race?
25  A. I believe -- this is what I believe. Like I

44 (Pages 173 to 176)

HANNA & HANNA, INC.
713-840-8484

Page 177

```
 1    said earlier, that she was being coached, a lot of them
 2    was being influenced by Bill Piatt.
 3        Q.  And on what do you base your belief that she
 4    was being coached or influenced by Bill Piatt?
 5        A.  My observations, things that other people said.
 6    Melissa and I, you know, prior to me working with her, I
 7    had been working with her for years.  And then some of
 8    the treatment did not take place until after I started
 9    working for her.
10            And then Bill would be in her office.  And
11    like I said earlier, when he would go in her office,
12    then I would start getting emails from her.  So that
13    would lead me to believe that he was coaching her on how
14    to treat me.
15        Q.  And when you say the emails, it was the email
16    asking you what time you would be coming into work?
17        A.  That, anything about work-related issues or
18    work about audits or, you know, training, things of that
19    nature.
20        Q.  The excessive monitoring that we discussed
21    earlier?
22        A.  That's just one of them.  So that's one.  We
23    also had emails -- like when he would go into her office
24    and come out, then I would get emails about, you know,
25    What's going with this project or What's going with that
```

Page 178

```
 1    project, which is fine.  But like I said, as far as the
 2    excessive monitoring, I think that was more coaching
 3    from Bill Piatt.
 4        Q.  You also -- so that was one of your
 5    observations.  Do you have any other observations to
 6    support your conclusion that Ms. King was being coached
 7    or influenced by Mr. Piatt?
 8        A.  And then things that people would say.
 9        Q.  What things?
10        A.  You know, same thing that I'm saying to you,
11    agreeing that Bill is influencing her.
12        Q.  And who made these comments?
13        A.  Kimberly Long was one of them.
14        Q.  Anybody else?
15        A.  That's all I can think of right now.
16            And then Linda also made the comment that
17    Bill wants to build his empire.
18        Q.  So what actions -- do you contend Ms. King took
19    any actions to discriminate against you because of your
20    gender?
21        A.  No.
22        Q.  Do you believe Ms. King took any actions to
23    discriminate against you because of your race?
24        A.  Right, and that's -- like I said, that has
25    something to do with Bill's influence.
```

Page 179

```
 1        Q.  I know you believed Bill influenced her, but
 2    what did she -- do you specifically contend she did
 3    toward you that was discriminatory?
 4        A.  Treated me different than other people.
 5        Q.  And does that go back to the excessive
 6    monitoring we discussed?
 7        A.  Right.
 8        Q.  And it goes back to the email about what hours
 9    you are working?
10        A.  Yes.
11        Q.  Does it go back to what you raised in the
12    hotline complaint?
13        A.  Right.
14        Q.  Are there any other actions that Ms. King took
15    that we haven't discussed today that you believe were
16    discriminatory against you because of your race?
17        A.  No, none that I can think of.
18        Q.  Do you believe Ms. King took any actions that
19    are retaliatory against you?
20        A.  Not that I can think of.
21        Q.  To your knowledge, did Ms. King have any
22    knowledge regarding your hotline complaint?
23        A.  Oh, yes.  Yes.
24        Q.  Or the fact you made a hotline complaint?
25        A.  Yes.  She had knowledge of that.
```

Page 180

```
 1        Q.  Do you have any -- or to your knowledge, was
 2    Ms. King aware of your complaints to Ms. Hubbard about
 3    Mr. Piatt?
 4        A.  I don't know for sure about that.
 5        Q.  Are you basing any claims here today off of
 6    Ms. King's actions?
 7        A.  The fact that, you know, I believe that she had
 8    a role to play as far as my race, yes.
 9        Q.  And that's what we just discussed with the
10    excessive monitoring?
11        A.  Right.
12        Q.  And then the hotline complaint?
13        A.  Uh-huh.  And eventually, we did have a meeting,
14    and she was trying to attack me in that meeting.  And I
15    believe I have that recorded as well.  I can't remember
16    about that one, when she was trying to attack me in that
17    meeting.
18            And then, again, I believe this is under
19    the influence of Bill, you know, putting certain
20    stipulations on me because we eventually had the meeting
21    about the goals and the expectations, but she wanted me
22    to sign off on it and agree to certain things.  So I
23    think that was more -- and we had that meeting in
24    February.
25        Q.  And so the goals and expectations that she set
```

HANNA & HANNA, INC.
713-840-8484

Page 181

1   for you, you believe that those were discriminatory?
2       A.  Right.  And those are the ones she came up with
3   by herself.  It was not a joint decision.  So the
4   process at Siemens is for individuals to have a joint
5   conversation and agreement about the goals and the
6   expectations, you know, because that same information,
7   as I was stating earlier, is going to be used as the
8   basis for merit increases and promotions.
9       Q.  Do you contend that Ms. King undertook any
10  other actions that were discriminatory with respect to
11  your race?
12      A.  Not that I can recall.
13      MS. GRANT:  Do you want to take a
14  ten-minute break?
15      MR. BAIL:  Sure.
16      (A recess was taken.)
17      Q.  (BY MS. GRANT)  Ms. Lane, you understand you're
18  still under oath?
19      A.  Yes.
20      Q.  When we left or took a break, we were
21  discussing Melissa King.  Do you recall?
22      A.  Yes.
23      Q.  And that's your former supervisor, correct?
24      A.  Yes.
25      Q.  And we were discussing the instances when

Page 182

1   Ms. King discriminated against you, and I want to make
2   clear, are you asserting Ms. King discriminated against
3   you because of your gender?
4       A.  No.
5       Q.  But you are contending she discriminated
6   against you because of your race?
7       A.  Yes.
8       Q.  And we have gone through some of those, the
9   excessive monitoring, the not having the goals and
10  expectations meeting with you.  And when we left you
11  were saying also the items in your goals and
12  expectations meetings once she had that.
13      Is that a contention that you -- are you
14  forming -- strike that.
15      Do you contend that, too, was a form of
16  discrimination based on your race?
17      A.  Right.  I had never -- so the goals -- yeah.
18  Yes.
19      Q.  The actual goals and expectations that she set
20  for you?
21      A.  Right, and the process, yes, the process.  Yes.
22  Yes.  And the goals and expectations, yes.
23      Q.  Were there any other instances that you allege
24  Ms. King took discriminatory actions because of your
25  race?

Page 183

1       A.  Not that I recall.
2       Q.  And we went over this with respect to your
3   hotline, but you are not asserting any claims based on
4   your PTO or request for PTO, correct?
5       A.  No.
6       Q.  I have seen before there were some emails about
7   an alternative work location.  Do you recall those
8   discussions with Ms. King?
9       A.  Yes.
10      Q.  Are you basing any claims here based on those
11  email discussions about your request for an alternative
12  work location?
13      A.  No.
14      Q.  I'm handing you what's been marked as
15  Exhibit 19.
16      (Exhibit 19 was marked.)
17      Q.  (BY MS. GRANT)  Is Exhibit 19 the goals and
18  expectations that Ms. King ultimately set for you that
19  we were just discussing?
20      A.  Let me look through here.  Yes.
21      Q.  And what aspect or part of Exhibit 19 do you
22  contend was discriminatory to you because of your race?
23      A.  Okay.  So before, you know, all my years
24  working for Rolls-Royce and Siemens -- because Siemens
25  bought Rolls-Royce out -- I've never had to do this.

Page 184

1   I've never had to have a presentation where it was -- we
2   have never done this.  There is a form.  There is a
3   template that you can -- if you want to have
4   professional development that you can do, but I have
5   never had to do anything like this and then be requested
6   to sign it.
7       Q.  Did you prepare Exhibit 19?
8       A.  No.
9       Q.  Ms. King did?
10      A.  I'm not sure who prepared it, but I didn't.
11      Q.  But the way this meeting was presented to you
12  is partly what you believe was discriminatory?
13      A.  Right.  It treated me different than anyone
14  else.
15      Q.  To your knowledge, did anyone else get a
16  similar presentation?
17      A.  I'm not sure.
18      Q.  Do you have any personal knowledge about what
19  presentation or goals and expectations, how they were
20  delivered to any other employee?
21      A.  No.
22      Q.  When did you have this meeting with Ms. --
23      A.  I want to say February.  I don't know.  We
24  tried to have one at first, but then that's when that
25  meeting had to be canceled.

46 (Pages 181 to 184)

HARRIET MARIE LANE - 11/20/2019

Page 185

1      Q.  Why was that meeting canceled?
2      A.  Because the way that she was attacking me and
3  coming up with false information.
4      Q.  So did you cancel that meeting?
5      A.  Yes.  I asked that I leave the meeting, and
6  Patrik gave me permission.
7      Q.  What false information was she stating here in
8  this meeting?
9      A.  There is one in here about the meeting itself.
10  So here.  So this is -- okay.  So I have -- so she has a
11  meeting in here December 1, whatever.  So she was saying
12  something about that we were going to have weekly
13  meetings.  But we never had the weekly meetings.  She
14  never showed up for the weekly meetings.  So this was,
15  again, after the complaint.
16      Q.  And so is it your contention that her
17  requirement that you have weekly meetings but then she
18  never showed up, that was -- are you alleging that was
19  discriminatory or retaliatory?
20      A.  I'm talking about this entire process here that
21  was discrimination.
22      Q.  Okay.  And do you allege it was retaliatory?
23      A.  What, this here?
24      Q.  Yes.
25      A.  It could be construed that way.  I don't know

Page 186

1  for sure, but I'm just talking about the process.
2      Q.  Okay.  And "the process" meaning the
3  cancellation of the meetings?
4      A.  No.  The process of the goals and expectations.
5  She put these together without my input, things of that
6  nature.
7      Q.  Are you aware of any other expectations or
8  goals that she prepared for other employees that
9  reported to her?
10      A.  No.
11      Q.  And do you have any knowledge whether or not
12  she prepared those for other employees without their
13  input?
14      A.  I'm not aware of that.
15      Q.  So going back to this page that you pointed
16  out, can you provide -- just clarify for me what about
17  this recurring meeting and canceling, why are you
18  singling that out?
19      A.  Okay.  So remember we came -- I started working
20  for Melissa in October of 2016.  This meeting here says
21  that -- what's the date on here?  12/23.
22      Q.  Okay.
23      A.  So the time frame there.
24      Q.  Okay.
25      A.  So she sent this to me and then -- back when I

Page 187

1  was requesting back in October let's have a discussion.
2  Let's talk about what your expectations are, what my
3  expectations are.  Let's establish some goals.
4          So by that time all that time had passed,
5  and then when she sent this, we never even starting
6  having any type of meeting.
7      Q.  So the fact she sent this but then you never
8  had them, that's the description of the process that you
9  are describing, correct?
10      A.  When I talk about the process -- so this is a
11  process.  This is a process for goals and expectations.
12  So when I'm talking about goals and expectations
13  process, I have never had it done in this format before.
14      Q.  The format is your complaint there?
15      A.  Right.
16      Q.  And then your other complaint is with respect
17  to she set up a meeting and it never happened?
18      A.  Right.
19      Q.  Until months later?
20      A.  Right.  And, also, the complaint is that in
21  October when I initially learned that she was going to
22  be my supervisor, I requested, Let's come together.
23  Let's try to establish rapport.  Let's have a
24  relationship.
25          And two months later, this is when she

Page 188

1  sends this.  But then even after she sends it, we never
2  had sit down one-on-ones.  And when we did eventually
3  have a sit down one-on-one, it was in this format.
4      Q.  And it was the meeting you discussed was
5  contentious?
6      A.  Right.
7      Q.  What inaccurate statements did she say to you
8  during this meeting?
9      A.  Did I say anything inaccurate?  Something about
10  that I had canceled meetings or something like that, but
11  nothing was ever canceled.
12      Q.  Any other comments that she made during this
13  meeting that were inaccurate?
14      A.  Not that I recall.
15      Q.  But you ended the meeting and left, correct?
16      A.  Got permission to leave from Patrik because he
17  was a part of meeting as well.
18          And then again, going back to that, I'm
19  thinking it's me and my supervisor.  I'm not sure why
20  Patrik needed to be a part of the meeting.
21      Q.  Are you aware of whether Patrik attended any
22  other goals and expectations meetings?
23      A.  I'm not aware.
24      Q.  Do you have any knowledge of whether he did not
25  attend?

HANNA & HANNA, INC.
713-840-8484

Page 189

1    A. I'm not aware.
2    Q. You have no personal knowledge about any other
3    employee's goals and expectations meetings?
4    A. No.
5    Q. What else about this Exhibit 19 do you find to
6    be discriminatory by Ms. King?
7    A. Okay. So she -- again, she wanted the
8    documented information about time and attendance. So
9    anything she wanted me to do, she wanted to make sure it
10   was being documented.
11   Q. So her documenting her expectations of you, you
12   contend that was discriminatory?
13   A. Right.
14   Q. And do you know whether or not she documented
15   any other goals and expectations for other employees?
16   A. I'm not aware.
17   Q. Do you have any -- do you find any complaints
18   about the actual expectations themselves here in this,
19   like with respect to time and attendance?
20   A. What was that again?
21   Q. Did you have any complaints regarding the
22   actual time and attendance expectations that she listed
23   here?
24   A. Not that I can recall right now.
25       And then --

Page 190

1    Q. It was just the fact that she documented them?
2    A. Yeah, just everything. So there that's just
3    building -- that's not building up a rapport.
4        And then go back here to the surveys. So,
5    again, this is what I was talking about with Bill.
6    Never before. Okay? So they're going outside the
7    process in general.
8        And then let me see what else did I have
9    information about? So those are some examples there.
10   But you see there that --
11   Q. What's the page at the bottom? Would you read
12   the Bates number.
13   A. 99 --
14   Q. Siemens-Lane 202, that's what you are referring
15   to?
16   A. Yes.
17   Q. And the goals and expectations are outlined in
18   Siemens-Lane 198 that we already discussed. I'm just
19   making it clear for the record.
20       So turning to 202, here it says
21   "Additional Expectations."
22   A. Okay. So these are my job responsibilities.
23   So she wanted me to continue supporting the IMS
24   documentation requirements, but when I came back from
25   FMLA, that was taken away from me.

Page 191

1        She want me to perform all the -- anything
2    here, just about everything was taken away from me when
3    I came back from FMLA.
4    Q. Do you believe Ms. King made the decision to
5    take that away from you?
6    A. I'm not sure.
7    Q. So with respect to page 202, you are just
8    pointing out that these were actually the duties that
9    were taken away from you later?
10   A. Yeah, these were taken away, right.
11   Q. Did you find anything discriminatory about the
12   fact that these list of duties were in your expectations
13   and goals for Ms. King?
14   A. No, I don't find -- what was the question
15   again? I'm sorry.
16   Q. Did you find this list on page 202 -- Ms. King
17   here lists them as additional expectations of you -- did
18   you find the fact that she believed this list was an
19   expectation of you, did you believe that was
20   discriminatory?
21   A. No.
22   Q. This on 202 reflects -- I believe you just said
23   this was pretty much your job duties here.
24   A. Yeah, pretty much. But then when I came back,
25   all this was taken away from me.

Page 192

1        And then when we talked about earlier
2    that -- about this being used to form the basis of my
3    merit increase and promotion. So yes, this would be
4    used to determine whether or not and how much of a merit
5    increase I would receive, whether or not I'll get
6    promoted to another position. But if this was going to
7    be used to make those decisions, why would those
8    responsibilities be taken away?
9    Q. With respect to promotions, were you ever
10   denied any promotion at Siemens?
11   A. When I was on the Performance Improvement Plan,
12   I could not get a promotion.
13   Q. Other than that period, did you ever apply for
14   and were denied any promotion?
15   A. No.
16   Q. Are you asserting any claims here for denial of
17   a promotion?
18   A. No.
19   Q. You also said with certificate receives. In
20   2017 or after this, did you receive a merit increase?
21   A. No.
22   Q. Were merit increases guaranteed?
23   A. I don't know about that time.
24   Q. Did you receive a merit increase every year?
25   A. Yes.

HARRIET MARIE LANE - 11/20/2019

Page 193

1    Q.  Except this year?
2    A.  Except 2017, yes.
3    Q.  And are you asserting that you were denied a
4  merit increase because of your race?
5    A.  No.
6    Q.  Are you contending you were denied a merit
7  increase because of your gender?
8    A.  No.
9    Q.  Are you contending you were denied a merit
10  increase in retaliation for your complaining?
11    A.  No.
12    Q.  And are you asserting a claim here in this
13  lawsuit based upon any denial of merit increase?
14    A.  No.
15    Q.  You are just saying that Exhibit 19 is
16  something that's considered?
17    A.  Yes.
18    Q.  And because these items were in here, it could
19  have had an effect?
20    A.  Yes.
21    Q.  But you are not aware of any negative effect
22  Exhibit 19 had, actually had on any term or condition of
23  your employment?
24    A.  Right.
25    Q.  You had mentioned that there was a standard

Page 194

1  form that most people used.
2    (Exhibit 20 was marked.)
3    Q.  (BY MS. GRANT)  I'm handing you what's been
4  marked as Exhibit 20.  Is this the standard form you are
5  referring to?
6    A.  Yes.  Something like that, yes.
7    Q.  One of the complaints about Exhibit 19 is that
8  it came in this format, not the format of Exhibit 20?
9    A.  Right.  So this -- just everything in here.
10  Not just the format but the process.
11    Q.  I understand that.  But I just want to make
12  sure.  With respect to format, your complaint is that it
13  should have looked like Exhibit 20?
14    A.  Yes.  And I should have been provided input.
15  This was already predetermined for me.
16    Q.  And you'd provide input when you do Exhibit 20?
17    A.  Yes.
18    MR. BAIL:  So this is Exhibit 20?
19    MS. GRANT:  Yes.
20    A.  Going back to this --
21    Q.  (BY MS. GRANT)  "This" meaning Exhibit 20?
22    A.  Yes.  I'm sorry.  So Exhibit 20, okay, so this
23  is something that is filled out at the beginning of the
24  year, and then you also make updates mid-year and then
25  you also make updates at the end of year.  So that's

Page 195

1  what this is used for, Exhibit 20 is used for.
2    Q.  That was not done with respect to Exhibit 19?
3    A.  No.
4    Q.  And you believe that was discriminatory based
5  on your race?
6    A.  Right.  Yes.
7    Q.  Are there any other actions that you believe
8  Ms. King took to discriminate against you because of
9  your race?
10    A.  Not that I can think of right now.
11    Q.  Did you ever hear Ms. King make any comments
12  about your race?
13    A.  No.
14    Q.  Did you ever hear Ms. King make any negative
15  comments about the fact that you complained to HR, Patti
16  Davis, Linda Hubbard?  Did you ever hear her make any
17  negative comments about that?
18    A.  No.
19    Q.  To your knowledge, was she aware of those
20  complaints?
21    A.  Yes.
22    Q.  Do you contend Ms. King retaliated against you
23  in any way?
24    A.  I mean, like I said she -- I mean, I don't know
25  for sure.  This is personal belief.  That's all I know.

Page 196

1    Q.  Other than what we have already discussed, is
2  there any other relevant knowledge Ms. King has with
3  respect to your claims?
4    A.  Not that I'm aware of.
5    Q.  Turning back to Exhibit 5, will you turn the
6  page.  On our list of employees, Kimberly Long is the
7  next one.
8    We have already discussed her, correct?
9    A.  Yes, we did.
10    Q.  Then next we have got the infamous Bill Piatt.
11  And we have talked at length about Mr. Piatt.
12    Let me ask you this:  Have we discussed
13  all the issues or basis of your claim of racial
14  discrimination against Mr. Piatt?
15    A.  Yes, as far as I can recall, as far as
16  retaliation, discrimination because of my race and
17  because of my gender.
18    Q.  Do you believe Mr. Piatt
19  discriminated -- retaliated against you for taking FMLA
20  leave?
21    A.  Yes.
22    Q.  And on what do you base that belief?
23    A.  Because going back to like personal belief and
24  the fact that he was involved in the discussion when we
25  talked about the Performance Improvement Plan, he was

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 197

1    there in that meeting.
2      Q.  Anything else?
3      A.  That's it right now that I can recall.
4      Q.  And we have discussed the instances -- there
5    were complaints about him harassing you?
6      A.  Right.
7      Q.  And those were -- have we gone over all the
8    instances that you claim where he harassed you?
9      A.  We did.  We talked about those.
10     Q.  At the beginning and with respect to your
11   complaints to Ms. Hubbard?
12     A.  Those and then the ones that I made to
13   Safecall, the ones that I made to Toni Horton.
14     Q.  Are there any other instances where you believe
15   Mr. Piatt harassed you because of your race?
16     A.  None that I can recall that we haven't
17   talked -- just those we have talked about.
18     Q.  And are those actions by Mr. Piatt forming the
19   basis of your claims here today?
20     A.  Yes.
21     Q.  Did you ever hear Mr. Piatt make any negative
22   comments about your race?
23     A.  No.
24     Q.  Did you ever hear him make any negative
25   comments about your gender?

Page 198

1      A.  No.
2      Q.  Did you ever hear Mr. Piatt make any negative
3    comments about you taking FMLA leave?
4      A.  No.
5      Q.  Are you -- do you have any evidence that
6    Mr. Piatt was aware you complained to Linda Hubbard
7    about him?
8      A.  Going back to the meetings, the meetings that
9    we talked about earlier, just that -- those meetings.
10     Q.  The meeting with the PIP?
11     A.  Right.
12     Q.  Anything else?
13     A.  And the fact that Linda said she talked to him.
14   That's it.
15     Q.  Okay.  Did Linda say that she told him you
16   complained about him?
17     A.  No.
18     Q.  Did you record any conversations with
19   Mr. Piatt?
20     A.  Yes.  I have -- yes, I have.
21     Q.  And going back, did you record any
22   conversations with Ms. King?
23     A.  Ms. King?  I want to say yes, I have, yes.
24     Q.  And the subject or nature of those
25   conversations are accurately in those recordings?

Page 199

1      A.  Yes.
2      Q.  Did Mr. Piatt or Ms. King know you were
3    recording them at the time?
4      A.  No.
5      Q.  And did those recordings take place on Siemens'
6    property?
7      A.  Yes.
8      Q.  And do you contend that those conversations
9    evidence discrimination or harassment?
10     A.  What was that again?  I'm sorry.
11     Q.  Do you contend the conversations in those
12   recordings were evidence of discrimination or
13   harassment?
14     A.  Those conversations?  I don't know.  I can't
15   really -- I don't know.  I can't guess right now.  I
16   can't recall.
17     Q.  But we have covered the allegations regarding
18   Mr. Piatt's discriminatory, retaliatory and harassing
19   conduct?
20     A.  Yes.
21     Q.  I just want to make sure we have covered
22   everything.
23     A.  Yes.
24     Q.  Is there any other relevant knowledge Mr. Piatt
25   would have?

Page 200

1      A.  Not that I'm aware of.
2      Q.  Do you have any knowledge whether he had a role
3    in your layoff?
4      A.  My personal belief and then also the fact that
5    he had a role in several things.  I mean, my personal
6    belief and then the fact that me being the internal
7    auditor and having to report to him and then him
8    that position is being eliminated.  And then him
9    distributing my roles and responsibilities to other
10   people, you know, all is a basis to get rid of me.
11         And then the conversation with the
12   receptionist that he was going to -- telling her to
13   deactivate my badge because I was not coming back, and
14   that's when I was on FMLA.
15     Q.  When you were on FMLA leave, were you allowed
16   to come onto Siemens' property?
17     A.  Yes.  If I needed to, yes.
18     Q.  Was there any need for you to come on?
19     A.  During the time?
20     Q.  Yes.
21     A.  Maybe -- not that I can think of at the time,
22   no.
23     Q.  And your badge was reinstated that same day,
24   your first day back?
25     A.  Right.

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 201

1  Q. It's just you went to badge in when you showed
2  up, and it wasn't working?
3  A. Right.
4  Q. Is there any other knowledge here that you
5  believe forms the basis -- strike that.
6  Do you believe Mr. Piatt has any other
7  relevant knowledge regarding your claims?
8  A. Not that I'm aware of.
9  Q. Going back to Exhibit 5, we have got Mark
10  Shipley.
11  A. Oh, this one.
12  Q. Yes.  We have touched on Mark Shipley some.
13  What is Mark Shipley's race?
14  A. He's a Caucasian, European.
15  Q. And he is the general manager or president at
16  the facility?
17  A. Yes.  At Siemens, yes.
18  Q. So he wasn't your direct supervisor, but he
19  would have been your supervisor a couple levels up?
20  A. Right, yes.
21  Q. And do you contend that Mr. Shipley took any
22  actions that were discriminatory because of your race?
23  A. Only thing that I know is that he allowed the
24  treatment to take place.
25  Q. Mr. Piatt's treatment?

Page 202

1  A. Yes.
2  Q. Do you contend that Mr. Shipley took -- strike
3  that.
4  So it's his inaction that you believe?
5  A. Right.  Right.
6  Q. When you say Mr. Piatt's actions, do you mean
7  those specifically towards you or with regards to the
8  general Mr. Piatt's treatment of women?
9  A. Okay.  So when I say towards me, as far as the
10  African-American, black woman, and then also
11  retaliation, he allowed that.  And then he allowed the
12  mistreatment of women, yes.
13  Q. And by allowing, you mean he just didn't take
14  any action to prevent it?
15  A. Right.
16  Q. Are you aware of any actions Mr. Shipley did --
17  strike that.
18  Is it Mr. Shipley's inaction that you
19  contend was retaliatory against you?
20  A. Right.
21  Q. Are you aware of whether Mr. Shipley knew of
22  your complaints to Ms. Hubbard?
23  A. Other than him being a part of the meetings
24  that took place for the PIP, and then Linda telling me
25  that because he's the president, she has to communicate

Page 203

1  what's going on.  But she said that in that PIP meeting.
2  She explained the reason why he was there.
3  Q. Other than the PIP meeting, is there any
4  evidence that he was aware of your complaints to
5  Ms. Hubbard?
6  A. Not that I'm aware of, because I didn't go to
7  him directly.
8  Q. And that PIP meeting also is how you believe he
9  was aware of your hotline complaint?
10  A. Yes.
11  Q. Do you contend Mr. Shipley took any actions in
12  retaliation for you taking FMLA leave?
13  A. I don't know that he was involved directly.  I
14  mean -- but like I said, he allowed a lot of the
15  treatment to take place.
16  Q. To your knowledge, was Mr. Shipley aware that
17  you had taken FMLA leave?
18  A. Oh, yes, he was aware because Linda and I had a
19  conversation.  They had released me.  My doctors had --
20  and this is in the medical records.  They released me to
21  go on part-time, but then Linda -- when I called Linda
22  to discuss that with her, she said that -- "Let me talk
23  to management."  And that is Mark Shipley.  She said she
24  was going to talk to management and get back with me.
25  She never got back to me.  Who got back with me was my

Page 204

1  FMLA contact that said it was denied.
2  So, yes, he knew about the FMLA, yes.
3  Q. And you reached that conclusion because Linda
4  Hubbard said he had to talk to management?
5  A. Yes.
6  Q. And how do you know that by "management" she
7  meant Mark Shipley?
8  A. Yes, I know that because he's the president.
9  He's the president of that facility, of that location,
10  and he's considered management.
11  Q. Are there any other employees that are
12  considered management?
13  A. Yes, like Bill Piatt, Donna Wilson.
14  Q. And so do you contend Ms. Hubbard told every
15  member of management about your FMLA leave?
16  A. No, I wouldn't say that.
17  Q. So on what basis do you believe she told
18  Mr. Shipley?
19  A. Because he's the president and the general
20  manager of that facility, and I think that she told him
21  because he needs to know about it.
22  Q. So do you contend that she tells Mr. Shipley of
23  every employee who takes FMLA leave?
24  A. Probably so.
25  Q. And do you have any evidence to support that

51  (Pages 201 to 204)

HARRIET MARIE LANE - 11/20/2019

Page 205

1    conclusion?
2        A. No.
3        Q. Did you ever hear Mr. Shipley make any negative
4    comments about your gender?
5        A. No.
6        Q. Did you hear Mr. Shipley ever make any negative
7    comments about your race?
8        A. No.
9        Q. Did you hear Mr. Shipley ever make any negative
10   comments about you taking FMLA leave?
11       A. No.
12       Q. Did he ever make any negative comments about
13   you complaining to Linda Hubbard?
14       A. No.
15       Q. And did Mr. Shipley ever make any negative
16   comments about the fact that you called the hotline?
17       A. No.
18       Q. Did he make any comments during your PIP
19   meeting?
20       A. Did he make any comments?
21       Q. Yes.
22       A. When I said that I have a good working
23   relationship with him, he agreed.
24       Q. And other than agreeing that he did have a good
25   working relationship, did Mr. Shipley say anything else

Page 206

1    during that PIP meeting?
2        A. No, none that I can think of.
3        Q. What about Mr. Piatt? Did he make any
4    statements during that PIP meeting?
5        A. No.
6        Q. Who mostly talked during that PIP meeting?
7        A. Linda.
8        Q. Hubbard?
9        A. Yes.
10       Q. What did Linda Hubbard tell you during that PIP
11   meeting?
12       A. She went over pretty much the PIP.
13       Q. She just read it to you?
14       A. We talked about the information and talked
15   about who I was going to report to and things in that
16   conversation as well, those details.
17       Q. If I recall, Patrik Hols was also present in
18   that meeting.
19       A. Yes.
20       Q. Did he make any statements during that PIP
21   meeting?
22       A. Not that I recall.
23       Q. Was Ms. King in that meeting?
24       A. No.
25       Q. Was anyone else in that meeting?

Page 207

1        A. Donna Wilson.
2        Q. Did Donna Wilson make any comments in that
3    meeting?
4        A. She made comments, yes.
5        Q. What did Ms. Wilson speak of in that meeting?
6        A. More so about our relationship as far as how we
7    worked in the past, which was positive.
8        Q. And at this point when you came back,
9    Ms. Wilson was your new manager?
10       A. Yes.
11       Q. In place of Ms. King?
12       A. Right.
13       Q. Are you asserting any claims here based on
14   Mr. Shipley's actions?
15       A. No.
16       Q. And then if you turn to the next one, it's
17   Ms. Wilson.
18       A. Okay.
19       Q. What is Ms. Wilson's race?
20       A. She's Caucasian female.
21       Q. She was your direct supervisor?
22       A. Yes.
23       Q. Up through your termination?
24       A. Yes.
25       Q. Did you ever hear Ms. Wilson say any negative

Page 208

1    comments about your race?
2        A. No.
3        Q. And to your knowledge, was Ms. Wilson aware of
4    your complaints to Ms. Hubbard?
5        A. Yes.
6        Q. Because she was present in that PIP meeting?
7        A. Right, and we talked about them individually,
8    me, her and Linda, yes.
9        Q. Was she aware of your -- was Ms. Wilson aware
10   of your hotline complaint?
11       A. Yes.
12       Q. Did she make any negative comments about the
13   fact you filed a hotline complaint?
14       A. No.
15       Q. Are you contending that Ms. Wilson took any
16   actions that were discriminatory based on your race or
17   gender?
18       A. Right. She called me silly. She also
19   retaliated against me by assisting in the layoff.
20       Q. So I just want to back up with just
21   discrimination. So it was the comment of calling you
22   silly?
23       A. Yes.
24       Q. Any other actions?
25       A. That's what I recall right now.

52  (Pages 205 to 208)

HARRIET MARIE LANE - 11/20/2019

Page 209

1    Q.  And you contend that this was a comment about
2    your race?
3    A.  Right.
4    Q.  And you base that conclusion off of you were
5    having a serious conversation.  You weren't joking
6    around?
7    A.  Right.
8    Q.  Anything else?
9    A.  Not that I can think of.
10   Q.  And she called you this just once, correct?
11   A.  Right.
12   Q.  Any other actions that Ms. Wilson took that you
13   contend were discriminatory because of your race?
14   A.  The retaliation to lay me off.
15   Q.  But do you contend that you were laid off
16   because of your race?
17   A.  Right, and the retaliation.
18   Q.  Other than your layoff, were there any other
19   actions that you believe Ms. Wilson took because of your
20   race?
21   A.  Not that I can think of.
22   Q.  Do you contend that she called you silly
23   because of your gender?
24   A.  No.
25   Q.  Do you contend that your gender played a role

Page 210

1    in the decision to lay you off?
2    A.  I don't know.  I don't know about that.
3    Q.  And then going to your claims of retaliation,
4    you mentioned the layoff.  Is there any other actions
5    that you believe Ms. Wilson took in retaliation against
6    you?
7    A.  No.  She came on after the layoff, but like I
8    said, she participated in the layoff.
9    Q.  And do you contend these were in retaliation
10   for your complaints to Ms. Hubbard?
11   A.  Right, and Patti and Toni.  Because I
12   complained to Toni about her calling me silly.
13   Q.  And do you believe that Ms. Wilson made the
14   decision or was involved in the decision to lay you off
15   in retaliation for taking FMLA leave?
16   A.  I don't know about that.
17   Q.  Is there any other actions that you contend
18   Ms. Wilson took that formed the basis -- strike that.
19       Did Ms. Wilson take any other actions that
20   you allege were discriminatory or retaliatory?
21   A.  None that I can think of.
22   Q.  And are you asserting any claims based on
23   Ms. Wilson's actions?
24   A.  Right.  We talked about those.
25   Q.  The layoff.

Page 211

1    A.  Uh-huh.
2    Q.  And the silly comment?
3    A.  Yes.
4    Q.  And to your knowledge, what exactly was
5    Ms. Wilson's role with respect to your layoff?
6    A.  Okay.  As far as I know, she helped make the
7    decision that, yes, Harriet is no longer needed.
8    Q.  To your knowledge, who all was involved in the
9    decision to lay you off?
10   A.  To my knowledge, in the conference room was --
11   Donna Wilson and Toni Horton were in the conference
12   room.  But I think Toni just being in HR was just
13   relaying the information.  And I believe Bill Piatt also
14   had influence on that.
15   Q.  And so to your knowledge, you believe that
16   Donna Wilson, Toni Horton and Bill Piatt had some
17   involvement, but really Donna Wilson and Bill Piatt?
18   A.  Right.  Toni was just, "Here, Harriet, you're
19   being laid off."  She was acting as the HR
20   representative.
21   Q.  So you described the room.  So was it Donna
22   Wilson and Toni Horton who informed you of your layoff?
23   A.  Yes.
24   Q.  And what did they tell you with respect to your
25   layoff?

Page 212

1    A.  That my position -- that they had sold the
2    Siemens Springfield, Missouri, location and that my
3    position as an internal auditor had been eliminated as
4    an internal auditor, although I was hired as a senior
5    basis process specialist.
6    Q.  But at the time when you had your duties taken
7    away, you were only performing internal auditing?
8    A.  That's all they had me doing.  They had taken
9    away everything else when I came back from FMLA.  And
10   never gave it back to me.
11   Q.  Did they tell you any other reason for the
12   decision to eliminate your position?
13   A.  That was the only one.
14   Q.  The only reason was the Springfield decision?
15   A.  Right.  That I hadn't worked at or performed
16   any audits for since July, June of 2016.
17   Q.  Is that true?
18   A.  No.  They didn't tell me that.  I'm saying that
19   to you.
20   Q.  Okay.
21   A.  They just said that "I'm eliminating your
22   position as an internal auditor because we sold the
23   Springfield, Missouri, location and your role as an
24   internal auditor is being eliminated."
25   Q.  And they gave you no other justification other

53  (Pages 209 to 212)

HARRIET MARIE LANE - 11/20/2019

Page 213

```
 1    than the Springfield, Missouri?
 2         A. Right.
 3         Q. And you're saying the last time you performed
 4    an audit at the Springfield, Missouri, location was in
 5    June or July of 2016?
 6         A. Yes.
 7         Q. And so is that your basis for contending that
 8    that was false?
 9         A. Right. Because also, too, Kimberly Long, she
10    work for the Springfield location. Brad Monroe worked
11    for the Springfield location. To my knowledge at that
12    time, they were not laid off.
13         Q. With Kimberly Long, what was her position?
14         A. She was EHS.
15         Q. And so she was performing auditor positions on
16    top of her additional duties, correct?
17         A. Yes. She performed work for the Springfield
18    location as I did.
19         Q. In addition to other duties that you did not
20    perform, correct?
21         A. Right.
22         Q. Do you have any knowledge that she continued to
23    perform any audits or work for the Springfield facility
24    after your termination?
25         A. No. After the termination they told me they
```

Page 214

```
 1    sold it.
 2         Q. Do you have any evidence to refute the
 3    contention that they sold that facility?
 4         A. No, I don't have any information about that.
 5         Q. And you said Bradley Role?
 6         A. No, Monroe, M-O-N-R-O-E.
 7         Q. Monroe?
 8         A. Yes.
 9         Q. And so what was Bradley Monroe's position?
10         A. Well, he was over everything as far as he had
11    dealings with the -- I don't know his title. But he was
12    global.
13         Q. Was he in the Telge facility?
14         A. No, he wasn't. That was one of the locations
15    that he was responsible for, though.
16         Q. And so he also performed audits at the
17    Springfield position, but he did work at other positions
18    global or nationwide?
19         A. He did the internal auditing. He was over that
20    program globally.
21         Q. Not just at Springfield?
22         A. Right.
23         Q. And that's different job duties and
24    responsibilities than you had in your position, correct?
25         A. We both did internal auditing.
```

Page 215

```
 1         Q. But did you do internal auditing nationwide?
 2         A. No. I did it for -- just at the time I was
 3    only doing it for Telge. But like I said, they told me
 4    my position was being eliminated because they had sold
 5    the Springfield location.
 6         Q. But you and -- Mr. Monroe and you had different
 7    job duties and responsibilities. I understand you are
 8    both internal auditing, but you were at the Telge
 9    facility, and he was doing a lot of other facilities
10    nationwide, including Springfield?
11         A. Okay.
12         Q. Is that correct?
13         A. Yes.
14         Q. Is there any other employee that you contend
15    were actually doing the work of Springfield?
16         A. Other than the ones that worked there, I don't
17    know -- I can't remember everybody that was working
18    there. But even those people that worked in finance.
19    So Donna worked in finance.
20         Q. And she was doing work for the Springfield
21    facility?
22         A. Yes.
23         Q. And so is it your contention that Ms. Long or
24    Mr. Monroe or Ms. Wilson should have been laid off
25    instead of you because they were doing that work?
```

Page 216

```
 1         A. Uh-uh. I didn't say that. I mean, they should
 2    have been laid off in addition to me. If you were
 3    laying me off because you were getting rid of that
 4    facility, then why not lay these other Caucasian people
 5    off.
 6         Q. But they were also performing additional duties
 7    separate and apart from the Springfield internal audits?
 8         A. Right. But I was, too. Remember, I was
 9    responsible for the document control and the management
10    system that they took away and never gave back. That
11    was my role. The job description for senior business
12    process specialist, that was the job I was hired for. I
13    was not hired to be an internal auditor. They put me
14    into that when I came back after FMLA.
15         Q. And so with respect to the closing of the
16    Springfield facility, you admit that you were performing
17    some audits for them, correct?
18         A. Back -- not at the time of my layoff. In the
19    past, yes, along with Kimberly Long, Brad Monroe, yes.
20    Kathy DeGeorge at one point, too. We performed audits
21    for the Springfield location.
22         Q. And so you are not contesting, you know, This
23    is false because that wasn't even my job ever?
24         A. What was that?
25         Q. It's not your position that that justification
```

54 (Pages 213 to 216)

HARRIET MARIE LANE - 11/20/2019

Page 217

1  is a lie because Springfield audits never fell under
2  your purview?
3       A.  What I'm saying is what they told me the reason
4  for them laying me off is because of the
5  Springfield -- my position would no longer be needed
6  because I'm an internal auditor, and they are
7  eliminating or they sold the Springfield location.  That
8  was their reason for laying me off.
9       Q.  So it's your position that they should have
10 also laid off Kimberly Long and Brad Monroe and Donna
11 Wilson?
12      A.  If that's the reason why they were laying me
13 off, because they sold the location.
14      Q.  And they relayed no other reason for your
15 layoff?
16      A.  No.
17      Q.  And because the fact that you weren't doing
18 work with Springfield, that's the basis of why you
19 believe you weren't actually laid off for that reason?
20      A.  Exactly.
21      Q.  But instead were laid off in discrimination and
22 retaliation?
23      A.  Exactly.
24           (Exhibit 21 was marked.)
25      Q.  (BY MS. GRANT)  I'm handing you what has been

Page 218

1  marked as Exhibit 21.  Exhibit 21 is the letter that you
2  received at the time of your termination, correct?
3       A.  Yes.
4       Q.  And did they present this to you at the meeting
5  with Donna Wilson and Toni Horton?
6       A.  Yes.
7       Q.  And it says here, again, that you were
8  terminated as part of a reduction in force, and your
9  position was being eliminated, correct?
10      A.  Yes.
11      Q.  Are you aware of whether your specific position
12 actually was eliminated at this time?
13      A.  The only thing I know is what they told me.
14 They told me my position was being eliminated because of
15 the Springfield location being terminated.
16      Q.  Do you know if Siemens hired an internal
17 auditor after you were laid off?
18      A.  I don't know.
19      Q.  Do you have any knowledge whether Siemens hired
20 any other I think you said senior business process
21 specialist?
22      A.  I'm not sure.
23      Q.  And do you know who took over your internal
24 auditing duties after your layoff?
25      A.  No, I don't.  But I do know who took over the

Page 219

1  senior business process specialist job duties.
2       Q.  Who did?
3       A.  Remember, that was the combination of the
4  receptionist and then another person that worked in
5  engineering.
6       Q.  So the individuals we discussed earlier, they
7  assumed -- your duties were split up amongst a number of
8  individuals?
9       A.  Right.
10      Q.  And so they performed other duties in addition
11 to your duties?
12      A.  Right.  And then remember, Kathy DeGeorge, she
13 took over some of my responsibilities, too.
14      Q.  Yes.  But generally, your duties were split up
15 and given to other people, correct?
16      A.  Uh-huh.  And they were never given back to me
17 when I returned from medical leave.
18      Q.  And at the time after your termination, to your
19 knowledge, it stayed that way?
20      A.  As far as I know.
21      Q.  And they had done those duties in addition to
22 duties they had with their different positions?
23      A.  Right.
24      Q.  So for example, Kim Long?
25      A.  Uh-huh.

Page 220

1       Q.  She did EHS and then some internal auditing
2  duties?
3       A.  Yes.
4       Q.  But to your knowledge, there was no business
5  process specialist who was hired who did your exact
6  duties after your termination?
7       A.  Not that I'm aware of because I didn't have any
8  dealings with them after that.  But they do have
9  internal auditor positions, yes.
10      Q.  What about at the Telge facility?
11      A.  Full-time?
12      Q.  Yes.
13      A.  I don't know about that.
14           (Exhibit 22 was marked.)
15      Q.  (BY MS. GRANT)  I'm handing you what's been
16 marked as Exhibit 22.
17           Do you recognize Exhibit 22?
18      A.  No.  I mean, from previously the investigation.
19 But when I was working there, no.
20      Q.  You were not aware this existed prior to your
21 termination or the lawsuit?
22      A.  No.
23      Q.  Exhibit 22 is a Position Elimination Form that
24 was completed by -- it looks like from Toni Horton to
25 Lori Lee and Joyce Triglia Bagwell.

55  (Pages 217 to 220)

Page 221

1    Do you know who Lori Lee or Joyce Bagwell
2  is?
3    A.  No.
4    Q.  And according to this, it says "Business
5  Justification" and outlines the decision to eliminate
6  your employment.  Here it says -- I want to walk through
7  it -- "The responsibility of the auditor is to perform
8  all internal auditors of the Telge Road, Houston and
9  Springfield sites."
10    Was that statement correct?
11    A.  Remember, my role when I hired on, I was a
12  senior business process specialist.
13    Q.  As of 2017 was that statement correct?
14    A.  The responsibility of an auditor?
15    Q.  Yes.
16    A.  I don't know that because, remember, I was a
17  senior business process specialist.
18    Q.  And then at the end, though, you were only
19  performing internal audits, right?
20    A.  Right.  So if they changed my job, I didn't
21  know about that.
22    Q.  So if your job title changed, you were unaware
23  of that?
24    A.  Yes, that's correct.
25    Q.  But were you required to perform internal

Page 222

1  audits at the Houston and Springfield sites?
2    A.  Only at the Houston Telge Road location.
3    Q.  Okay.  And she, says, "The schedule for 2017
4  consisted of seven internal audits and seven process
5  audits."  Was that correct?
6    A.  I'm not sure.
7    Q.  Do you have any evidence to refute that?
8    A.  Not at this time.  I don't have any evidence to
9  say that it's true, either.
10    Q.  "When reviewing the time frame needed to
11  complete the audits and maintain the audit database,
12  it's determined that the function does not require one
13  full-time person."
14    So do you have any evidence to refute that
15  there was not enough workload to keep one full-time
16  person busy?
17    A.  Yeah.  There could have been more than enough
18  work -- there was more than enough.  Remember, they
19  took -- this is going back to when I came back from
20  FMLA.  All my responsibilities were taken away.  They
21  took everything and distributed it to other people.  So
22  in my knowledge, yes, there was more than enough work to
23  keep one person busy full-time.  That's what I agreed
24  to.
25    Q.  And then the next one it says here, This year

Page 223

1  the sale of the Springfield site was finalized to be
2  effective October 1, 2017, which also reduces the
3  workload for the internal auditor for the upcoming
4  fiscal year '18.  We have already discussed that
5  statement.
6    Says, "DR Olean also has a Central Office
7  Department that was not previously available to Houston
8  as a resource."
9    Who's DR Olean?
10    A.  I can only assume that that means Dresser Rand
11  Olean, yes.  That's another location.
12    Q.  And so you are not aware of whether or not they
13  had a central office that could be used after this?
14    A.  No, I don't know about that.
15    Q.  It says, "It has been determined that internal
16  audit workload could be reorganized to the Quality
17  Department without adding any additional head count."
18    And in a way, it was reorganized prior to
19  this, correct, because as you said, other people were
20  performing your duties?
21    A.  Uh-huh.  Yes.
22    Q.  Customer and DVN certification are currently
23  responsible for the Quality, and the internal audit role
24  is not part of the customer and DNV other than to
25  comment and provide feedback on the current audits.

Page 224

1    Is that accurate?
2    A.  I'm not sure who -- this is all new to me.
3  Like I said, I have never seen this before.  Never even
4  received a job description or anything.  This is the
5  first time I have seen this.  So I don't know what's
6  true and what's not.  I mean, I can't really attest to
7  that.
8    Q.  It says, "Four Houston Telge Road employees are
9  currently trained to assist with audits.  These trainees
10  have taken on this responsibility in addition to their
11  current workload.  They are not part of Quality or
12  Finance."
13    Do you have any evidence to refute the
14  accuracy of that statement?
15    A.  Uh-uh.  No.
16    Q.  And then it says, "Based upon the above
17  justification, there is no longer a need for the auditor
18  role."
19    MR. BAIL:  How convenient.
20    MS. GRANT:  I'll object to the sidebar.
21    Q.  (BY MS. GRANT)  Do you have any reason to
22  refute that this was the justification for eliminating
23  your position?
24    A.  Okay.  So going back to what I said, I
25  never -- when I hired on, I was a senior business

Page 225

1    process specialist. When I came back from medical
2    leave, the only thing they wanted me to do was to do
3    audits. So it's my personal belief that all this was
4    used in retaliation to get rid of me. And so I cannot
5    agree with any of this. This is my first time ever
6    seeing any of this information.
7         Q. But you are not aware of any evidence that
8    would refute this information?
9         A. My evidence, my personal belief. When you are
10   talking about the responsibility of the internal auditor
11   or an auditor, and then I know this is not true. Are
12   you talking about me in general, or are you talking
13   about internal auditors? Because it just says internal
14   auditor, the responsibility of the auditor. Who are
15   they talking about? Me?
16        Q. Other than questioning who they're talking
17   about, the actual factual evidence in here for this
18   position, do you have any evidence to refute the
19   justifications provided in here?
20        A. My personal interaction when I was there. It
21   says all internal auditors for the Telge Road in Houston
22   and Springfield sites. So that's inaccurate.
23        Q. Because at that point there was only one, the
24   Houston, Telge?
25        A. If you're talking about for the Telge Road

Page 226

1    location, the only ones being done were the ones at
2    Telge. So myself or any other auditors that we talked
3    about previously, they were not doing any at the other
4    Houston locations or the Springfield sites.
5         Q. So it's your position the elimination or sale
6    of the Springfield position had no effect on your duties
7    going forward after that?
8         A. Right.
9         Q. And that's why you support your contention that
10   this was really in retaliation or discrimination?
11        A. Yes.
12        Q. Is there any other evidence you believe that
13   supports your contention that you were laid off in
14   discrimination because of your race or gender?
15        A. Okay. So we're going back to the Performance
16   Improvement Plan, them taking away my responsibilities
17   and my duties when I came back, me being immediately
18   placed on a PIP as soon as I came back from FMLA, and
19   then the excessive monitoring, everything that we talked
20   about, and then for them to lay me off, change my job
21   description without me even knowing. Okay?
22             So I never received any type of pay
23   supplement or anything for -- if they say I'm an
24   internal auditor, I never signed off on any of this.
25        Q. Is there any other evidence you believe, other

Page 227

1    than what we have discussed today, leading up to it that
2    you believe supports your contention that you were laid
3    off because of your race?
4         A. No.
5         Q. Do you believe you were laid off because of
6    your gender?
7         A. Yes.
8         Q. And is it the same evidence like what we've
9    talked about, the events leading up to your termination
10   that you believe support your claim?
11        A. Yes.
12        Q. And is it your contention you were laid off in
13   retaliation for taken FMLA leave?
14        A. Yes.
15        Q. And again, we discussed the events leading up
16   to support your evidence?
17        A. Yes.
18        Q. Any more?
19        A. No.
20        Q. And you contend that you were laid off in
21   retaliation for complaining to Ms. Hubbard, correct?
22        A. Ms. Hubbard.
23        Q. And then also the hotline?
24        A. Yes, and Patti.
25        Q. And again, all of that was based upon the

Page 228

1    events we have discussed here today?
2         A. Yes.
3         Q. Is there any other evidence you believe
4    supports your contention that you were laid off in
5    retaliation for your complaints?
6         A. No, not that I can recall.
7             (Exhibit 23 was marked.)
8         Q. (BY MS. GRANT) I'm handing you what's been
9    marked as Exhibit 23.
10            Do you recognize Exhibit 23?
11        A. It's an application for employment.
12        Q. And is that your electronic signature at the
13   back, or do you recall electronically signing an
14   employment application at the beginning of your
15   employment?
16        A. I can't recall.
17        Q. Do you have any evidence to refute that this is
18   not your application for employment to Siemens?
19        A. No.
20        Q. And you touched on this earlier, but you had
21   been working for Rolls-Royce, which was then purchased
22   by Siemens?
23        A. Right.
24        Q. That's when you hired and became a Siemens
25   employee?

57 (Pages 225 to 228)

HARRIET MARIE LANE - 11/20/2019

Page 229

1    A.  Yes.
2    Q.  So you began your employment with Siemens on
3  October 8, 2014?
4    A.  No, that was more like November, November 2014.
5    Q.  When Siemens purchased Rolls-Royce, you had to
6  still apply for a position within Siemens, correct?
7    A.  Yes.
8    Q.  Which is Exhibit 23?
9    A.  Yes.
10    Q.  If you look at the bottom, it says the
11  "business process improvement specialist"?
12    A.  Where are we at?
13    Q.  The bottom-left corner.
14    A.  Yes, that was my position when I applied.
15    Q.  And did you understand when you submitted this
16  that you were verifying that the information in your
17  application was truthful and accurate to the best of
18  your knowledge?
19    A.  Yes.
20    Q.  And do you contend that the information in here
21  is truthful and accurate to the best of your knowledge?
22    MR. BAIL:  Look at it.
23    A.  So this is just saying the position I had at
24  the time when I applied, this one here and then -- yes.
25        (Exhibit 24 was marked.)

Page 230

1    Q.  (BY MS. GRANT)  I'm handing you Exhibit 24.  Do
2  you recall seeing Exhibit 24?
3    A.  Yes.
4    Q.  Exhibit 24 is the offer letter you received
5  after you submitted the application?
6    A.  Yes.
7    Q.  And it's dated October 20, 2014.  And according
8  to Exhibit 24, you were offered a role or employment as
9  a senior business process specialist with Siemens; is
10  that correct?
11    A.  Yes.
12    Q.  And you were at the Houston office location,
13  correct?
14    A.  Yes.
15    Q.  And did you understand with this offer letter
16  that you were being offered employment at will?
17    A.  Yes.
18    Q.  And do you understand that that means that you
19  could terminate or end your employment with Siemens for
20  any reason at any time?
21    A.  Yes.
22    Q.  And vice versa, Siemens could decide to
23  terminate their employment relationship with you for any
24  reason at any time?
25    A.  Yes.

Page 231

1    MR. BAIL:  Any legal reason.
2    MS. GRANT:  Correct.  Any legal reason.
3    Q.  (BY MS. GRANT)  And how long after this did you
4  begin your employment?
5    A.  I started around November, November.
6    Q.  When you applied, did you interview for the
7  position?
8    A.  Yes.
9    Q.  Who did you interview with?
10    A.  Ann Maslyk and Ayana Browne.
11    Q.  And do you know who made the decision to hire
12  you?
13    A.  Ayana Browne and Ann Maslyk.
14    Q.  And with respect to your termination as
15  reflected in Exhibit 21, your date of termination was
16  October 13, 2017?
17    A.  Yes.
18    Q.  At the time you began your employment with
19  Siemens, did you go through an orientation?
20    A.  Did I?  I can't remember.
21    Q.  Did you receive copies of company policies?
22    A.  Yes.
23        (Exhibit 25 was marked.)
24    Q.  (BY MS. GRANT)  I'm handing you what's been
25  marked as Exhibit 25.  Exhibit 25 is the electronic

Page 232

1  signature summary for you.  Do you recall receiving
2  electronic copies of various Siemens policies at the
3  beginning of your employment?
4    A.  Probably so, yes.
5    Q.  And if you turn to the second page, there is a
6  chart that lists a number of them, and it has the date
7  October 22, 2014.
8        That would have been the beginning of your
9  employment with Siemens?
10    A.  Okay.
11    Q.  Is that correct?
12    A.  Okay.  So remember, I didn't start until like
13  November.
14    Q.  You didn't start until November?
15    A.  Right.  That's when I started working.  That
16  was like the offer letter that you are looking at on
17  Exhibit 24.
18    Q.  Do you have any evidence or are you refuting
19  that you acknowledged receiving these policies on or
20  around October 22, 2014?
21    A.  No.
22    Q.  And I believe you said this a couple minutes
23  ago, but you are not refuting that you received copies
24  of these policies?
25    A.  No.

HANNA & HANNA, INC.
713-840-8484

Page 233

1          (Exhibit 26 was marked.)
2      Q.  (BY MS. GRANT)  And I'm going through just a
3  list of some of these policies.
4          Handing you what's been marked as
5  Exhibit 26.  Do you recognize Exhibit 26?
6      A.  Yes.  This is -- let's see here.  Harassment
7  Free.  I have seen these.
8      Q.  And so you understood that Siemens had a policy
9  prohibiting discrimination with respect to race, color,
10  gender, age and other protected bases?
11      A.  Yes.
12      Q.  And you also understood that Siemens had a
13  policy that prohibited any form of harassment based on
14  protected characteristics?
15      A.  Yes.
16      Q.  And you understood that you were encouraged and
17  the company had a procedure by which you could raise any
18  complaints of harassment and discrimination or
19  retaliation to the company, correct?
20      A.  Yes.
21      Q.  And so along those same lines, you understand
22  the company prohibited retaliation for raising
23  complaints of harassment and discrimination?
24      A.  Right, yes.
25      Q.  And you understood that pursuant to that

Page 234

1  policy, they had a number of avenues for you to raise
2  complaints, your manager, human resources, the hotline
3  we discussed already?
4      A.  Yes.
5          (Exhibit 27 was marked.)
6      Q.  (BY MS. GRANT)  I'm giving you what's been
7  marked as Exhibit 27.  Do you recognize Exhibit 27?
8      A.  No.  I mean, I'm sure I have looked at it at
9  one point in time.
10      Q.  Exhibit 27 is the open communication policy.
11  And again, did you understand that Siemens had a policy
12  that encouraged employees to resolve their work-related
13  issues through their management chain?
14      A.  Yes.
15      Q.  And you also understood that employees who
16  faced serious problems could -- such as harassment and
17  discrimination, could consult with human resources?
18      A.  Yes.
19          (Exhibit 28 was marked.)
20      Q.  (BY MS. GRANT)  I'm handing you Exhibit 28.
21  Have you seen a copy of 28 before?
22      A.  Yes.
23      Q.  And 28 is the recording devices policy?
24      A.  Yes.
25      Q.  And did you understand that Siemens had a

Page 235

1  policy that prohibited certain recording or recording
2  conversations with Siemens' employees or other visitors
3  on Siemens' facilities?
4      A.  Yes.
5      Q.  And did you understand that that applied to all
6  communications except with respect to anything protected
7  or concerted under Section 7 of the NLRA?
8      A.  Yes.
9      Q.  And you understand that a violation of this
10  policy could result in disciplinary action up to and
11  including termination?
12      A.  Yes.
13          (Exhibit 29 was marked.)
14      Q.  (BY MS. GRANT)  Handing you what's been marked
15  Exhibit 29.  Exhibit 29 is Standards of Conduct.
16          Have you seen this before?
17      A.  Yes, I have.
18      Q.  And you are aware that under Siemens' policies
19  there were certain levels of violations?  For example,
20  Level 1, that was types of conduct that were so serious
21  they would result in immediate termination?
22      A.  Okay.
23      Q.  And did you understand there was also a group
24  where certain conduct could result in some sort of
25  termination up to and including -- disciplinary action

Page 236

1  up to and including termination?
2      A.  Yes.
3      Q.  Did you receive a copy of this at the beginning
4  of your employment?
5      A.  I may have.  I can't recall right off.
6          (Exhibit 30 was marked.)
7      Q.  (BY MS. GRANT)  I'm handing you what's been
8  marked as Exhibit 30, which is the Performance
9  Improvement Process.  And as we have discussed today,
10  you were issued a PIP, correct?
11      A.  Yes, I was.
12      Q.  And did you understand that there was a policy
13  governing issuing a PIP for employees?
14      A.  Yes.
15      Q.  Do you allege -- I understand you disagree with
16  the reasons for the PIP, but do you contest or believe
17  that Siemens violated its policy with respect to issuing
18  a PIP?
19      A.  Yes.
20      Q.  I understand the reasons you disagree with --
21      A.  But if we go by the policy, I believe they did
22  violate their policy.
23      Q.  And how so?
24      A.  So it talks about -- you know, so I didn't
25  receive the PIP until after FMLA -- I mean, when I

59 (Pages 233 to 236)

HARRIET MARIE LANE - 11/20/2019

Page 237

1    returned from FMLA.  It says, Step 1, verbal
2    counseling/coaching, never received any of that.  Never
3    received written counseling.  So those are just some of
4    the examples there.
5         Q.  And so you contest they didn't follow the
6    progressive steps outlined in this policy?
7         A.  Yes.
8         Q.  But did you understand that this also -- policy
9    also states you don't have to follow the progressive
10   steps?
11        A.  Right, but you need to have, you know,
12   substantiating evidence.  Right?
13        Q.  Then that goes back to you disagree with the --
14        A.  Right.  Because they put on here untimely
15   processing of expenses, and they use an example that
16   occurred when I was on FMLA.  So their allegations were
17   not correct in here.
18        Q.  And that's why you believe this was issued in
19   violation?
20        A.  Yes.
21             (Exhibit 31 was marked.)
22        Q.  (BY MS. GRANT)  I'm handing you what's been
23   marked as Exhibit 31, which is the Reduction in Force
24   Process.
25             Did you understand that Siemens had

Page 238

1    policies and procedures regarding the reduction in
2    force?
3         A.  Okay.
4         Q.  And did you understand -- we have discussed
5    this -- you were laid off as part of a reduction in
6    force?
7         A.  Yes.
8         Q.  And did you understand that as part of this
9    policy, it states that Human Resources would be involved
10   in and would review decisions with respect to reductions
11   in force?
12        A.  Okay.  Yes.
13        Q.  And at the time who was the Human Resources?
14        A.  Toni Horton.
15        Q.  And so you contend that Toni Horton allowed
16   you to be selected for layoff as part of a reduction in
17   force because of your race?
18        A.  No.  Again, no.
19        Q.  But you are aware that she would have been
20   involved to review the process or your selection for
21   reduction of force?
22        A.  Right.  Like I told you earlier I -- yes.
23             (Exhibit 32 was marked.)
24        Q.  (BY MS. GRANT)  Handing you what's been marked
25   Exhibit 32.  Do you recall receiving a copy of

Page 239

1    Exhibit 32 during your employment?
2         A.  No.
3         Q.  So you were unaware of the Business Conduct
4    Guidelines?
5         A.  I'm sure they existed but they don't just give
6    it to you.  You've got to go out there and research it.
7    And they'll probably set up some computer-based
8    training.
9         Q.  Like on the intranet?
10        A.  Yes.  You do it at leisure.
11             (Exhibit 33 was marked.)
12        Q.  (BY MS. GRANT)  I have given you what's been
13   marked as Exhibit 33.  This is an Employee Patent and
14   Secrecy Agreement.
15             Do you recall at the beginning of your
16   employment signing an agreement with respect to Siemens'
17   non -- excuse me; confidential information and trade
18   secrets?
19        A.  I may have but I don't recall right off, but
20   I'm sure I knew about this.
21        Q.  And were you aware that as an employee of
22   Siemens you were -- you would agree to not disclose any
23   company confidential information or trade secrets?
24        A.  Yes.
25        Q.  And so you knew that that was part of your

Page 240

1    duty, not to disclose that outside of the company,
2    correct?
3         A.  Yes.
4         Q.  And did you understand that at the time of your
5    termination or your layoff you were required to return
6    any company information and property back to the
7    company?
8         A.  Yes.
9         Q.  And is it your position that you returned all
10   company information and documents in your possession?
11        A.  Yes.
12             (Exhibits 34 - 38 were marked.)
13        Q.  (BY MS. GRANT)  Did you understand that
14   violating that policy could lead to your termination?
15        A.  I'm sure.
16        Q.  I'm handing you a grouping of documents,
17   Exhibits 34 through 38.
18             Do you recognize the documents forming
19   Exhibits 34 through 38?
20        A.  No.  Looks like just emails that were sent to
21   my email, my personal email.
22        Q.  So these exhibits are all where you would email
23   your personal email address hmlane33@yahoo.com?
24        A.  Yes.
25        Q.  And in these emails there is a list of

HARRIET MARIE LANE - 11/20/2019

Page 241

1    documents here, and you were forwarding those documents
2    described here to your personal email address, correct?
3         A. Yes.
4         Q. And the list of documents here were all Siemens
5    documents?
6         A. Okay.
7         Q. By looking at the names of these documents,
8    would any of this contain information regarding Siemens'
9    operations or Siemens' businesses?
10        A. No.
11        Q. Why did you forward all of these documents to
12   your personal email?
13        A. Because going back to what we talked about
14   earlier, when I filed complaints about being
15   discriminated against because of my race and my gender
16   and the retaliation, you know, I didn't have any -- use
17   this as supporting evidence in this case we needed to do
18   a lawsuit.
19        Q. Do you still have all of these documents in
20   your possession?
21        A. I don't think, no.  Not to my knowledge.
22        Q. At the time you filed this lawsuit, did you
23   have them in your possession?
24        A. Not that I recall.  I can't remember right now.
25   Like my résumé, of course, I have my résumé, yes.

Page 242

1         Q. What about -- let's look to -- I didn't write
2    the numbers on mine.  It's the one that's Bates
3    labeled 1108.
4              MR. BAIL: It's 37.
5              MS. GRANT: Thank you.
6         Q. (BY MS. GRANT)  There's a document titled
7    "DNV-GL Audit Open Topics."  What would that -- I
8    understand you don't have it with you.  I saved us
9    because it would have been a large stack.
10             Based upon the description, does that
11   refresh your recollection as far as to what that
12   document might have been?
13        A. No, I'm not sure what that is.
14        Q. There is one here that says "I-Docs Training"
15   on this list.
16             Do you see that that?
17        A. Yes.
18        Q. Does that refresh your recollection as to what
19   that document would have been?
20        A. No.
21        Q. Do you know what "Procedure Audits for FY17"
22   would have been?
23        A. Probably just what it says.  I don't remember
24   because I don't have the documents with me.  I don't
25   have them in my possession.  I no longer have the

Page 243

1    documents, even if it was a document that was actually
2    sent to me.  Okay?  So -- I mean, that I sent to myself.
3         Q. Do you have any -- I guess do you contest that
4    you sent these documents to yourself?
5         A. I mean, I would have to -- I mean, this is just
6    a list.  I would have to see, you know, that I actually
7    sent it to myself.  I mean, this could be -- it doesn't
8    mean it's necessarily a document that was sent.  It
9    could be just an email, you know.  So I don't know -- I
10   don't know the contents of the information because I
11   don't have it in my possession right now or access.
12        Q. What happened to all of the documents that you
13   forwarded to yourself during your employment?
14        A. Some of them just automatically just deleted on
15   their own after a time or I purged them myself.
16        Q. When did you purge them?
17        A. I don't know.  That's what I'm saying.
18        Q. Was it before or after your termination?
19        A. What, the documents?
20        Q. When you purged the documents -- I understand
21   you don't know when exactly, but when you purged the
22   documents in your personal email, did that happen before
23   or after your termination?
24        A. Some probably happened before and after.
25        Q. Had you filed your EEOC charge at the time you

Page 244

1    purged the documents you sent to yourself?
2         A. I'm sure, yeah.
3         Q. Did you purge them before or after you filed
4    this lawsuit?
5         A. I can't recall.
6         Q. Did you ever inform your attorney that you had
7    all of these -- forwarded these documents to yourself?
8         A. That I had forwarded emails to myself, yes.
9    But it's not documents; it's emails.  You know, like my
10   conversations back and forth.
11        Q. That would have been attached?
12        A. Some may have.  I don't know.  I don't want to
13   lie; I don't want to guess.  I'm under oath.
14        Q. But you don't have any of these emails in your
15   possession anymore?
16        A. No.
17        Q. Because either they deleted automatically or
18   you purposefully purged them at some point in time?
19        A. Yes.
20        Q. Did you inform anyone at Siemens that you were
21   forwarding all of those emails and documents to
22   yourself?
23        A. No.
24        Q. And the sole reason why you were doing that was
25   as evidence for your complaints, correct?

61 (Pages 241 to 244)

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 245

1    A.  Yes.  Yes.
2         (Exhibit 39 was marked.)
3    Q.  (BY MS. GRANT)  I'm handing you what's been
4    marked as Exhibit 39.  Do you recognize Exhibit 39?
5    A.  Yes.
6    Q.  Exhibit 39 is your charge of discrimination
7    that you filed with the Texas Workforce Commission?
8    A.  Okay.
9    Q.  Do you recognize Exhibit 39?
10   A.  Yes.
11   Q.  And is that your signature down at the bottom
12   left-hand corner?
13   A.  Yes.
14   Q.  Did you understand that by signing this you
15   were declaring under penalty of perjury that the
16   information in here was true and correct to the best of
17   your knowledge?
18   A.  Yes.
19   Q.  And you signed it January 17, 2018?
20   A.  Yes.
21   Q.  So approximately three months after your
22   termination?
23   A.  Yes.
24   Q.  And according to this charge, if you go pretty
25   much in the exact middle, you filed a charge of

Page 246

1    discrimination based on you checked race, retaliation,
2    color and disability?
3    A.  Yes.
4    Q.  And what disability were you contending formed
5    the basis of your claim?
6    A.  So the FMLA.
7    Q.  Are you contending -- I understand you have an
8    FMLA retaliation claim, but are you contending you were
9    discriminated on the basis of a disability?
10   A.  Right --
11        MR. BAIL:  No.  It's no.
12   A.  No.
13   Q.  (BY MS. GRANT)  When you say "disability,"
14   you're referring to your FMLA leave?
15   A.  Yes.
16   Q.  Okay.
17   A.  Yes.
18   Q.  That's a better way to ask it.
19        And it says here next to that for the
20   dates of discrimination, you have March 2016 to
21   October 13, 2017.
22   A.  Yes.
23   Q.  So up to your termination?
24   A.  Yes.
25   Q.  And have we discussed all of the items today

Page 247

1    that you contest form the basis of your claims of
2    discrimination and retaliation?
3    A.  Yes, we have discussed them all that I can
4    recall.
5         (Exhibit 40 was marked.)
6    Q.  (BY MS. GRANT)  I'm handing you what's been
7    marked as Exhibit 40.  Exhibit 40 do you recognize?
8    A.  Yes.
9    Q.  And this purports to be an amended charge of
10   discrimination with the Texas Workforce Commission?
11   A.  Yes.
12   Q.  Is that your signature on the bottom right-hand
13   corner?
14   A.  Yes.
15   Q.  And you signed that on August 2, 2018?
16   A.  Yes.
17   Q.  And here, according to this, you had filed this
18   in order to amend your EEOC charge to add discrimination
19   based on sex?
20   A.  Yes.
21   Q.  And you note you forgot to check the box for
22   sex on the first EEOC charge you filed, which was
23   Exhibit 39?
24   A.  Yes.
25   Q.  How did you send this to the EEOC?

Page 248

1    A.  That was through my attorney.
2    Q.  And to the extent the EEOC does not have any
3    record of receiving this, do you have a record that they
4    received that and acknowledged it?
5    A.  Yes.
6         (Exhibit 41 was marked.)
7    Q.  (BY MS. GRANT)  I'm handing you what's been
8    marked as Exhibit 41.
9         And going back, we have already discussed
10   all of the allegations that form your claim of sex
11   discrimination?
12   A.  Yes.
13   Q.  Exhibit 41 is your notice of right to sue.  Do
14   you recall receiving Exhibit 41?
15   A.  Yes.
16   Q.  And by issuing this, the EEOC was informing you
17   that it was terminating its investigation of the charge?
18   A.  Yes.
19   Q.  And the reason was that more than 180 days had
20   passed?
21   A.  Okay.  Yes.
22   Q.  To your knowledge, did you request this be
23   issued?
24   A.  My attorney handled all this.
25   Q.  So you have no personal knowledge regarding

62  (Pages 245 to 248)

HARRIET MARIE LANE - 11/20/2019

Page 249

1    what triggered the issue of that?
2        A. No.
3            MS. GRANT: I told you, rapid fire.
4            MR. BAIL: I appreciate it.
5        (Exhibit 42 was marked.)
6        Q. (BY MS. GRANT) I'm handing you what's been
7    marked as Exhibit 42. Exhibit 42 is your amended
8    complaint, which is the live pleadings in this action.
9            Did you review a copy of your lawsuit
10   before it was filed?
11       A. Yes.
12       Q. And did you review the amended complaint before
13   it was filed?
14       A. Yes.
15       Q. And you understand that you are asserting a
16   number of claims, first being race discrimination?
17       A. Yes.
18       Q. Have we discussed all your allegations of race
19   discrimination today?
20       A. That I can recall.
21       Q. You also allege discrimination based on color?
22       A. Yes.
23       Q. And have we discussed the allegations here with
24   respect to your claim of color discrimination?
25       A. Yes.

Page 250

1        Q. You also are alleging claims of gender
2    discrimination, correct?
3        A. Yes.
4        Q. And have we discussed all the instances of
5    gender discrimination that are forming the basis of your
6    claim here today?
7        A. Yes.
8        Q. You are also alleging retaliation, correct?
9        A. Yes.
10       Q. And that would be retaliation with respect to
11   your FMLA claim, correct?
12       A. Yes.
13       Q. And your complaints to Human Resources, being
14   Toni Horton, Linda Hubbard, Patti Davis?
15       A. Yes.
16       Q. And your hotline complaint?
17       A. Yes.
18       Q. Have we discussed all of the bases of what you
19   allege you suffered retaliation, meaning the actual acts
20   of retaliation?
21       A. That I can recall, yes.
22       Q. And you also are alleging hostile work
23   environment or harassment based on race, correct?
24       A. Yes.
25       Q. And have we discussed all the instances of

Page 251

1    harassment that support your claim?
2        A. Yes, that I can recall.
3        Q. The next is hostile work environment based on
4    color?
5        A. Yes.
6        Q. And have we discussed all the instances of your
7    harassment that support your claim of hostile work
8    environment based on color?
9        A. Yes.
10       Q. Next, hostile work environment based on gender?
11       A. Yes.
12       Q. And have we discussed all the instances of
13   gender harassment that form the basis of your claim?
14       A. Yes, that I can recall.
15       Q. If you look to -- are you alleging any claim
16   that you were denied FMLA leave?
17       A. No.
18       Q. With respect to the FMLA leave that you believe
19   you were retaliated for, that was one from February
20   through May 2017, correct?
21       A. Yes.
22       Q. Turning to page 7, which discusses the damages
23   you are seeking in this lawsuit.
24       A. In Exhibit 42?
25       Q. Yes.

Page 252

1        A. What was the number again? I'm sorry.
2        Q. Page 7. And first, how much money are you
3    seeking in this lawsuit?
4        A. That's what I'm going to have to talk to my
5    attorney about.
6        Q. If I just had to ask you here what you are
7    looking for?
8        A. What do you mean, as far as a monetary amount?
9        Q. Yes.
10       A. Back pay, you know, the pain and suffering. So
11   that's what I'm looking for.
12       Q. Now, with respect to back pay, how long do you
13   contend you would have remained employed with Siemens
14   had you not been laid off?
15       A. I would still be employed with them today.
16       Q. And on what do you base that conclusion?
17       A. Because of my loyalty, my performance.
18   Remember, altogether that would have been 17 years. You
19   know, you go from 2001, I was laid off in 2017. We were
20   bought out in October of 2014 but -- so I would have
21   been still with them to this day. That's a global
22   company. I could have had other promotions. Remember,
23   I moved here from Indianapolis, got promoted. So I
24   would have been still employed.
25       (Exhibit 43 was marked.)

HARRIET MARIE LANE - 11/20/2019

Page 253

1    Q. (BY MS. GRANT) I'm handing you what's been
2  marked as Exhibit 43.  Exhibit 43 -- remember we
3  discussed initial disclosures, the information the
4  parties are required to provide?
5    A. Yes.
6    Q. One of the bits of information you are required
7  to provide to me is a calculation of your damages.  And
8  so on pages 3 to 4, you walk through your back pay.  And
9  if you turn to page 4 -- it literally runs from page 3
10  to 4, it says your approximate back pay is somewhere
11  close to 40 to $50,000?
12        MR. BAIL:  That was as of July 1.
13    A. Yes, that as of July 1, 2019.
14    Q. (BY MS. GRANT)  So you are -- obviously, that
15  will go up the longer it goes?
16    A. Yes.
17    Q. Do you have any background in economics or
18  finance?
19    A. Other than education?
20    Q. What education did you receive in finance and
21  economics?
22    A. My business, my MBA.
23    Q. And what was your specialty or focus with your
24  MBA?
25    A. So that was business, applied management.

Page 254

1    Q. And did you take any courses on the lost value
2  or future wages?
3    A. And then also my paralegal studies.  That's
4  what my associate's is in.
5    Q. You have an associate's in paralegal studies?
6    A. Yes.
7    Q. So are you telling me that because of that, you
8  are familiar with how to calculate damages in legal
9  matters such as back pay and front pay?
10    A. Yes.
11    Q. With respect you also said that you were
12  seeking lost benefits?
13    A. Yes.
14    Q. And what benefit did you receive while you were
15  employed with Siemens?
16    A. 401(k), a match.  I could make contributions;
17  they matched it.  My health care, my life insurance.  If
18  I wanted to go back for tuition reimbursement or to get
19  more additional education, they would pay for that.
20    Q. At the time of your termination, did you have
21  any plans or intentions to go to school and use the
22  tuition reimbursement benefits?
23    A. Yes.  For additional certifications for
24  professional development, yes.
25    Q. What about any university education?

Page 255

1    A. Oh, to get my Ph.D.?  Not at the time, or
2  doctorate, no.
3    Q. Once you were able to end your employment, were
4  you able to obtain health insurance from another source?
5    A. Not right away, no.
6    Q. Do you have health insurance today?
7    A. Yes.
8    Q. Do you have any knowledge of the value of the
9  benefits that you received from Siemens?
10    A. I don't know that right now.  That's, like I
11  said, you know...
12    Q. You also claim you are seeking compensatory
13  damages.  Other than back pay and back wages and lost
14  benefits, what other sort of compensatory damages are
15  you seeking?
16    A. That's what I can think of right now.
17        MR. BAIL:  Compensatory includes emotional
18  pain and suffering.
19    A. Yeah, the emotional pain and suffering.
20    Q. (BY MS. GRANT)  And so with respect to
21  emotional pain and suffering, we have talked about you
22  took FMLA leave for stress?
23    A. Yes.
24    Q. And did that manifest itself in any physical
25  conditions?

Page 256

1    A. Right.  They had me on medications for, you
2  know, what I was going through.  Like I couldn't sleep
3  and anxiety.  Yeah.
4    Q. Other than lack of sleep and anxiety, what
5  other physical symptoms were you experiencing because of
6  your stress?
7    A. Lack of concentration and memory.  I mean, all
8  that you would have to go to the doctor's report for
9  that and psychiatrist and my therapist.  I'm not -- I
10  can't remember everything right now.
11    Q. Are you still suffering anxiety?
12    A. No.
13    Q. Are you still suffering the lack of
14  concentration?
15    A. No.
16    Q. When did you stop experiencing the lack of
17  concentration?
18    A. I can't remember the exact dates.
19    Q. And when did you stop suffering from anxiety?
20    A. That will all be in medical records.  I can't
21  remember exact dates, sorry.
22    Q. Any other physical manifestations that you have
23  experienced because of the mental anguish that you
24  suffered as a result of Siemens?
25    A. Not that I can recall.

64  (Pages 253 to 256)

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 257

1      Q. And you stated medications. Do you recall any
2  of those medications you took?
3      A. No. I provided that list to you guys.
4      Q. When did you first begin to experience these
5  symptoms?
6      A. That was back in 2016.
7      Q. Did you stop experiencing them before or after
8  your termination?
9      A. It was still going on. I can't remember
10 exactly when it stopped. Because I got terminated in
11 October of 2017. I can't remember when he released me
12 or she released me or they released me.
13     Q. Are you still seeking treatment with your
14 psychiatrist or therapist?
15     A. Not with the psychiatrist, no.
16     Q. But with your therapist?
17     A. Occasionally.
18     Q. When did you first start seeing a therapist?
19     A. I want to say I started seeing her in December
20 or -- December I want to say of 2016.
21     Q. And when did you start seeing your
22 psychiatrist?
23     A. So that was right after the layoff -- no. That
24 was when I went on medical leave. That was February
25 2017.

Page 258

1      Q. Have you experienced any other physical
2  symptoms that you contend form your pain and suffering
3  damages?
4      A. Not that I recall right now.
5      Q. According to your claims, you also said you are
6  seeking damages for humiliation?
7      A. Yes.
8      Q. Are those damages in addition to the emotional
9  pain and suffering we have already discussed?
10     A. Yes.
11     Q. Have you suffered or experienced any physical
12 symptoms of humiliation other than those that we
13 discussed?
14     A. Remember the depression, all that comes with
15 it. It's an emotional thing.
16     Q. Were you diagnosed with depression or you had
17 said due to stress?
18     A. It's in the medical records. I don't know the
19 medical term. I would be making up stuff at this point.
20     Q. You are also seeking damages for -- damage to
21 professional reputation?
22     A. Yes.
23     Q. What damages have you experienced due to your
24 professional reputation?
25     A. Being the fact that -- so I was at Rolls-Royce

Page 259

1  and Siemens for a very long time. I mean, those are
2  reputable companies. So I haven't been able to get a
3  job, full-time job.
4      Q. And you contend that's because Siemens laid you
5  off?
6      A. Right.
7      Q. In the energy industry it's not uncommon for
8  people to be laid off in their jobs. Do you agree?
9      A. Right.
10     Q. But you still contest that your layoff somehow
11 had effects on your professional reputation?
12     A. Yes.
13     Q. Have you ever been -- have you had anybody tell
14 you that you aren't able to find a job because you were
15 laid off at Siemens?
16     A. No.
17     Q. You are also seeking punitive and liquidated
18 damages?
19     A. Yes.
20     Q. Is it your contention that Siemens acted
21 maliciously towards you?
22     A. Yes.
23     Q. On what do you base this assertion that Siemens
24 acted maliciously towards you?
25     A. Based on what we talked about, the retaliation,

Page 260

1  the PIP, the things we have talked about throughout the
2  day.
3      Q. The actions that form the basis of your claim
4  also evidence that they were malicious?
5      A. Yes.
6      Q. Do you believe that Siemens acted with any
7  reckless indifference towards you?
8      A. Yes.
9      Q. And on what do you base your contention that
10 they acted with reckless indifference towards you?
11     A. Going back to what we've talked about.
12     Q. Everything we've talked about here today?
13     A. Yes.
14     Q. What evidence do you have that Siemens did not
15 act in good faith?
16     A. We looked at some of the information today. We
17 looked at the inaccurate information on the PIP, as far
18 as the untimely processing of expenses. I mean, we've
19 looked at them not communicating to me what my new role
20 was going to be as far as changing me from a senior
21 business process specialist to an internal auditor.
22 Them telling me that the reason why they laid me off had
23 something to do with the sale of the Springfield
24 location. Those are just a few of the examples.
25     And then Mark Shipley allowing for -- or

65 (Pages 257 to 260)

HANNA & HANNA, INC.
713-840-8484

HARRIET MARIE LANE - 11/20/2019

Page 261

1    his inaction for the retaliation and the -- you know,
2    all the treatment that I was getting from Bill Piatt.
3    You know, those are just some of the examples.  And it's
4    more than what we have talked about.  Then all that, you
5    know, caused -- you know, affected my health.
6        Q.  Did you ever complain personally to Mark
7    Shipley about Bill Piatt's behavior?
8        A.  No.  That was gone -- no.
9        Q.  And, also, you are seeking attorney's fees?
10       A.  Yes.
11       Q.  When did you first contemplate filing a lawsuit
12   against Siemens?
13       A.  I can't remember exactly when.
14       Q.  When did you first contact your attorney?
15       A.  I have to look at records.  I want to say that
16   was in, what, 2017.
17       Q.  Have you paid any attorney bills?
18       A.  Have I?  No.
19       Q.  Are you aware of what your fee arrangement is
20   with your attorney?
21       A.  Yes.
22       Q.  Is it a contingency fee arrangement?
23       A.  Yes.
24       Q.  You are also -- finally, you are seeking costs?
25       A.  Costs?

Page 262

1        Q.  Meaning the costs associated with filing the
2    lawsuit other than his fees.
3        A.  Yes.
4        Q.  Do you have any knowledge about how much in
5    costs you or your attorney have paid to this point?
6        A.  Not right now.
7            MR. BAIL:  Not much.
8        Q.  (BY MS. GRANT)  Have you paid any bills that
9    include costs?
10       A.  No.
11           MS. GRANT:  I'll pass the witness.
12           MR. BAIL:  I pass the witness.  Reserve
13   questioning for trial.
14           MS. GRANT:  Thank you.
15           (The deposition concluded at 2:59 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 263

1                CHANGES AND SIGNATURE
2    WITNESS NAME:  HARRIET MARIE LANE
3    DATE OF DEPOSITION:  NOVEMBER 20, 2019
4    PAGE  LINE   CHANGE        REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   Job 18141

Page 264

1        I, HARRIET MARIE LANE, have read the foregoing
2    deposition and hereby affix my signature that same is
3    true and correct, except as noted above.
4
5
6            _____
7            HARRIET MARIE LANE
8    THE STATE OF _____)
9    COUNTY OF _____)
10
11       Before me, _____, on this day
12   personally appeared HARRIET MARIE LANE, known to me (or
13   proved to me under oath or through _____)
14   (description of identity card or other document)) to be
15   the person whose name is subscribed to the foregoing
16   instrument and acknowledged to me that they executed the
17   same for the purposes and consideration therein
18   expressed.
19       Given under my hand and seal of office this
20   _____ day of _____, _____.
21
22           _____
23           NOTARY PUBLIC IN AND FOR
24           THE STATE OF _____
24
25   Job 18141

66  (Pages 261 to 264)

HARRIET MARIE LANE - 11/20/2019

Page 265

1                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
2                      HOUSTON DIVISION
3    HARRIET LANE,            *
                              *
4              Plaintiff,     *
                              *
5    v.                       * C.A. No. 4:19-cv-00435
                              *
6    SIEMENS ENERGY, INC.,    *
                              *
7              Defendant.     *
                              *
8
               REPORTER'S CERTIFICATION
9                ORAL DEPOSITION OF
                 HARRIET MARIE LANE
10               NOVEMBER 20, 2019
11        I, CONSTANCE KOENIG, RPR, Certified Shorthand
12   Reporter in and for the State of Texas, hereby certify
13   to the following:
14        That the witness, HARRIET MARIE LANE, was duly
15   sworn by the officer and that the transcript of the
16   deposition is a true record of the testimony given by
17   the witness;
18        That the original deposition was delivered to
19   Ashlee Grant, Custodial Attorney.
20        That a copy of this certificate was served on
21   all parties shown herein on _____.
22        I further certify that pursuant to FRCP
23   Rule 30(f)(1) that the signature of the deponent:
24        __X__ was requested by the deponent or a party
25   before the completion of the deposition and that

Page 266

1    signature is to be returned within 30 days from the date
2    of receipt of the transcript.  If returned, the attached
3    Changes and Signature Page contains any changes and the
4    reasons therefore.
5        _____ was not requested by the deponent or party
6    before the completion of the deposition.
7        I certify that I am neither attorney or counsel
8    for, related to, nor employed by any of the parties or
9    attorneys in the action in which this testimony was
10   taken.  Further, I am not a relative or employee of any
11   attorney of record in this cause, nor am I financially
12   or otherwise interested in the outcome of the action.
13        Certified to by me this, the 27th day of
14   November, 2019.
15
16
17        _____
          CONSTANCE KOENIG, Texas CSR 6577
18        Texas CSR 6577
          Expiration Date:  12/31/20
19        Firm Registration No. 10434
          Hanna & Hanna, Inc.
20        8582 Katy Freeway, Suite 105
          Houston, Texas 77024
21        (713) 840-8484
          www.hannareporting.com
22
23
24
25

                              67  (Pages 265 to 266)

HANNA & HANNA, INC.
713-840-8484