# EXHIBIT 7

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

HARRIET LANE,              *
                           *
      Plaintiff,           *
                           *
v.                         * C.A. No. 4:19-cv-00435
                           *
SIEMENS ENERGY, INC.,      * JURY TRIAL DEMANDED
                           *
      Defendant.           *
                           *
***********************************************************

ORAL DEPOSITION OF
WILLIAM MICHAEL PIATT
FEBRUARY 4, 2020
***********************************************************

   ORAL DEPOSITION of WILLIAM MICHAEL PIATT, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on February 4, 2020, from 12:39 p.m. to 1:49 p.m. before Constance Koenig, RMR and CSR No. 6577 in and for the State of Texas, reported by stenographic method at Baker & Hostetler, LLP, 811 Main Street, Suite 1100 Houston, Texas 77002, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record attached hereto.

Page 2

1    APPEARANCES:
2
3    FOR THE PLAINTIFF:
4        Mr. Ashok Bail
         THE BAIL LAW FIRM, PLLC
5        3120 Southwest Freeway, Suite 450
         Houston, Texas 77098
6        832.216.6693
         ashok@baillawfirm.com
7
8    FOR THE DEFENDANT:
9        Ms. Ashlee Grant
         BAKER & HOSTETLER LLP
10       811 Main Street, Suite 1100
         Houston, Texas 77002
11       713.646.1316
         agrant@bakerlaw.com

Page 3

                    I N D E X

Appearances                                    2

WILLIAM MICHAEL PIATT

  Examination by Mr. Bail                      4
  Examination by Ms. Grant                    45
Changes and Signature                         46
Reporter's Certificate                        48

                   E X H I B I T S

Exhibit 1   Defendant Siemens Energy Inc.'s   14
            Supplemental Objections and Answers
            to Plaintiff's First Set of
            Interrogatories (NO BATES NUMBERS)

Exhibit 2   Record and Notes of Bill Piatt    21
            (SIEMENS-LANE_00326)
Exhibit 3   Chain of Emails with Attachments, 30
            Subject:  FW: Business Justification
            (SIEMENS-LANE_00841-844)
Exhibit 4   Internal Auditing Role and        34
            Responsibilities
            (SIEMENS-LANE_00206-207)

Page 4

1         WILLIAM MICHAEL PIATT,
2  having been first duly sworn, testified as follows:
3              E X A M I N A T I O N
4  BY MR. BAIL:
5      Q.  Can you please state your full name and spell
6  it out for the Court, please?
7      A.  William Michael Piatt, W-I-L-L-I-A-M,
8  M-I-C-H-A-E L, P-I-A-T-T.
9      Q.  Mr. Piatt, do you also go by "Bill"?
10     A.  I do.
11     Q.  Can I call you "Bill"?
12     A.  Yes, you may.
13     Q.  Thank you.
14         For the record, do you classify yourself
15 as a Caucasian male?
16     A.  I do.
17     Q.  Have you ever had your deposition taken before?
18     A.  I have.
19     Q.  How long ago was that?
20     A.  Maybe a year and a half.
21     Q.  Okay.  Was it in relation to an employment
22 matter?
23     A.  No.
24     Q.  I'm going to go over a couple of guidelines you
25 have probably heard before and she has probably gone

WILLIAM MICHAEL PIATT - 2/4/2020

Page 5

1  over with you already, but I'm going to do it again.
2          One of the rules for us to abide by is for
3  me to ask you a question and for you wait to wait for me
4  to finish my question before responding.  And, likewise,
5  I will wait for you -- try my best to wait for you to
6  finish your response before I ask a question.  Okay?
7      A.  Okay.
8      Q.  Another thing to keep in mind is when you are
9  responding -- and you are already doing a good job of
10 it -- is to have oral responses as opposed to nodding of
11 the head or shaking of the head and things of that
12 nature, because she can't pick it up.
13     A.  Okay.
14     Q.  If there is a question you don't understand,
15 please ask me to rephrase the question and I will until
16 you understand it.
17     A.  Okay.
18     Q.  If you need a break, let me know.  I don't
19 think this is going to take too long, maybe an hour,
20 hour and a half.  Still, if you need a break during that
21 period of time, just let me know.
22     A.  Okay.
23     Q.  Bill, could you please tell the Court your
24 educational background from college, just college-wise?
25     A.  No college.

Page 6

1      Q.  Okay.  Can you please -- strike that.
2          How long have you worked for Siemens?
3      A.  Almost 19 years.
4      Q.  Did you ever work for Rolls-Royce?
5      A.  I did not.
6      Q.  In the 19 years that you've been working for
7  Siemens, can you chronologically tell me what your
8  positions within the company have been?
9      A.  Yes.  I was hired on as an inspector.  I worked
10 on the shop floor.  I then was a surveillance inspector
11 working at vendor sites.  I then became the inspection
12 coordinator, then the Quality Assurance manager, and
13 then the Quality manager.
14     Q.  Okay.  When were you the inspection coordinator?
15     A.  Without my record in front of me, I'll have to
16 guess for you.
17     Q.  Please guess.
18     A.  About nine years back.
19     Q.  Okay.  And about nine years ago -- strike that.
20         When did you become a quality assurance
21 manager?
22     A.  About seven years ago.
23     Q.  And when did you become the Quality manager?
24     A.  Four, five years ago.
25     Q.  So --

Page 7

1      A.  And, again, this is the best of my recollection
2  without any record in front of me.
3      Q.  Understood.
4          You know who my client Harriet Lane is,
5  correct?
6      A.  I do.
7      Q.  You used to work with her when she was working
8  at Siemens?
9      A.  I did.
10     Q.  Were you ever her supervisor?
11     A.  I was not.
12     Q.  When you became the Quality manager, who did
13 you manage?
14     A.  Dennis Pluskota.
15     Q.  Can you spell his last name?
16     A.  I'll try.  P-L-U-S-K-O-T-A.
17     Q.  Okay.
18     A.  Andrew Loera, L-O-E-R-A; Frank Gutierrez, I
19 won't try; Todd Adams; Sylvia Nadal; Marlon Vaughn.  Had
20 a couple temporary people.  One of them I know was David
21 Moltamoyal [phonetic], and now I also have a Chris
22 Guidry.
23     Q.  And the individuals that you just listed, are
24 they all the individuals, to your knowledge, that you
25 have supervised since you have been a Quality manager?

Page 8

1      A.  I believe that's all of them.
2      Q.  Okay.  Of all the individuals you listed, there
3  is only one female, Sylvia Nadal; is that correct?
4      A.  This is correct.
5      Q.  You still supervise Sylvia Nadal?
6      A.  I do.
7      Q.  What position does she hold?
8      A.  She is inspection coordinator/document control.
9      Q.  When you became the Quality manager, did you
10 have to apply for that position?
11     A.  Yes.  It was offered and I applied.
12     Q.  Was it something that was announced internally
13 within Siemens?
14     A.  The position?
15     Q.  Uh-huh.
16     A.  I do not know for sure.
17     Q.  How did you become aware of the position?
18     A.  My boss retired or left.
19     Q.  Who was your boss?
20     A.  Give me a second.  Hector Torres.
21     Q.  How would you describe your relationship
22 working with Hector Torres?
23     A.  Good.
24     Q.  In 2017 can you explain like the divisions you
25 were working with and the ones you were working under?

2 (Pages 5 to 8)

HANNA & HANNA, INC.
713-840-8484

Page 9

1  A. I'm not sure what you mean by "divisions."
2  Q. So you are Quality manager, correct?
3  A. Correct.
4  Q. So is Quality a department or a division?
5  A. Department.
6  Q. A department, okay.
7     How many other supervisors -- strike that.
8     How many other managers were in the
9  Quality department besides you?
10  A. None.
11  Q. I'm going to read out the names that I
12  just -- that you just testified to, and could you please
13  let me know which ones you were supervising in 2017
14  after Harriet came back from her leave?
15     Were you supervising Andrew Loera?
16  A. Yes.
17  Q. Were you supervising Frank Gutierrez?
18  A. Yes.
19  Q. Were you supervising Todd Adams?
20  A. I don't recall if he had left or not yet.
21  Possibly.
22  Q. Possibly. Okay.
23     What about Pluskota?
24  A. Yes.
25  Q. Sylvia?

Page 10

1  A. Yes.
2  Q. Marlon Vaughn?
3  A. Yes.
4  Q. David whatever?
5  A. No. He was not there at the time.
6  Q. And Chris?
7  A. No.
8  Q. Of the individuals that I have listed, have you
9  been involved with the termination of any of them?
10  A. Yes.
11  Q. Which one?
12  A. Todd Adams and Andrew Laura.
13  Q. Do you recall when Todd Adams was terminated?
14  A. I don't know the date. It was several years
15  ago.
16  Q. Several years ago.
17     What about Loera?
18  A. He was probably about a year and a half ago.
19  He went to a competitor.
20  Q. Okay. So he wasn't terminated; he chose to
21  leave?
22  A. Correct.
23  Q. So the only person that you were involved with
24  their termination is Todd Adams?
25  A. I believe he chose to resign.

Page 11

1  Q. Okay. He took resignation in lieu of
2  termination?
3  A. I believe so. I would have to see the records
4  to know for sure.
5  Q. Other than the people that you supervised, were
6  there any other employees of Siemens that you were
7  involved in their termination action?
8     MS. GRANT: Objection; form.
9  A. Yes.
10  Q. (BY MR. BAIL) Who was that?
11  A. Another person that actually I supervised that
12  I left off that list. And I can't remember the
13  gentleman's name. It was a long time back.
14  Q. Okay.
15  A. I could give you the information, if it's
16  needed.
17  Q. I appreciate that.
18     You recall there was a time period when
19  Harriet was working here that she took off two or three
20  months' leave? Do you recall that?
21  A. I recall.
22  Q. Do you recall that being an FMLA leave?
23  A. I do.
24  Q. How did you know that?
25  A. I was told by her manager.

Page 12

1  Q. Who was her manager at that time?
2  A. Bear with me. We go through managers.
3  Q. Was that Melissa King?
4  A. Yes, thank you.
5  Q. And during that time period when my client was
6  on leave, did you assume any of her duties?
7  A. Yes.
8  Q. Can you tell me which ones you assumed?
9  A. May I rephrase? The audit team assumed some of
10  her duties.
11  Q. Okay. How does the audit team relate
12  to -- what is its relation to the Quality department?
13  A. The Quality department is responsible for your
14  Integrated Management System. Internal auditing is part
15  of the Integrated Management System.
16  Q. Okay. So you being the Quality manager, would
17  you be supervising people on the audit team?
18  A. I don't know if I would say "supervising," but
19  working with.
20  Q. Do you recall who was on the audit team at that
21  time period?
22  A. Ms. Lane, myself, Melissa -- and I can't get
23  her name -- Stozavik.
24  Q. I know who you are talking about.
25  A. And Andrew Loera was all on the team.

Page 13

1  Q. Do you know what duties Melissa assumed of
2  Harriet's during that time period?
3  A. We divided up what audits Harriet was scheduled
4  to do amongst the team. I don't recall who took what
5  audits.
6  Q. Okay. Did y'all try to divide the audits up
7  equally?
8  A. I believe that was the plan. Again, I'd have
9  to look at the records, but more or less.
10 Q. Okay. Besides auditing, what other job
11 functions of Harriet's, if any, did you or any of the
12 other members of the audit team assume?
13 A. None.
14 Q. Only the audit duties?
15 A. Yes.
16 Q. Okay. To your knowledge?
17 A. Yes.
18 Q. And when Harriet returned from leave, do you
19 remember any changes in her role?
20 A. No. I know she took back over audit as lead on
21 the audit teem.
22 Q. What does it mean to be a lead auditor?
23 A. The roles were to keep the database up to date,
24 to help others, if needed, on the audit team. I think
25 preparing the yearly audit plan. That's what the lead

Page 14

1  did.
2  Q. Okay. Were you ever aware at any time during
3  my client's employment with Siemens that she was
4  classified as a senior business process specialist?
5  A. I'm not sure what her titles were.
6  Q. Okay. It's fair to say, you know what you saw
7  her do?
8  A. Correct.
9  Q. You didn't know particularly what she was
10 called?
11 A. Correct.
12 Q. Okay. You saw her doing auditing. She could
13 have been doing other things that you weren't aware of,
14 right --
15 A. Yes.
16 Q. -- as a senior business process specialist?
17 A. Correct.
18 Q. I'm going to hand you some documents. You may
19 have reviewed them; you may have seen them. I'm going
20 to ask you some questions from them. Please take a look
21 at these.
22      (Exhibit 1 was marked.)
23 Q. (BY MR. BAIL) Please take a few minutes to
24 review this, and let me know when you are comfortable
25 discussing it.

Page 15

1  A. You want me to read all this legal?
2  Q. You can -- it's up to your attorney about how
3  you want to treat that document. I just want to ask you
4  questions from it.
5      MS. GRANT: You don't need to read all of
6  the legal.
7  Q. (BY MR. BAIL) I'll tell you what, I'm going to
8  ask you questions from Interrogatory No. 5, No. --
9  A. Thank you. That's helpful.
10 Q. -- Nos. 11 and 12. 5, 11 and 12. So whenever
11 you have reviewed those, let me know.
12     MS. GRANT: While he's reading that, can
13 we stipulate to read and sign?
14 Q. (BY MR. BAIL) What number are you looking at
15 right now?
16 A. On page 13.
17 Q. You don't have to read that one for this one.
18 You want to go to page 15, Nos. 11 and 12.
19     MS. GRANT: He's only going to ask you
20 about three of them, these two.
21 A. Okay.
22 Q. (BY MR. BAIL) If you could please turn to
23 page 7.
24 A. Okay.
25 Q. Have you ever seen this document before you or

Page 16

1  a similar document in this case?
2  A. No.
3  Q. Have you ever been asked to respond to any of
4  the -- strike that.
5      Do you know what interrogatory questions
6  are?
7  A. Not really.
8  Q. Okay.
9      MR. BAIL: For the record, in front of the
10 witness is Defendant Siemens Energy's Supplemental
11 Objections and Answers to Plaintiff's First Set of
12 Interrogatories.
13     If you go to the bottom of page 7, the
14 last paragraph, see where it says, "By October 2016 upon
15 the completion of a larger organizational restructuring,
16 the Business Excellence department was eliminated."
17     Do you see that?
18 A. I do.
19 Q. Do you know what that's all about?
20     MS. GRANT: Objection; form.
21 A. I know that we had a reduction in workforce due
22 to lack of work around 2016.
23 Q. (BY MR. BAIL) Was the Business Excellence
24 department under the Quality department?
25 A. It was the Quality department.

Page 17

1  Q. Okay. So was there even a Quality department
2  before this changed?
3  A. At one point in time there was a Quality
4  department. At one point in time there was a Business
5  Excellence. At one point in time there was both. I
6  mean, organizational restructuring.
7  Q. Okay. So as of October 2016, it was called the
8  Quality department?
9  A. I believe that to be the case.
10 Q. And you were the manager of the Quality
11 department at that time?
12 A. I believe at that time Hector Torres was still
13 the manager of the Business Excellence department and
14 the name changed, takes some time. I don't have the
15 dates in front of me. So I can't say.
16 Q. Were you the manager of the Quality department
17 before Harriet went on her leave?
18 A. Yes.
19 Q. And was that a pretty new position for you at
20 that time?
21 A. I was a Quality assurance manager prior to that
22 and then the Quality manager, if you will, and I don't
23 know the length of time. Again, I'd have to have this
24 timeline in front of me to fully answer.
25 Q. How many individuals that you have supervised

Page 18

1  have you had any role in their hiring?
2  A. Three or four.
3  Q. Of those three or four, were all three or four
4  of those individuals selected for permanent positions
5  within the company?
6  A. Yes.
7  Q. Were you involved with interviews for all of
8  those positions?
9  A. Yes.
10 Q. Could you name the individuals that you are
11 referring to?
12 A. David Moltamoyal [phoentic], Chris Guidry,
13 Marlon Vaughn, and I had some interaction on those lines
14 for Andrew Loera, but that was before I was a manager.
15 Q. So you were in some role or fashion involved
16 with hiring those individuals, correct?
17 A. Andrew, an interview only; the other three,
18 yes.
19 Q. Okay. Do you know -- were you ever on an
20 interview panel where you were interviewing applicants
21 for positions?
22 A. Yes.
23 Q. And on those interview panels for the positions
24 you just testified to, were there female applicants?
25 A. I don't recall.

Page 19

1  Q. Okay. In your role as a Quality manager, have
2  you hired any new employees?
3  A. Yes.
4  Q. Were they the same individuals you just
5  testified to?
6  A. Yes, the three.
7  Q. If you turn to page 8 of the document that's in
8  front of you and go towards the middle, you see my
9  document? I'm going to be asking questions right there.
10 See where it says, "From February 13,
11 2017, through May 21, 2017, while Plaintiff was out on
12 FMLA leave, Bill Piatt, Quality manager, assumed
13 Plaintiff's duties and responsibilities."
14 Do you see that?
15 A. I do.
16 Q. Okay. You testified earlier that you assumed
17 her duties and responsibilities, but others in the
18 auditing department also did?
19 A. I believe I was saying the audit team took on
20 the responsibilities of her internal audits that she was
21 going to do.
22 Q. Now, the next line, it says, "On May 25, 2017,
23 upon Plaintiff's return from leave" -- and the Plaintiff
24 we're talking about is Harriet Lane -- "Piatt and Donna
25 Wilson decided that Plaintiff's prior IMS system

Page 20

1  responsibilities would remain under Piatt's purview and
2  Plaintiff's responsibilities would be limited to her job
3  duties and responsibilities would be limited to those
4  Lead Internal Auditor duties and responsibilities."
5  Do you recall this May 25, 2017 --
6  A. I recall the meeting, but I do not recall what
7  you have just read.
8  Q. Okay.
9  A. What I recall was Ms. Lane asked to stop doing
10 the IMS procedures. When you are saying IMS system, the
11 role is IMS documents in and out of our repository, the
12 updating of those, the assisting and writing, things of
13 that nature. And I recall that it was her that asked to
14 no longer do those duties.
15 Q. And those were given to Irene? Those duties?
16 A. Just the part of the database, the in and out
17 of documents.
18 Q. Okay. Is there anything else you can recall
19 from that May 25, 2017, meeting with you, Donna Wilson
20 and my client?
21 A. I recall there was a lot of requests from
22 Ms. Lane. There was also decisions made with her
23 manager Donna, and there is a report and then there was
24 a lot of things asked of myself to do, which I recall
25 complying to to close out those meeting notes. I don't

Page 21

1  know what they exactly are. If you pull the sheet up,
2  we can talk about it further.
3      Q. Speaking of which, prior to your testimony
4  today, did you review any documents?
5      A. I met with my lawyer, or Siemens' lawyer, and
6  we looked at a few documents.
7      Q. Do you recall what documents you reviewed?
8      A. The one I'm speaking of.
9      Q. This one that you are looking at?
10     A. No. The one of the meeting minutes.
11     Q. Okay. Anything else?
12     A. An email that I have that I gave to HR.
13     Q. Okay. What was the contents of that email?
14     A. Some comments that I had made to HR.
15     Q. Did it look like this?
16     A. That would be the one.
17     Q. Anything else?
18     A. Not that I recall.
19     Q. Okay. Let's go ahead and talk about this.
20         (Exhibit 2 was marked.)
21     Q. (BY MR. BAIL) Please take a look at this. And
22  if you want to review it again, please review it.
23     A. Yes.
24     Q. Okay. Could you please tell the Court what
25  this document in front of you is?

Page 22

1      A. It was a record that I chose to keep over this
2  time period.
3      Q. Okay. You have an entry here for September 13,
4  2016. Do you see that?
5      A. Yes, I do.
6      Q. When did you write that?
7      A. That week or that date. I don't know exactly,
8  but I'm sure it's right around that date.
9      Q. Did you write it in handwriting and then copied
10 it and typed it up, or did you type it into a computer?
11     A. Pretty sure it was just typed.
12     Q. Then you also have the paragraph here about
13 what you alleged happened on July 25, 2017, correct?
14     A. Correct.
15     Q. Okay. If you could focus your attention on the
16 bullet points in the middle of it.
17     A. Yes.
18     Q. So the first bullet point, it says, "Harriet
19 met with HR and Melissa King just prior to her FMLA
20 leave and stated that I was harassing her. She produced
21 two emails as evidence that was unfounded."
22         Do you see that?
23     A. I do.
24     Q. Who told you that she was complaining about you
25 harassing her?

Page 23

1      A. Either Melissa or HR, or this was actually the
2  meeting when Ms. Lane, myself, HR and some other person
3  on the phone sat down and discussed this matter.
4      Q. Would it have been Linda Hubbard from HR?
5      A. It would have been Linda Hubbard.
6      Q. Because Toni Horton wasn't there at that time?
7      A. She wasn't there.
8      Q. The next bullet point, "In June 2017 Harriet
9  told her manager, Donna Wilson, that I was harassing
10 her. I have no details of what I was supposed to have
11 done, but it was also unfounded."
12         Who told you about what happened
13 June 2017?
14     A. I believe it was Donna.
15     Q. Then you have "July 21, 2017, Harriet made
16 accusations about me to HR. I was harassing her or
17 something, because I have made changes to how and what
18 we audit."
19         Who told you about that?
20     A. I believe that would be Donna again. I
21 believe. I'm not positive.
22     Q. Okay. So June 2017, July 2017 are both dates
23 that were after Harriet came back from her FMLA leave,
24 correct?
25     A. I believe. I guess.

Page 24

1      Q. You wouldn't know the specifics.
2         Do you recall if Donna Wilson said --
3  strike that.
4         Did Donna Wilson ever tell you that
5  Harriet thinks that you are treating her negatively or
6  harassing her because of her race or gender?
7      A. No.
8      Q. Okay. But you knew that there was some
9  complaints that she made during those time periods?
10     A. Correct.
11     Q. Okay. Let's go to this July 25, 2017,
12 paragraph. Let's go to the last line. It says, "I fear
13 that this is a race or gender issue. She seemed to have
14 no issue prior to her previous managers leaving the
15 company, Ayana Brown, Black female, and Hector Torres,
16 Hispanic male."
17         So explain what you meant by that.
18     A. Well, I will explain the whole paragraph.
19     Q. Go ahead.
20     A. I wrote the paragraph, as you see, after the
21 June, July incidents where I was notified. I personally
22 felt that I was being attacked. I felt it was
23 harassment. I felt that it was racial. I felt that it
24 was gender. I took this, wrote it down so I would have
25 my thoughts of how I felt and perceived the situation.

Page 25

1  I took it to HR. I presented it to them, and I asked to
2  have a case opened, which they denied to do.
3     Q. They denied it?
4     A. This is why it is written down, because this is
5  how I felt that day after that had taken place. I felt
6  I was being attacked and unwarrantedly and that Ms. Lane
7  was after my job, wanted me fired. I don't know what it
8  was. But I felt this way, so it's written down for
9  evidence.
10    Q. But you know at that time Ms. Lane felt you
11  were harassing her, correct?
12    A. From the several notices, yes.
13    Q. And one of the points here on July 31 it says
14  something about you making changes with audits.
15       What is that all about? How are they
16  done?
17    A. I wanted things done differently. Might have
18  been a different report form. I'm not sure exactly what
19  the changes were, but yes, there were things that we
20  were trying to improve.
21       Internal auditing is about the process
22  owner and helping that process owner do a better job.
23  So there were changes that I felt needed to be made
24  through feedback from the process owners. So those
25  changes I wanted implemented at the request of the

Page 26

1  process owners.
2     Q. Did you have any power over my client at that
3  point in terms of management to make sure, -- strike
4  that. Too many words.
5       Was Harriet apprehensive to the changes
6  that you were making?
7     A. I'm not sure. I believe so, but so were some
8  of the other auditors. It was brought up in a meeting
9  and it was more of, This is what I'd like to do. Audit
10  team, what shall we do?
11    Q. Okay. Did you have the power to tell anybody,
12  Hey, this is how we're doing it. Do it?
13    A. No.
14    Q. Okay.
15    A. It would have been a procedural change that
16  would have put that into play.
17    Q. When you say "procedural change," would you
18  have to get it okayed by higher-ups, something like
19  that?
20    A. Others would have to sign off on the audit
21  procedure.
22    Q. Was that ever done with the changes that you
23  were recommending?
24    A. I don't believe they were.
25    Q. So you were wanting my client and other

Page 27

1  auditors to do audit a certain way, but that certain way
2  was not approved by your upper management?
3        MS. GRANT: Objection; form.
4     A. Can you rephrase? I'm not sure how I'm going
5  to answer that.
6     Q. Yes. You just testified that in order for a
7  change to be implemented, it had to be approved by
8  upper-level management, right?
9     A. Other managers.
10    Q. So the changes that you were wanting to make
11  during this time period regarding audits were never
12  approved by other managers, correct?
13    A. I do not believe they were sent to me to be
14  approved, correct.
15    Q. Why were they not sent?
16    A. I don't recall.
17    Q. You just explained how -- explain the process
18  by and which you would want a certain procedure changed.
19  What would you do?
20    A. Write the procedure and then the parties that
21  are involved are responsible for making changes, would
22  be sent to those for review, comments, agreements made
23  and then changes made or not changed.
24    Q. And you don't recall doing that for the audit
25  changes that you wanted?

Page 28

1     A. I don't believe we changed the process. I
2  believe these changes -- I'm trying to remember. This
3  was a while back.
4     Q. Sure.
5     A. I think this was more about how to report and
6  the forms to use and the goals of an audit versus how we
7  were practicing our auditing at the time.
8     Q. Okay.
9     A. And may not have required procedural change.
10  I'm not positive what all the details were.
11    Q. Let's go back to the first exhibit, Exhibit 1.
12  If you could flip to page 15, and if you could go down
13  to Interrogatory No. 11. Let me know when you are
14  there.
15    A. Okay.
16    Q. Interrogatory No. 11, the answer is, "Donna
17  Wilson and Bill Piatt made the decision to eliminate
18  Plaintiff's position and to terminate Plaintiff's
19  employment as part of a reduction in force after they
20  were instructed to reduce the head count in the Quality
21  department."
22       Okay. Let's take this part by part. Is
23  it true that yourself and Donna Wilson made the decision
24  to eliminate Plaintiff's position?
25    A. No.

Page 29

1  Q. Can you explain your version of the facts?
2  A. I have no decision-making in Ms. Lane's
3  employment or nonemployment. That was her manager and
4  others, I presume. But I had no decision-making
5  ability.
6  Q. What input did you have, if any?
7  A. The same input I guess I had with my team.
8  This would be the second round of layoffs. We were
9  asked to look at our department, to look at -- I was
10 asked to look at the role of auditing, what it takes to
11 do auditing, put together this is the time it takes to
12 do audits, this is what I would expect to see, the hours
13 to take to do the job.
14         I did a similar thing for all the reports
15 that I had and presented that to my boss. And then what
16 they did with that information was up to that team that
17 was making these decisions.
18  Q. Did Donna Wilson ever discuss Harriet
19 specifically with you?
20  A. No.
21  Q. Never?
22  A. Well, sorry. About what?
23  Q. About other than her -- strike that.
24         Did she ever express her opinion about
25 Harriet to you?

Page 30

1          MS. GRANT: Objection; form.
2  A. Again, about what?
3  Q. (BY MR. BAIL) About Harriet, about her
4  personality or --
5  A. No, her personality.
6  Q. What about her work qualities?
7  A. I didn't have that much interaction with her
8  managers about what she did. I have to go with I don't
9  believe so.
10 Q. Okay.
11         (Exhibit 3 was marked.)
12 Q. (BY MR. BAIL) Take a look at that one and let
13 me know when you are finished.
14 A. Okay.
15 Q. I just wanted to go back to the other one real
16 quick. I didn't finish Interrogatory No. 11, the second
17 part. It says -- let me know when you are there.
18 A. Okay.
19 Q. Were you ever instructed to reduce the head
20 count in the Quality department?
21 A. I was instructed to look at the Quality
22 department, look at the workload and report back to my
23 boss whether we were utilized or underutilized.
24 Q. Do you recall when you were asked to do that?
25 A. No. Probably several months or a month before

Page 31

1  the actual layoff, the second layoff took place,
2  whenever that was.
3  Q. Okay. Was my client part of the second layoff?
4  A. Yes.
5  Q. Okay. So a couple of months before she was
6  terminated but after she came back from her leave?
7  A. I'm assuming. I do not know the dates. If you
8  show me all the dates, the timelines, I can confirm, but
9  I don't know the actual dates.
10 Q. Neither do I. That's why I'm asking you.
11 A. I'm sorry; I don't know the dates.
12 Q. All right. But you do recall being told to
13 reduce the head count in the Quality department?
14 A. No. I recall being told to look at the head
15 count in the Quality department and show what
16 everybody's doing, does that meet -- I'm not sure how to
17 describe this.
18         To look at the roles, the duties and the
19 responsibilities of the Quality department and here's
20 the workload that we have and here's the forecast, and
21 then report that back to my manager for a decision to be
22 made if I need to reduce or not.
23 Q. Did your managers ask you for your opinion on
24 your work product? Right now you discussed making
25 changes to the audit -- strike that.

Page 32

1  I think I have exactly what you were
2  talking about.
3         Did you prepare this document?
4  A. Yes, I did.
5  Q. Can you please identify that document for the
6  record?
7  A. "Internal Audit" is the title.
8  Q. Okay. Is that what you are referring to, what
9  you prepared?
10 A. This was for internal auditing only. There was
11 other assessments done of my team of the Quality
12 department.
13 Q. Okay. Was my client part of the Quality
14 department at that time?
15 A. No.
16 Q. That document you just looked at --
17         MS. GRANT: Are we going to introduce that
18 into the record?
19         MR. BAIL: Yes, we are. I'm jumping all
20 over the place. I'll get to that one.
21 Q. (BY MR. BAIL) Let's go back to page 15 of
22 Exhibit No. 1. If you look at Defendant's response to
23 Interrogatory No. 12, it says, "After they were
24 instructed to reduce the head count in the Quality
25 department, Donna Wilson and Bill Piatt made the

Page 33

1  decision to eliminate Plaintiff's stand-alone position
2  of Lead Internal Process Auditor."
3        Is that true?
4     A. No. I made no decision with Harriet's
5  employment or role or anything. That was her manager
6  and others, possibly.
7     Q. Did Donna Wilson ask for your opinion on
8  whether to keep Harriet employed?
9     A. No. She asked for that audit document you
10 showed me a few minutes ago. That's what I was asked to
11 do. And that, I believe, was asked by my manager, who
12 was Mark Shipley.
13    Q. Okay. Do you know anything about the
14 stand-alone position of Lead Internal Process Auditor?
15    A. Not sure what it means, no.
16    Q. Have you ever heard of that position before?
17    A. I never heard of any stand-alone position
18 titled "stand-alone."
19    Q. Okay. Did you ever make a recommendation that
20 auditing did not warrant an independent, full-time
21 position?
22    A. Again, the form that you put out, I showed it,
23 and in my opinion it did not warrant a full-time
24 position. I was asked and answered.
25    Q. Okay.

Page 34

1        MR. BAIL: Let's mark that as an exhibit.
2            (Exhibit 4 was marked.)
3     Q. (BY MR. BAIL) Can you please identify this
4  document in front of you for the record?
5     A. It's entitled "Internal Auditing."
6     Q. Did you prepare this document?
7     A. I did.
8     Q. Do you recall when you prepared this document?
9     A. Not exactly. Prior to the second layoff.
10    Q. Prior to the second layoff. Within a month or
11 two?
12    A. If you could remind me when the second layoff
13 was.
14    Q. September, October 2017.
15    A. I would say most likely within a month or two
16 of that time frame, yes.
17    Q. Okay. What did you mean by towards the bottom
18 part of this document, the last full paragraph, it says,
19 "Harriet's duties are only internal auditing." And then
20 you have in parentheses, "May want to mention that her
21 previous role was Process Improvement Specialist (I
22 believe) in the BE department, which is no longer a
23 department."
24        What is that all about?
25    A. That as far as I knew at the time, her only

Page 35

1  roles or duties were internal auditing, and I knew that
2  they were no longer IMS, and I did not know if her
3  previous role as process improvement was still existing.
4  I didn't believe it was because the BD department was
5  gone. So, basically, a statement.
6     Q. So you weren't really sure about that statement
7  factually?
8     A. No.
9     Q. Okay. Did you have any -- strike that.
10        Did you make the decision to give the IMS
11 duties to somebody other than Harriet?
12    A. After Harriet asked to have them removed and it
13 was agreed with her manager that it would be, then
14 ultimately it was given back to me to be responsible
15 for. I then decided to give it to Irene to do instead
16 of myself.
17    Q. Okay. Do you recall any other duties of
18 Harriet's that you were involved in giving to another
19 employee to do?
20    A. No.
21    Q. Your testimony is only the duties that were
22 given to Irene Manrique? The only duties of Harriet's
23 that you are aware given to anybody else by you is what
24 was given to Irene, right?
25    A. Other than on her FMLA, the auditing was given

Page 36

1  to the auditing team to do in her absence.
2     Q. During that period of time?
3     A. Yes.
4     Q. Okay. And this document was given to who?
5     A. I either gave it to Donna or to my boss Mark.
6  I can't recall which one. I think it was to Mark.
7     Q. Okay. And if we go to that short paragraph
8  right on top of the one I was just reading, it says, "On
9  staff at the Telge Road are four lead internal auditors:
10 Harriet Lane, William" --
11    A. Yes.
12    Q. -- "Kimberly Long, Lorraine Menezes, less one
13 leave 3, 2 coauditors - Andrea Lorea and Melissa
14 Shovelski?"
15        Was Kimberly Long an auditor at that time?
16    A. She was. I misspoke earlier and left her off
17 on one of your previous questions.
18    Q. Did you supervise her?
19    A. No, I did not.
20    Q. How would you describe your working
21 relationship with Kimberly Long?
22    A. Good.
23    Q. Did you have any disagreements with her?
24    A. I wouldn't say I had disagreements with anyone.
25    Q. Just for the record, did Melissa Shovelski ever

Page 37

1  have any disagreements with you?
2      A. May I speak?
3      Q. Please.
4      A. May I change your word? I have business
5  disagreements, if that's what you are referring to.
6  Yes, differences in opinions, of course.
7      Q. Okay. Would that be the same for Kimberly
8  Long, differences in opinion?
9      A. It would probably be the same with everybody I
10 have ever worked with.
11     Q. For the record, are you testifying that there
12 was no -- there wasn't any difference in the
13 disagreements that you had with Kimberly Long and
14 Melissa compared to disagreements with anybody else at
15 work?
16     A. I can't say they were the same differences in
17 opinions, but I have differences in opinions through the
18 course of doing business with most anyone from time to
19 time. Whether they're the same or different, I wouldn't
20 know.
21         I'm trying to answer your question, but
22 I'm not sure what you are asking me.
23     Q. Have you ever been accused of discriminating
24 against female coworkers?
25     A. I believe Harriet has made that and was found

Page 38

1  to be unfounded. Other than that, I'm not aware of
2  anyone.
3      Q. But you were aware of Harriet's complaint
4  about -- her allegations that you were a male chauvinist
5  prior to her termination, correct?
6      A. I don't recall ever hearing that word, no.
7      Q. Okay. Did you know that she had issues with
8  you in relation to your treatment of women prior to her
9  being terminated?
10     A. I knew of the points that we looked at in
11 Exhibit No. 2 that were her complaints on me. But I
12 wasn't aware of anything other than --
13     Q. Other than what's in Exhibit No. 2?
14     A. Correct.
15     Q. Okay. Have you ever placed an employee on a
16 performance improvement plan?
17     A. I have not.
18     Q. You were aware -- strike that.
19         Were you aware that Harriet was on a PIP?
20     A. Not until yesterday.
21     Q. Okay. Were you aware of any other employees
22 being on a PIP in 2016 and 2017?
23     A. Not that I recall, no.
24     Q. How would you describe your working
25 relationship with Donna Wilson?

Page 39

1      A. Good.
2      Q. Did you have your own office, or did you work
3  in a cubicle?
4      A. Both. Depends on the time frame.
5      Q. At the time period of my client's termination,
6  September, October 2017.
7      A. An office.
8      Q. How close were you to Donna Wilson's office?
9      A. About six down and over two.
10     Q. Okay. That's pretty good.
11         How often would you communicate with her
12 on a daily level, approximately?
13     A. Might talk once a day, twice a week. It just
14 depends if we had anything to communicate about. Not
15 often.
16     Q. When you did speak to her, would you go to her
17 office or ask her to come to your office?
18     A. I don't recall. I imagine both.
19     Q. Let's go back to this document. What do I have
20 that one marked as?
21     A. 3, I believe.
22     Q. So back to Exhibit No. 3. If you go to the
23 second-to-last paragraph, the paragraph right before the
24 last line. And the last sentence says, "Four, Telge
25 Road employees are currently trained to assist with

Page 40

1  audits. These" --
2      A. I'm on the wrong document. Which one are we
3  on? Where are we reading?
4      Q. At the end, where my highlight is.
5      A. Okay. I got you. Thank you.
6      Q. "Four, Telge Road employees are currently
7  trained to assist with audits. These trainees have
8  taken on this responsibility in addition to their
9  current workload. They are not part of Finance or
10 Quality."
11         Do you know anything about these
12 employees?
13     A. Yes. They're the audit team.
14     Q. Okay.
15     A. Audit team is a voluntary job.
16     Q. It's collateral duty to what their main
17 function is?
18     A. Yes.
19     Q. Do you know if these trainees volunteered or
20 were they assigned?
21     A. No. It's a volunteer job.
22     Q. Do you know who they were?
23     A. The ones that you have already written down.
24 I'll try to remember them again, if you like. They were
25 in Exhibit 4. So at the time there was Harriet Lane,

Page 41

1  myself, Kimberly Long, Lorraine Menezes. They were, I
2  believe, all lead auditors at the time. And then Andrew
3  Loera and Melissa Shovelski, they were both in training
4  to become lead auditors.
5     Q. Okay. Do you know if the person training them
6  was Harriet?
7     A. The training was -- whoever would be the lead
8  auditor, you would pair a trainee up with the lead
9  auditor. So it would have been any one of the four of
10 us.
11    Q. What about Kathy DeGeorge? Was she also a
12 trainee?
13    A. She signed up to be an auditor and then never
14 did any audits. So technically, yes, she was, but never
15 did any audits.
16    Q. How would you classify your working
17 relationship with Kathy DeGeorge?
18    A. I think it's good.
19    Q. How long have you worked with her?
20    A. Ever since she hired on. I don't know. I
21 guess she's been there four years or so.
22    Q. Do you recall when Siemens took over the
23 business of Rolls-Royce in some fashion?
24    A. I recall it but the time frame I don't. Might
25 have been nine years, eight years, six years. I don't

Page 42

1  recall. But it was a while back.
2     Q. Okay. Do you recall discussing this Exhibit 4
3  with --
4     A. No. 4? Yes.
5     Q. Do you recall discussing this document with
6  Donna Wilson?
7     A. It was either her or Mark Shipley. I don't
8  recall which one it was.
9     Q. Was it over the phone or in person?
10    A. It would have been in person.
11    Q. Okay. Do you have this as No. 2?
12    A. No. It's 4.
13    Q. Which one do you have as No. 2? Thanks.
14       MR. BAIL: Can I get like 10 minutes?
15       MS. GRANT: Yeah.
16       MR. BAIL: We're going off the record for
17 10 minutes.
18       (A recess was taken.)
19    Q. (BY MR. BAIL) You testified earlier about IMS
20 responsibilities. Correct?
21    A. Correct.
22    Q. What does "IMS" stand for?
23    A. Integrate Management System.
24    Q. I don't know anything about this. Explain to
25 me like a child what it is.

Page 43

1     A. ISO 9001, ISO 14001, and OHSAS 18001 -- or I
2  got those two backwards -- it's a management scheme and
3  you become certified in those. So the three documents I
4  mentioned are standards that you are to follow, and then
5  you are audited by a notified body that you are
6  following the requirements of the standard. And you
7  receive a certificate.
8        IMS stands for all three of them together,
9  where ISO 9001 certificate is a stand-alone certificate.
10 So Integrated Management System integrating quality,
11 health, safety and environmental creates an Integrated
12 Management System.
13    Q. And you have to be certified to work with this?
14    A. You don't have to be. It is what you -- a
15 company makes the decision to be, to present theirself
16 as an ISO-certified company or integrated management
17 system.
18    Q. You testified earlier that according to you, my
19 client said she didn't want to do IMS responsibilities
20 anymore. Is that correct?
21    A. The document control part of it, which was in
22 exhibit -- we don't have it. That part of it she did
23 not want to do anymore. I don't know any further duties
24 that she had within that IMS scheme.
25    Q. Okay. Then did you have the authority to

Page 44

1  assign the duties that she allegedly didn't want to do
2  anymore to someone else?
3     A. Once it was decided to follow that request,
4  they were then assigned back to me to have that taken
5  care of, do myself or however I deem necessary.
6     Q. Okay. So you did have that discretion?
7     A. Yes.
8     Q. Who gave you that discretion to make that
9  decision?
10    A. Mark Shipley.
11    Q. Let's talk about Mark Shipley. How long have
12 you known Mark?
13    A. Since he's been there.
14    Q. How long has that been?
15    A. I'm going to guess nine years maybe.
16    Q. Do you have a friendship relationship with Mark
17 outside of the office?
18    A. No.
19    Q. Okay. Do you guys go out to lunch together?
20    A. No.
21    Q. Okay. Do you have any friendship relationships
22 with any employee outside of the office at Siemens?
23    A. No.
24       MR. BAIL: I pass the witness.
25       MS. GRANT: I just have a couple of

WILLIAM MICHAEL PIATT - 2/4/2020

Page 45

1  follow-up questions.
2          E X A M I N A T I O N
3  BY MS. GRANT:
4     Q.  With regard to Exhibit 2, which was your notes
5  and there's references to Harriet complaining about you
6  harassing her, although you knew that Ms. Lane
7  complained about you harassing her, did you know that
8  she complained specifically that you were harassing her
9  because of her race?
10    A.  No.
11    Q.  Did you know that she complained you were
12 harassing her specifically because she was a female?
13    A.  No.
14    Q.  You were asked some questions about the
15 auditing team, and you had testified earlier that the
16 auditing was a collateral duty for the members of the
17 audit team.
18         Do you recall that testimony?
19    A.  Yes.
20    Q.  Was auditing a collateral duty for Harriet?
21    A.  Not to my knowledge.  I believe that was one of
22 her main functions.
23         MS. GRANT:  No further questions.
24         MR. BAIL:  No further questions.
25         (The deposition concluded at 1:49 p.m.)

Page 46

1              CHANGES AND SIGNATURE
2  WITNESS NAME:  WILLIAM MICHAEL PIATT
3  DATE OF DEPOSITION:  FEBRUARY 4, 2020
4  PAGE  LINE   CHANGE        REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 JOB NUMBER: 18930

Page 47

1     I, WILLIAM MICHAEL PIATT, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5         _____
6         WILLIAM MICHAEL PIATT
7
8  THE STATE OF _____)
9  COUNTY OF _____)
10
11    Before me, _____, on this day
12 personally appeared WILLIAM MICHAEL PIATT, known to me
13 (or proved to me under oath or through _____)
14 (description of identity card or other document)) to be
15 the person whose name is subscribed to the foregoing
16 instrument and acknowledged to me that they executed the
17 same for the purposes and consideration therein
18 expressed.
19    Given under my hand and seal of office this
20 _____day of _____, 2020.
21
22         _____
23         NOTARY PUBLIC IN AND FOR
         THE STATE OF _____
24
25 JOB NUMBER: 18930

Page 48

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
2                 HOUSTON DIVISION
3  HARRIET LANE,            *
                            *
4       Plaintiff,          *
                            *
5  v.                       * C.A. No. 4:19-cv-00435
                            *
6  SIEMENS ENERGY, INC.,    * JURY TRIAL DEMANDED
                            *
7       Defendant.          *
                            *
8
           REPORTER'S CERTIFICATION
9            ORAL DEPOSITION OF
            WILLIAM MICHAEL PIATT
10            FEBRUARY 4, 2020
11    I, CONSTANCE KOENIG, RPR, Certified Shorthand
12 Reporter in and for the State of Texas, hereby certify
13 to the following:
14    That the witness, WILLIAM MICHAEL PIATT, was
15 duly sworn by the officer and that the transcript of the
16 deposition is a true record of the testimony given by
17 the witness;
18    That the original deposition was delivered to
19 Ashok Bail, Custodial Attorney.
20    That a copy of this certificate was served on
21 all parties shown herein on _____.
22    I further certify that pursuant to FRCP
23 Rule 30(f)(1) that the signature of the deponent:
24    __X__ was requested by the deponent or a party
25 before the completion of the deposition and that

WILLIAM MICHAEL PIATT - 2/4/2020

Page 49

1  signature is to be returned within 30 days from the date
2  of receipt of the transcript. If returned, the attached
3  Changes and Signature Page contains any changes and the
4  reasons therefore.
5       _____ was not requested by the deponent or party
6  before the completion of the deposition.
7       I certify that I am neither attorney or counsel
8  for, related to, nor employed by any of the parties or
9  attorneys in the action in which this testimony was
10 taken. Further, I am not a relative or employee of any
11 attorney of record in this cause, nor am I financially
12 or otherwise interested in the outcome of the action.
13      Certified to by me this, the 10th day of
14 February 2020.
15
16
17 _____
        CONSTANCE KOENIG, Texas CSR 6577
18      Expiration Date: 01-31-2021
        Hanna & Hanna, Inc.
19      CRF – 10434 – Expiration: 10-31-2022
        8582 Katy Freeway, Suite 105
20      Houston, Texas 77024
        713-840-8484 – 713-583-2442
21      www.hannareporting.com
22
23
24
25

13 (Page 49)