# EXHIBIT 12

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

HARRIET LANE,      )
                   )
 Plaintiff,        )
                   ) C.A. NO. 4:19-cv-00435
VS.                )
                   )
SIEMENS ENERGY, INC.,  )
                   )
 Defendant.        )

*******************************
ORAL DEPOSITION OF
LINDA HUBBARD
February 6, 2020
*******************************

ORAL DEPOSITION OF LINDA HUBBARD, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on February 6, 2020, from 10:12 a.m. to 10:47 a.m., by machine shorthand before MICHELLE R. PROPPS, CSR, in and for the State of Texas, reported at the offices of BakerHostetler, 811 Main Street, Suite 1100, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated in the record or attached hereto.

Page 2

```
             A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. ASHOK BAIL
The Bail Law Firm
3120 Southwest Freeway, Suite 450
Houston, Texas 77098
Tel: 832.216.6693
Fax: 832.263.0616
Email: ashok@baillawfirm.com

FOR THE DEFENDANT:

MS. ASHLEE GRANT
BakerHostetler LLP
811 Main Street, Suite 1100
Houston, Texas 77002-6111
Tel: 713.646.1316
Fax: 713.751.1717
Email: agrant@bakerlaw.com


              * * * * *
```

Page 3

```
                    INDEX
                                              PAGE
Appearances.................................... 2

LINDA HUBBARD

Examination by Mr. Ashok Bail..................... 4
Examination by Ms. Ashlee Grant................... 31

Changes and Signature...........................
                    32
Reporter's Certification....................... 34

                   EXHIBITS
EXHIBIT NO.    DESCRIPTION               PAGE
Exhibit 5   Memo Dated 2-13-17 (Davis to Lane)
            (Bates No. Siemens-Lane 000060-62).. 10
Exhibit 6   Performance Improvement Plan Dated
            5-22-17 (Bates Nos. Siemens-Lane
            000063-64)......................... 16
Exhibit 7   Product Costing/DG Commercial BA
            Organization (Bates No.
            Siemens-Lane 000839)................ 20
Exhibit 8   Quality Organization Org Chart
            (Bates No. Illegible)............... 25
```

Page 4

             LINDA HUBBARD,
having been first duly sworn, testified as follows:
             EXAMINATION
QUESTIONS BY MR. ASHOK BAIL:
    Q.   Can you please state your full name and spell it out for the Court, please.
    A.   Linda, L-I-N-D-A, Sue, S-U-E, Hubbard, H-U-B-B-A-R-D.
    Q.   Thank you.  Ms. Hubbard, have you ever had your deposition taken before?
    A.   Yes, I have.
    Q.   When was the last time?
    A.   About 2005.
    Q.   Okay.  Let me go over a few guidelines that will help the deposition.  I'm sure your attorney has already gone over them with you.  One is whenever I ask a question, wait for me to fully ask the question before responding.  And, likewise, I'll do my best to wait for you to respond before I ask another question.  Okay?
    A.   Yes.
    Q.   Another thing that's important is to make sure that your responses are verbal so that the court reporter can transcribe them, instead of hand motions and -- like, I would be difficult in

Page 5

1  deposition because I do a lot of hand motions. But
2  don't do that. If you need a break, please let me
3  know and we can take a break. I don't think this
4  deposition is going to be longer than an hour, but
5  if you still need a break, no problem. Okay?
6      A.   Yes.
7      Q.   All right. Prior to attending this
8  deposition today, did you review any documents?
9      A.   Yes.
10     Q.   Can you recall which documents those
11 were?
12     A.   I reviewed my emails.
13     Q.   Anything else?
14     A.   That's it.
15     Q.   Okay. And did you speak to any other
16 individuals in your preparation for this deposition?
17     A.   No.
18     Q.   So how long have you worked for Siemens?
19     A.   I started February the 14th of 2005.
20     Q.   And what position did you start at?
21     A.   Human resource manager.
22     Q.   And prior to that, how long had you been
23 with the human resources work?
24     A.   Fifteen years.
25     Q.   Okay. And are you still currently human

Page 6

1  resource manager?
2      A.   I am, yes. But we're now called senior
3  human resources business managers.
4      Q.   Golly. Senior human resources -- I tell
5  you, your company has a lot of titles that are
6  confusing.
7      A.   Yes.
8      Q.   Senior -- say it again. Senior what?
9      A.   Senior human resources business manager.
10     Q.   Human resources business manager.
11         When did you assume that title?
12     A.   2017.
13     Q.   Okay. And in your current position, do
14 you conduct investigations of complaints of
15 discrimination that an employee may bring?
16     A.   In my current role, no.
17     Q.   In your past roles, have you?
18     A.   Yes.
19     Q.   During the time period that Ms. Lane, my
20 client, was employed with Siemens, were you
21 responsible for conducting investigations of
22 discrimination complaints?
23     A.   Yes, if I received any.
24     Q.   Okay. Do you recall doing -- strike
25 that.

Page 7

1          During the time period of your
2  employment with Siemens, how many complaints of
3  discrimination have you investigated?
4          MS. GRANT: Objection; form.
5      Q.   (By Mr. Bail) You understand the
6  question?
7      A.   Yes, I do understand the question.
8      Q.   Okay.
9      A.   I was trying to think if I had any.
10 None.
11     Q.   Okay. Harriet Lane made a complaint of
12 discrimination. Correct?
13     A.   No.
14     Q.   She did not?
15     A.   No.
16     Q.   Okay. We'll get into that.
17         How do you know Harriet Lane?
18     A.   Harriet Lane was employed from an
19 acquisition that we were looking into.
20     Q.   Uh-huh.
21     A.   And she elected to join our company
22 before the acquisition went into -- officially was
23 done. And we interviewed her at that point.
24     Q.   Okay.
25     A.   And she joined our organization as an

Page 8

1  auditor.
2      Q.   Okay. Were you responsible for any of
3  her hiring decisions?
4      A.   Yes, along with the manager at the time
5  who was making the decision to hire Harriet.
6      Q.   I see. Who was that manager?
7      A.   Hector Torrez.
8      Q.   Hector Torrez. Was there an African
9  American female manager before Torrez that you're
10 aware of?
11     A.   Yes.
12     Q.   You didn't work with her, did you?
13     A.   Yes, I did.
14     Q.   Okay. What was her name?
15     A.   Ayanna Brown.
16     Q.   Okay. In your capacity as an employee
17 of Siemens, how many investigations, period, have
18 you conducted?
19         MS. GRANT: Objection; form.
20     Q.   (By Mr. Bail) Any type of
21 investigation.
22     A.   There were different kinds of
23 investigations that I've done.
24     Q.   Okay. What type of investigations do
25 you do?

2 (Pages 5 to 8)

Page 9

1   A.   Those that have to do mainly around
2   performance. Those are the ones that I've been
3   involved in.
4   Q.   Okay. How many individuals have you
5   been involved with their personal -- well, strike
6   that. What does PIP stand for in human resources?
7   A.   Performance improvement plan.
8   Q.   Okay. How many employees have you
9   worked with on their performance improvement plans?
10  A.   Several.
11  Q.   Can you name them?
12  A.   The employees themselves?
13  Q.   Uh-huh.
14  A.   Probably if I pull up my computer, yes.
15  Q.   Okay.
16  A.   But offhand --
17  Q.   Well, let's do this. How many employees
18  under the supervision of Donna Wilson have you
19  worked with them with regards to their PIPs?
20  A.   None, other than Harriet.
21  Q.   Harriet. Okay. But it's your testimony
22  today that you have not worked on an investigation
23  regarding a discrimination complaint of any employee
24  at Siemens.
25  A.   That's correct.

Page 10

1   Q.   Okay. Can you please take a look at
2   this document?
3            MR. BAIL: We'll be marking that
4   No. 5.
5            (Exhibit No. 5 marked.)
6            (Document review.)
7   Q.   (By Mr. Bail) Please let me know when
8   you've had a chance to review it.
9   A.   I am finished.
10  Q.   Okay. Have you ever seen this document
11  before?
12  A.   Yes, I have.
13  Q.   If you turn to Page 3 of the document,
14  does it have your signature on it?
15  A.   Yes, it does.
16  Q.   And do you see something in handwriting
17  under there?
18  A.   I do.
19  Q.   Do you know who wrote that?
20  A.   Harriet.
21  Q.   Okay. Can you please read it?
22  A.   "The comments outlined do not provide
23  details of all the information provided during Safe
24  Call or investigation. I feel this is continued
25  harassment, intimidation, bullying and

Page 11

1   discrimination. I will provide my feedback in
2   separate communication that I ask be attached to my
3   HR records or this file.
4   Q.   Okay. So Harriet Lane is complaining
5   about discrimination here. Correct?
6   A.   This is the first.
7   Q.   Right.
8   A.   That's correct.
9   Q.   But earlier you testified that you had
10  never seen anything regarding discrimination from
11  any other employee. Correct?
12  A.   That is correct.
13  Q.   But here it says contrary to what you
14  testified to. Correct? It's a discrimination
15  complaint from Harriet Lane.
16  A.   It is a discrimination complaint. But
17  you asked if -- this is in reference to Harriet.
18  This is in reference to Harriet.
19  Q.   Right. But earlier, I asked you if you
20  knew of any employee at Siemens that had filed a
21  discrimination complaint or you had been involved in
22  a discrimination complaint, you said none.
23  A.   Harriet had not filed a discrimination
24  case until after the Safe Call.
25  Q.   I didn't ask you when. I asked you if.

Page 12

1            So is it your testimony now that you
2   were involved with a discrimination complaint that
3   was filed by Harriet Lane?
4   A.   I was a party to listening to the
5   discrimination case. There was an outside
6   investigator who came in and handled the claim that
7   Harriet made through a Safe Call.
8   Q.   Who was the outside investigator?
9   A.   Patti Davis.
10  Q.   And Patti Davis, was she -- do you know
11  what the company is she works for?
12  A.   She works for Siemens. She's outside of
13  your organization.
14  Q.   Okay. She's not -- she's not another
15  company.
16  A.   Oh, no.
17  Q.   Okay. And did you have any -- strike
18  that.
19           ==What input did you have, if any, in==
20  ==this -- what's been marked as Exhibit No. 5?==
21  ==A.   The Safe Call?==
22  ==Q.   Yeah.==
23  ==A.   The only thing I had any input is==
24  ==providing Patti information as to what the manager==
25  ==had stipulated as the issues. And that was what is==

Page 13

1  incorporated in part of this as well, in this
2  document.
3       Q.  Okay.
4       A.  Based on the feedback also from Harriet
5  in her discussion with Patti Davis.
6       Q.  Okay.  Did you make any recommendations?
7       A.  My recommendations are on the
8  performance improvement plan.
9       Q.  Gotcha.  Okay.  And we're going to get
10 to that.  So what is the date on Exhibit No. 5?
11      A.  February the 13th, 2017.
12      Q.  Are you aware that Ms. Lane was on leave
13 during that time period?
14      A.  No.  She --
15          MS. GRANT:  Objection; form.
16      A.  Ms. Lane went on leave after a
17 discussion that she had with Patti Davis, Patrik
18 Hols and myself.  Patti Davis was on a telephone
19 call.  Ms. Lane asked for input on the results of
20 the Safe Call.  I told her that we did not have the
21 written final warning yet or the documentation
22 around the findings.  And she insisted that we -- if
23 we could do a telephone call with Patti.  This was
24 prior to Patti going out on leave -- excuse me --
25 Harriet going out on leave.

Page 14

1           We also told Harriet during that
2  time that based on the information from her manager
3  and the findings, we will be putting her on a
4  performance improvement plan.  Again, that was prior
5  to her going out on leave.  The next day, Ms. Lane
6  did not come into work after we'd had that
7  discussion and I met with the leadership team, which
8  was Patrik Hols and Melissa, and explained that when
9  Ms. Lane returned from her leave, we would give her
10 the verbal written warning from the Safe Call and
11 she would be put on her performance improvement
12 plan.
13      Q.  Okay.  What evidence do you have,
14 besides your testimony, that you instructed -- that
15 you advised Ms. Lane that she was going to be put on
16 a PIP prior to her going on leave?
17      A.  She was sitting in the room.  Patti
18 Davis was also a witness to that conversation.
19 Patrik Hols was a witness to that conversation that
20 we had.
21      Q.  And that was -- do you know what date
22 that was?
23      A.  That was in -- before she went out, a
24 few days before.  I cannot give you the exact date,
25 but that was before -- it was the day before she

Page 15

1  went on leave.
2       Q.  Isn't it true that she went out on leave
3  and then she came back one day and you had told her
4  that -- why are you here?  You're not supposed to be
5  here?
6           MS. GRANT:  Objection; form.
7       A.  I don't recall that.
8       Q.  (By Mr. Bail)  You don't recall that?
9       A.  No.
10      Q.  Telling her, You're on FMLA, you're not
11 supposed to be here.
12      A.  If she came in, I would definitely have
13 told her that, You're on FMLA.
14      Q.  Okay.  If she was on FMLA.  Right?
15      A.  Yeah.
16      Q.  Okay.
17      A.  Because we -- you're not supposed to
18 work while you're out on FMLA.
19      Q.  Correct.  Okay.
20      A.  You want this one back?
21      Q.  Yeah.  I didn't mark that one.  I put
22 the wrong one.
23      A.  Oh, okay.  This is the one that we just
24 looked at.
25          MR. BAIL:  Yeah, I don't want --

Page 16

1           MS. GRANT:  Yeah.  He marked it as
2  an exhibit.
3           MR. BAIL:  I just want you to keep
4  it.
5       Q.  (By Mr. Bail)  Here.  This is the one
6  you were alluding to earlier.
7       A.  Yes.  This is the performance
8  improvement plan.
9       Q.  Can you please identify the document
10 that's before you now?
11      A.  Yes.  It's the performance improvement
12 plan that was issued to Harriet Lane on May
13 the 22nd, 2017.
14          (Exhibit No. 6 marked.)
15      Q.  (By Mr. Bail)  And on this performance
16 improvement plan, does your name appear anywhere on
17 it?
18      A.  Yes, it does, at the top under the cc.
19 And then also on the second page, where I initiated
20 [sic] "Employee refused to sign," and dated it
21 5-24-2017.  Then I had her new manager sign
22 underneath my name, which is Donna Wilson.
23      Q.  Okay.
24      A.  Again, May 22nd, 2017, is the date.
25      Q.  Was that the date that my client

LINDA HUBBARD - 2/6/2020

Page 17

1  returned to work for Siemens?
2      A.  No.  That was -- the 24th is when she
3  returned.
4      Q.  Okay.  So and this --
5      A.  And she actually signed it at the
6  bottom.
7      Q.  The 24th, yeah.
8      A.  Yes.
9      Q.  Did you prepare this document?
10     A.  I did.
11     Q.  Okay.
12     A.  And I shared the information with
13 Mr. Hols and Ms. Donna Wilson.
14     Q.  Okay.
15     A.  Based on the information that I had
16 received from Melissa King, who was the former
17 manager.
18     Q.  Okay.  Gotcha.  Did you ever interview
19 Melissa Shovelski, who is a coworker of my client?
20     A.  I did not.
21     Q.  Okay.  Did you interview any of my
22 client's coworkers to see if there was any truth to
23 her claim of gender discrimination?
24         MS. GRANT:  Objection; form.
25     A.  No.

Page 18

1      Q.  (By Mr. Bail)  Okay.  And Donna Wilson,
2  how do you know her?
3      A.  Donna Wilson is a manager in the finance
4  organization.
5      Q.  Okay.
6      A.  She succeeded Melissa in becoming her
7  manager.
8      Q.  When did you first meet her?
9      A.  When I first met who?
10     Q.  Donna Wilson.
11     A.  I've known Donna for quite a while.
12 She's been at the organization for quite a while.
13     Q.  Okay.  That's what I want to know.  I
14 don't know her?
15     A.  I mean, I -- I can't give you the exact
16 date.
17     Q.  Yeah.  Sure.
18     A.  But, I mean, she's been -- she was part
19 of Siemens Health -- it's called Healthineers now.
20 But she came from the medical division into our
21 organization, a highly respected finance manager.
22     Q.  Okay.
23     A.  And we brought her over.
24     Q.  When she assumed the role of -- strike
25 that.

Page 19

1          It says here she was the finance
2  manager at the time this PIP was created.  Correct?
3      A.  That's correct.
4      Q.  Okay.  Do you recall who else she
5  managed during that time period besides my client?
6      A.  I don't -- I know she had at least three
7  direct reports.  I can't name them for you, it's
8  been a while.  But I do know we have a -- what we
9  call the rule of three.  You had to have at least a
10 minimum of three direct reports to have the manager
11 classification.
12     Q.  Ah, gotcha.
13     A.  I just don't know who those individuals
14 were besides Harriet.
15     Q.  Let me see if I can help you out with
16 that.  Does that help refresh your memory?
17 (Handing.)
18     A.  Oh, yes.  Carrie Janak, Samantha
19 Briceno.  I don't know -- Carrie I know more than I
20 do Samantha.
21     Q.  And Harriet.
22     A.  And Harriet, yes.
23     Q.  Okay.
24         MR. BAIL:  Can we mark that as
25 Exhibit No. 7.

Page 20

1          (Exhibit No. 7 marked.)
2      Q.  (By Mr. Bail)  The chart before you
3  is -- you see the name "Samantha Briceno"?
4      A.  Yes.
5      Q.  Is she African American or Caucasian or
6  Hispanic?
7      A.  To be honest, I don't know.
8      Q.  Okay.
9      A.  I don't know.
10     Q.  What about Carrie Janak?
11     A.  Carrie, I do know, is Caucasian.
12     Q.  Caucasian.  Okay.  You see where it
13 says -- at the bottom right-hand corner of this
14 document, it says -- there's an asterisk.  It says
15 "Auditor role moving to the quality organization."
16     A.  That, I don't know anything about.
17     Q.  Okay.  Thanks.  Did you have any
18 discussions -- strike that.  Do you know who Bill
19 Piatt is?
20     A.  I do.  He is the quality manager.
21     Q.  Okay.  And how long have you known Bill?
22     A.  Since I moved to that organization in
23 2010.
24     Q.  Okay.  And other than my client making
25 complaints about Bill, have you been involved with

HANNA & HANNA, INC.
713.840.8484

Page 21

1  any other employee who also complained about Bill's
2  behavior towards them?
3     A.  No.
4     Q.  Did Bill have any input whatsoever in
5  the performance improvement plan of Harriet Lane?
6     A.  Not at all.
7     Q.  And just for the record, you had nothing
8  to do with my client's termination.  Correct?
9     A.  That is correct.
10    Q.  At that time, you were --
11    A.  I was not part of the organization at
12 that time.
13    Q.  Okay.  Where were you?
14    A.  I had transitioned into a promotion to
15 the service side of the business.
16    Q.  Is that where you're at now?
17    A.  That's correct.
18    Q.  Is that in Florida?
19    A.  No.  That's actually in -- it's in
20 Houston.  It's off of the Sam Houston Parkway.  It's
21 the old Dresser-Rand facility.
22    Q.  My dad used to work for Dresser when we
23 first came to this country.  It's been around for a
24 long time.
25    A.  It has.

Page 22

1     Q.  Did you have any -- during the time
2  period of 2016, 2017, did you supervise anybody?
3     A.  I did.  Well, I -- how do I say this?  I
4  had direct reports dotted-line to me as far as my
5  supervision.
6     Q.  Uh-huh.
7     A.  But then 2017, when I transitioned to
8  the new role, I picked up four individuals.
9     Q.  Okay.  And who are those individuals?
10    A.  They are Don Smith, Andrew Farren,
11 Melinda Romine and Kristina Beyer.  Those were all
12 the Dresser-Rand HR people, except for Don, who
13 joined my team.
14    Q.  Okay.  Did any of those individuals work
15 on Harriet Lane's case?
16    A.  No.
17    Q.  Okay.
18    A.  The HR admin support people responded to
19 a call that I received.
20    Q.  Okay.  What -- what notices are
21 generally given to Siemens employees that they're
22 going to be laid off?
23    A.  It varies.
24    Q.  Please explain the different ways
25 Siemens handles separations of employment for people

Page 23

1  who are getting laid off.
2     A.  It varies.  For instance, if the
3  business is struggling, which is the case with the
4  new unit, the business unit head and HR sit down and
5  they talk about what they need to do to get the
6  numbers to align to meet their targets.
7        So, for instance, if you're laying
8  off a -- individuals out of each department, which
9  is possible, then you decide who those individuals
10 are based on performance and business need and you
11 make the decision to include them in the reduction
12 in force.
13    Q.  Okay.
14    A.  But I don't know the reasons that were
15 selected for this particular reduction that involved
16 Harriet because I was not included.
17    Q.  Understood.  We're speaking in general
18 terms here.
19    A.  I can say on my side of the business,
20 we're performing extremely well.  So services has
21 not had to do any reductions.  The business that
22 Harriet is in is called new unit.  And they have
23 done a lot of reductions.
24    Q.  Since what time period?
25    A.  I would say since 2017 through

Page 24

1  present --
2     Q.  Okay.
3     A.  -- there's been reductions.  They have
4  been -- if they're not reductions, they have had
5  people -- what do I want to say -- natural
6  attrition, leave on their own because they could see
7  that the business wasn't doing well.
8     Q.  Okay.
9     A.  But, again, I don't know what the
10 circumstances were that included her in this
11 reduction.
12    Q.  Okay.  Is there something called a
13 60-day notice?
14    A.  60-day notice is only used when you have
15 50 or more people being impacted.
16    Q.  Okay.
17    A.  That's the warn notice.  And part of
18 it -- again, I don't think they reached those kind
19 of numbers.  That would have pretty much decimated
20 the group over there.
21    Q.  Explain the group, if you could, the
22 structure of the individuals that worked with
23 Harriet and the individuals that were above Harriet
24 as of February -- February 2017 at the time period
25 that Donna Wilson became her supervisor?

Page 25

1  A. Donna's organization is pretty much what
2  you see in here.
3  Q. Okay.
4  A. Bill's organization, he had field
5  quality people. I don't recall the exact number of
6  people that were part of Bill's organization.
7  Q. Uh-huh. Does this help you out?
8  (Handing.)
9  A. Yeah, those are the inspectors, the
10 field guys. Silvia's quality control. And then --
11 I didn't know about Marlon being a quality engineer,
12 but, again, it's been a while.
13 Q. Okay.
14       MS. GRANT: Do we want to mark that
15 as an exhibit?
16       MR. BAIL: Yeah. That's Exhibit
17 No. 8.
18       (Exhibit No. 8 marked.)
19 Q. (By Mr. Bail) So you had just mentioned
20 two organizational structures there between who
21 Donna supervised and then who Bill Piatt supervised.
22 Correct?
23 A. Yes.
24 Q. Are those the two groups of people that
25 Harriet would be working with?

Page 26

1  A. Actually, Harriet worked with the whole
2  facility as an auditor. It's not just one
3  particular group.
4  Q. Okay.
5  A. You know, she audited engineering.
6  There were even portions that HR was involved in
7  from an audit standpoint, so it was the whole
8  business that Harriet --
9  Q. So there's a lot of work to do.
10 A. Depending on if the business is doing
11 well --
12 Q. Right.
13 A. -- yes, there could be.
14       But part of our business required
15 the packaging and the instruments coming in. And
16 that was -- being new unit, that was part of the
17 issue. There wasn't a backlog of work.
18       And as I shared with my boss when I
19 took this new role, I could see that the work was
20 really trailing off.
21 Q. Uh-huh.
22 A. And that's part of the reason why I
23 looked for a new opportunity.
24 Q. Gotcha. Within the organization.
25 A. Correct.

Page 27

1  Q. Do you recall if Harriet ever gave you
2  names of witnesses to contact?
3  A. No, she didn't.
4  Q. Okay.
5  A. No, she didn't.
6  Q. What did you do in terms of -- to
7  investigate any claims that my client had made about
8  discrimination?
9  A. I didn't hear actual claims of
10 discrimination until -- Harriet came into my office
11 regarding wanting an extension of PTO. And I
12 explained to Harriet the rules. And she got a
13 little upset, said that I was taking the manager's
14 side versus her side. And I explained to Harriet
15 that I look at the rules and apply them across the
16 board, whether it's the manager or the employee.
17 She didn't like that. And at that point, Harriet
18 said that she was going to call -- at the time it
19 was called Tell Us, it's now called Safe Call. And
20 she was going to make a Tell Us case. And I said,
21 Harriet, if that's what you feel you need to do, do
22 so.
23 Q. Okay. Was this conversation before or
24 after the February 13th PIP?
25 A. That was before.

Page 28

1  Q. I'm sorry. Before or after the
2  February 13th warning?
3  A. Before.
4  Q. Before.
5  A. And part of -- Harriet, again, we
6  talked -- I talked to Harriet about that the rules
7  apply to her like they do every employee --
8  Q. Okay.
9  A. -- whether it's a manager or an
10 individual contributor.
11 Q. So prior to her receiving the verbal
12 warning -- strike that.
13       Did this conversation happen with
14 Harriet before or after she went on leave?
15 A. Before.
16 Q. Okay. Did you make any of her
17 supervisors aware that she had complained about
18 discrimination at that time?
19 A. Melissa King.
20 Q. Okay.
21 A. And, again, Melissa, if you know --
22 well, you don't know her. She was a very -- she was
23 a very good manager. She applied the rules to all
24 of her direct reports, not just Harriet.
25       The thing that baffled me about

Page 29

1  Harriet was she was looking for exceptions to the
2  rule. We gave her the PTO policy numerous times.
3      Q.   Well, isn't it true that her prior
4  supervisor, who was an African American female,
5  allowed her to do some of the things she was asking
6  for, the exceptions?
7      A.   Yes. And you need to make note that
8  Ayanna Brown, that was her first time being a
9  manager. She had never managed before.
10     Q.   Okay.
11     A.   And I had numerous discussions with her
12 in regards to the rules.
13     Q.   Gotcha. But you didn't take it upon
14 yourself to contact any of my client's coworkers to
15 see if they were feeling that they were
16 discriminated against or if Bill was part of the
17 problems?
18     A.   We do what we call a survey. And a
19 survey was initiated on the department, but the
20 feedback did not come back negative.
21     Q.   Okay.
22     A.   And that's what we base our -- one of
23 the things that we look at. We also do what we call
24 an upward feedback, where the managers are given
25 feedback from the direct reports about things in

Page 30

1  line to their performance. We didn't get anything
2  to submit.
3      Q.   Okay. Do you know who Melissa Shovelski
4  is?
5      A.   I know of her. I -- I think she's part
6  of the project management team.
7      Q.   Uh-huh.
8      A.   She loved -- I remember her coming to me
9  saying she loved working for Siemens, she loved her
10 job.
11     Q.   That is true. Would you be surprised to
12 know that she just recently testified that she felt
13 that Bill Piatt was discriminating against her?
14          MS. GRANT: Objection; form.
15     A.   I would be surprised.
16     Q.   (By Mr. Bail) You would be surprised?
17     A.   Yes.
18     Q.   Okay. She did.
19          MS. GRANT: Objection; form.
20     Q.   (By Mr. Bail) Would it have been
21 beneficial for you to have interviewed her?
22     A.   I don't understand why. She does not --
23 she's not part of that organization. And I had no
24 complaint from her or anyone in regards to
25 discrimination.

Page 31

1      Q.   Okay.
2          MR. BAIL: I pass the witness.
3          MS. GRANT: I just have a couple of
4  quick follow-up questions.
5               EXAMINATION
6  QUESTIONS BY MS. ASHLEE GRANT:
7      Q.   Did Harriet ever complain to you
8  specifically that she felt she was being treated
9  differently because of her race?
10     A.   No.
11     Q.   Did Harriet ever complain to you that
12 she felt she was being treated differently because
13 of her gender?
14     A.   No.
15         MS. GRANT: I have no further
16 questions.
17         MR. BAIL: Pass the witness.
18
19
20              * * * * * *
21
22
23
24
25

Page 32

1            CHANGES AND SIGNATURE
2  WITNESS NAME:            DATE OF DEPOSITION:
3  LINDA HUBBARD            FEBRUARY 6, 2020
4  PAGE    LINE    CHANGE          REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 Job No. 18929

8 (Pages 29 to 32)

Page 33

1  I, LINDA HUBBARD, have read the
2  foregoing deposition and hereby affix my signature
3  that same is true and correct, except as noted
4  herein.
5
6  _____
    LINDA HUBBARD
7
8  STATE OF      )
9  COUNTY OF     )
10
11  BEFORE ME, _____, on this day
12  personally appeared LINDA HUBBARD, known to me
13  (proved to me on the oath of
14  _____ or through
15  _____ (description of identity
16  card or other document) to be the person whose name
17  is subscribed to the foregoing instrument and
18  acknowledged to me same was executed for the
19  purposes and consideration therein expressed.
20
21  Given under my hand and seal of office this _____
22  day of _____, _____.
23
    _____
24  NOTARY PUBLIC IN AND FOR
       THE STATE OF _____
25  Job No. 18929

Page 34

1       IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
2              HOUSTON DIVISION
3
    HARRIET LANE,        )
4                        )
    Plaintiff,           )
5                        )
    VS.                  ) C.A. NO. 4:19-cv-00435
6                        )
    SIEMENS ENERGY, INC., )
7                        )
    Defendant.           )
8                        )
9         REPORTER'S CERTIFICATION
10           ORAL DEPOSITION OF
                LINDA HUBBARD
11            FEBRUARY 6, 2020
12       I, MICHELLE R. PROPPS, Certified
13  Shorthand Reporter in and for the State of Texas,
14  hereby certify to the following:
15       That the witness, LINDA HUBBARD,
16  was duly sworn by the officer and that the
17  transcript of the oral deposition is a true record
18  of the testimony given by the witness;
19       I further certify that pursuant to
20  FRCP Rule 30 (f) (1) that the signature of the
21  deponent:
22       __X__ was requested by the deponent
23  or a party before the completion of the deposition
24  and returned within 30 days from date of receipt of
25  the transcript. If returned, the attached Changes

Page 35

1  and Signature Page contains any changes and the
2  reasons therefor;
3       _____ was not requested by the
4  deponent or a party before the completion of the
5  deposition.
6       I further certify that I am neither
7  attorney nor counsel for, related to, nor employed
8  by any of the parties to the action in which this
9  testimony was taken. Further, I am not a relative
10  or employee of any attorney of record in this cause,
11  nor am I financially or otherwise interested in the
12  outcome of the action.
13       Subscribed and sworn to on this the
14  10th day of February, 2020.
15
16
17
18
19       _____
       MICHELLE PROPPS, CSR
20       Expiration Date 10-31-21
       Hanna & Hanna, Inc.
21       Firm Registration No. 10434
       8582 Katy Freeway, Suite 105
22       Houston, Texas 77024
       713.840.8484
23       www.hannareporting.com
24
25