# EXHIBIT 13

DONNA WILSON - 2/6/2020

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

HARRIET LANE,            )
                         )
 Plaintiff,              )
                         ) C.A. NO. 4:19-cv-00435
VS.                      )
                         )
SIEMENS ENERGY, INC.,    )
                         )
 Defendant.              )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL DEPOSITION OF
DONNA WILSON
FEBRUARY 6, 2020
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF DONNA WILSON, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on February 6, 2020, from 12:37 p.m. to 1:23 p.m., by machine shorthand before MICHELLE R. PROPPS, CSR, in and for the State of Texas, reported at the offices of BakerHostetler, 811 Main Street, Suite 1100, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated in the record or attached hereto.

## Page 2

             APPEARANCES

FOR THE PLAINTIFF:

MR. ASHOK BAIL
The Bail Law Firm
3120 Southwest Freeway, Suite 450
Houston, Texas 77098
Tel: 832.216.6693
Fax: 832.263.0616
Email: ashok@baillawfirm.com

FOR THE DEFENDANT:

MS. ASHLEE GRANT
BakerHostetler LLP
811 Main Street, Suite 1100
Houston, Texas 77002-6111
Tel: 713.646.1316
Fax: 713.751.1717
Email: agrant@bakerlaw.com

             \* \* \* \* \*

## Page 3

                    INDEX
                                              PAGE
Appearances.................................... 2

DONNA WILSON

Examination by Mr. Ashok Bail..................... 4
Examination by Ashlee Grant....................... 39

Changes and Signature...........................
                        43
Reporter's Certification........................ 45

                  EXHIBITS
EXHIBIT NO.      DESCRIPTION          PAGE
Exhibit 11   Type Meeting Notes (Bates Nos.
             Siemens-Lane 00327-333)............ 20
Exhibit 12   Inter-Office Correspondence
             (Wilson to Lane) (Bates Nos.
             Siemens-Lane 000066)............... 30

        PREVIOUSLY MARKED AND REFERRED TO EXHIBITS

             Exhibits No. 1, 3 and 7

## Page 4

  1           DONNA WILSON,
  2   having been first duly sworn, testified as follows:
  3              EXAMINATION
  4   QUESTIONS BY MR. ASHOK BAIL:
  5       Q.  Ms. Wilson, could you please state your
  6   full name and spell it out for the Court.
  7       A.  Donna Elizabeth Wilson.  D-O-N-N-A.
  8   E-L-I-Z-A-B-E-T-H.  W-I-L-S-O-N.
  9       Q.  Thank you, Donna -- Ms. Wilson.  Do you
 10   prefer me to call you Ms. Wilson or Donna?
 11       A.  Donna is fine.
 12       Q.  Donna, have you ever had your deposition
 13   taken before?
 14       A.  No.
 15       Q.  Just a couple of guidelines that we can
 16   adhere to and make the whole process easier.
 17       A.  Okay.
 18       Q.  One is make sure you wait for me to
 19   finish asking my question before you answer.  And
 20   then, likewise, I'll wait for you to finish your
 21   response before I ask you another question or we'll
 22   just start running over each other.  Because a lot
 23   of times, you may want to respond because you
 24   already know the answer, but just wait for me to
 25   finish.

Page 5

1    A.    Okay.
2    Q.    If there's anything that -- if it's a
3  question that you don't understand, ask me to
4  rephrase it and I'll do my best to put it in a
5  fashion to where you understand it.  Okay?
6    A.    Okay.
7    Q.    Also, it's very important to make sure
8  you do verbal responses.  Shaking heads and nodding
9  won't be transcribed by her.  Okay?
10   A.    Okay.  Yes.
11   Q.    All right.  Can you -- it's a weird
12 question, but can you identify your race for the
13 record?
14   A.    Caucasian.
15   Q.    Okay.  And have you taken any
16 medications today that would prevent you from
17 testifying truthfully?
18   A.    No.
19   Q.    Okay.  And you understand that you're
20 under oath.
21   A.    Yes.
22   Q.    Okay.  And prior to attending today's
23 deposition, did you review anything?
24   A.    No.
25   Q.    Okay.  Did you speak to anybody in

Page 6

1  regards to your testimony that you're giving today?
2    A.    I spoke to Ashlee.
3    Q.    Okay.  Besides Ashlee.
4    A.    Oh.  No.
5    Q.    Okay.  No other former employees?
6    A.    I spoke to one that knows I'm coming
7  here.
8    Q.    Who is that?
9    A.    Carrie Janak.  She does not work for
10 Siemens anymore, though.
11   Q.    Oh, okay.  But you haven't spoken to any
12 other current Siemens employees about your coming
13 here to testify.  Correct?
14   A.    I spoke to one other person who was one
15 of my peers, Amy Barr.
16   Q.    Okay.  Great.  And your accent, are you
17 from Boston?
18   A.    I am from Boston, yes.
19   Q.    I just wanted to see if I was good with
20 that.
21   A.    Very good.  I've been here 20 years,
22 but...
23   Q.    All right.  Cool.
24         MS. GRANT:  You can't shake the
25 accent.

Page 7

1         THE WITNESS:  I guess not.
2    Q.    (By Mr. Bail)  All right.  How long have
3  you worked for Siemens?
4    A.    Thirty-four years.
5    Q.    Nice.  Well, gosh, I didn't expect that.
6  Could you tell me your experience -- I mean, your
7  different positions you've held at Siemens for those
8  past --
9    A.    Thirty-four years?
10   Q.    Let's do the last ten years.
11   A.    Okay.
12   Q.    Yeah.
13   A.    So let's see.  The past ten years, I've
14 been in Texas.  I worked for Siemens Healthcare.
15 And then for the past -- I worked for them for eight
16 years.  And then I went from Siemens Healthcare in
17 Texas to Siemens Energy in Texas, here in Houston.
18   Q.    So the last two years, you've been --
19   A.    Well, it was eight years with Siemens
20 Healthcare in Houston and then eight years with
21 Siemens Energy.  I'm no longer working with Siemens
22 Energy.
23   Q.    Ah, that's right.  That's right.  You
24 recently --
25   A.    I left in August, August 30th of last

Page 8

1  year.
2    Q.    Okay.  So during the time period of
3  2016, 2017, what position did you hold?
4    A.    I was head of commercial -- commercial
5  project management and head of commercial sales.
6  First I was head of commercial sales, probably, for
7  that time period.
8    Q.    Okay.  At some point during your career
9  with Siemens, you supervised my client, Harriet
10 Lane.  Correct?
11   A.    Yes.
12   Q.    During the time period that you
13 supervised her, were you the head of -- what was it?
14   A.    Commercial sales.
15   Q.    Commercial sales.
16   A.    Yes.
17   Q.    Okay.  If you could pull those documents
18 close to you, I'm going to be asking you questions
19 from some of them.
20         I'll ask you to turn now -- in the
21 bottom right-hand corner, you'll see numbers.
22   A.    Uh-huh.
23   Q.    If you could turn -- go to Exhibit No.
24 7.  It's a chart.  It looks like this.
25 (Indicating.)

Page 9

1  A.  Okay.
2  Q.  This is a document that was given to me
3  by Siemens' counsel.
4  A.  Okay.
5  Q.  Could you take a minute to take a look
6  at that and let me know when you're finished?
7  A.  Yes. Okay.
8  Q.  Okay. Does this document accurately
9  reflect who you were supervising?
10  A.  Yes.
11  Q.  Okay. Is it -- were you -- is it
12  missing anybody?
13  A.  No. I mean, I don't really remember the
14  time frames of when people have come and gone from
15  the department.
16  Q.  Okay.
17  A.  But, no. I mean, Samantha, Carrie and
18  Harriet. Yeah.
19  Q.  Prior to you becoming Harriet's
20  supervisor, did you have any other encounters with
21  Harriet?
22  A.  No.
23  Q.  Did you know who she was?
24  A.  Yes, I knew who she was. I knew who she
25  was, yes.

Page 10

1  Q.  Okay. How did you know who she was?
2  A.  She was in the office. She -- I knew
3  she did audit. I'm trying to -- I don't remember if
4  she ever audited one of the processes in my
5  department. But our office was relatively small --
6  Q.  Okay.
7  A.  -- so that's how I knew who she was.
8  Q.  All right. And do you know who Bill
9  Piatt is?
10  A.  Yes.
11  Q.  And at some point, you were working with
12  Bill Piatt in regards to Harriet Lane. Correct?
13  A.  Yes.
14  Q.  Okay. We're going to get to that. But
15  what I'd like for you to do -- let's see here. If
16  you can go to the -- the first document. It's No. 1
17  at the beginning.
18      Have you seen this document or
19  something similar to it in regards to this case?
20  A.  No.
21  Q.  Okay.
22  A.  No.
23  Q.  Could you please turn to Page 11 -- I
24  mean 15. Sorry. And if you could read -- if you
25  could review Pages 15 and 16 and let me know when

Page 11

1  you're done. Actually, let's -- just No. 11 and
2  No. 12.
3  A.  Oh, these two?
4  Q.  Yeah.
5  A.  Okay.
6      (Document review.)
7  A.  To this part here? Just to No. 13?
8  Q.  (By Mr. Bail) Yeah. You don't have
9  to -- yeah. You don't need to look at 13.
10  A.  Okay.
11  Q.  If you could flip back to Page 15 and
12  take a look at Interrogatory No. 11 towards the
13  bottom.
14  A.  Uh-huh.
15  Q.  You see where it says "Donna Wilson and
16  Bill Piatt made the decision to eliminate
17  plaintiff's position and to terminate plaintiff's
18  employment as part of a reduction in force after
19  they were instructed to reduce the head count of the
20  quality department."
21      Is that true?
22  A.  We don't make the sole decision. We
23  make the recommendation or we provide the analysis
24  to the management and HR.
25  Q.  Okay.

Page 12

1  A.  And then they review and approve it.
2  Q.  Okay.
3  A.  And then they probably have additional
4  approvals.
5  Q.  So -- but --
6  A.  We did the justification.
7  Q.  You and Bill.
8  A.  Uh-huh.
9  Q.  So you and Bill made the recommendation
10  and then they can do whatever the heck they want
11  with it after that. Right? Pretty much. That's a
12  slang word, but --
13  A.  Yes, yes.
14  Q.  So it's fair to say Bill and you made
15  the recommendation to terminate my client. Correct?
16  A.  Yes.
17  Q.  Okay. And it says also here as part --
18  it says "to terminate employee's employment as part
19  of the reduction in force after they were instructed
20  to reduce the head count in the quality department."
21      Who instructed you to reduce the
22  head count in the quality department?
23  A.  No one instructed me to reduce the head
24  count in the quality department. They would ask us
25  to review all departments --

Page 13

1   Q.  Okay.
2   A.  -- and your workload. And we always
3   would do that. So we would look at the -- not just
4   the quality department. We would look at project
5   management and we would look at my -- the commercial
6   sales department.
7   Q.  Is that --
8   A.  It's not -- it's not, like, look at an
9   isolated department.
10  Q.  Huh. So how did you go about -- I mean,
11  who instructed you to reduce the head count, if
12  anybody? Nobody?
13  A.  Senior management always asked us to
14  review our head count.
15  Q.  Okay.
16  A.  It's on an ongoing basis. And I don't
17  remember if there was a specific instruction at a
18  specific date that says you must reduce the head
19  count.
20  Q.  Okay. So you're just saying as a part
21  of your normal scope of job duties, it would have
22  been something that you would look at in each
23  department that you work with?
24  A.  Yes.
25  Q.  So what departments were you working

Page 14

1   with at the time that you would analyze in such a
2   fashion?
3   A.  It would be just the three that I had.
4   Q.  Okay.
5   A.  So it would be --
6   Q.  Which ones were they?
7   A.  Carrie, Samantha and then Harriet.
8   Q.  All right. Why was Bill involved with
9   it?
10  A.  Bill was -- I knew nothing about audit
11  when Harriet became my employee. And I worked with
12  Bill and Harriet. We all worked together because of
13  my lack of knowledge of the audit functions. So
14  Bill had the expertise.
15  Q.  Okay. So you relied on Bill
16  significantly in dealing with Harriet. Correct?
17  A.  I was learning -- yes. Initially, yes.
18  And I was learning the audit function, the
19  requirements, but Bill -- again, Bill knew much more
20  than I did.
21  Q.  So almost like he was helping you
22  supervise her at some point.
23  A.  At some point we were -- we were working
24  together, yes.
25  Q.  Okay.

Page 15

1   A.  We were definitely working together.
2   Q.  When's -- when's the last time you spoke
3   to Bill Piatt?
4   A.  Probably August 30th, my last day.
5   Q.  Ah, okay.
6   A.  I spoke to a lot of people on my last
7   day.
8   Q.  Sure. Well, how was your working
9   relationship with Bill?
10  A.  It was -- it was good. Uh-huh.
11  Q.  Okay. Were you involved with reducing
12  Harriet Lane's work responsibilities in any fashion?
13  A.  Not that I recall, no.
14  Q.  Okay. Do you recall what her position
15  was at the time period that you were managing her?
16  A.  I would say auditor, but I'm not a
17  hundred percent sure.
18  Q.  Okay. Your position title has probably
19  changed hundreds of times probably. Right?
20  A.  Yes, yes, yes.
21  Q.  Do you know why that is?
22  A.  Siemens has -- Siemens has changed the
23  job categories many times and so what they were
24  trying to do is so you can go from company to
25  company -- like I said, I was in healthcare, then I

Page 16

1   went to energy. They have categories that may be
2   called contracts, but they have, like, a job family,
3   so -- but then they have individual
4   responsibilities. So you might be in a category of
5   contract manager, but you might do multiple
6   functions. You could go to healthcare, from
7   healthcare to communications as contract manager, as
8   a job category, but the actual of what you're
9   working may be something different. So they may
10  say, Okay, you're a commercial sales manager.
11  Q.  Okay.
12  A.  So it's -- it's just because we changed
13  our HR systems frequently. And the job families,
14  they always try to bundle them up, like an analyst,
15  a financial analyst could be multitude of
16  different --
17  Q.  Names.
18  A.  -- names, yeah.
19  Q.  Okay. Interesting.
20  A.  Yeah.
21  Q.  And you were aware that my client went
22  on FMLA leave. Correct? Right?
23  A.  Yes.
24  Q.  Isn't it true that you started
25  supervising her right after she came back from

DONNA WILSON - 2/6/2020

Page 17

```
 1   leave?  Correct?
 2        A.    Her manager left the company when she
 3   was on leave.
 4        Q.    Yeah.
 5        A.    So that's when I became her manager.
 6        Q.    Okay.
 7        A.    So --
 8        Q.    Yeah.
 9        A.    -- technically, I guess, I was her
10   manager when she was on leave.
11        Q.    I guess.  It just depends.
12        A.    Yeah.
13        Q.    Okay.  But you were definitely her
14   manager when she got back.
15        A.    I was definitely her manager when she
16   got back, yes.
17        Q.    And were you aware that she was given a
18   written warning when she returned?  Let's see.  You
19   can just flip to Exhibit No. 5.
20        A.    Yes.
21        Q.    You see that?
22        A.    Yes, I was aware of this.
23        Q.    Okay.
24        A.    Yes, I saw -- I had seen this.
25        Q.    Okay.  And then also if you flip to
```

Page 18

```
 1   No. 6, that is the -- performance improvement plan?
 2   Yes.  You're aware of this document as well?
 3        A.    Yes.
 4        Q.    And the top of No. 6, it says it has
 5   your name up there, finance manager.  Correct?
 6        A.    Oh, so finance manager.  Yeah.
 7        Q.    You didn't author this document, did
 8   you?
 9        A.    No.
10        Q.    It was Linda Hubbard, to your
11   understanding?
12        A.    Yes, to my understanding.
13        Q.    And most the items in this document, you
14   didn't have any firsthand knowledge of.  Right?
15        A.    No.
16        Q.    So you're just -- a lot of what you knew
17   about Harriet at that time was based upon what other
18   people told you.  Correct?
19        A.    Yes.  And my -- I mean, I had worked
20   with her periodically.  You know, I knew her from
21   the office.
22        Q.    Right.  But I'm pretty certain Bill
23   Piatt gave you his opinion about her and working
24   with her when he was working with you while she was
25   gone.  Correct?
```

Page 19

```
 1        A.    Yes.
 2        Q.    Okay.  Did he -- do you recall what he
 3   said about Harriet?
 4        A.    I -- I don't really recall.
 5        Q.    It was pretty negative, would you say?
 6              MS. GRANT:  Objection; form.
 7              You can answer.
 8        A.    I don't really recall.
 9        Q.    (By Mr. Bail)  You don't remember?
10        A.    No, I really don't.
11        Q.    Okay.  And are you aware at some point
12   that Harriet claimed that you were discriminating
13   against her or bullying her?
14        A.    Not -- not really, no.  I -- I don't
15   think I'm aware that she ever said I was bullying
16   her or discriminating against her.
17        Q.    Let me show you -- take a look at these
18   entries and let me know if you're the author of this
19   document.
20        A.    Yeah.
21        Q.    Okay.  Can you identify for the Court
22   what that document is?
23        A.    I -- I think this was my notes from my
24   meetings with Harriet.
25        Q.    Okay.  Great.
```

Page 20

```
 1              MR. BAIL:  Can you put this sticker
 2   on the bottom?
 3              MS. GRANT:  Uh-huh.
 4              (Exhibit No. 11 marked.)
 5        Q.    (By Mr. Bail)  Great.  So Exhibit No. 11
 6   is your notes with Harriet.
 7              What made you decide to take these
 8   notes?
 9        A.    I believe HR had asked me to keep track
10   of our meetings.
11        Q.    Okay.  If you could turn -- we're going
12   to go from the last -- second-to-the-last page to
13   the first page.  So if you turn to Page 332 at the
14   bottom.
15        A.    Okay.  Uh-huh.
16        Q.    And that one -- okay.  So you made an
17   entry on Monday, May 22nd, 2017.  Correct?
18        A.    That's what it says, yes.
19        Q.    Yeah.  And it says here that there was a
20   meeting -- go ahead.  You were about to say
21   something.
22        A.    This looks like a -- is it an email?
23        Q.    Yeah.
24        A.    Okay.  Sorry.
25        Q.    So is it fair to say what we're looking
```

Page 21

1   at on Page 332 is an email from you to Linda
2   Hubbard?
3       A.   Yes. That's what this looks like, yes.
4       Q.   Okay. And you're discussing a meeting
5   that was attended by Lane, Hubbard, yourself, Hols
6   and Shipley. Correct?
7       A.   Okay. Yes, yes.
8       Q.   Do you remember this meeting?
9       A.   Yes. Yes, I remember -- I remember
10  meeting.
11      Q.   So the main point of this meeting, is it
12  fair to say, was to let Harriet know that she's now
13  on a performance improvement plan?
14      A.   Yes.
15      Q.   Okay. If we could turn to Page 331.
16  And it says "Meeting Wednesday May 24th, 2017."
17           You see that?
18      A.   Yes. Uh-huh, yes.
19      Q.   If you go to the third paragraph down
20  and the second sentence, it says "She felt the PIP
21  was not fair because she was technically not late of
22  her expense report and has not had any behavior
23  issues in the past. She got very upset and agitated
24  at Linda over the letter and the PIP."
25           What did she -- you said she was

Page 22

1   agitated. Do you remember this?
2       A.   I -- I don't remember.
3       Q.   Okay. If --
4       A.   Maybe -- I don't know. She might have
5   been fidgety or --
6       Q.   But for the most part, were your
7   meetings with her cordial?
8       A.   Yes, yes. For the most part.
9       Q.   Because just -- if you look at the next
10  entry right there at the bottom, you said "Overall
11  the meeting was cordial" for May 25th. Correct?
12      A.   May 25th.
13      Q.   Yeah, at the bottom.
14      A.   Yes, yes. I mean, it wasn't a good
15  situation, so...
16      Q.   I know. It was a difficult situation.
17      A.   Yeah.
18      Q.   I understand. How did you feel about
19  being in that situation?
20      A.   I was not happy.
21      Q.   Yeah.
22      A.   I mean, I was not happy about being put
23  in that situation.
24      Q.   Right. I imagine. Let's talk about the
25  entries on May 25th. You say "Meeting with Harriet,

Page 23

1   Bill and myself to go over the goals outlined by
2   Melissa."
3            What goals do you recall being
4   outlined by Melissa? What were they about?
5       A.   No. I don't do audit. I don't know. I
6   don't remember.
7       Q.   Okay. And Melissa who?
8       A.   Melissa King, who was her previous --
9       Q.   Supervisor.
10      A.   -- supervisor, yes.
11      Q.   And you said "Decided to keep all goals
12  related to audit and remove two goals related to
13  IMS."
14           So was that meaning removing two
15  goals that Harriet was working on and give them to
16  somebody else?
17      A.   I don't remember.
18      Q.   Okay.
19      A.   And I don't even remember what IMS
20  stands for.
21      Q.   Understood.
22      A.   Yeah.
23      Q.   You know, if I had quit, I would just --
24  everything out of my -- I resigned, everything would
25  be out of my brain and I'd be moving on, so I --

Page 24

1   unfortunately, I have to ask you these questions.
2       A.   I understand. I understand.
3       Q.   So "Bill will transfer over to the EHS
4   procurement and two other to Harriet."
5            What does that mean? Third line.
6   Third sentence.
7       A.   Yes, I see it. I don't know what that
8   means.
9       Q.   Okay. Let's go to the next page, 330.
10  And let's go from the bottom up.
11      A.   Okay.
12      Q.   So if we try -- June 2nd, 2017, you
13  state in the first line, second sentence "Overall,
14  it was a good meeting."
15      A.   Uh-huh.
16      Q.   Now, if you look at the second paragraph
17  you state "She did mention that she still has" --
18  "feels harassed and not comfortable with Mark,
19  Patrik and Bill, as she does not want to do the
20  presentation from her trip to Germany."
21      A.   Yes.
22      Q.   Can you explain a little bit about that,
23  if you recall?
24      A.   Yes. She went to Germany for
25  training -- and I don't remember specifics of the

Page 25

1  training. But we had asked her, when she came back,
2  to present to us what she learned.
3      Q.   Okay.
4      A.   And she said she didn't want to present
5  to Mark and Patrik and Bill.
6      Q.   Did you go into any more detail as to
7  why she didn't want to? Did she tell you?
8      A.   Well, I say here that she feels
9  harassed --
10     Q.   Okay.
11     A.   -- and is uncomfortable.
12     Q.   So that's what she told you?
13     A.   Yeah.
14     Q.   Gotcha. Okay. Let's go to June 23rd,
15 2017, on the top, you do -- you indicate "Overall
16 positive meeting, no issues." Right?
17     A.   Uh-huh. Yes.
18     Q.   And this is -- are you asked to do these
19 notes like the way you are because she's on a PIP
20 and HR wants you to keep track of her behavior and
21 performance for the PIP? Is that why this is all
22 being done?
23     A.   I don't remember why I was specifically
24 doing the notes. But, one, it was to remember what
25 our meetings -- what we went over in our meetings

Page 26

1  and just -- I guess that's probably why. I mean, I
2  don't know -- I don't know if this even had
3  information pertaining to all of the -- what was in
4  the PIP.
5      Q.   On the PIP, yeah.
6      A.   I think it was more of just for me to
7  kind of keep track of the progression --
8      Q.   How she's doing.
9      A.   -- and how she's doing.
10     Q.   Were you keeping -- were you asked to
11 keep notes like this on any of your other
12 subordinates?
13     A.   No. I do periodically keep notes on --
14 but, no, not to this...
15     Q.   Okay.
16     A.   I wasn't meeting with anyone else
17 weekly.
18     Q.   Just her. Now, if we turn to the next
19 page, 329, the bottom entry is June 30, 2017.
20 Correct?
21     A.   Yes.
22     Q.   And that paragraph starts here and it
23 goes on to the next page. And at the end you say
24 "Overall positive meeting. No issues," as of
25 June 30th, 2017; is that correct? Here, flip the

Page 27

1  page and you'll see.
2      A.   Yes, yes. Yep.
3      Q.   So let's go to page -- stay on Page 329.
4  There's a pretty long entry. This is coming from
5  the previous page. It will be July 7th, 2017 starts
6  on Page 328 and continues onto Page 329.
7      A.   Yes.
8      Q.   Okay. So if you go to look at Page 329
9  and count up one, two, three, four -- four
10 paragraphs. And it starts with "She said" -- "she
11 said."
12          Do you see it?
13     A.   Yes.
14     Q.   Okay. It says "She said this is
15 discrimination, retaliation that we are forcing her
16 to use all her PTO. I explained again we are asking
17 her to follow policy."
18          Do you recall her making that
19 statement?
20     A.   Yes, yes.
21     Q.   So at some point, she's accusing you of
22 being discriminatory to her; is that correct?
23     A.   I didn't -- I don't feel like it was at
24 me. I felt like it was the company.
25     Q.   Okay.

Page 28

1      A.   I didn't feel like she was saying, You
2  are discriminating against me.
3      Q.   It was more Bill Piatt, wouldn't you
4  say?
5          MS. GRANT: Objection; form.
6      Q.   (By Mr. Bail) You can answer. Is it
7  Bill that she was --
8      A.   No, no. I don't even know if Bill knew
9  about this.
10     Q.   Uh-huh. About this specific issue.
11     A.   Yeah.
12     Q.   Okay. But it's fair to say you had to
13 rely a lot on Bill because you were new to all this.
14 Correct?
15     A.   Not anything regarding this.
16     Q.   What is "this"?
17     A.   This --
18     Q.   PTO issue.
19     A.   The PTO.
20     Q.   Okay. But dealing with audits, that's
21 where you had to rely on Bill, because that wasn't
22 your --
23     A.   The duties.
24     Q.   The duties.
25     A.   Yes, yes.

Page 29

1    Q.   Gotcha.  And he was the one that
2  recommended termination -- right? -- to you.
3          MS. GRANT:  Objection; form.
4    Q.   (By Mr. Bail)  To you.  Bill Piatt, did
5  he recommend that my client be terminated?
6    A.   He didn't recommend that she be
7  terminated.  He did the analysis.
8    Q.   Okay.  So the termination was based
9  partly on his analysis.  Correct?
10   A.   Yes.  Yes.
11   Q.   All right.  And how many employees have
12 you -- strike that.
13          While you were employed by Siemens,
14 how many employees have you participated with PIPs
15 with -- worked on PIPs with them?
16   A.   In my 34 years, I cannot remember.
17   Q.   Okay.  So that's a good amount then.
18   A.   No, no.  No, it is not a lot.  No.
19   Q.   Maybe a handful?
20   A.   Maybe -- yeah, a handful.
21   Q.   Okay.  All right.  Well, in this
22 particular case, it's true that ultimately Harriet
23 passed -- right? -- her PIP.
24   A.   Yes, yes.
25   Q.   And if you could -- let's see here.

Page 30

1          (Exhibit No. 12 marked.)
2    Q.   (By Mr. Bail)  If you could take a look
3  at that document and let me know when you're
4  finished reviewing it.
5          MR. BAIL:  I'm trying to find you a
6  copy.
7          MS. GRANT:  It's fine.  I've seen
8  it.
9          (Document review.)
10   Q.   (By Mr. Bail)  So have you had a chance
11 to review that document?
12   A.   Yes.
13   Q.   What is it?
14   A.   This is the removal of the performance
15 improvement plan.
16   Q.   Okay.  And your signature is on that
17 document as well?
18   A.   Yes, my signature is on the document.
19   Q.   Okay.  And did you make the decision to
20 remove her or did you make a recommendation?
21   A.   I don't --
22   Q.   You don't know?
23   A.   I don't know the -- I don't understand.
24   Q.   Earlier, you said sometimes after you
25 make a recommendation, then somebody above you makes

Page 31

1  the decision.  So on this particular -- like, a
2  manager above you, like Hols or somebody else.  But
3  in this situation, who made the decision to take her
4  off the PIP?
5    A.   I mean, I -- I probably did in
6  conjunction with HR.
7    Q.   Okay.
8    A.   I mean, if she met all the PIP
9  requirements, there's no need for her to be on a PIP
10 anymore, you know.  Yeah.
11   Q.   But that was your decision?
12   A.   Probably.
13   Q.   Probably, okay.
14   A.   Yeah.
15   Q.   And why did you resign from Siemens?
16   A.   I retired.  Thirty-four years, lots of
17 changes in the company, Siemens made a decision to,
18 kind of, sell off the oil and gas business or
19 separate the oil and gas business.
20   Q.   Are you enjoying retirement?
21   A.   I am.
22   Q.   Wonderful.
23   A.   How can you not?
24   Q.   Okay.  I'm almost finished here.
25          Are you aware if an employee is

Page 32

1  allowed to look for job opportunities within Siemens
2  if they are on a PIP?
3    A.   I believe an employee can look.  I don't
4  know if an employee can be transferred.
5    Q.   Ah, okay.  Did you ever discuss with
6  Harriet that there was some type of analysis going
7  on about the head count in the departments that you
8  were supervising?
9    A.   Probably not.
10   Q.   Okay.  Is it -- in the past, have you
11 informed employees that are under you that the
12 company is taking a look and there might be -- at
13 laying off individuals prior to the layoff?
14   A.   Probably, in a general sense, the
15 employees know that that's what happens because we
16 have lay-offs, so -- but I would not specifically
17 say to an employee, We're looking at your position
18 and reviewing it.
19   Q.   Gotcha.
20   A.   I mean, it's a departmental, typically,
21 thing.
22   Q.   Okay.  At the time period that Harriet's
23 position was being reviewed, I asked you earlier
24 who -- who directed you.  And you testified that
25 it's something that you do ongoing; is that correct?

8 (Pages 29 to 32)

Page 33

1  A. Yes.
2  Q. Okay. So even though it's ongoing, who
3  kind of initiated the analysis? Was it you or Bill?
4  A. Bill would have.
5  Q. Okay. So as an ongoing thing, he was
6  the idea to, Hey, let's just take a look at it now
7  and see if we can put -- take a look at whatever
8  department you and Bill were working at and decide
9  whether or not to let go of certain people?
10 A. Yes. Patrik, who is our senior manager,
11 would have been asking us to look at departments.
12 Q. Okay. But you don't know for sure at
13 this point, because you said it's ongoing. So you
14 don't know if Patrik told you or not. Correct?
15      MS. GRANT: Objection; form.
16 Q. (By Mr. Bail) You can answer.
17 A. Yeah. I mean, I don't know on -- if it
18 was this specific date, he said to all the
19 management team, Everybody look. I don't remember
20 that.
21 Q. You don't remember.
22 A. No, I don't recall that.
23 Q. But you do know that Bill Piatt was the
24 one working on the audit duties and whether they
25 were needed anymore or something to that extent?

Page 34

1  A. Yes.
2  Q. Okay. And do you know who Toni Horton
3  is?
4  A. Yes.
5  Q. She's HR. Right?
6  A. Yes.
7  Q. And you recall -- strike that.
8      Do you recall working with Tony
9  Horton on any matters dealing with Harriet?
10 A. Yes, yes.
11 Q. Can you explain to the Court the nature
12 of those communications or your involvement with
13 Ms. Horton regarding Harriet?
14 A. When Linda Hubbard, who was the -- her
15 predecessor left, I would have worked on any HR
16 issues with Toni. I mean, Toni replaced Linda.
17 Q. Oh, okay.
18 A. So Linda left the office. She was not
19 our HR support anymore, so I worked with Toni.
20 Q. Okay. Did Toni ever sit in on you --
21 with you and Harriet on any type of meetings?
22 A. Probably.
23 Q. Okay. Can you turn to Document No. 10?
24 A. Okay.
25 Q. Have you ever seen this document before?

Page 35

1  A. I mean, the -- the text is similar to
2  other -- the other document, but I don't know if
3  I've --
4  Q. Seen that one, specifically.
5  A. I don't remember.
6  Q. It's okay. We can move on.
7  A. Okay.
8  Q. Yeah.
9  A. But the text is similar.
10 Q. Similar to what?
11 A. I think that -- one of the
12 justifications in the other document.
13 Q. Oh, okay.
14 A. Or this -- wait. I thought it was in
15 one of the other documents. I don't know.
16 Q. That's all right.
17 A. Okay.
18      MR. BAIL: I just need, like, five
19 minutes.
20      MS. GRANT: Uh-huh.
21 Q. (By Mr. Bail) Okay. Can you turn to
22 page -- sorry -- Exhibit No. 3. And please take a
23 look at this document and -- it's about three pages.
24 Let me know when you're finished.
25      (Document review.)

Page 36

1  A. Okay.
2  Q. (By Mr. Bail) The first page, have you
3  seen this, the email at the bottom before?
4  A. The -- this is -- looks like the other
5  document I just looked at.
6  Q. It might. I mean -- yeah.
7  A. Yeah. I mean, it's from me.
8  Q. Right. As a lawyer, I have to -- I know
9  these things --
10 A. Okay.
11 Q. -- but I have to identify them for --
12 A. Okay.
13 Q. So at the bottom of this Exhibit No. 3,
14 do you see an email from yourself to Toni Horton?
15 A. Yes.
16 Q. Okay. So at the top of it, that email
17 says "Toni, after checking with Patrik and Bill,
18 here is the statement."
19      So what did you discuss with Patrik
20 and Bill regarding this statement?
21 A. I don't remember what I discussed with
22 them on the statement.
23 Q. Okay. Can you go to the second to the
24 last paragraph after the one-liner at the bottom?
25 A. Yes.

Page 37

1  Q.  It says "Four Telge Road employees are
2  currently trained to assist with audits. These
3  trainees have taken on this responsibility in
4  addition to their current workload. They are not
5  part of finance or quality."
6      What does that mean?
7  A.  What that means is we have -- there were
8  a few admin, administrative support, people that had
9  done some audits. So I believe we had our front
10 desk receptionist, who was also doing audits. And
11 there was three other people that were doing audits.
12 Q.  So those audit duties that Harriet was
13 doing before, these people were going to now do it?
14 A.  I think they were already doing some
15 audits.
16 Q.  Ah, okay.
17 A.  Yes.
18 Q.  Were you aware of Harriet training
19 certain -- any employees to do audits?
20 A.  Possibly, yes.
21 Q.  Okay. If you look -- turn to Page 3 of
22 this document at the bottom, it says "843."
23      Do you see at the top it says
24 "Internal auditing workload review"?
25 A.  Yes.

Page 38

1  Q.  This was an attachment to this email?
2  A.  Yes.
3  Q.  You didn't create this document, did
4  you?
5  A.  No, I did not create it.
6  Q.  The person who created this document was
7  Bill Piatt. Correct?
8  A.  Yes.
9  Q.  But you relied on this, along with other
10 advice that Bill gave to you, making this email
11 here?
12 A.  Yes.
13 Q.  Yeah. The email I'm referring to is the
14 August 25th, 2017, email between Donna Wilson to
15 Toni Horton.
16      And it says "business
17 justification." What does that mean?
18 A.  I don't know. I mean --
19 Q.  Does that mean business justification
20 for the termination of Harriet Lane?
21 A.  Termination -- yes. This would be the
22 justification for the elimination of the position.
23 Q.  Okay. Gotcha.
24      MR. BAIL: I pass the witness.
25      MS. GRANT: I've got just a couple

Page 39

1  of questions.
2      EXAMINATION
3  QUESTIONS BY ASHLEE GRANT:
4  Q.  Ms. Wilson, my name is Ashlee Grant.
5  And I am Siemens Energy, Inc.'s attorney in this
6  matter.
7      I just want to have a couple of
8  follow-up questions with respect to some of the
9  questions you were asked today.
10     Counsel just recently asked you
11 about you relying on Bill Piatt's analysis in
12 Exhibit 3 with regards to the justification for
13 Harriet Lane. Do you recall that testimony?
14 A.  Yes.
15 Q.  Did you rely solely on Bill Piatt's
16 analysis and information when making that
17 justification?
18 A.  No.
19 Q.  What else did you rely on?
20 A.  I mean, Bill and I worked together, but
21 there was other things that I knew that was going on
22 with the business, like the Springfield and other
23 things. So it was -- it wasn't just his analysis
24 and her current workload.
25 Q.  And what are those other things, if you

Page 40

1  wouldn't mine elaborating, to the extent you can
2  recall?
3  A.  I was aware of the Dresser-Rand
4  acquisition and the Dresser-Rand -- that they had
5  their own team of people that did some of those
6  audit functions. I was aware of the Springfield --
7  us getting rid of Springfield and her primarily
8  supporting Springfield.
9  Q.  And that information also went into your
10 recommendation to eliminate Ms. Harriet Lane's
11 position?
12 A.  Yes.
13 Q.  Did you have any reason to believe that
14 the information in Bill Piatt's analysis was false
15 or incorrect?
16 A.  No.
17 Q.  To your knowledge, was the analysis of
18 her position and the hours that she was spending
19 working correct?
20 A.  Yes.
21 Q.  And on what did you base that
22 determination?
23 A.  Based on observing her and based on --
24 based on this and observing her and how long it
25 would take for doing certain audits.

Page 41

1  Q.  Did anyone assume Harriet's position
2  after she was terminated?
3  A.  No.
4  Q.  To your knowledge, has anyone assumed
5  that position after she was terminated?
6  A.  No.
7  Q.  And I believe, as you recall, the
8  position was eliminated.
9  A.  Yes.
10 Q.  Were you aware that Harriet had made any
11 complaints that she was being discriminated or
12 harassed because of her race?
13 A.  Yes.
14 Q.  What was your understanding of her
15 complaints?
16 A.  Just what you said, that she was being
17 discriminated against.
18 Q.  When did -- was it discriminated against
19 or was it on a specific basis?
20 A.  She made reference to it in some of our
21 meetings, but that was it.  I mean -- that was it.
22 Q.  And the reference to that, would that be
23 reflected in your notes --
24 A.  Yes.
25 Q.  -- on Exhibit 11?

Page 42

1  A.  Oh, sorry.  Yes.
2  Q.  I have no further questions.
3      MR. BAIL:  No questions.  Thank you.
4      MS. GRANT:  Thank you.
5      THE WITNESS:  Thank you.
6
7
8
9          * * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 43

1           CHANGES AND SIGNATURE
2  WITNESS NAME:           DATE OF DEPOSITION:
3  DONNA WILSON            FEBRUARY 6, 2020
4  PAGE    LINE   CHANGE         REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 Job No. 18929

Page 44

1       I, DONNA WILSON, have read the foregoing
2  deposition and hereby affix my signature that same
3  is true and correct, except as noted herein.
4
5          _____
           DONNA WILSON
6
7  STATE OF        )
8  COUNTY OF       )
9
10  BEFORE ME, _____, on this day
11 personally appeared DONNA WILSON, known to me
12 (proved to me on the oath of
13 _____ or through
14 _____ (description of identity
15 card or other document) to be the person whose name
16 is subscribed to the foregoing instrument and
17 acknowledged to me same was executed for the
18 purposes and consideration therein expressed.
19
20  Given under my hand and seal of office this _____
21 day of _____, _____.
22
              _____
23            NOTARY PUBLIC IN AND FOR
              THE STATE OF _____
24
25 Job No. 18929

Page 45

```
 1      IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              HOUSTON DIVISION
 3
        HARRIET LANE,        )
 4                           )
        Plaintiff,           )
 5                           )
        VS.           ) C.A. NO. 4:19-cv-00435
 6                           )
        SIEMENS ENERGY, INC.;)
 7                           )
        Defendant.           )
 8                           )
 9            REPORTER'S CERTIFICATION
10            ORAL DEPOSITION OF
                DONNA WILSON
11            FEBRUARY 6, 2020
12            I, MICHELLE R. PROPPS, Certified
13   Shorthand Reporter in and for the State of Texas,
14   hereby certify to the following:
15            That the witness, DONNA WILSON, was
16   duly sworn by the officer and that the transcript of
17   the oral deposition is a true record of the
18   testimony given by the witness;
19            I further certify that pursuant to
20   FRCP Rule 30 (f) (1) that the signature of the
21   deponent:
22            __X__ was requested by the deponent
23   or a party before the completion of the deposition
24   and returned within 30 days from date of receipt of
25   the transcript.  If returned, the attached Changes
```

Page 46

```
 1   and Signature Page contains any changes and the
 2   reasons therefor;
 3            _____ was not requested by the
 4   deponent or a party before the completion of the
 5   deposition.
 6            I further certify that I am neither
 7   attorney nor counsel for, related to, nor employed
 8   by any of the parties to the action in which this
 9   testimony was taken.  Further, I am not a relative
10   or employee of any attorney of record in this cause,
11   nor am I financially or otherwise interested in the
12   outcome of the action.
13            Subscribed and sworn to on this the
14   10th day of February, 2020.
15
16
17
18
19            _____
               MICHELLE PROPPS, CSR
20             Expiration Date 10-31-21
               Hanna & Hanna, Inc.
21             Firm Registration No. 10434
               8582 Katy Freeway, Suite 105
22             Houston, Texas 77024
               713.840.8484
23             www.hannareporting.com
24
25
```

12 (Pages 45 to 46)