# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

HARRIET LANE, )
)
Plaintiff, )
) C.A. NO. 4:19-cv-00435
VS. )
)
SIEMENS ENERGY, INC., )
)
Defendant. )

*********************************
ORAL DEPOSITION OF
TONI HORTON
FEBRUARY 6, 2020
*********************************

ORAL DEPOSITION OF TONI HORTON, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on February 6, 2020, from 11:02 a.m. to 11:28 a.m., by machine shorthand before MICHELLE R. PROPPS, CSR, in and for the State of Texas, reported at the offices of BakerHostetler 811 Main Street, Suite 1100, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated in the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. ASHOK BAIL
The Bail Law Firm
3120 Southwest Freeway, Suite 450
Houston, Texas 77098
Tel: 832.216.6693
Fax: 832.263.0616
Email: ashok@baillawfirm.com

FOR THE DEFENDANT:

MS. ASHLEE GRANT
BakerHostetler LLP
811 Main Street, Suite 1100
Houston, Texas 77002-6111
Tel: 713.646.1316
Fax: 713.751.1717
Email: agrant@bakerlaw.com

* * * * *

INDEX

PAGE
Appearances.................................. 2

TONI HORTON

Examination By Mr. Ashok Bail.................... 4

Changes and Signature........................... 28
Reporter's Certification........................ 30

EXHIBITS
EXHIBIT NO. DESCRIPTION PAGE
Exhibit 9 Letter Dated 10-13-17 (Wilson to Lane) (Bates Nos. Siemens-Lane 00067-69)..........................17
Exhibit 10 Position Elimination Dated 9-20-17 (Bates Nos. Siemens-Lane 00845-846).........................23

PREVIOUSLY MARKED AND REFERRED TO EXHIBITS
Exhibit No. 1

TONI HORTON,
having been first duly sworn, testified as follows:
EXAMINATION
QUESTIONS BY MR. ASHOK BAIL:
Q. Good morning, Ms. Horton.
A. Good morning.
Q. Can you please state your full name for the Court and please spell it out.
A. Toni Renee Horton. T-O-N-I. R-E-N-E-E. H-O-R-T-O-N.
Q. That's a very pretty necklace you have, Ms. Horton.
A. Thank you.
Q. Can you please let me know whether you've ever had your deposition taken before?
A. Yes.
Q. How long ago was the last time?
A. 2015.
Q. Just a few guidelines that will make the deposition easier. I'm sure your attorney has gone over it with you. One is make sure that all responses should be verbal. Nodding the head or hand movements, she can't transcribe it. If there is a question that you don't know and you don't understand, ask me to repeat the question and I'll

Page 5

1   do that.  I'm missing one thing.
2         How long have you been an employee
3   of Siemens?
4      A.   I've been employed with Dresser-Rand
5   since 2009.  Siemens acquired us in 2015.  So you
6   could say ten years total.
7      Q.   And what position did you encumber [sic]
8   when you first started working for Siemens?
9      A.   Recruiter.  Or Dresser-Rand as a
10  recruiter in 2009.  So when Siemens took us over in
11  2015, I was in human resources, a generalist --
12     Q.   Generalist.
13     A.   -- is what the title was back then.
14  Uh-huh.
15     Q.   Did your title ever change since that
16  time?
17     A.   Yes.
18     Q.   When did it change?
19     A.   I don't know when.  But we were acquired
20  in 2015 and so we were integrated into the Siemens
21  HR structure.  So it was changed to human resource
22  consultant.  Then it was changed again to HR
23  business consultant.  My duties have never changed.
24     Q.   Okay.  HR consultant, then HR business
25  consultant --

Page 6

1      A.   Business partner, yeah.  And it's going
2   to change again.
3      Q.   Okay.  Really makes it hard here.  So HR
4   business consultant, you did all the same duties.
5      A.   Yes.
6      Q.   Nothing changed.
7      A.   Yes, same duties.
8      Q.   Okay.  As an HR business consultant or
9   an HR consultant, do you conduct interviews of
10  claims of discrimination by employees of Siemens?
11     A.   I conduct any claim that an employee
12  makes --
13     Q.   Okay.
14     A.   -- for any reason.
15     Q.   All right.  Approximately how many
16  investigations have you done since 2015?
17     A.   I don't remember, to tell you the truth.
18     Q.   More than 50, less than 50?
19     A.   No.  Less than 50 for sure.
20     Q.   Less than 30, more than 30?
21     A.   Less than 30 for sure.
22     Q.   More than 20, less than 20?
23     A.   Less than 20.
24     Q.   Okay.  Now is where it's probably going
25  to get difficult.  More than 10 or less than 10?

Page 7

1      A.   I don't know.  Sorry.
2      Q.   Somewhere less than 20.  Of all --
3   whatever number it is, of those claims that you've
4   investigated, how many times have you made a
5   founding -- finding that the client was actually
6   discriminated against?
7      A.   None.
8      Q.   And of those 20 investigations,
9   approximately how many of them were discrimination
10  complaints?
11     A.   I would say -- I'm trying to think.  I
12  don't know the exact number.  One.  One I do recall
13  for sure.
14     Q.   Is that one other than Harriet Lane's
15  complaints?
16     A.   Yes, that's correct.
17     Q.   What's the name of that individual?
18          MS. GRANT:  And I'll just put on the
19  record this will fall under the terms of the
20  protective order.
21          MR. BAIL:  Absolutely.
22          MS. GRANT:  It's information related
23  to another individual.
24          MR. BAIL:  Sure.
25     Q.   (By Mr. Bail) You know what?  To make

Page 8

1   it even easier, was that individual an African
2   American female?
3      A.   No.
4      Q.   Then I don't need to know.  Okay.  Cool.
5          MS. GRANT:  I thought it would be
6   easier on the record than me writing you a letter.
7          MR. BAIL:  Yeah.  No.  Absolutely.
8   Let's just clean it up here.
9      Q.   (By Mr. Bail) What does PIP stand for
10  in the HR field?
11     A.   Performance improvement plan.
12     Q.   How many individuals -- strike that.
13          How many employees at Siemens have
14  you worked on PIPs with?
15     A.   Quite a few.  I don't have an exact
16  number.  I mean.  It's a part of my job.
17     Q.   Okay.  More than 50, less than 50?
18     A.   Maybe less than 50.
19     Q.   More than 40, less than 40?
20     A.   Maybe less than 40.  I'm guessing.
21  I've, you know, been in the HR role since 2015.  And
22  a plan is when a manager has an issue with the
23  person's performance, so...
24     Q.   More than 20 for sure.  Right?
25     A.   I can't say for sure.

Page 9

1  Q. Okay.
2  A. I don't know the exact number.
3  Q. It's true that you were involved in some
4  manner with a PIP regarding Harriet Lane.  Correct?
5  A. The removal.  Correct.
6  Q. The removal.
7  A. The removal.
8  Q. Strike that.  Yeah.  The removal.  Let's
9  go back to PIPs, though.  Of all the PIPs that
10 you've been involved with, has an employee ever
11 passed it?
12 A. Yes.  Yes.
13 Q. Okay.  And how do you know Harriet Lane?
14 A. Because I started supporting the Siemens
15 site in June of 2017.  And she's an employee at that
16 site.
17 Q. And what complaints of -- strike that.
18    Did she ever make a complaint of
19 discrimination to you?
20 A. She's made complaints and I've had to
21 investigate each cause.
22 Q. Okay.  Did she complain of gender and
23 race discrimination?
24 A. No.
25 Q. What did she complain about?

Page 10

1  A. It was bullying.  That's what she was --
2  bullying and harassing is the term she used quite
3  often.
4  Q. And were one of the individuals that she
5  was concerned about was Bill Piatt?
6  A. Yes.
7  Q. How do you know Bill?
8  A. He's a manager at the site that I
9  support.
10 Q. And what was your nature of working with
11 Bill in regards to Harriet Lane's employment?
12 A. So as an HR rep at the site, I support
13 their managers in any of their concerns.  Or if
14 they're -- you know, have questions about policies.
15 So there's nothing in relation to Harriet because
16 she did not report to him.  So I'm not sure I'm
17 understanding your question exactly.
18 Q. Well, did you -- did you talk to him
19 about anything regarding Harriet?
20    MS. GRANT:  Objection; form.
21    You can answer.
22 A. Essentially, about her claim.  I had to
23 investigate her claim against him for bullying.  So
24 I did have to ask him questions as related to her
25 claims in certain situations.

Page 11

1  Q. (By Mr. Bail)  Other than that, any
2  other involvement of Bill Piatt with Harriet Lane --
3  A. No.
4  Q. -- that you're aware of?
5  A. No.
6  Q. Did Harriet identify any potential
7  witnesses for you to interview?
8  A. Yes, she did.  I do believe it is
9  documented in my -- my interviews that I -- the
10 claims that I did.
11 Q. Your notes?
12 A. Yes.
13 Q. I don't have that in front of me right
14 now, but do you recall if Melissa Shovelski was one
15 of those individuals?
16 A. I do not recall.
17 Q. Do you recall any of the names of the
18 individuals?
19 A. I believe Amy Barr may have been one.
20 Q. Anybody else?
21 A. I don't recall any others.
22 Q. But if there are, they should be in your
23 notes.
24 A. Yes.
25 Q. Okay.  And you said you had no

Page 12

1  involvement with the performance improvement plan of
2  Harriet.  Correct?
3  A. I wasn't supporting the group at the
4  time.  No.
5  Q. Okay.  Have you always worked in the
6  Houston office of Siemens?
7  A. Yes.
8  Q. Okay.  So before 2015, you were working
9  for -- what was the name of the company?
10 A. Dresser-Rand.
11 Q. Dresser-Rand?
12 A. Yes.
13 Q. And have you supervised any individuals
14 in your capacity as an HR employee?
15 A. Not as a -- well, as a recruiter, I was
16 a staffing manager, so I did have recruiters that
17 reported to me.
18 Q. Okay.  But not since you were an HR
19 business consultant.
20 A. Not since we moved over to this new
21 structure, no.
22 Q. Okay.  Do you know who Donna Wilson is?
23 A. Yes.
24 Q. Who is she?
25 A. She's a former employee of Siemens.  She

Page 13

1  was a manager at Siemens.
2      Q.  Was she the manager at the time of
3  Harriet Lane's termination?
4      A.  Yes.
5      Q.  What do you recall -- strike that.
6          Did you ever have any discussions
7  with Donna Wilson regarding Harriet?
8      A.  Yes.
9      Q.  Can you please tell the nature of those
10 discussions?
11     A.  A couple of things.  Each time they
12 would meet, I was aware that they had follow-up
13 meetings post the PIP removal, or as a part of it to
14 check in.  I believe they did have some -- some kind
15 of disagreement on a leave request.  I don't know
16 the details of that.  But, you know, Donna would
17 visit with me about their talks.  She was, you know,
18 also concerned with Harriet and some of the
19 behavior.  So just in an HR capacity were our
20 discussions, basically.
21     Q.  Donna was frustrated -- correct? -- with
22 Harriet?
23     A.  I believe they may have had an incident
24 where the FML came into question where -- or I think
25 something had to do with Harriet's pay.  And Harriet

Page 14

1  had accused Donna -- this is according to Donna --
2  of causing payroll to have a delay in her pay or
3  missing pay, so that.  But I don't know that overall
4  she was -- I can't answer that she was --
5      Q.  I have to ask her.  Right?
6      A.  Yeah.
7      Q.  Did Donna express to you any concerns
8  about Harriet complaining about discrimination and
9  retaliation?
10     A.  No.
11     Q.  Okay.  Did you ever interview Donna as
12 to any claims my client made about --
13     A.  Yes.
14     Q.  -- discrimination?
15     A.  Yes.  Well, I made -- I interviewed
16 Donna based on a claim that Harriet said that Donna
17 called her out of her name.
18     Q.  Okay.
19     A.  So that's in my notes as well.
20     Q.  When she called her silly or something
21 like that?
22     A.  Yes.  She said "it was silly," that she
23 did not call her "silly" is what Donna testified to
24 me about, but yeah.
25     Q.  Okay.  But did Harriet tell you that she

Page 15

1  felt that Donna called her silly because she was
2  black or because --
3      A.  No, she did not.  No.
4      Q.  Okay.  But you're aware that she was
5  claiming that she was being discriminated against.
6  Correct?
7      A.  At the end, I did.  The initial claims
8  to me, no.
9      Q.  Okay.  What do you mean "at the end"?
10     A.  So I believe her last -- I had a meeting
11 with her to kind of go over all of my findings
12 because she's made several complaints.  And that's
13 when she made the comment, I feel like I'm being
14 discriminated against.  She didn't say specifically
15 for what, but she used the term "discriminated
16 against," I'm being harassed and I'm being bullied.
17     Q.  Did you ask her specifically for what?
18     A.  So -- yes.  I mean, give me examples.
19 Walk me through it.  And everything is in my notes.
20 And you'll find there's no specific basis of what
21 she said she was targeted for.
22     Q.  Okay.  She never told you specifically
23 gender or race.
24     A.  No.
25     Q.  And you didn't ask.

Page 16

1      A.  That's a part -- yeah.  I'm asking you,
2  what are you being discriminated -- based on what?
3      Q.  Okay.
4      A.  Right.  And so she's saying, Well,
5  they're bullying me.  And I can't speak word for
6  word, but you have my notes.
7      Q.  But you didn't ask her what specific
8  category she felt she was being discriminated
9  against, like, race, gender, national origin?
10     A.  I asked an open question.  What are you
11 being discriminated on the basis of?  So I'm not
12 going to feed you, you know, the whole Title 7.
13     Q.  Do you know that she was aware when you
14 asked the question that that's an open-ended
15 question, it's not specific towards --
16     A.  I don't know what she knows.  I can't
17 speak to what she understood or not.
18     Q.  Okay.  If you can take a look at --
19     A.  Uh-huh.
20     Q.  -- this document and let me know if
21 you've seen it before.
22     A.  Yes.
23     Q.  And I will --
24         MR. BAIL:  Could you put this
25 sticker on that?

Page 17

1	MS. GRANT: Uh-huh.
2	(Exhibit No. 9 marked.)
3	Q.	(By Mr. Bail) Can you identify that
4	document for the record?
5	A.	Yes. This is a notification letter that
6	is used when an employee's position is going to be
7	eliminated.
8	Q.	Did you prepare this letter?
9	A.	No. I don't prepare these letters.
10	Q.	Okay.
11	A.	These are prepared in Orlando.
12	Q.	Ah, okay. Have you ever seen it before?
13	A.	Yes.
14	Q.	When did you see this?
15	A.	When it was sent to me so that I could
16	deliver it to the employee.
17	Q.	Okay. Did you make any recommendations
18	in regards to whether Harriet should be terminated
19	or not?
20	A.	Did I make any -- no.
21	Q.	Okay.
22	A.	No.
23	Q.	What involvement, if any, did you have
24	in Harriet's termination?
25	A.	So as the HR person, I facilitate it.

Page 18

1	So there's a certain process that we go through to
2	validate why a position is being eliminated, there's
3	an approval process that goes through -- up through
4	the VP level.
5	Q.	Okay. Can you explain that process?
6	A.	Essentially, you have to spell out the
7	cost of what it will take to sever an employee. So
8	you have to get a rule for the cost. You're also
9	working with legal on certain aspects to make sure
10	that it's aligned with company policy and local law.
11	Q.	Is that what you did in regards to
12	Harriet?
13	A.	Yes.
14	Q.	I'm going to show you what's been marked
15	as Exhibit No. 1.
16	A.	Okay.
17	Q.	Can you please tell me whether you've
18	ever seen this document or something similar to it
19	in this case?
20	A.	No. I know what these are, but I've
21	never seen this.
22	Q.	Okay. Let's keep that in front of you.
23	A.	Okay.
24	Q.	Has anybody -- strike that. Has any --
25	if you could please turn to page -- I think it is --

Page 19

1	let's...
2	MS. GRANT: Is it 15?
3	MR. BAIL: Yeah.
4	MS. GRANT: That's the one I'm
5	looking at.
6	A.	Okay. Just a second. All right.
7	MS. GRANT: Are you looking for
8	Interrogatory 11 and 12.
9	MR. BAIL: Uh-huh. You're so smart.
10	MS. GRANT: I just have a good
11	memory.
12	Q.	(By Mr. Bail) All right. If you could
13	take a look at -- are you on Page 15?
14	A.	Yes, I'm on Page 15.
15	Q.	I know you've never seen this before,
16	but please take a look at Interrogatory No. 11 --
17	A.	Okay.
18	Q.	-- and No. 12.
19	A.	Okay.
20	Q.	And 12 finishes up on the next page.
21	And then when you're finished with that, please let
22	me know.
23	(Document review.)
24	A.	I'm finished reading it.
25	Q.	(By Mr. Bail) So if you go to Page 15.

Page 20

1	And we're going to talk about Interrogatory No. 11.
2	You see where it says -- under Interrogatory 11, the
3	answer, it says "Donna Wilson and Bill Piatt made
4	the decision to eliminate plaintiff's position and
5	terminate plaintiff's employment."
6	Do you know if that is true or not?
7	A.	I do know that they did review it and
8	Donna actually approached me about eliminating the
9	role.
10	Q.	Okay.
11	A.	So she may have, I can't -- you know,
12	maybe she talked to Bill behind the scenes.
13	Q.	Did Bill discuss anything with you in
14	regards to anything you were working on regarding
15	her termination?
16	A.	No. Donna is my contact.
17	Q.	Okay. Toward the end of that same
18	paragraph, it says "As part of a reduction in force,
19	after they were instructed to reduce the head count
20	of the quality department."
21	Do you see that?
22	A.	Yes.
23	Q.	Do you know anything about reducing the
24	head count in the quality department?
25	A.	No.

Page 21

1  Q. If you go to Interrogatory No. 12, do
2  you see where it says "Bill Piatt made the
3  decision" -- "Donna Wilson and Bill Piatt made the
4  decision to eliminate plaintiff's standalone
5  position of lead internal process auditor and
6  terminated plaintiff's employment"?
7      Do you see that?
8  A. Yes.
9  Q. Do you know anything about that?
10 A. Do I -- Donna approached me to eliminate
11 the role. That's what you're asking. Is that what
12 you're asking me?
13 Q. Yeah. Do you know anything about the
14 lead internal process auditor position, that term?
15 A. I don't know what they were calling -- I
16 don't know the specific title of what -- I don't
17 recall what they were calling her.
18 Q. Okay.
19 A. Because that's most likely not the job
20 code in the HR system.
21 Q. Okay. It says here that allegedly they
22 conducted an analysis. Were you a part of that
23 analysis?
24 A. I was not a part of the analysis. They
25 presented me with the -- I believe you may have

Page 22

1  copies of that, where they list out the hours needed
2  for the role.
3  Q. Uh-huh. Okay.
4  A. That's the analysis piece that they
5  conducted. Or that's the part I'm aware of.
6  Q. Okay. And that analysis, to your
7  knowledge, was it created by Bill Piatt or Donna
8  Wilson?
9  A. To my knowledge, both may have had a
10 hand in it. I don't know who specifically typed it
11 up --
12 Q. Okay.
13 A. -- or who provided input to who.
14 Q. Did you use that analysis in any manner
15 in your work product?
16 A. Yes.
17 Q. Can you please explain to the Court how?
18 A. Yes. I used that when working with
19 internal legal on reasons as to why the position
20 needed to be eliminated.
21 Q. Okay. So whatever Bill or Bill and
22 Donna Wilson prepared was used in whatever work you
23 were doing and presenting to legal.
24 A. Yes.
25 Q. All right. Do you have any knowledge of

Page 23

1  any -- about Harriet Lane's work duties being
2  reduced in any manner?
3  A. No.
4  Q. Okay.
5      (Exhibit No. 10 marked.)
6  Q. (By Mr. Bail) Can you please identify
7  that document for the record?
8  A. Yes. This is called a delegation of
9  authority. And this is the form that I use to
10 obtain approval from HR, business and legal to move
11 forward with a position elimination.
12 Q. Okay. And is this particular
13 designation of authority dealing with my client,
14 Harriet Lane?
15 A. Yes.
16 Q. Okay. On the top of this document, it
17 says "To Lori Lee, Joyce Triglia Bagwell."
18 A. Triglia.
19 Q. Are they the lawyers?
20 A. No.
21 Q. Who are they?
22 A. They are HR management. So Lori Lee is
23 my manager. Joyce Triglia was the VP of HR at the
24 time.
25 Q. Okay. So why -- what happens after you

Page 24

1  send a document like this to those individuals?
2  A. Everyone has to approve before we can
3  move forward with even this document that you
4  provided to me. So this is the -- the first step in
5  obtaining approval before you even get to
6  conversations with the employee or having it
7  approved at all.
8  Q. Okay. Did you recommend that my client
9  be terminated?
10 A. I agreed with the recommendation.
11 Q. Okay. But you didn't make the
12 recommendation.
13 A. The recommendation comes from the
14 business, not HR.
15 Q. Gotcha. I just want to make sure.
16     Do you know who made the
17 recommendation from business?
18 A. Donna Wilson.
19 Q. Did you talk to Bill Piatt about it as
20 well?
21 A. No. I believe you asked me that before.
22 No.
23 Q. All right. Do you know how -- or do you
24 have any knowledge of any -- of who did my client's
25 duties, work duties after she was terminated?

Page 25

1  A. No.
2  Q. And this business justification that --
3  the document we're looking at, Exhibit 10 speaks to,
4  that business justification comes from management.
5  A. Donna Wilson.
6  Q. Yeah.
7  A. Yes.
8  Q. Donna Wilson being management.
9  A. Yes.
10  Q. Did you ever sit down with Donna Wilson
11  and Bill Piatt to discuss anything regarding my
12  client's termination?
13  A. Donna Wilson only. Bill is not her
14  manager. It is not -- it's not his business.
15  Q. Isn't it true that Bill Piatt was
16  present with Donna Wilson when they were having
17  follow-up meetings with Harriet Lane?
18  A. I wasn't present, so I can't -- I have
19  no --
20  Q. You weren't present?
21  A. No.
22  Q. So you were never present for any
23  discussions between Donna Wilson, Bill Piatt and my
24  client.
25  A. No.

Page 26

1  Q. Never present.
2  A. No.
3  Q. Was there any other HR individual that
4  was working on my client's case specifically at this
5  time period that you were?
6  A. No. I'm the only HR supporting that
7  site from June 2017 to current.
8  Q. Okay.
9     MR. BAIL: I'm almost finished, just
10  going to...
11    MS. GRANT: Take your time.
12  Q. (By Mr. Bail) I don't remember if I
13  asked you this or not. But do you know who Melissa
14  Shovelski is?
15  A. I know who she is.
16  Q. Okay. Did you ever interview her in
17  regards to any complaints my client made?
18  A. You did ask. I don't recall ever
19  interviewing her.
20  Q. You don't recall. That's right.
21  A. Yeah.
22  Q. Would you be surprised to know that
23  she's testified that she felt Bill Piatt was
24  discriminating against her because of her gender?
25  A. Not necessarily.

Page 27

1  Q. You wouldn't be surprised?
2  A. No, not surprised one way or the other.
3  Q. Did Bill Piatt make any comments to you
4  about my client?
5  A. Yes, we've -- yes.
6  Q. What did he say?
7  A. He's talked in terms -- he's made
8  complaints himself of being harassed by Harriet.
9  Q. Okay.
10  A. That's the nature of our discussion.
11  Q. That's it?
12  A. Yeah, yeah. He felt like he was being
13  harassed.
14  Q. But then when Harriet was -- said she
15  felt she was being harassed, you didn't have any
16  discussions with him about --
17  A. Yes, I had to -- like I said before, the
18  claims -- I have to speak to the people she's making
19  claims against and any witnesses. And I believe
20  there -- my notes are included in my meeting with
21  him, so yeah.
22  Q. Okay.
23     MR. BAIL: I pass the witness.
24     MS. GRANT: I have no questions.
25        * * * * * *

Page 28

1        CHANGES AND SIGNATURE
2  WITNESS NAME:          DATE OF DEPOSITION:
3  TONI HORTON            FEBRUARY 6, 2020
4  PAGE   LINE   CHANGE        REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 Job No. 18929

Page 29

```
 1        I, TONI HORTON, have read the foregoing
 2   deposition and hereby affix my signature that same
 3   is true and correct, except as noted herein.
 4
 5               _____
                 TONI HORTON
 6
 7   STATE  OF        )
 8   COUNTY OF        )
 9
10    BEFORE ME, _____, on this day
11   personally appeared TONI HORTON, known to me (proved
12   to me on the oath of _____ or
13   through _____ (description of
14   identity card or other document) to be the person
15   whose name is subscribed to the foregoing instrument
16   and acknowledged to me same was executed for the
17   purposes and consideration therein expressed.
18
19    Given under my hand and seal of office this _____
20   day of _____, _____.
21
22
                 _____
23               NOTARY PUBLIC IN AND FOR
                 THE STATE OF _____
24
25   Job No. 18929
```

Page 30

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              HOUSTON DIVISION
 3
     HARRIET LANE,       )
 4                       )
        Plaintiff,       )
 5                       )
        VS.              ) C.A. NO. 4:19-cv-00435
 6                       )
     SIEMENS ENERGY, INC., )
 7                       )
        Defendant.       )
 8
              REPORTER'S CERTIFICATION
 9              ORAL DEPOSITION OF
                   TONI HORTON
10              FEBRUARY 6, 2020
11        I, MICHELLE R. PROPPS, Certified
12   Shorthand Reporter in and for the State of Texas,
13   hereby certify to the following:
14        That the witness, TONI HORTON, was
15   duly sworn by the officer and that the transcript of
16   the oral deposition is a true record of the
17   testimony given by the witness;
18        I further certify that pursuant to
19   FRCP Rule 30 (f) (1) that the signature of the
20   deponent:
21        __X__ was requested by the deponent
22   or a party before the completion of the deposition
23   and returned within 30 days from date of receipt of
24   the transcript.  If returned, the attached Changes
25   and Signature Page contains any changes and the
```

Page 31

```
 1   reasons therefor;
 2        _____ was not requested by the
 3   deponent or a party before the completion of the
 4   deposition.
 5        I further certify that I am neither
 6   attorney nor counsel for, related to, nor employed
 7   by any of the parties to the action in which this
 8   testimony was taken.  Further, I am not a relative
 9   or employee of any attorney of record in this cause,
10   nor am I financially or otherwise interested in the
11   outcome of the action.
12        Subscribed and sworn to on this the
13   10th day of February, 2020.
14
15
16
17
18               _____
                 MICHELLE PROPPS, CSR
19               Expiration Date 10-31-21
                 Hanna & Hanna, Inc.
20               Firm Registration No. 10434
                 8582 Katy Freeway, Suite 105
21               Houston, Texas 77024
                 713.840.8484
22               www.hannareporting.com
23
24
25
```

8 (Pages 29 to 31)

HANNA & HANNA, INC.
713.840.8484