# EXHIBIT 27

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

HARRIET LANE,            *
                         *
        Plaintiff,       *
                         *
v.                       * C.A. No. 4:19-cv-00435
                         *
SIEMENS ENERGY, INC.,    * JURY TRIAL DEMANDED
                         *
        Defendant.       *
                         *
**********************************************************

ORAL DEPOSITION OF
KATHY ELLIOTT DEGEORGE
FEBRUARY 4, 2020
**********************************************************

   ORAL DEPOSITION of KATHY ELLIOTT DEGEORGE, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on February 4, 2020, from 10:46 a.m. to 11:09 a.m. before Constance Koenig, RMR and CSR No. 6577 in and for the State of Texas, reported by stenographic method at Baker & Hostetler, LLP, 811 Main Street, Suite 1100 Houston, Texas 77002, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record attached hereto.

## Page 2

```
 1              A P P E A R A N C E S:
 2
 3   FOR THE PLAINTIFF:
 4      Mr. Ashok Bail
        THE BAIL LAW FIRM, PLLC
 5      3120 Southwest Freeway, Suite 450
        Houston, Texas 77098
 6      832.216.6693
        ashok@baillawfirm.com
 7
 8   FOR THE DEFENDANT:
 9      Ms. Ashlee Grant
        BAKER & HOSTETLER LLP
10      811 Main Street, Suite 1100
        Houston, Texas 77002
11      713.646.1316
        agrant@bakerlaw.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                     I N D E X
 2
 3   Appearances                               2
 4   KATHY ELLIOTT DEGEORGE
 5     Examination by Mr. Bail                 4
       Examination by Ms. Grant               18
 6   Changes and Signature                    22
 7   Reporter's Certificate                   24
 8
                    E X H I B I T S
 9
             (No exhibits were marked.)
10
11
12
...
25
```

## Page 4

```
 1              KATHY ELLIOTT DEGEORGE,
 2   having been first duly sworn, testified as follows:
 3                   E X A M I N A T I O N
 4   BY MR. BAIL:
 5      Q. Can you please state your full name and spell
 6   it out for the record?
 7      A. Kathy Elliott DeGeorge, K-A-T-H-Y,
 8   E-L-L-I-O-T-T, D-E-G-E-O-R-G-E.
 9      Q. Thank you.
10          And have you ever had -- do you mind if I
11   call you by your first name?
12      A. Please.
13      Q. Have you ever had your deposition taken before?
14      A. No.
15      Q. Okay.  Let me go over a few guidelines to make
16   the whole process a little bit easier.
17      A. Okay.
18      Q. One is wait for me to finish asking a question
19   before you respond.  And, likewise, I'll do my best to
20   do the same.  And you'll tend to see that I talk real
21   fast.  I have to be remembering this rule more than you.
22   So just bear with me.
23          If you have a question that you don't
24   understand, just please ask me to repeat it and I'll do
25   my best to repeat it in a manner that you can respond
```

KATHY ELLIOTT DEGEORGE - 2/4/2020

Page 5

1  and that you understand.
2          If you want to take a break, just let me
3  know.  I think this is going to take 30, 45 minutes.
4  Still, even if you need to take a break, just let me
5  know.
6     A.  Okay.
7     Q.  Have you taken any medications today that would
8  affect your ability to testify truthfully?
9     A.  No.
10    Q.  And I know this is kind of a weird question,
11 but for the record, do you identify yourself as a
12 Caucasian female?
13    A.  I do.
14    Q.  Okay.  And how long have you worked for
15 Siemens?
16    A.  Just over five years.
17    Q.  Okay.  And were you working for Siemens during
18 the time period where Rolls-Royce was the business
19 entity -- strike that.
20         Have you ever worked for Rolls-Royce?
21    A.  No.
22    Q.  When you started working for Siemens, what was
23 the title of your position?
24    A.  It's called QMIP, and that means quality
25 manager in projects.

Page 6

1     Q.  Okay.  Is that what you currently do, as well?
2     A.  No.  When the reorganizations happened, our
3  roles changed.
4     Q.  Okay.  Let's get to that.
5          So you were quality QM --
6     A.  QMIP.
7     Q.  Okay.  And how long did you hold that position?
8     A.  It was about a year, maybe a little over a year
9  before the reorgs happened.
10    Q.  Okay.
11    A.  And they eliminated those.
12    Q.  Okay.  When was the reorg, approximately?
13    A.  I would say it was in '16.
14    Q.  '16?
15    A.  I started late '14.  So it would have been
16 either late '15 or maybe I'm thinking the fiscal year
17 '16.
18    Q.  Okay.  And what was the title of your new
19 position?
20    A.  Didn't really have a title, but I think it
21 falls under quality professional as a technical HR role.
22 And so under that that can fit a number of things as a
23 title.
24    Q.  And is that the same role that you have held up
25 until today?

Page 7

1     A.  Yes.
2     Q.  Okay.  And you mentioned something about a
3  reorg.  Can you explain to me what happened in regards
4  to this reorganization?
5     A.  There was a massive cost-cutting effort that
6  went on probably about the 2015 -- end of 2015 fiscal
7  year, and they eliminated an entire organization called
8  Business Excellence.  Harriet and I were both part of
9  that.  So there were managers who left, the department
10 itself was left, the work remained.  So we basically had
11 to disseminate the work.
12    Q.  So is your testimony the Business Excellence
13 department no longer existed but the work for that
14 department still needed to be done?
15    A.  Yes.
16    Q.  Okay.  So was that work under a different
17 department now?  How did you guys decide to divvy the
18 roles?
19         MS. GRANT:  Objection; form.
20    Q.  (BY MR. BAIL)  You can answer.
21         MS. GRANT:  You can answer.
22    A.  They split it in different ways.  So different
23 managers were given different elements of the work.  For
24 many of us it stayed similar and just expanded, so we
25 took on additional responsibilities.  Probably the most

Page 8

1  dramatic was that QMIP role was eliminated.
2     Q.  For you?
3     A.  For me and the other two.  I think only one at
4  that point.  I think Errol had already left.  So -- but
5  that was probably the most significant, at least in my
6  space.
7     Q.  Okay.  What was the name of the organization
8  that you were under at that time?
9     A.  They didn't really fold us under a new
10 organization.  So we were somewhat homeless is the way I
11 described it.  We were positioned under different
12 managers, so they spread us out a bit.  I believe the
13 manager that I went under at that time was Patrik Hols
14 when they removed Business Excellence.  So that was the
15 head of finance at that time, which you can always
16 assume is temporary.
17    Q.  So at that time if he was the head of the
18 finance, would that mean that you were also a part of
19 the finance division?
20    A.  I was reporting through them I think it's safe
21 to say.  It was a misfit in terms of function.  My role
22 has nothing to do with function and finance, and finance
23 has nothing to do with my role.  They don't understand
24 that work.  We had to be placed under a manager.
25    Q.  Okay.  How long was Patrik Hols your manager?

2 (Pages 5 to 8)

KATHY ELLIOTT DEGEORGE - 2/4/2020

Page 9

1    A. Until he left the company, and I believe that
2  was '17 maybe. I'm not going to be good on dates. I
3  apologize.
4    Q. Okay. Do you recall a time period when Harriet
5  Lane was away from work for two, three months?
6    A. Yes.
7    Q. Okay. During that time period did your roles
8  change at all?
9    A. Not that I can recall. I don't believe
10 anything was added or taken away during that time
11 period.
12   Q. Okay. After that time period that she was out,
13 do you recall if your role changed at all?
14   A. My role has been evolving, yes.
15   Q. Can you please explain to the Court the
16 evolution of your role?
17   A. Sure.
18   Q. Before that, if you could tell me dates or
19 approximate dates, if you can.
20   A. I'm so bad on dates. I can tell them to you if
21 you please don't hold me to them.
22       My role from that Quality manager point in
23 time I went into a role that was largely a reporting and
24 I would call it a program management function over at
25 least two programs. I have since had a third program

Page 10

1  added to that, as well as a lot of I'll call it
2  miscellaneous-type of task work that I have picked up.
3  I'm also am a backup for some of our new reporting tools
4  that we have developed in-house. So it's a little bit
5  across the board on some of these job responsibilities.
6    Q. Who is your current is supervisor?
7    A. My supervisor is Robert Forness out of Olean.
8  So I report to Quality management at the US ops level.
9    Q. Okay. I'm guessing Robert is not here locally.
10   A. No. He sits in Olean, New York.
11   Q. Okay. After Harriet returned from her leave,
12 did you both share the same supervisor?
13   A. I don't think so. I have an understanding of
14 who mine was. I'm not sure I understood whose Harriet's
15 was.
16   Q. Who was yours? It was Patrik, right?
17   A. It was Patrik and then I reported to Melissa
18 King and then I reported to Amy Barr and then Robert
19 Forness.
20   Q. Have you ever reported to Donna Wilson?
21   A. No.
22   Q. What department was Donna Wilson in in 2017?
23   A. She was also finance.
24   Q. Finance?
25   A. As well as Amy Barr.

Page 11

1    Q. As well as Amy Barr?
2    A. Amy Barr and Melissa King. They were all
3  finance.
4    Q. How often did you work with Harriet in the year
5  2017?
6    A. It would probably just be on our audits as we
7  were assigned. Harriet was a lead auditor, and so I was
8  a coauditor for a period, and so we worked largely on
9  audit and audit issues. So frequency, it would depend
10 on the audit plan and the planned audits for those
11 periods.
12   Q. Did you both work on the same floor?
13   A. Yes. Small building, single floor.
14   Q. Okay. And how would you describe your working
15 relationship at that time with Harriet?
16   A. I have always had a good working relationship
17 with Harriet.
18   Q. How would you describe your working
19 relationship -- strike that.
20       Do you know who Bill Piatt is?
21   A. I do.
22   Q. Who is he?
23   A. The Quality manager for our location.
24   Q. Do you know how long he's been the Quality
25 manager?

Page 12

1    A. Since the larger transition. So the removal of
2  Business Excellence, his role evolved, as well. So he
3  would have become the acting Quality manager for quite a
4  period of time during that transition. I cannot tell
5  you when he was formally made Quality manager, but that
6  was his role through that transition.
7    Q. Would it have been after the reorg?
8    A. Yes. The reorg precipitated all of it.
9    Q. You never worked in the Quality department, did
10 you?
11   A. In his department, no.
12   Q. Okay. And do you have any opinion how --
13 strike that.
14       Did you ever see or witness Bill Piatt
15 treat women any differently than men?
16   A. Yes.
17   Q. Can you please tell the Court what you base
18 this on?
19   A. My personal experience and what I have seen
20 over the course of the years in my position.
21   Q. And I know this is very difficult, but can you
22 please tell us specifically what it is you experienced
23 and what you witnessed as to Bill Piatt's treatment of
24 women?
25   A. So my experience with Bill, it is difficult to

3 (Pages 9 to 12)

HANNA & HANNA, INC.
713-840-8484

Page 13

1   kind of summarize. He had issues with me. I had a
2   tendency to disagree with some of his positions. He
3   didn't care for that, and as a result, his behavior
4   reflected that. I would describe it as inappropriate.
5   I would describe it as unprofessional.
6       Q. Why -- do you think it's because you're a
7   female?
8       A. So my opinion is what you are asking for?
9       Q. Your opinion, yes.
10          MS. GRANT: And I'll just state for the
11  record, she's not here as a corporate rep for Siemens.
12          MR. BAIL: For sure.
13      A. I have heard him make derogatory comments
14  regarding women. I have witnessed the fact that when I
15  would disagree with him, I was called confrontational
16  and insubordinate, and he reported me to my manager,
17  Melissa King. He had an issue when women speak up, as
18  it's my opinion that his issue was when women speak up
19  or disagree with him when he's wrong, that is what
20  happens.
21      Q. (BY MR. BAIL) What happens?
22      A. It's everything -- well, his behavior is I'll
23  say demeaning. It is -- in my case it was somewhat
24  harassing and he will negate, correct those types of
25  things, and it's not in a polite or professional manner.

Page 14

1       Q. Understood.
2           And in regards to Harriet, have you ever
3   seen or witnessed Bill treat Harriet in a hostile
4   manner?
5       A. I would say that in our one training session
6   that we were all in together, as Harriet was trying to
7   make her points about the audit process and some
8   misinformation that was being shared by Bill, I would
9   say that he treated her with somewhat of the same
10  condescending, demeaning method of negating her opinion
11  and her comments.
12      Q. In terms of location of your office to where
13  Harriet was located, how close were you physically?
14      A. So we all relocated several times, but we're in
15  a cubicle environment, and I was two cubicles away from
16  Harriet on the same aisle at our last relocation.
17      Q. Were you close enough to hear the specifics of
18  her communications with other individuals?
19      A. I probably could have. I was close enough.
20      Q. But it's fair to say you weren't always a
21  witness to all communications between Bill and my
22  client, correct?
23      A. No, not at all. I tend to be away from my desk
24  quite a bit, too.
25      Q. What meeting was it that you state that Bill

Page 15

1   treated Harriet differently? What meeting was that?
2       A. We had an audit training session where our head
3   of the internal office for audit came to town to do
4   training and coaching with the new auditees. So several
5   of us were auditees in training. Harriet was a lead
6   auditor, and they came in largely to get it on the same
7   page at that point and cover audit topics that we might
8   be struggling with.
9       Q. Do you know when that was?
10      A. I don't recall the exact date.
11      Q. Do you think it was 2017 or 2016 or before
12  that?
13      A. I'm really sorry. I don't know.
14      Q. Okay. What was it called again?
15      A. So I called it an audit training.
16      Q. And who was present at that meeting, to your
17  recollection?
18      A. That would have been Brad Munroe, who's head of
19  central office; Bill; Andrew Loera, who was an auditor
20  in training at that point. I don't even think he was
21  coauditor at that point; Lorraine I believe had been
22  brought into the program at that point; Melissa
23  Shovelski and myself; Kimberly Long. That may not be
24  complete.
25      Q. Does Kim Long still work for the company?

Page 16

1       A. She does. She's in a new position in Olean,
2   New York.
3       Q. And Melissa Shov- --
4       A. Shovelski.
5       Q. She still works for Siemens, correct?
6       A. Yes, in another location and another position
7   now.
8       Q. Okay. Do you know what?
9       A. Digital Industries, around 290 and the Beltway.
10      Q. Okay. Still local?
11      A. Uh-huh.
12      Q. Did Bill ever make any racially -- racial
13  comments regarding my client?
14      A. Not that I heard.
15      Q. Okay. Did you hear anybody make any racial
16  comments about my client behind her back?
17      A. No.
18      Q. Other than what you have testified to about the
19  examples of Bill's behavior, is there anything else that
20  you can think of that you would like to add?
21      A. About what?
22      Q. His treatment, whether you remember any other
23  examples of him treating women negatively.
24      A. I know that Kimberly Long had a similar issue.
25      Q. What was her issue?

KATHY ELLIOTT DEGEORGE - 2/4/2020

Page 17

1   MS. GRANT: Objection; form.
2   Q. (BY MR. BAIL) Strike that.
3       Do you recall what issue Kimberly Long had
4   that you were about to testify to?
5   A. I can tell you her comment to me.
6   Q. Please.
7   A. And that was strictly that she had raised a
8   similar issue with Bill where she was disagreeing with
9   him and he called her confrontational, and she was
10  basically being negated, as well, but it turned into a
11  bit of a loud scene in his office.
12  Q. Okay.
13  A. I was not present. That was going from what
14  she told me.
15  Q. You just testified that he thought she was
16  confrontational?
17  A. He called her confrontational.
18  Q. Did he also call you confrontational?
19  A. He reported me as being confrontational to my
20  manager, Melissa King.
21  Q. Okay. Do you know of any other females that
22  worked for Siemens that confided in you about Bill
23  Piatt's behavior?
24  A. Not to my knowledge. I know that Harriet,
25  Kimberly and I had similar experiences.

Page 18

1   Q. Okay. Did any person from the Human Resources
2   department of Siemens contact you for an investigation
3   regarding my client?
4   A. No.
5   Q. Do you know who Linda Hubbard is?
6   A. Yes.
7   Q. How do you know her?
8   A. She was our HR rep for our site before she
9   transferred to a different location.
10  Q. Do you know why she transferred to a different
11  location?
12  A. No, I do not.
13  Q. Do you know who Toni Horton is?
14  A. Yes.
15  Q. Who is that?
16  A. She's our current HR representative for our
17  location.
18      MR. BAIL: No further questions. I pass
19  the witness.
20      MS. GRANT: I have just a couple follow-up
21  questions.
22          E X A M I N A T I O N
23  BY MS. GRANT:
24  Q. Good morning. I'm Ashlee Grant. I am here on
25  behalf of Siemens.

Page 19

1   You discussed this audit training session
2   meeting and your belief that Mr. Piatt was speaking to
3   Ms. Lane in a certain manner because she was a female.
4       Do you recall that testimony?
5   A. I think what I said was that it was demeaning
6   and condescending in the way he negated her.
7   Q. And is it your testimony you believe it was
8   because she was a female?
9   A. I'll say it is my belief.
10  Q. And is this based solely on your own personal
11  belief and opinion?
12  A. It is based on my experience with him. So that
13  forms my belief and my opinion.
14  Q. Were you involved in any discussions regarding
15  discipline taken against Ms. Lane?
16  A. With management?
17  Q. Yes.
18  A. No.
19  Q. Were you ever involved in any discussions or
20  decisions regarding Ms. Lane's termination of her
21  employment?
22  A. No.
23  Q. Were you ever involved in any discussions with
24  management regarding the removal of Ms. Lane's duties?
25  A. No.

Page 20

1   Q. Do you have any personal knowledge regarding
2   any decisions related to placing Ms. Lane on any
3   disciplinary action or performance improvement plan?
4   A. From management?
5   Q. Yes.
6   A. No.
7   Q. Do you have any personal knowledge regarding
8   management's decision to terminate Ms. Lane's
9   employment?
10  A. I do not.
11  Q. Do you have any personal knowledge regarding
12  the decision of removing any of Ms. Lane's duties by
13  management?
14  A. The reason?
15  Q. Yes.
16  A. No, I do not.
17  Q. Do you have any personal knowledge regarding
18  Mr. Piatt's involvement in any disciplinary action taken
19  against Ms. Lane?
20  A. Personal knowledge, no, I do not.
21  Q. Do you have any personal knowledge regarding
22  any involvement by Mr. Piatt, if any, in the decision to
23  terminate Ms. Lane's employment?
24  A. I do not.
25  Q. Do you have any personal knowledge regarding

5 (Pages 17 to 20)

### Page 21

```
 1    Mr. Piatt's involvement in any decisions related to the
 2    removal of Ms. Lane's duties?
 3        A.  Other than the fact that he was over that
 4    program at that time, no.
 5        Q.  And then one just follow-up, did you ever
 6    assume any of the roles and responsibilities that
 7    Harriet had -- Ms. Lane, that she had performed while
 8    she was employed at Siemens?
 9        A.  No.
10            MS. GRANT:  I have no further questions.
11            MR. BAIL:  No further questions.
12            THE REPORTER:  Any further stipulations
13    before I close the record?
14            MS. GRANT:  We will read and sign.
15        (The deposition concluded at 11:09 a.m.)
16
17
18
19
20
21
22
23
24
25
```

### Page 22

```
 1              CHANGES AND SIGNATURE
 2    WITNESS NAME:  KATHY ELLIOTT DEGEORGE
 3    DATE OF DEPOSITION:  FEBRUARY 4, 2020
 4    PAGE  LINE    CHANGE          REASON
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    JOB NUMBER: 18930
```

### Page 23

```
 1        I, KATHY ELLIOTT DEGEORGE, have read the foregoing
 2    deposition and hereby affix my signature that same is
 3    true and correct, except as noted above.
 4
 5                _____
 6                KATHY ELLIOTT DEGEORGE
 7
 8    THE STATE OF _____)
 9    COUNTY OF _____)
10
11        Before me, _____, on this day
12    personally appeared KATHY ELLIOTT DEGEORGE, known to me
13    (or proved to me under oath or through _____)
14    (description of identity card or other document)) to be
15    the person whose name is subscribed to the foregoing
16    instrument and acknowledged to me that they executed the
17    same for the purposes and consideration therein
18    expressed.
19        Given under my hand and seal of office this
20    _____day of _____, 2020.
21
22                _____
23                NOTARY PUBLIC IN AND FOR
24                THE STATE OF _____
25    JOB NUMBER: 18930
```

### Page 24

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   HOUSTON DIVISION
 3    HARRIET LANE,        *
                           *
 4        Plaintiff,       *
                           *
 5    v.                   *  C.A. No. 4:19-cv-00435
                           *
 6    SIEMENS ENERGY, INC., *  JURY TRIAL DEMANDED
                           *
 7        Defendant.       *
                           *
 8
               REPORTER'S CERTIFICATION
 9              ORAL DEPOSITION OF
                KATHY ELLIOTT DEGEORGE
10              FEBRUARY 4, 2020
11        I, CONSTANCE KOENIG, RPR, Certified Shorthand
12    Reporter in and for the State of Texas, hereby certify
13    to the following:
14        That the witness, KATHY ELLIOTT DEGEORGE, was
15    duly sworn by the officer and that the transcript of the
16    deposition is a true record of the testimony given by
17    the witness;
18        That the original deposition was delivered to
19    Ashok Bail, Custodial Attorney.
20        That a copy of this certificate was served on
21    all parties shown herein on _____.
22        I further certify that pursuant to FRCP
23    Rule 30(f)(1) that the signature of the deponent:
24    __X__ was requested by the deponent or a party
25    before the completion of the deposition and that
```

KATHY ELLIOTT DEGEORGE - 2/4/2020

Page 25

1  signature is to be returned within 30 days from the date
2  of receipt of the transcript.  If returned, the attached
3  Changes and Signature Page contains any changes and the
4  reasons therefore.
5  _____ was not requested by the deponent or party
6  before the completion of the deposition.
7       I certify that I am neither attorney or counsel
8  for, related to, nor employed by any of the parties or
9  attorneys in the action in which this testimony was
10 taken.  Further, I am not a relative or employee of any
11 attorney of record in this cause, nor am I financially
12 or otherwise interested in the outcome of the action.
13      Certified to by me this, the 10th day of
14 February 2020.
15
16
17 _____
   CONSTANCE KOENIG, Texas CSR 6577
18 Expiration Date:  01-31-2021
   Hanna & Hanna, Inc.
19 CRF – 10434 – Expiration:  10-31-2022
   8582 Katy Freeway, Suite 105
20 Houston, Texas 77024
   713-840-8484 – 713-583-2442
21 www.hannareporting.com
22
23
24
25

7 (Page 25)